**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE CASTEL

06 CV 1759

)
Supreme Foodservice AG, )
)
   Plaintiff, )
)
  v. )  **COMPLAINT AND JURY DEMAND**
)
Compass Group PLC, ESS (aka Eurest )
Support Services), IHC Services, Inc., Peter )
Harris, Andrew Seiwert, Alexander Yakovlev, )
Moxyco, Ltd., Doug Kerr, Steve Kemp, Len )
Swain, Vladimir Kuznetsov, Nikal, Ltd. and )
Ezio Testa, )
)
   Defendants. )
)
_____ )



Plaintiff, Supreme Foodservice AG ("Supreme"), for its complaint against Defendants,

Compass Group PLC ("Compass"), ESS (aka Eurest Support Services), IHC Services, Inc.

("IHC"), Peter Harris, Andrew Seiwert, Alexander Yakovlev, Moxyco, Ltd. ("Moxyco"), Doug

Kerr, Steve Kemp, Len Swain, Vladimir Kuznetsov, Nikal, Ltd. ("Nikal") and Ezio Testa, alleges

on knowledge with respect to itself and its own conduct, and upon the basis of information and

belief as to all other matters:

## I.  INTRODUCTION

1.  For approximately five years, Defendants engaged in an illegal scheme involving

mail fraud, wire fraud and bribery to rig the award of United Nations ("U.N.") contracts for the

provision of food rations to U.N. peacekeeping forces around the world.  This conspiracy

corrupted the United Nations and defrauded the U.N.'s member states.  It contaminated a bidding

process designed to be free and fair, and it cheated Plaintiff Supreme out of contracts that could

be worth in excess of $350 million.  The Defendants' disgraceful conduct violated the Racketeer

1

Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act and New York State's Donnelly Act, and their conduct tortiously interfered with Plaintiff Supreme's prospective business advantage and business relations.

2.      Plaintiff Supreme, a world leader in food supply for military and multinational forces, brings this action to recover damages from Defendants' massive conspiracy.  Plaintiff also seeks injunctive relieve to prevent the reoccurrence of the unlawful and criminal acts of Defendants.

3.      Defendant Compass is the largest foodservice company in the world.  (Compass, ESS and all of Compass's divisions, affiliates and subsidiaries are herein collectively referred to as "Compass").

4.      From 2000 through 2005, Defendant Compass "won" United Nations contracts that could be worth in excess of $350 million by bribing Defendant Alexander Yakovlev, a U.N. official, to manipulate the U.N.'s top-secret bidding procedures in favor of Compass.

5.      Defendant Compass, by its employees, including Defendants Peter Harris, Andrew Seiwert, Doug Kerr, Steve Kemp and Len Swain, concealed from the U.N. its illegal payments to Defendant Yakovlev, amounting to at least several hundred thousand dollars, by making them through Defendant IHC.

6.      Defendant IHC gave Defendant Yakovlev cash payments to rig bids for Defendant Compass.  In furtherance of the bribery and bid-rigging scheme, Defendant Ezio Testa, Defendant IHC's Chief Executive Officer ("CEO"), hired Defendant Yakovlev's son to work at Defendant IHC's headquarters in New York City.

7.      As Defendant Yakovlev amassed wealth from illegal payments, he enlisted the help of Defendant Vladimir Kuznetsov, a fellow Russian national working at the U.N.

73444.2

Defendant Kuznetsov received at least several hundred thousand dollars in return for his assistance, which began in approximately 2000.

8.      Defendants' scheme to corrupt the United Nations, defraud its member states and swindle Plaintiff Supreme out of profits it otherwise would have earned was first exposed on August 8, 2005, when Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken at least approximately $1 million in bribes relating to U.N. procurement contracts and the Oil-for-Food program.  That same day, U.N. Secretary-General Kofi Annan stripped Defendant Yakovlev of his diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Yakovlev with conspiracy to commit wire fraud, wire fraud and money laundering in connection with Defendant Yakovlev's role as a U.N. procurement officer between the years 1993 and 2005.  Defendant Yakovlev pleaded guilty to all three crimes before the Honorable William H. Pauley, United States District Judge for the Southern District of New York.

9.      Soon after Defendant Yakovlev's plea, news of Defendant Kuznetsov's complicity became public.  In early September 2005, Kofi Annan waived Defendant Kuznetsov's diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with conspiracy to commit money laundering.

