## IV. RELEVANT MARKET

28. Vendors interested in supplying food to U.N. peacekeeping missions must take part in a competitive bidding process administered by the Procurement Service at U.N. Headquarters in New York. The U.N. sets specific requirements for its contracts, and it seeks bids to supply food rations to peacekeeping missions only from qualified vendors.

29. No reasonable substitute exists for the supply of food rations to U.N. peacekeeping missions. Before a food vendor may be invited to bid on a food rations contract, it must become a U.N.-approved vendor. Before it may be awarded a U.N. food rations contract, a food vendor must be invited to bid and it must submit a response to a formal request for a proposal (an "RFP") for a food rations contract. An entity wishing to became a U.N.-approved vendor must submit an application to the U.N. and establish that it meets the U.N.'s technical requirements.

30. The relevant product market for antitrust purposes is the market for the supply of food rations to U.N. peacekeeping missions. The relevant geographic market is global.

## V. THE PARTIES

### A. Plaintiff Supreme

31. Plaintiff Supreme, headquartered in Switzerland, is a U.N.-registered, global foodservice company specializing in the provision of foodservice to organizations in regions of crisis. It is a world leader in food supply for military and multinational forces, and has more than 45 years of experience in the food supply business. Plaintiff Supreme has provided foodservice to numerous multinational military and governmental organizations, including the United Nations, and has also provided foodservice to numerous national military forces, including the United States military. Plaintiff Supreme currently has a five-year, $1 billion contract with the United States to provide food rations to military forces in Afghanistan. Plaintiff Supreme is a

signatory to the U.N. Global Compact. It regularly conducts business in New York by submitting bids for food rations contracts to the U.N. Headquarters in New York City.

32. Plaintiff Supreme is the parent and successor-in-interest of Supreme Sales GmbH, a wholly-controlled subsidiary that succeeded Alfred Orenstein Gbr, an entity that began providing deliveries of food rations to U.S. military forces stationed in Germany in the late 1950s. (Supreme, Supreme Sales GmbH and Alfred Orenstein Gbr are collectively referred to herein as "Supreme".)

**B. Defendant Compass Group**

33. Defendant Compass Group is the twelfth largest employer in the world. It has 400,000 employees and annual revenues in excess of $21 billion. It is headquartered in the town of Chertsey in Surrey, United Kingdom.

34. Defendant Compass Group has foodservice contracts with the United States government – including at least one contract to provide foodservice to a federal courthouse – and it owns several restaurants in New York City, including The Brasserie, Sea Grille, Tropica, Naples 45, Macy's Cellar Bar & Grill and Cucina & Co. Defendant Compass provides catering services to some of New York City's most popular attractions, including the American Museum of Natural History, Carnegie Hall, the Central Park Zoo, the Intrepid Sea, Air and Space Museum, Lincoln Center, The Metropolitan Museum of Art and the Guggenheim Museum.

**C. Defendants ESS**

35. Defendant ESS, also known as Eurest Support Services, is a division of Defendant Compass Group that specializes in providing services to remote sites, defense locations and off-shore locations, including areas patrolled by U.N. peacekeeping forces. It is managed and operated by Defendant Compass Group at its offices in the United Kingdom. Defendant ESS regularly conducts business in New York by submitting bids for food rations

contracts to the U.N. Headquarters in New York City. ESS Support Services Worldwide and Eurest Support Services (Cyprus) International Limited are divisions of Defendant Compass Group or Defendant ESS through which these Defendants conduct business operations.

**D. Defendant IHC**

36. Defendant IHC is a corporation doing business in New York with its base of operations at 192 Lexington Avenue. While IHC has sold some goods directly to the U.N., it mainly operates as a so-called "vendor intermediary." In such capacity, IHC has helped other companies obtain lucrative U.N. contracts.

