61.     By obtaining a job for his son, Defendant Yakovlev violated at least two U.N. conflict-of-interest rules. One such rule stated, "Staff members shall not use their office or knowledge gained from their official functions for private gain, financial or otherwise, or for the private gain of any third party, including family, friends and those they favour." The other rule required U.N. officials to certify that they did not have a "conflict of interest with regard to the economic activities of spouses and children." Defendant Dmitry lived with Defendant Yakovlev while employed by Defendant IHC.

62.     Through his father, Defendant Dmitry had access to confidential U.N. information concerning, among other things, vendor bids for food rations contracts and the U.N.'s evaluations of such bids. Defendant Dmitry's cell phone records indicate that during his employment with IHC, Defendant Dmitry placed numerous phone calls to IHC that were immediately preceded or followed by phone calls to Defendant Yakovlev. By making these calls, Defendant Dmitry acted as a conduit through which confidential U.N. information was transferred between and among Defendants Yakovlev, IHC and Testa. Even after his employment relationship with IHC ceased in December 2003, Defendant Dmitry continued to speak to IHC officials using his cellular phone and regularly telephoned Defendant Yakovlev immediately before and after such phone calls.

63.     Defendants Harris, Seiwert, Kerr, Kemp and Swain were instrumental in Defendants' bribery and bid-rigging scheme.

64.     In addition to violating various laws, the bribery and bid-rigging scheme violated Defendant Compass's Statement of Business Principles and the United Nations Global Compact. Defendant Compass's Statement of Business Principles includes the directive that "[n]o employee may offer or receive – or influence others to offer or receive – any money, gift or

hospitality that could be construed as being intended as a bribe or influence." The anti-corruption provision of the U.N. Global Compact mandates that "Business should work against all forms of corruption, including extortion and bribery." Defendant Compass is a signatory to the Global Compact.

65. Defendant Yakovlev paid Defendant Kuznetsov a portion of his illicit proceeds, amounting to several hundred thousand dollars, in exchange for Defendant Kuznetsov's assistance.

66. Collectively, the Defendants perpetrated a scheme whereby Defendant Compass was awarded U.N. contracts in exchange for illicit payments and patronage to Defendant Yakovlev. As part of this scheme, Defendant Yakovlev disclosed confidential information to Defendant Compass concerning Defendant Compass's performance on at least one U.N. contract. The purpose of disclosing information relating to Defendant Compass's performance failures was to enable Defendant Compass to correct its service problems before the U.N. cancelled its contract with Defendant Compass and tendered the contract to the marketplace for re-bid. Without such support, Defendant Compass not only would have lost the Burundi Rations Contract, but its other U.N. contracts would have been put in jeopardy.

### B.   A Pattern of Racketeering Activity

#### i)   Defendant Yakovlev's Money Laundering Scheme

67. Defendant Yakovlev instructed Defendant IHC to make payments to the account he set up for Defendant Moxyco at Antigua Overseas and to a secret bank account in Switzerland in exchange for confidential information and illegal assistance that Defendant Compass utilized to obtain and retain U.N. contracts.

### ii) Defendant Kuznetsov Joins Defendant Yakovlev's Criminal Scheme

68. In early 2000, Defendant Yakovlev informed Defendant Kuznetsov of his criminal scheme to obtain money from companies seeking to secure U.N. contracts.

69. Sometime thereafter, Defendant Kuznetsov established Defendant Nikal and opened a bank account in the name of Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

70. Defendant Kuznetsov did not report Defendant Yakovlev to the U.N. or any law enforcement authority. In exchange for Defendant Kuznetsov's silence, Defendant Yakovlev agreed to transfer, and did transfer, a share of his illegally-obtained proceeds to Defendant Kuznetsov.

71. Defendant Kuznetsov used the off-shore account for Defendant Nikal at Antigua Overseas to facilitate and hide Defendant Yakovlev's payments of hush money.

72. From approximately 2000 through June 2005, Defendant Kuznetsov received at least several hundred thousand dollars in criminal proceeds from Defendant Yakovlev.

### iii) Authorities Discover the Criminal Conspiracy - Defendant Yakovlev Pleads Guilty

73. Defendant Yakovlev resigned from the U.N. in June 2005 after the news media reported that Defendant Yakovlev had obtained a job for his son at Defendant IHC's headquarters in New York City at a time when Defendant Yakovlev had been overseeing Defendant IHC's performance on a U.N. contract.

74. On August 8, 2005, Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken bribes in connection with U.N. procurement contracts and the Oil-for-Food program.

75. Following Volcker's announcement, authorities arrested Defendant Yakovlev on August 8, 2005. That same day, Defendant Yakovlev pleaded guilty before the Honorable William H. Pauley, United States District Judge for the Southern District of New York, to charges of conspiracy to commit wire fraud, wire fraud and money laundering stemming from his receipt of several hundred thousand dollars, if not more, from foreign companies seeking to obtain contracts from the U.N. between the years 1993 and 2005.

76. Prior to his guilty plea, Defendant Yakovlev was able to effect several transfers of cash from Moxyco's offshore account to Olga's Swiss bank account.

