UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUPREME FOODSERVICE AG,

        Plaintiff,

   v.

COMPASS GROUP PLC, ESS (A/K/A
EUREST SUPPORT SERVICES), IHC
SERVICES, INC., PETER HARRIS,
ANDREW SEIWERT, ALEXANDER
YAKOVLEV, MOXYCO, LTD., DOUG
KERR, STEVE KEMP, LEN SWAIN,
VLADIMIR KUZNETSOV, NIKAL, LTD.,
EZIO TESTA, DMITRY YAKOVLEV AND
OLGA YAKOVLEV,

        Defendants.

**FIRST AMENDED COMPLAINT AND
JURY DEMAND**

**Case No. 06-CV-1759 (PKC)**

Plaintiff, Supreme Foodservice AG ("Supreme"), for its complaint against Defendants,

Compass Group PLC ("Compass Group"), ESS (a/k/a Eurest Support Services), IHC Services,

Inc. ("IHC"), Peter Harris, Andrew Seiwert, Alexander Yakovlev ("Yakovlev"), Moxyco, Ltd.

("Moxyco"), Doug Kerr, Steve Kemp, Len Swain, Vladimir Kuznetsov, Nikal, Ltd. ("Nikal"),

Ezio Testa, Dmitry Yakovlev ("Dmitry") and Olga Yakovlev ("Olga") alleges on knowledge

with respect to itself and its own conduct, and upon the basis of information and belief as to all

other matters:

## I.    INTRODUCTION

1.      For approximately five years, Defendants engaged in an illegal scheme involving wire fraud and bribery to rig the award of United Nations ("U.N.") contracts for the provision of food rations to U.N. peacekeeping forces around the world. This conspiracy corrupted the United Nations and defrauded the U.N.'s member states. It contaminated a bidding process designed to be free and fair, and it cheated Plaintiff Supreme out of contracts that could be worth in excess of $350 million. The Defendants' disgraceful conduct violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act and New York State's Donnelly Act, and their conduct tortiously interfered with Plaintiff Supreme's prospective business advantage and business relations.

2.      Plaintiff Supreme, a world leader in food supply for military and multinational forces, brings this action to recover damages from Defendants' massive conspiracy. Plaintiff also seeks injunctive relief to prevent the reoccurrence of the unlawful and criminal acts of Defendants.

3.      Defendant Compass Group is the largest foodservice company in the world. ESS (a/k/a Eurest Support Services) represents a division of Compass Group that performed U.N. contracts for the provision of food rations to peacekeeping missions around the world. Compass Group, ESS and all of Compass's divisions, affiliates and subsidiaries are herein collectively referred to as "Compass."

4.      From 2000 through 2005, Defendant Compass "won" United Nations contracts that could be worth in excess of $350 million by bribing Defendant Alexander Yakovlev, a U.N. official, to manipulate the U.N.'s top-secret bidding procedures in favor of Compass.

5.      Defendant Compass, by its employees, including Defendants Peter Harris, Andrew Seiwert, Doug Kerr, Steve Kemp and Len Swain, concealed from the U.N. its illegal

2

payments to Defendant Yakovlev, amounting to at least several hundred thousand dollars, by making them through Defendant IHC.

6.      Defendant IHC gave Defendant Yakovlev cash payments to rig bids for Defendant Compass. In furtherance of the bribery and bid-rigging scheme, Defendant Ezio Testa, Defendant IHC's Chief Executive Officer ("CEO"), hired Defendant Yakovlev's son to work at Defendant IHC's headquarters in New York City.

7.      As Defendant Yakovlev amassed wealth from illegal payments, he enlisted the help of Defendant Vladimir Kuznetsov, a fellow Russian national working at the U.N. Defendant Kuznetsov received at least several hundred thousand dollars in return for his assistance, which began in approximately 2000.

8.      Defendants' scheme to corrupt the United Nations, defraud its member states and swindle Plaintiff Supreme out of profits it otherwise would have earned was first exposed on August 8, 2005, when Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken at least approximately $1 million in bribes relating to U.N. procurement contracts and the Oil-for-Food program. That same day, U.N. Secretary-General Kofi Annan stripped Defendant Yakovlev of his diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Yakovlev with conspiracy to commit wire fraud, wire fraud and money laundering in connection with Defendant Yakovlev's role as a U.N. procurement officer between the years 1993 and 2005. Defendant Yakovlev pleaded guilty to all three crimes before the Honorable William H. Pauley, United States District Judge for the Southern District of New York.

9.     Soon after Defendant Yakovlev's plea, news of Defendant Kuznetsov's complicity became public. In early September 2005, Kofi Annan waived Defendant Kuznetsov's diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with conspiracy to commit money laundering.

10.     Defendants' bid-rigging conspiracy succeeded in snatching multiple U.N. contracts, including a contract worth in excess of $62 million for the provision of food rations to U.N. peacekeeping forces stationed in Liberia (the "Liberia Rations Contract"). To secure the Liberia Rations Contract, Defendant Compass used top-secret, highly-confidential U.N. information illegally obtained from Defendant Yakovlev. When the news media reported this scandal in October 2005, the U.N. removed Defendant Compass and Defendant IHC from its approved vendor list and began an investigation into the relationship between Defendant Compass, Defendant IHC and the United Nations.