10.     Defendants' bid-rigging conspiracy succeeded in snatching multiple U.N. contracts, including a contract worth in excess of $62 million for the provision of food rations to U.N. peacekeeping forces stationed in Liberia (the "Liberia Rations Contract").  To secure the Liberia Rations Contract, Defendant Compass used top-secret, highly-confidential U.N. information illegally obtained from Defendant Yakovlev.  When the news media reported this

73444.2

scandal in October 2005, the U.N. removed Defendant Compass and Defendant IHC from its approved vendor list and began an investigation into the relationship between Defendant Compass, Defendant IHC and the United Nations.

11.    Also in October 2005, Defendant Compass announced that it had launched a full-scale investigation into the circumstances surrounding Defendant Compass's procurement of U.N. contracts.  It hired Freshfields Bruckhaus Deringer and Ernst & Young to lead the investigation.  Less than one month later, Defendant Compass terminated the employment of Defendants Peter Harris, Andrew Seiwert and Doug Kerr because the Defendants participated in a scheme to bribe Defendant Yakovlev to obtain U.N. contracts for Defendant Compass.

12.    In November 2005, the United Kingdom's Serious Fraud Office ("SFO") launched an investigation into Defendant Compass's business practices.  Currently, Defendant Compass faces investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the SFO and the United Nations.

13.    Defendant Compass has failed to admit publicly the depth of corruption within its ranks.  Defendant Compass neglected to disclose the involvement of at least two executives – Defendants Steve Kemp and Len Swain –  in its fraudulent scheme.  In April 2005, Defendant Seiwert forwarded an e-mail from Defendant Yakovlev to Defendants Kemp and Swain that included information labeled "strictly confidential, not for release outside of the United Nations." This confidential information described Defendant Compass's poor performance on a contract for the provision of food rations to peacekeepers in Burundi (the "Burundi Rations Contract"). Defendant Yakovlev sent the confidential information to Defendant Compass so that Compass could take steps to prevent the cancellation of Defendant Compass as a supplier for the Burundi

73444.2

Rations Contract.  The Burundi Rations Contract was worth as much as $111 million, including optional add-ons.  Supreme had bid on the Burundi Rations Contract and lost it to Compass.

14.    Defendants' bribery and bid-rigging scheme violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act, New York State's Donnelly Act and the common law.

15.    Defendants, by their illegal conduct, not only corrupted the United Nations and defrauded the U.N.'s member states, including the United States, but Defendant also swindled Plaintiff Supreme out of profits it would have earned from U.N. food rations contracts that could be worth in excess of $350 million.

## II.    JURISDICTION

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under 18 U.S.C. § 1964(c) of the RICO Act, which provides federal jurisdiction for injuries resulting from RICO violations.

17.    This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, because Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, provide federal jurisdiction for claims arising under the antitrust laws.  The Sherman Act applies because the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a, makes the Sherman Act applicable to foreign trade or commerce having a direct, substantial and reasonably foreseeable effect on domestic trade or commerce.

18.    This Court also has jurisdiction pursuant to Article III, Section 7 of the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations, 61 Stat. 758, which provides that federal courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district, as provided in applicable federal, state and local laws.

73444.2

19.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), in that the RICO and Sherman Act claims arise under the laws of the United States and the state-law claims are so related to the RICO and Sherman Act claims that they form part of the same case or controversy.

### III.     TRADE AND COMMERCE

20.     The United Nations has established a Procurement Service at United Nations Headquarters in New York City, located at 304 East 45th Street, New York, New York.  The Procurement Service handles procurement for U.N. peacekeeping missions worldwide, the various departments and offices of the U.N. Secretariat in New York and other U.N. offices, organizations, regional commissions and departments worldwide.

21.     In 2003, the U.N. purchased more than 822 different categories of goods and services representing a total value in excess of $891 million.  Of this total, more than $41 million was spent on food rations and catering services in 2003.

22.     Vendors from around the world, including vendors located in the United States, apply to become UN-approved vendors.  These applications are sent to and evaluated by the Procurement Service at U.N. Headquarters in New York.

23.     The Procurement Service also solicits bids for U.N. contracts, including food rations contracts.  Requests for proposals and invitations to bid are issued from the Procurement Service at U.N. Headquarters in New York.

24.     Vendors bidding on U.N. contracts submit sealed bids to the Procurements Service at U.N. Headquarters in New York.  The Procurement Service opens these bids at the U.N. Headquarters in New York.

73444.2

25.     Defendant Compass retained Defendant IHC, whose headquarters is in New York City, as its so-called "vendor intermediary" so that Defendant IHC could assist it with Defendant Compass's bid submissions to the Procurement Service at U.N. Headquarters in New York.

26.     The U.N. releases payments to vendors providing goods and services, including vendors providing food rations, from an account in New York.