**E. Defendant Peter Harris**

37. Prior to the termination of his employment from Defendant Compass in November 2005, Defendant Peter Harris was a member of Defendant Compass Group PLC's senior management team and sat on the Board of Compass as a Director. He was the CEO of Defendant Compass's United Kingdom and Ireland, Middle East and Africa divisions, and he was also the Chief Executive Officer of Defendant ESS. Defendant Harris held these positions when Defendant Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

**F. Defendant Andrew Seiwert**

38. Prior to the termination of his employment in November 2005, Defendant Andrew Seiwert was a senior executive for business development at Defendant ESS. Defendant Seiwert may also be known as Markus or Marcus Andreas Seiwert. He was Defendant Compass's main liaison with the U.N. Procurement Service, regularly meeting with Defendant Yakovlev to discuss business issues. Defendant Seiwert performed this function when Defendant Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

**G. Defendant Alexander Yakovlev**

39. Defendant Yakovlev is a Russian citizen living in Yonkers, New York who was employed at the U.N. from 1985 to 2005. Beginning in at least 1998 through June 22, 2005, Defendant Yakovlev played a major role within the U.N. as a senior procurement officer in the U.N.'s Procurement Service and possessed substantial authority to affect the U.N.'s selection of a winning bidder, the U.N.'s response to allegations of service problems by a vendor and the U.N.'s decision whether to grant advantageous price adjustments to a vendor during the performance of a contract.

40. Defendant Yakovlev was responsible for the U.N.'s award of the Liberia Rations Contract, the Burundi Rations Contract and other, if not all, food supply contracts Defendant Compass won.

**H. Defendant Moxyco**

41. Defendant Yakovlev established Defendant Moxyco, an off-shore company, in or about 2000. Soon thereafter, Defendant Yakovlev opened an account for Defendant Moxyco at Antigua Overseas Bank Limited ("Antigua Overseas") to facilitate the transfer and concealment of illicit payments.

**I. Defendant Doug Kerr**

42. Defendant Kerr, an executive of Defendant Compass who worked directly with Defendant Seiwert to prepare Defendant Compass's bids for the U.N., was terminated from Defendant Compass in November 2005. At the time of Defendant Kerr's termination, Defendant Compass did not disclose Defendant Kerr's involvement in the bribery and bid-rigging conspiracy. Defendant Kerr's involvement became publicly known only after U.S. congressional investigators disclosed his identity.

**J. Defendant Steve Kemp**

43. Defendant Kemp is the Regional Operations Director for Defendant ESS. He is responsible for Defendant Compass's performance of U.N. food rations contracts.

**K. Defendant Len Swain**

44. Until recently, Defendant Swain had been responsible for Defendant Compass's purchases in connection with Defendant Compass's performance on its rations contracts with the U.N. He is slated to leave Defendant Compass's employment soon. Defendant Compass has not offered details of Defendant Swain's anticipated departure other than to say that it is "part of the ongoing restructuring of ESS."

**L. Defendant Vladimir Kuznetsov**

45. Defendant Vladimir Kuznetsov is a former United Nations official. Beginning no later than 2000, Defendant Kuznetsov served on the U.N.'s Advisory Committee on Administrative and Budgetary Questions. Beginning on or about January 1, 2004, he served as Chairman of this Committee.

**M. Defendant Nikal**

46. Defendant Kuznetsov established Defendant Nikal, an off-shore company, in or about 2000. Soon thereafter, Kuznetsov opened a bank account for Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

**N. Defendant Ezio Testa**

47. Defendant Ezio Testa was President and CEO of IHC from approximately 2003 through approximately 2005. Defendant Testa is currently an IHC board member.

### O. Defendant Dmitry Yakovlev

48. Defendant Dmitry is Defendant Yakovlev's son. Defendant Dmitry lives in Yonkers, New York. On or about May 2000, Defendant IHC hired Defendant Dmitry, pursuant to Defendant Yakovlev's request, to work in IHC's New York City headquarters. Defendant Dmitry was employed by IHC from approximately May to August 2000 and 2001 and from approximately December 2002 to December 2003. During his employment with IHC, Defendant Dmitry served as a conduit through which confidential United Nation information was transferred between and among Defendants Yakovlev, Testa and IHC.

### P. Defendant Olga Yakovlev

49. Defendant Olga is the wife of Defendant Yakovlev. Defendant Olga received transfers of cash to her Swiss bank account from Moxyco's offshore account, which is the account Defendant Yakovlev used as the storehouse for cash he obtained through the bribery and bid-rigging scheme described herein.