77. Following Defendant Yakovlev's plea, the FBI arrested Defendant Kuznetsov on September 1, 2005. The United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with one count of conspiracy to commit money laundering in connection with his receipt of hush money from Defendant Yakovlev. This case is pending before the Honorable Debra A. Batts, United States District Judge for the Southern District of New York.

    iv)    **Defendant IHC Leaks U.N.'s Top Secret Information on Liberia Rations Contract to Defendant Compass**

78. Under U.N. rules, sealed bids for procurement contracts are submitted to the U.N. in a top-secret bidding process pursuant an RFP. Responses to an RFP must include a technical and a financial proposal, which are submitted in separate sealed envelopes. Pursuant to United Nations procedures, technical proposals submitted to the Procurement Division are opened publicly for the sole purpose of recording that the proposals were submitted by the due date and time. No price is to be extrapolated or announced at the time of the public opening. The financial proposals are not revealed at the public opening.

79. As of November 6, 2003, the U.N. had not yet decided who would be awarded the Liberia Rations Contract. Yet, on that date, Defendant Testa (Defendant IHC's CEO), and Defendant Seiwert received three highly confidential U.N. documents concerning the Liberia Rations Contract.

80. One of those documents was a draft of the U.N. Procurement Service's official recommendation to the U.N. Headquarters Committee on Contracts to award the $62 million Liberia Rations Contract to Defendant Compass.

81. Another of those documents was an evaluation of the technical abilities of twelve food supply firms bidding for the Liberia Rations Contract (the "Technical Evaluation"). According to the Technical Evaluation, Supreme met the U.N.'s technical requirements.

82. The third document showed that Plaintiff Supreme was a finalist in the competition for the Liberia Rations Contract. This document provided a cost description of the finalists' bids, including bids by Plaintiff Supreme and Defendant Compass.

83. On or about November 12, 2003, the U.N. Headquarters Committee on Contracts approved the award of the $62 million Liberia Rations Contract to Defendant Compass, as per the Procurement Service's recommendation.

84. In October 2005, after learning of Defendant Testa's e-mail to Defendant Seiwert, the U.N. launched an investigation to determine how Defendant Testa obtained the information and why Defendant Compass did not inform the U.N. of the leak. Defendant Compass was de-listed from the United Nations registry of vendors soon thereafter.

    v)    **Defendant Yakovlev Leaks Top-Secret Information on Burundi Rations Contract to Defendant Compass**

85. On April 27, 2005, Defendant Yakovlev leaked confidential information to Defendant Seiwert concerning Defendant Compass's performance failings with respect to the

Burundi Rations Contract. Defendant Seiwert forwarded the e-mail to Defendants Kemp and Swain, seeking their urgent attention, and to Defendant Testa.

### vi) Current Investigations

86.    Defendant Compass, which announced the completion of its internal investigation on February 1, 2006, is currently subject to investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the Serious Fraud Office of the United Kingdom and the United Nations. So far, Defendant Compass has fired Defendants Harris, Seiwert and Kerr. Defendant Compass has not terminated the employment of Defendants Kemp and Swain, though Defendant Swain is purportedly scheduled to leave the company soon. Defendant Compass has also disciplined at least three other employees as a result of the involvement of those employees in the big-rigging and bribery conspiracy.

## VIII.    UNLAWFUL RESTRAINT OF TRADE AND COMMON LAW VIOLATIONS

87.    Defendants attempted to rig, and did rig, the bidding process associated with the award of food rations contracts to U.N. peacekeeping forces. As a result, the U.N. and its member states were defrauded and Plaintiff Supreme was swindled out of the profits it would have earned from contracts it would have won but for Defendants' illegal conduct.

88.    Defendants knowingly and intentionally corrupted the U.N.'s bidding process so that Defendant Compass would "win" contracts that it otherwise would not have won and keep contracts that it otherwise would not have kept. Defendants knew that by engaging in such conduct, they interfered with Plaintiff Supreme's ability to win those contracts. In the case of the Liberia Rations Contract and other contracts for which Plaintiff Supreme submitted bids, Defendant Compass knew that by bribing Defendant Yakovlev, its bids would prevail over Plaintiff Supreme's bids and Defendant Compass would win the contracts. In the case of the Burundi Rations Contract, Defendant Compass knew that by bribing Defendant Yakovlev, it

would obtain confidential information that would enable it to correct performance failures before the U.N. acted to cancel Defendant Compass's contract.

89. By their illegal scheme, Defendants sought to reduce and eliminate competition in the market for the supply of food rations to U.N. peacekeeping missions, thereby, and to achieve a monopoly position in that market for Defendant Compass.

90. There are significant barriers to entry into the market for the supply of food rations to U.N. peacekeeping missions, including the registration requirements to become a U.N. vendor and, more importantly, the very high standards imposed on vendors before such vendors' bids will be considered by the U.N. Thus, the market for U.N. food rations contracts was particularly vulnerable to Defendants' illegal scheme to reduce and eliminate competition and to gain monopoly power for Defendant Compass.

91. Defendants used their illegal tactics described above, including bid-rigging and bribery, in an effort to reduce and eliminate competition and to gain monopoly power for Defendant Compass

92. As a result of Defendants' illegal scheme, competition was restrained and eliminated in the market for the supply of food rations to U.N. peacekeeping missions, causing antitrust injury to both the U.N. and Compass's competitors, including Plaintiff Supreme. The U.N. was been deprived of the benefits of free and fair competition in its bidding process. Plaintiff Supreme was deprived of the opportunity to compete in a free and fair bidding process, causing it to lose contracts and market share to Defendant Compass.

93. As a result of Defendants' illegal scheme, there was a dangerous probability that Defendants would succeed in their goal of achieving a monopoly for Defendant Compass. Due to Defendants' illegal scheme, the market share of Defendant Compass grew substantially after it