11.     Also in October 2005, Defendant Compass announced that it had launched a full-scale investigation into the circumstances surrounding Defendant Compass's procurement of U.N. contracts. It hired Freshfields Bruckhaus Deringer and Ernst & Young to lead the investigation. Less than one month later, Defendant Compass terminated the employment of Defendants Peter Harris, Andrew Seiwert and Doug Kerr because the Defendants participated in a scheme to bribe Defendant Yakovlev to obtain U.N. contracts for Defendant Compass.

12.     In November 2005, the United Kingdom's Serious Fraud Office ("SFO") launched an investigation into Defendant Compass's business practices. Currently, Defendant Compass faces investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the SFO and the United Nations.

4

13.    Defendant Compass has failed to admit publicly the depth of corruption within its ranks. Defendant Compass neglected to disclose the involvement of at least two executives – Defendants Steve Kemp and Len Swain – in its fraudulent scheme. In April 2005, Defendant Seiwert forwarded an e-mail from Defendant Yakovlev to Defendants Kemp and Swain that included information labeled "strictly confidential, not for release outside of the United Nations." This confidential information described Defendant Compass's poor performance on a contract for the provision of food rations to peacekeepers in Burundi (the "Burundi Rations Contract"). Defendant Yakovlev sent the confidential information to Defendant Compass so that Compass could take steps to prevent the cancellation of Defendant Compass as a supplier for the Burundi Rations Contract. The Burundi Rations Contract was worth as much as $111 million, including optional add-ons. Supreme had bid on the Burundi Rations Contract and lost it to Compass.

14.    Defendants' bribery and bid-rigging scheme violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act, New York State's Donnelly Act, the Robinson-Patman Act and the common law.

15.    Defendants, by their illegal conduct, not only corrupted the United Nations and defrauded the U.N.'s member states, including the United States, but Defendants also swindled Plaintiff Supreme out of profits it would have earned from U.N. food rations contracts that could be worth in excess of $350 million.

## II.    JURISDICTION

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under 18 U.S.C. § 1964(c) of the RICO Act, which provides federal jurisdiction for injuries resulting from RICO violations.

17.    This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, because Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 2(c) of the Robinson-Patman

Act, 15 U.S.C. § 13(c) and Section 4 of the Clayton Act, 15 U.S.C. § 15, provide federal jurisdiction for claims arising under the antitrust laws. The Sherman Act applies because the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a, makes the Sherman Act applicable to foreign trade or commerce having a direct, substantial and reasonably foreseeable effect on domestic trade or commerce.

18.     This Court also has jurisdiction pursuant to Article III, Section 7 of the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations, 61 Stat. 758, which provides that federal courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district, as provided in applicable federal, state and local laws.

19.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), in that the RICO, Sherman Act and Robinson-Patman claims arise under the laws of the United States and the state-law claims are so related to the RICO, Sherman Act and Robinson-Patman claims that they form part of the same case or controversy.

### III.    TRADE AND COMMERCE

20.     The United Nations has established a Procurement Service at United Nations Headquarters in New York City, located at 304 East 45th Street, New York, New York. The Procurement Service handles procurement for U.N. peacekeeping missions worldwide, the various departments and offices of the U.N. Secretariat in New York and other U.N. offices, organizations, regional commissions and departments worldwide.

21.     In 2003, the U.N. purchased more than 822 different categories of goods and services representing a total value in excess of $891 million. Of this total, more than $41 million was spent on food rations and catering services in 2003.

22.    Vendors from around the world, including vendors located in the United States, apply to become U.N.-approved vendors. These applications are sent to and evaluated by the Procurement Service at U.N. Headquarters in New York.

23.    The Procurement Service also solicits bids for U.N. contracts, including food rations contracts. Requests for proposals and invitations to bid are issued from the Procurement Service at U.N. Headquarters in New York.

24.    Vendors bidding on U.N. contracts submit sealed bids to the Procurement Service at U.N. Headquarters in New York. The Procurement Service opens these bids at the U.N. Headquarters in New York.

25.    Defendant Compass retained Defendant IHC, whose headquarters is in New York City, as its so-called "vendor intermediary" so that Defendant IHC could assist it with Defendant Compass's bid submissions to the Procurement Service at U.N. Headquarters in New York.

26.    The U.N. releases payments to vendors providing goods and services, including vendors providing food rations, from an account in New York.

27.    The submission, evaluation and award of bids and the management of procurement contracts by the United Nations at its Headquarters in New York represent substantial and significant commerce in New York City. Defendants' anti-competitive and unlawful conduct, described more fully below, had a direct, substantial and reasonably foreseeable effect on trade and commerce occurring in this District, and such effect gives rise to Plaintiff Supreme's Sherman Act claim set forth below. Plaintiff's injuries are not independent of the effects of Defendants' anti-competitive and unlawful conduct on United States commerce.