27.      The submission, evaluation and award of bids and the management of procurement contracts by the United Nations at its Headquarters in New York represents substantial and significant commerce in New York City.  Defendants' anti-competitive and unlawful conduct, described more fully below, had a direct, substantial and reasonably foreseeable effect on trade and commerce occurring in this District, and such effect gives rise to Plaintiff Supreme's Sherman Act claim set forth below.  Plaintiff's injuries are not independent of the effects of Defendants' anti-competitive and unlawful conduct on United States commerce.

## IV.     RELEVANT MARKET

28.     Vendors interested in supplying food to U.N. peacekeeping missions must take part in a competitive bidding process administered by the Procurement Service at U.N. Headquarters in New York.  The U.N. sets specific requirements for its contracts, and it seeks bids to supply food rations to peacekeeping missions only from qualified vendors.

29.     No reasonable substitute exists to obtain contracts for the supply of food to U.N. peacekeeping missions.  Before a food vendor may bid on a food rations contract, it must become a UN-approved vendor.  Before it may be awarded a food rations contract, it must be invited to bid and it must submit a response to a request for a proposal for a food rations contracts.

73444.2

30.     The relevant product market for antitrust purposes is the market for competitive bidding for the supply of food rations to U.N. peacekeeping missions.  The relevant geographic market is global.

## V.     THE PARTIES

### A.     Plaintiff Supreme

31.     Plaintiff Supreme, headquartered in Switzerland, is a U.N.-registered, global foodservice company specializing in the provision of foodservice to organizations in regions of crisis.  It is a world leader in food supply for military and multinational forces, and has more than 45 years of experience in the food supply business.  Plaintiff Supreme has provided foodservice to numerous multinational military and governmental organizations and has also provided foodservice to numerous national military forces, including the United States military.  Plaintiff Supreme currently has a five-year, $1 billion contract with the United States to provide food rations to military forces in Afghanistan.  Plaintiff Supreme is a signatory to the U.N. Global Compact.  It regularly conducts business in New York by submitting bids for food rations contracts to the U.N. Headquarters in New York City.

32.     Plaintiff Supreme is the parent and successor-in-interest of Supreme Sales GmbH, a wholly-controlled subsidiary that succeeded Alfred Orenstein Gbr, an entity that began providing deliveries of food rations to U.S. military forces stationed in Germany in the late 1950s.  (Supreme, Supreme Sales GmbH and Alfred Orenstein Gbr are collectively referred to herein as "Supreme".)

73444.2

## B.      Defendant Compass

33.      Defendant Compass is the twelfth largest employer in the world.  It has 400,000 employees and annual revenues in excess of $21 billion.  It is headquartered in the town of Chertsey in Surrey, United Kingdom.

34.      Defendant Compass has foodservice contracts with the United States government – including at least one contract to provide foodservice to a federal courthouse – and it owns several restaurants in New York City, including The Brasserie, Sea Grille, Tropica, Naples 45, Macy's Cellar Bar & Grill and Cucina & Co.  Defendant Compass provides catering services to some of New York City's most popular attractions, including the American Museum of Natural History, Carnegie Hall, the Central Park Zoo, the Intrepid Sea, Air and Space Museum, Lincoln Center, The Metropolitan Museum of Art and the Guggenheim Museum.

## C.      Defendant ESS

35.      Defendant ESS, formerly known as Eurest Support Services, is a division of Defendant Compass that specializes in providing services to remote sites, defense locations and off-shore locations, including areas patrolled by U.N. peacekeeping forces.  It regularly conducts business in New York by submitting bids for food rations contracts to the U.N. Headquarters in New York City.

## D.      Defendant IHC

36.      Defendant IHC is a corporation doing business in New York with its base of operations at 192 Lexington Avenue.  While IHC has sold some goods directly to the U.N., it mainly operates as a so-called "vendor intermediary".  In such capacity, IHC has helped other companies obtain lucrative U.N. contracts.

73444.2

### E.      Defendant Peter Harris

37.      Prior to the termination of his employment from Defendant Compass in November 2005, Defendant Peter Harris was a member of Defendant Compass Group PLC's senior management team and sat on the Board of Compass as a Director.  He was the CEO of Defendant Compass's United Kingdom and Ireland, Middle East and Africa divisions, and he was also the Chief Executive Officer of Defendant ESS.  Defendant Harris held these positions when Defendant Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

### F.      Defendant Andrew Seiwert

38.      Prior to the termination of his employment in November 2005, Defendant Andrew Seiwert was a senior executive for business development at Defendant ESS.  He was Defendant Compass's main liaison with the U.N. Procurement Service, regularly meeting with Defendant Yakovlev to discuss business issues.  Defendant Seiwert performed this function when Defendant Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

### G.      Defendant Alexander Yakovlev

39.      Defendant Yakovlev is a Russian citizen living in Yonkers, New York who was employed at the U.N. from 1985 to 2005.  Beginning in at least 1998 through June 22, 2005, Defendant Yakovlev played a major role within the U.N. as a senior procurement officer in the U.N.'s Procurement Service and possessed substantial authority to affect the U.N.'s selection of a winning bidder, the U.N.'s response to allegations of service problems by a vendor and the U.N.'s decision whether to grant advantageous price adjustments to a vendor during the performance of a contract.