## VI. UNITED NATIONS RATIONS CONTRACTS

50. The market for U.N. rations contracts is a difficult market for vendors to enter. The U.N.'s standards are very high and, since the performance of procurement services are critical to peacekeeping missions, the U.N. does not welcome unproven entrants. Hence, relationships with the United Nations take many years to build.

51. Plaintiff Supreme has been providing service to the United Nations since the 1970s, when it delivered supplies to U.N. missions in the Middle East. In 1993, Plaintiff Supreme won a U.N. contract for the provision of food rations to 2,500 U.N. peacekeeping forces stationed in Mozambique. Also in that year, Plaintiff Supreme won a rations contract for

peacekeeping forces stationed in Croatia and Bosnia-Herzegovina ranging in size from 6,500 to 10,000 troops. From 1998 to 1999, Plaintiff Supreme provided food rations to a U.N. facility in Lebanon, and from 1999 to 2000, Plaintiff Supreme provided catering and food supply service to a U.N. facility in East Timor. Currently, Plaintiff Supreme provides foodservice and catering to U.N. peacekeepers in the Ivory Coast and catering and retail services to U.N. staff in Afghanistan.

52. Defendant Compass entered the market for the provision of food rations to U.N. peacekeeping forces when it became a U.N-registered vendor in approximately 2000. Shortly thereafter, Defendant Compass won a contract for the first bid it submitted to the U.N. – a contract for the provision of food rations to peacekeeping forces in East Timor. Despite the U.N.'s longstanding practice of requiring bidders to prove themselves over time, Defendant Compass's business with the U.N. grew at a torrid pace from the moment Defendant Compass entered the market for food rations contracts.

53. Defendant Compass hired Defendant IHC to be its so-called "vendor intermediary" for most, if not all, of its bid submissions.

54. The legitimacy of vendor intermediaries is highly suspect. The U.N. has issued the following statement concerning the use of such intermediaries:

> There are indications that certain parties have approached prospective vendors offering to act as intermediaries in dealings with the United Nations. Some of these intermediaries purport to have various arrangements with the United Nations, or to possess support facilities within UN missions or projects which can place a vendor in a more advantageous position in a competitive bidding exercise.
>
> Vendors are advised that the UN prefers to deal directly with principals to the extent possible. Vendors are therefore urged to consult with the Procurement Service before deciding to submit offers or negotiate contracts through any intermediary.

55. Defendant Compass, through its employees, paid Defendant IHC millions of dollars to be its so-called "vendor intermediary" for its U.N. contracts.

56. Since 2000, with the help of Defendant IHC, Defendant Compass won U.N. contracts for the provision of food rations to peacekeeping forces in Sudan, East Timor, Liberia, Burundi, Eritrea, Lebanon, Cyprus and Syria. As of October 2005, Defendant Compass serviced approximately 50% of the market for peacekeeping rations contracts. Defendant Compass's foodservice contracts could be worth in excess of $350 million.

57. Of the rations contracts won by Defendant ESS, Plaintiff Supreme submitted bids for Sudan, East Timor, Liberia, Burundi and Eritrea.

58. The U.N. removed Defendant IHC and Defendant Compass from its approved vendor list in late 2005, when the U.N. began to investigate how Defendant IHC and Defendant Compass obtained top-secret information about the Liberia Rations Contract.

## VII. RACKETEERING AND OTHER UNLAWFUL ACTIVITY

### A. The Criminal Enterprise

59. From 2000 to 2005, Defendant Yakovlev rigged the bidding process for U.N. food rations contracts so that Defendant Compass would win several U.N. contracts that could be worth in excess of $350 million.

60. Defendant Yakovlev received approximately nearly $1 million, if not more, from Defendant Compass as compensation for his illicit activities. Additionally, in an effort to bribe Defendant Yakovlev through patronage, Defendant IHC's CEO, Defendant Ezio Testa, hired Defendant Yakovlev's son, Defendant Dmitry, to work at Defendant IHC. This occurred at a time when Defendant IHC was supplying the U.N. with nearly $2 million worth of portable generators pursuant to a contract that Defendant Yakovlev had negotiated with Defendant IHC.