73444.2

40.     Defendant Yakovlev was responsible for the U.N.'s award of the Liberia Rations Contract, the Burundi Rations Contract and other, if not all, food supply contracts Defendant Compass won.

## H.     Defendant Moxyco

41.     Defendant Yakovlev established Defendant Moxyco, an off-shore company, in or about 2000.  Soon thereafter, Defendant Yakovlev opened an account for Defendant Moxyco at Antigua Overseas Bank Limited ("Antigua Overseas") to facilitate the transfer and concealment of illicit payments.

## I.     Defendant Doug Kerr

42.     Defendant Kerr, an executive of Defendant Compass who worked directly with Defendant Seiwert to prepare Defendant Compass's bids for the U.N., was terminated from Defendant Compass in November 2005.  At the time of Defendant Kerr's termination, Defendant Compass did not disclose Defendant Kerr's involvement in the bribery and bid-rigging conspiracy.  Defendant Kerr's involvement became publicly known only after U.S. congressional investigators disclosed his identity.

## J.     Defendant Steve Kemp

43.     Defendant Kemp is the Regional Operations Director for Defendant ESS.  He is responsible for Defendant Compass's performance of U.N. food rations contracts.

## K.     Defendant Len Swain

44.     Until recently, Defendant Swain had been responsible for Defendant Compass's purchases in connection with Defendant Compass's performance on its rations contracts with the U.N.  He is slated to leave Defendant Compass's employment soon.  Defendant Compass has not offered details of Defendant Swain's anticipated departure other than to say that it is "part of the ongoing restructuring of ESS."

73444.2

### L.  Defendant Vladimir Kuznetsov

45.    Defendant Vladimir Kuznetsov is a former United Nations official.  Beginning no later than 2000, Defendant Kuznetsov served on the U.N.'s Advisory Committee on Administrative and Budgetary Questions.  Beginning on or about January 1, 2004, he served as Chairman of this Committee.

### M.  Defendant Nikal

46.    Defendant Kuznetsov established Defendant Nikal, an off-shore company, in or about 2000.  Soon thereafter, Kuznetsov opened a bank account for Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

### N.  Defendant Ezio Testa

47.    Defendant Ezio Testa was President and CEO of IHC from approximately 2003 through approximately 2005.  Defendant Testa is currently an IHC board member.

## VI.  UNITED NATIONS RATIONS CONTRACTS

48.    The market for U.N. rations contracts is a difficult market for vendors to enter. The U.N.'s standards are very high and, since the performance of procurement services are critical to peacekeeping missions, the U.N. does not welcome unproven entrants.  Hence, relationships with the United Nations take many years to build.

49.    Plaintiff Supreme has been providing service to the United Nations since the 1970s, when it delivered supplies to U.N. missions in the Middle East.  In 1993, Plaintiff Supreme won a U.N. contract for the provision of food rations to 2,500 U.N. peacekeeping forces stationed in Mozambique.  Also in that year, Plaintiff Supreme won a rations contract for peacekeeping forces stationed in Croatia and Bosnia-Herzegovina ranging in size from 6,500 to 10,000 troops.  From 1998 to 1999, Plaintiff Supreme provided food rations to a U.N. facility in Lebanon, and from 1999 to 2000, Plaintiff Supreme provided catering and food supply service to

73444.2

a U.N. facility in East Timor.  Currently, Plaintiff Supreme provides foodservice and catering to

U.N. peacekeepers in the Ivory Coast and catering and retail services to U.N. staff in

Afghanistan.

50.    Defendant Compass entered the market for the provision of food rations to U.N.

peacekeeping forces when it became a U.N-registered vendor in approximately 2000.  Shortly

thereafter, Defendant Compass won a contract for the first bid it submitted to the U.N. – a

contract for the provision of food rations to peacekeeping forces in East Timor.  Despite the

U.N.'s longstanding practice of requiring bidders to prove themselves over time, Defendant

Compass's business with the U.N. grew at a torrid pace from the moment Defendant Compass

entered the market for food rations contracts.

51.    Defendant Compass hired Defendant IHC to be its so-called "vendor

intermediary" for most, if not all, of its bid submissions.

52.    The legitimacy of vendor intermediaries is highly suspect.  The U.N. has issued

the following statement concerning the use of such intermediaries:

> There are indications that certain parties have approached prospective vendors
> offering to act as intermediaries in dealings with the United Nations. Some of
> these intermediaries purport to have various arrangements with the United
> Nations, or to possess support facilities within UN missions or projects which can
> place a vendor in a more advantageous position in a competitive bidding exercise.
>
> Vendors are advised that the UN prefers to deal directly with principals to the
> extent possible. Vendors are therefore urged to consult with the Procurement
> Service before deciding to submit offers or negotiate contracts through any
> intermediary.

53.    Defendant Compass, through its employees, paid Defendant IHC millions of

dollars to be its so-called "vendor intermediary" for its U.N. contracts.

54.    Since 2000, with the help of Defendant IHC, Defendant Compass won U.N.

contracts for the provision of food rations to peacekeeping forces in Sudan, East Timor, Liberia,

73444.2

Burundi, Eritrea, Lebanon, Cyprus and Syria.  As of October 2005, Defendant Compass serviced approximately 50% of the market for peacekeeping rations contracts.  Defendant Compass's foodservice contracts could be worth in excess of $350 million.

55.     Of the rations contracts won by Defendant ESS, Plaintiff Supreme submitted bids for Sudan, East Timor, Liberia, Burundi and Eritrea.

56.     The U.N. removed Defendant IHC and Defendant Compass from its approved vendor list in late 2005, when the U.N. began to investigate how Defendant IHC and Defendant Compass obtained top-secret information about the Liberia Rations Contract.

## VII.    RACKETEERING AND OTHER UNLAWFUL ACTIVITY

### A.    The Criminal Enterprise

57.     From 2000 to 2005, Defendant Yakovlev rigged the bidding process for U.N. food rations contracts so that Defendant Compass would win several U.N. contracts that could be worth in excess of $350 million.

58.     Defendant Yakovlev received approximately nearly $1 million, if not more, from Defendant Compass as compensation for his illicit activities.  Additionally, in an effort to bribe Defendant Yakovlev through patronage, Defendant IHC's CEO, Defendant Ezio Testa, hired Defendant Yakovlev's son to work at Defendant IHC.  This occurred at a time when Defendant IHC was supplying the U.N. with nearly $2 million worth of portable generators pursuant to a contract that Defendant Yakovlev had negotiated with Defendant IHC.

59.     By obtaining a job for his son, Defendant Yakovlev violated at least two U.N. conflict-of-interest rules.  One such rule stated, "Staff members shall not use their office or knowledge gained from their official functions for private gain, financial or otherwise, or for the private gain of any third party, including family, friends and those they favour."  The other rule

14

required U.N. officials to certify that they did not have a "conflict of interest with regard to the economic activities of spouses and children."

60.     Defendants Harris, Seiwert, Kerr, Kemp and Swain were instrumental in Defendants' bribery and bid-rigging scheme.  In addition to violating various laws, the bribery and bid-rigging scheme violated Defendant Compass's Statement of Business Principles and the United Nations Global Compact.  Defendant Compass's Statement of Business Principles includes the directive that "[n]o employee may offer or receive – or influence others to offer or receive – any money, gift or hospitality that could be construed as being intended as a bribe or influence."  The anti-corruption provision of the U.N. Global Compact mandates that "Business should work against all forms of corruption, including extortion and bribery."  Defendant Compass is a signatory to the Global Compact.

61.     Defendant Yakovlev paid Defendant Kuznetsov a portion of his illicit proceeds, amounting to several hundred thousand dollars, in exchange for Defendant Kuznetsov's assistance.

62.     Collectively, the Defendants perpetrated a scheme whereby Defendant Compass was awarded U.N. contracts in exchange for illicit payments and patronage to Defendant Yakovlev.  As part of this scheme, Defendant Yakovlev disclosed confidential information to Defendant Compass concerning Defendant Compass's performance on at least one U.N. contract. The purpose of disclosing information relating to Defendant Compass's performance failures was to enable Defendant Compass to correct its service problems before the U.N. cancelled its contract with Defendant Compass and tendered the contract to the marketplace for re-bid. Without such support, Defendant Compass not only would have lost the Burundi Rations Contract, but its other U.N. contracts would have been put in jeopardy.

73444.2

### B.     A Pattern of Racketeering Activity

**i)     Defendant Yakovlev's Money Laundering Scheme**

63.     Defendant Yakovlev instructed Defendant IHC to make payments to the account he set up for Defendant Moxyco at Antigua Overseas and to a secret bank account in Switzerland in exchange for confidential information and illegal assistance that Defendant Compass utilized to obtain and retain U.N. contracts.

**ii)     Defendant Kuznetsov Joins Defendant Yakovlev's Criminal Scheme**

64.     In early 2000, Defendant Yakovlev informed Defendant Kuznetsov of his criminal scheme to obtain money from companies seeking to secure U.N. contracts.

65.     Sometime thereafter, Defendant Kuznetsov established Defendant Nikal and opened a bank account in the name of Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

66.     Defendant Kuznetsov did not report Defendant Yakovlev to the U.N. or any law enforcement authority.  In exchange for Defendant Kuznetsov's silence, Defendant Yakovlev agreed to transfer, and did transfer, a share of his illegally-obtained proceeds to Defendant Kuznetsov.

67.     Defendant Kuznetsov used the off-shore account for Defendant Nikal at Antigua Overseas to facilitate and hide Defendant Yakovlev's payments of hush money.

68.     From approximately 2000 through June 2005, Defendant Kuznetsov received at least several hundred thousand dollars in criminal proceeds from Defendant Yakovlev.

**iii)     Authorities Discover the Criminal Conspiracy - Defendant Yakovlev Pleads Guilty**

69.     Defendant Yakovlev resigned from the U.N. in June 2005 after the news media reported that Defendant Yakovlev had obtained a job for his son at Defendant IHC's

73444.2

headquarters in New York City at a time when Defendant Yakovlev had been overseeing Defendant IHC's performance on a U.N. contract.

70.     On August 8, 2005, Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken bribes in connection with U.N. procurement contracts and the Oil-for-Food program.

71.     Following Volcker's announcement, authorities arrested Defendant Yakovlev on August 8, 2005.  That same day, Defendant Yakovlev pleaded guilty before the Honorable William H. Pauley, United States District Judge for the Southern District of New York, to charges of conspiracy to commit wire fraud, wire fraud and money laundering stemming from his receipt of several hundred thousand dollars, if not more, from foreign companies seeking to obtain contracts from the U.N. between the years 1993 and 2005.

72.     Following Defendant Yakovlev's plea, the FBI arrested Defendant Kuznetsov on September 1, 2005.  The United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with one count of conspiracy to commit money laundering in connection with his receipt of hush money from Defendant Yakovlev.  This case is pending before the Honorable Debra A. Batts, United States District Judge for the Southern District of New York.

**iv)   IHC Leaks U.N.'s Top Secret Information on Liberia Rations Contract to Defendant Compass**

73.     Under U.N. rules, sealed bids for procurement contracts are submitted to the U.N. in a top-secret bidding process.

74.     As of November 6, 2003, the U.N. had not yet decided who would be awarded the Liberia Rations Contract.  Yet, on that date, Defendant Testa, Defendant IHC's CEO, and

17

73444.2

Defendant Seiwert received three highly confidential U.N. documents concerning the Liberia Rations Contract.

75.    One of those documents was a draft of the U.N. Procurement Service's official recommendation to the U.N. Headquarters Committee on Contracts to award the $62 million Liberia Rations Contract to Defendant Compass.

76.    Another of those documents was an evaluation of the technical abilities of twelve food supply firms bidding for the Liberia Rations Contract (the "Technical Evaluation"). According to the Technical Evaluation, Supreme met the U.N.'s technical requirements.

77.    The third document showed that Plaintiff Supreme was a finalist in the competition for the Liberia Rations Contract.  This document provided a cost description of the finalists' bids, including bids by Plaintiff Supreme and Defendant Compass.

78.    On or about November 12, 2003, the U.N. Headquarters Committee on Contracts approved the award of the $62 million Liberia Rations Contract to Defendant Compass, as per the Procurement Service's recommendation.

79.    In October 2005, after learning of Defendant Testa's email to Defendant Seiwert, the U.N. launched an investigation to determine how Defendant Testa obtained the information and why Defendant Compass did not inform the U.N. of the leak.  Defendant Compass was de-listed from the United Nations registry of vendors soon thereafter.

73444.2

### v)   Defendant Yakovlev Leaks Top-Secret Information on Burundi Rations Contract to Defendant Compass

80.   On April 27, 2005, Defendant Yakovlev leaked confidential information to Defendant Seiwert concerning Defendant Compass's performance failings with respect to the Burundi Rations Contract.  Defendant Seiwert forwarded the email to Defendants Kemp and Swain, seeking their urgent attention, and to Defendant Testa.

### vi)   Current Investigations

81.   Defendant Compass, which announced the completion of its internal investigation on February 1, 2006, is currently subject to investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the Serious Fraud Office of the United Kingdom and the United Nations.  So far, Defendant Compass has fired Defendants Harris, Seiwert and Kerr.  Defendant Compass has not terminated the employment of Defendants Kemp and Swain, though Defendant Swain is purportedly scheduled to leave the company soon.  Defendant Compass has also disciplined at least three other employees as a result of the involvement of those employees in the big-rigging and bribery conspiracy.

## VIII.   UNLAWFUL RESTRAINT OF TRADE AND COMMON LAW VIOLATIONS

82.   Defendants attempted to rig, and did rig, the bidding process associated with the award of food rations contracts to U.N. peacekeeping forces.  As a result, the U.N. and its member states were defrauded and Plaintiff Supreme was swindled out of the profits it would have earned from contracts it would have won but for Defendants' illegal conduct.

83.   Defendants knowingly and intentionally corrupted the U.N.'s bidding process so that Defendant Compass would "win" contracts that it otherwise would not have won and keep contracts that it otherwise would not have kept.  Defendants knew that by engaging in such conduct, they interfered with Plaintiff Supreme's ability to win those contracts.  In the case of the

Liberia Rations Contract and other contracts for which Plaintiff Supreme submitted bids, Defendant Compass knew that by bribing Defendant Yakovlev, its bids would prevail over Plaintiff Supreme's bids and Defendant Compass would win the contracts.  In the case of the Burundi Rations Contract, Defendant Compass knew that by bribing Defendant Yakovlev, it would obtain confidential information that would enable it to correct performance failures before the U.N. acted to cancel Defendant Compass's contract.

## IX.    COUNT ONE – RICO VIOLATION

84.    Plaintiff Supreme is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

85.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

86.    The Defendants (including officers, agents and employees not named in this Complaint) composed a group of persons associated together in fact for the common purpose of carrying out the fraudulent scheme described in this Complaint; namely, making secret payments and providing other non-cash benefits to Defendant Yakovlev and facilitating the transfer of cash payments to Defendant Yakovlev's off-shore bank accounts in exchange for confidential information used to circumvent an otherwise aboveboard bidding and procurement process.  As a result, the Defendants (including officers, agents and employees not named in this Complaint) constitute an association-in-fact enterprise (the "Bid-Rigging Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

87.    During all relevant times, the Bid-Rigging Enterprise was engaged in, and its activities affected by, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

20

88.     During all relevant times, each of the Defendants conducted and/or participated in the conduct of the Bid-Rigging Enterprise, directly or indirectly, through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

89.     During all relevant times, Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above.  The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1952 (racketeering) and 18 U.S.C. § 1956 (money laundering).  Under New York law, the acts set forth above also constitute commercial bribing in the first degree under Penal Law §180.03 and commercial bribe receiving in the first degree under Penal Law §180.05, each of which constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

90.     Each of the Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

91.     The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, a common victim (Plaintiff Supreme), a common method of commission and the common purpose and common result of a scheme designed to obtain through bribery U.N. contracts for the benefit of Defendant Compass by bribing Defendant Yakovlev and facilitating the transfer of Defendant Yakovlev's fraudulently-obtained proceeds.  The fraudulent scheme described herein began in or about 2000 and would have continued perpetually but for its discovery in or about June 2005 by the United States Attorney's Office for the Southern District of New York.

73444.2

92.     As a result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million plus an additional several million dollars resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass.

93.     As a result of Defendants' misconduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

94.     Pursuant to the RICO Act, 18 U.S.C. § 1964(c), Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants.

## X.     COUNT TWO –  RICO CONSPIRACY

95.     Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

96.     Defendants conspired to commit the violation of 18 U.S.C. § 1962(c) described in paragraphs 1 through 95 above.

97.     During all relevant times, each Defendant was associated with the Bid-Rigging Enterprise and each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

98.     The Defendants (including officers, agents and employees not named in this Complaint) committed and caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the object thereof.

99.     As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million plus an additional several million dollars resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass.

73444.2

100.    As a result of Defendants' conspiracy, each Defendant is liable for losses to Plaintiff Supreme in an amount to be determined at trial.

101.    Pursuant to the RICO Act, 18 U.S.C. § 1964(c), Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants.

### XI.    COUNT THREE – SHERMAN ACT VIOLATION

102.    Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

103.    Each of the Defendants is a "person" within the meaning of 15 U.S.C. § 7.

104.    Beginning in or about 2000, if not earlier, through June 2005, Defendants engaged in a contract, agreement, arrangement, combination and conspiracy to commit unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

105.    This contract, agreement, arrangement, combination and conspiracy consisted of, among other things, an agreement by Defendants to rig the award of U.N. contracts for the provision of food rations to peacekeeping forces so that Defendant Compass would be awarded these contracts and would continue to retain these contracts.  This bid-rigging took place in New York at U.N. Headquarters, with the assistance of Defendants Yakovlev and Kuznetsov, and facilitated by Defendant IHC as the so-called "vendor intermediary."

106.    Defendants' bid-rigging activities are a *per se* violation of the Sherman Act.

107.    As a result of Defendants' *per se* violation of the Sherman Act, Defendants restrained competition in the marketplace, thereby preventing Plaintiff Supreme from competing freely and obstructing the free and fair determination of contract prices.

108.    By corrupting the Procurement Service in the U.N.'s Headquarters in New York, Defendants' violations of the Sherman Act have injured competition in the market for competitive bidding for the supply of food rations to U.N. peacekeeping missions.

73444.2

109.    As a result of Defendants' conduct, Plaintiff Supreme lost U.N. food rations contracts that could be worth in excess of $350 million plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass.

110.    Plaintiff Supreme's injuries were not independent of Defendants' big-rigging activities in New York.  Plaintiff's Sherman Act claim results from the direct, substantial and reasonably foreseeable effect of Defendants' anti-competitive and unlawful conduct on United States commerce.

111.    As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

112.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each Defendant and injunctive relief.

## XII.    COUNT FOUR –  DONNELLY ACT

113.    Beginning in or about 2000, if not earlier, through June 2005, Defendants engaged in a contract, agreement, arrangement and combination in unreasonable restraint of trade and commerce in violation of the Donnelly Act, §§ 340 *et seq.* of New York General Business Law.

114.    This contract, combination, agreement and arrangement consisted of, among other things, an agreement by Defendants to rig the award of U.N. contracts for the provision of food rations to peacekeeping forces so that Defendant Compass would be awarded these contracts and would continue to retain these contracts.

115.    As a result of this conspiracy, Defendants restrained competition in the marketplace, thereby preventing Plaintiff Supreme from competing freely and obstructing the free and fair determination of contract prices.

116.    Defendants' bid-rigging activities are a *per se* violation of the Donnelly Act.

117.    As a result of Defendants' conspiratorial conduct, Plaintiff Supreme lost U.N. food rations contracts that could be worth in excess of $350 million plus an additional several million dollars resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass.

118.    Defendants' violations of the Donnelly Act took place in New York, at U.N. Headquarters, and Plaintiff sustained injury to its business and property as a result of Defendants' anti-competitive and wrongful conduct perpetrated in New York.

119.    As a result of Defendants' conspiracy, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

120.    Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

**XIII.   COUNT FIVE –  INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AND BUSINESS RELATIONS**

121.    Defendants knew that Plaintiff Supreme was a competitor of Defendant Compass's in the market for U.N. food rations contracts.

122.    With respect to the Liberia Rations Contract, Defendants knew that Defendant Compass and Plaintiff Supreme were the finalists in the U.N.'s bidding process.  With respect to the Burundi Rations Contract, Defendant Compass received early indication that its performance was unacceptable to the United Nations only because Defendant Yakovlev disclosed confidential

73444.2

information to Defendant Compass.  This breach by Defendant Yakovlev enabled Defendant Compass to correct its performance failures before the U.N. cancelled the Burundi Rations Contract and, perhaps, other contracts performed by Defendant Compass.

123.    The Defendants intentionally interfered with Plaintiff Supreme's prospective business relations by paying bribes to obtain confidential information and favorable treatment from Defendant Yakovlev and using such information and treatment to fraudulently obtain and fraudulently retain U.N. foodservice contracts, including the Liberia Rations Contract, the Burundi rations Contract and others.

124.    As a result of Defendants' intentional interference, Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained by Defendant Compass.

125.    As a result of Defendants' conspiracy, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(1)    awarding Plaintiff damages, including compensatory, treble and punitive damages, in an amount exceeding $125,000,000, as well as prejudgment and postjudgement interest, the precise amount of said damages to be determined at trial;

(2)    entering appropriate injunctive relief  including, but not limited to, an order directing Defendant Compass Group PLC and the individual Defendants to divest themselves of any interest each may have in Defendants ESS and IHC;

(3)    awarding Plaintiff the costs, expenses and attorneys' fees incurred in prosecuting this action; and

73444.2

(4)     such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues and claims so triable.

Dated: New York, New York
       March 6, 2006

Respectfully submitted,

CONSTANTINE CANNON, P.C.

By: _____
     Robert L. Begleiter (RB-7052)
     Gary J. Malone (GM-3119)
     Yang Chen (YC-3782)
     Michael C. Rakower (MR-2914)

     450 Lexington Avenue
     New York, New York  10017

     *Attorneys for Plaintiff*
     *Supreme Foodservice AG*

27

73444.2