UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUPREME FOODSERVICE AG,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>COMPASS GROUP PLC, ESS (AKA EUREST SUPPORT SERVICES), IHC SERVICES, INC., PETER HARRIS, ANDREW SEIWERT, ALEXANDER YAKOVLEV, MOXYCO, LTD., DOUG KERR, STEVE KEMP, LEN SWAIN, VLADIMIR KUZNETSOV, NIKAL, LTD., EZIO TESTA, DMITRY YAKOVLEV AND OLGA YAKOVLEV.<br><br>                              Defendants. | Case No. 06 CV 1759 (PKC) |
| ES-KO INTERNATIONAL, INC.,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>COMPASS GROUP PLC, ESS SUPPORT SERVICES WORLDWIDE, EUREST SUPPORT SERVICES (CYPRUS) INTERNATIONAL LIMITED, PETER HARRIS, ANDREW SEIWERT, STEVE KEMP, LEN SWAIN, STEVE BICKERSTAFF, DOUG KERR, IHC SERVICES, INC., EZIO TESTA, ALEXANDER YAKOVLEV, DMITRY YAKOVLEV, VLADIMIR KUZNETSOV, AND JOHN DOES 1 TO 100.<br><br>                              Defendants. | Case No. 06 CV 2422 (PKC) |

## MEMORANDUM OF LAW IN SUPPORT OF THE COMPASS DEFENDANTS' MOTION TO DISMISS ES-KO'S AND SUPREME'S RICO AND ANTITRUST CLAIMS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Richard A. Rosen
Kenneth A. Gallo
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... iv

Preliminary Statement.................................................................................................... 1

Statement of Facts.......................................................................................................... 2

    A.    U.N. Food Rations Contracts ............................................................................. 2

    B.    The Complaints in This Consolidated Action..................................................... 4

    C.    Alleged Wrongdoing.......................................................................................... 4

            1.    ES-KO's Complaint.................................................................................. 5

            2.    Supreme's Complaint............................................................................... 5

Argument ....................................................................................................................... 6

I. PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED........................................ 6

    A.    Civil RICO Claims Require Careful Scrutiny at the Outset ................................ 6

    B.    The Elements of a RICO Claim .......................................................................... 7

    C.    ES-KO and Supreme Have Failed To Allege That the Compass Defendants Proximately Caused Them To Lose Money on U.N. Food Service Contracts .............................................................................................. 8

            1.    Plaintiffs' Alleged Injuries Are Too Indirect to Satisfy *Ideal Steel*.......... 11

            2.    The Complexity of Calculating ES-KO's and Supreme's Alleged Damages Further Demonstrates the Indirectness of Their Injury............. 15

            3.    ES-KO's Alleged Injury with Respect to Contracts That It Won Is Even More Indirect Than Damages for Contracts That ES-KO Lost....... 17

            4.    If There Is Any Direct Victim, It Is the U.N., Not ES-KO ....................... 19

    D.    The Complaints Do Not Allege That Each of the Compass Defendants Committed Two Predicate Acts .......................................................................... 20

            1.    Supreme and ES-KO Fail To Allege Mail or Wire Fraud with the Specificity Required by Rule 9(b) .......................................................... 20

i

(a)     Plaintiffs' General Allegations of Mail and Wire Fraud as
        to Six of the Contracts Fail To Meet the Heightened
        Pleading Standard Under Rule 9(b) .............................................. 21

(b)     Plaintiffs Do Not Allege Any Improper Use of the Mail or
        Wires with Respect to the Sudan or Burundi Contracts .............. 22

2.   ES-KO and Supreme Fail To Plead a Violation of the Commercial
     Bribery Statute as a RICO Predicate Act.................................................. 24

3.   Plaintiffs Do Not Adequately Plead Money Laundering as a RICO
     Predicate Act............................................................................................. 27

4.   ES-KO Does Not Allege Any Predicate Acts with Respect to
     Contracts That It Was Awarded................................................................. 29

5.   Supreme Fails To State a Violation of the "Travel Act" as a RICO
     Predicate Act............................................................................................. 30

E.  ES-KO and Supreme Allege Associations-In-Fact That Are Not
    Sufficiently Distinct ............................................................................................ 30

F.  The Complaints Do Not Allege That Kemp, Swain or Bickerstaff
    "Managed or Conducted" the Affairs of the Alleged Enterprises ...................... 32

G.  Plaintiffs Have Failed To Allege RICO Conspiracy Under Section 1962(d)....... 33

1.   Plaintiffs Cannot Plead RICO Conspiracy Without Also
     Adequately Pleading Substantive Violations of RICO............................. 33

2.   In the Alternative, the Claim Under § 1962(d) Should Be
     Dismissed Because ES-KO and Supreme Do Not Adequately Plead
     That the Compass Defendants Conspired to Violate RICO...................... 33

II. ES-KO AND SUPREME FAIL TO STATE A CLAIM UNDER THE ROBINSON-
    PATMAN ACT............................................................................................................ 35

A.  Plaintiffs' Allegations of Commercial Bribery Do Not State a Claim
    Under Section 2(c) of the Robinson-Patman Act Because There Is No
    Allegation of Price Discrimination Favoring a Buyer ......................................... 36

B.  Plaintiffs Do Not Have Standing Because They Did Not Suffer Antitrust
    Injury.................................................................................................................. 40

1.   Plaintiffs Must Allege Antitrust Injury To Recover for a Violation
     of Section 2(c)............................................................................................ 41

Page

    2.    Loss Flowing From Continued Competition and Lower Prices
Does Not Constitute Antitrust Injury.........................................................43

C.    Even if Commercial Bribery Is Actionable Under Section 2(c), Dismissal
Is Warranted Because Plaintiffs Fail To Allege Injury to the U.N........................45

D.    The Robinson-Patman Act Claims Must Be Dismissed as to Those
Contracts in Which ES-KO Does Not Allege Bribery To Have Occurred...........45

III. SUPREME'S SHERMAN ACT CLAIMS MUST BE DISMISSED ...................................47

A.    Supreme's Section 1 Sherman Act Claim Should Be Dismissed .........................48

    1.    Commercial Bribery Does Not Constitute Bid-Rigging or a *Per Se*
Violation of the Sherman Act ...................................................................49

    2.    The Complaint Fails to Plead a Rule of Reason Violation Because
There Is No Alleged Injury to Competition.............................................50

    3.    Supreme Does Not Have Standing To Bring a Sherman Act Claim
Because It Has Not Alleged Antitrust Injury...........................................52

    4.    Dismissal of Supreme's Sherman Act Claim Is Warranted Because
Supreme Fails To Plead Adequately a Relevant Market ..........................53

B.    Supreme's Attempt To Monopolize Claim Under Section 2 of the
Sherman Act Must Be Dismissed .......................................................................57

C.    Supreme Has Failed To State a Claim for Conspiracy to Monopolize.................59

IV. THE SHERMAN AND ROBINSON-PATMAN ACTS DO NOT CONFER
SUBJECT MATTER JURISDICTION OVER THE ALLEGED CONDUCT...............62

A.    This Court Does Not Have Jurisdiction To Hear Plaintiff's Sherman Act
Claims .................................................................................................................62

B.    This Court Does Not Have Jurisdiction To Hear Plaintiffs' Robinson-
Patman Act Claims .............................................................................................65

V. SUPREME'S DONNELLY ACT CLAIMS FAIL FOR THE SAME REASONS
THAT THE SHERMAN ACT CLAIMS SHOULD BE DISMISSED ...........................67

Conclusion ..........................................................................................................................68

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216
(2d Cir. 1999)..............................................................................................................58

*Advanced Power Sys., Inc.* v. *Hi-Tech Sys., Inc.*, 801 F. Supp. 1450
(E.D. Pa. 1992)......................................................................................................49, 51

*Allen-Myland, Inc.* v. *IBM Corp.*, 33 F.3d 194 (3d Cir. 1994) ..........................................56

*Anza* v. *Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006)......................................... *passim*

*Anza* v. *Ideal Steel Supply Corp.*, 373 F.3d 251 (2d Cir. 2004) ...................................9, 24

*Anza* v. *Ideal Steel Supply Corp.*, 254 F. Supp. 2d 464 (S.D.N.Y. 2003) ..........................9

*Apani Southwest, Inc.* v. *Coca-Cola Enters., Inc.*, 300 F.3d 620
(5th Cir. 2002)............................................................................................................54

*Arbitron Co.* v. *Tropicana Prod. Sales, Inc.*, No. 91 Civ. 3697 (PKL), 1993 WL
138965 (S.D.N.Y. Apr. 28, 1993)................................................................................57

*Arzuaga-Collazo* v. *Oriental Fed. Sav. Bank*, 913 F.2d 5 (1st Cir. 1990).........................31

*Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U.S. 519 (1983) ..............15

*Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328 (1990) ................................ *passim*

*Augusta News Co.* v. *Hudson News Co.*, 269 F.3d 41 (1st Cir. 2001).........................39, 40

*B.V. Optische Industrie De Oude Delft* v. *Hologic, Inc*, 909 F. Supp. 162
(S.D.N.Y. 1995)..........................................................................................................57

*Baisch* v. *Gallina*, 346 F.3d 366 (2d Cir. 2003) ................................................................32

*Barr Labs., Inc.* v. *Abbott Labs.*, Civ. No. 87-4764 (AET), 1991 WL 259788
(D.N.J. Dec. 2, 1991)..................................................................................................56

*Belifore* v. *New York Times Co.*, 826 F.2d 177 (2d Cir. 1987).........................................55

*Benedict* v. *Amaducci*, No. 92 Civ. 5239 (KMW), 1995 U.S. Dist. LEXIS 17684
(S.D.N.Y. Nov. 28, 1995) ............................................................................................25

*Bernstein* v. *Misk*, 948 F. Supp. 228 (E.D.N.Y. 1997) ...............................................28, 30

*Blue Tree Hotels Inv. (Canada), Ltd.* v. *Starwood Hotels & Resorts*
*Worldwide, Inc.*, 369 F.3d 212 (2d Cir. 2004) ...................................................36, 41, 45

*Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) ...............................49

*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ..........51

*Brown Shoe Co.* v. *United States*, 370 U.S. 294 (1962) ........................................43, 51, 56

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ..........................43, 51

*Bunker Ramo Corp.* v. *Cywan*, 511 F. Supp. 531 (N.D. Ill. 1981) ....................................36

*Bunker Ramo Corp.* v. *United Bus. Forms, Inc.*, 713 F.2d 1272 (7th Cir. 1983) ........50, 51

*Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717 (1998) ....................................48, 50

*C.A. Westel de Venezuela* v. *AT&T Co.*, 90 Civ. 6665 (PKL),
1994 U.S. Dist. LEXIS 14481 (S.D.N.Y. Oct. 11, 1994) ........................................31, 32

*California Motor Transp. Co.* v. *Trucking Unlimited*, 404 U.S. 508 (1972) .....................38

*Calnetics Corp.* v. *Volkswagen of Am., Inc.*, 532 F.2d 674 (9th Cir. 1976) ......................50

*Cancall PCS* v. *Omnipoint Corp.*, No. 99 Civ. 3395 (AGS), 2000 WL 272309
(S.D.N.Y. Mar. 10, 2000) ..............................................................................................61

*Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993)...........................................................................................53

*Cargill, Inc.* v. *Montfort of Colorado, Inc.*, 479 U.S. 104 (1986) .....................................44

*Casio Computer Co.* v. *Sayo*, No. 98 Civ. 3772 (WK), 2000 WL 1877516
(S.D.N.Y. Oct. 13, 2000) ...............................................................................................28

*CDC Techs., Inc.* v. *IDEXX Labs., Inc.*, 186 F.3d 74 (2d Cir. 1999) .................................58

*Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158 (2001).........................................31

*Chapman* v. *New York State Div. for Youth*, No. 1:04-CV-867, 2005 WL 2407548
(N.D.N.Y. Sept. 29, 2005) ..............................................................................................53

Page(s)

*Chicago Prof'l Sports Ltd. P'ship* v. *Nat'l Basketball Ass'n*, 961 F.2d 667
(7th Cir. 1992)......................................................................................................44

*Citadel Mgmt., Inc.* v. *Telesis Trust, Inc.*, 123 F. Supp. 2d 133
(S.D.N.Y. 2000) ...................................................................................................33

*City of New York* v. *Cyco.net, Inc.*, 383 F. Supp. 2d 526 (S.D.N.Y. 2005)........................7

*City of New York* v. *Joseph L. Balkan, Inc.*, 656 F. Supp. 536 (E.D.N.Y. 1987) ........26, 27

*Cont'l T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36 (1977) ........................................48, 50

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
691 F.2d 1335 (9th Cir. 1982) ..................................................................................46

*Crab House of Douglaston, Inc.* v. *Newsday, Inc.*, 418 F. Supp. 2d 193
(E.D.N.Y. 2006)................................................................................................22, 33

*DM Research, Inc.* v. *Coll. of Am. Pathologists*, 170 F.3d 53 (1st Cir. 1999) .................61

*DeFalco* v. *Bernas*, 244 F.3d 286 (2d Cir. 2001) .............................................................20

*Dibbs* v. *Roldan*, 356 F. Supp. 2d 340 (S.D.N.Y. 2005) ...................................................24

*Dickson* v. *Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002)..............................................49

*Dietrich* v. *Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999) ...................................................34

*Downstream Envtl., L.L.C.* v. *Gulf Coast Waste Disposal*, Civ. No. H-05-1865,
2006 WL 1875959 (S.D. Tex. July 5, 2006).........................................................11, 19

*E. & G. Gabriel* v. *Gabriel Bros., Inc.*, No. 93 Civ. 0894 (PKL),
1994 WL 369147 (S.D.N.Y. July 13, 1994) ...................................................53, 57, 58

*Envtl. Tectonics* v. *W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir. 1988)...................39, 42

*Excel Handbag Co.* v. *Edison Bros. Stores*, 630 F.2d 379 (5th Cir. 1980) ...............40, 45

*Expert Masonry, Inc.* v. *Boone County, Ky.*, 440 F.3d 336 (6th Cir. 2006) ......................50

*FD Prop. Holding, Inc.* v. *US Traffic Corp.*, 206 F. Supp. 2d 362
(E.D.N.Y. 2002)................................................................................................34, 35

*F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155 (2004) ...............................62

*Fed. Paper Bd. Co.* v. *Amata*, 693 F. Supp. 1376 (D. Conn. 1988) .......................... *passim*

*Fed. Trade Comm'n* v. *Henry Broch & Co.*, 363 U.S. 166 (1960)............................ *passim*

*First Capital Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159
    (2d Cir. 2004)..................................................................................................21

*Fitch* v. *Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12 (6th Cir. 1943)...............39

*Fitzgerald* v. *Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997).............................................31

*Fustok* v. *Conticommodity Servs., Inc.*, 618 F. Supp. 1074 (S.D.N.Y. 1985) ...................31

*Gant* v. *Wallingford Bd. of Educ.*, 69 F.3d 669 (2d Cir. 1995) ...........................................2

*Genesco Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir. 1987) ......................................42

*Goldfine* v. *Sichenzia*, 118 F. Supp. 2d 392 (S.D.N.Y. 2000) ........................................6, 32

*Goold Elecs. Corp.* v. *Galaxy Elecs., Inc.*, No. 91 C 5989, 1991 WL 281744
    (N.D. Ill. Dec. 30, 1991) ..............................................................................44

*Grace* v. *E.J. Kozin Co.*, 538 F.2d 170 (7th Cir. 1976) ....................................................39

*Granite Partners, L.P.* v. *Bear, Stearns & Co.*, 58 F. Supp. 2d 228
    (S.D.N.Y. 1999)........................................................................................59, 60

*Great Atl. & Pac. Tea Co.* v. *Town of E. Hampton*, 997 F. Supp. 340
    (E.D.N.Y. 1998)............................................................................................67

*Gross* v. *New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242 (S.D.N.Y. 1997) ...............46

*Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U.S. 186 (1974)..................................................65

*H.L. Moore Drug Exch.* v. *Eli Lilly & Co.*, 76 Civ. 2817, 1978 U.S. Dist. LEXIS
    17371, (S.D.N.Y. June 6, 1978)....................................................................55

*Hack* v. *President & Fellows of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000)..........................53

*Haff* v. *Jewelmont Corp.*, 594 F. Supp. 1468 (N.D. Cal. 1984).........................................42

*Harris* v. *Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272 (9th Cir. 1991).......................39

*Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) ........................7, 18

*Heffernan* v. *HSBC Bank USA*, No. 1:99CV07891, 2001 WL 803719
    (E.D.N.Y. Mar. 29, 2001) ............................................................................34

*Hiram Walker, Inc.* v. *A&S Tropical, Inc.*, 407 F.2d 4 (5th Cir. 1969)..............................65

*Hollander* v. *Flash Dancers Topless Club*, 340 F. Supp. 2d 453 (S.D.N.Y. 2004) ....18, 24

*Holmes* v. *Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)........................................ *passim*

*Hudson* v. *Larouche*, 579 F. Supp. 623 (S.D.N.Y. 1983)..................................................31

*Hudson Valley Asbestos Corp.* v. *Tougher Heating & Plumbing Co.*,
    510 F.2d 1140 (2d Cir. 1975)........................................................................................61

*Hunt-Wesson Foods, Inc.* v. *Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980) .................61

*Intellective, Inc.* v. *Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600
    (S.D.N.Y. 2002)............................................................................................................54

*Interstate Cigar Co.* v. *Sterling Drug Inc.*, 1980-2 Trade Cases P 63,430,
    1980 WL 1862 (S.D.N.Y. July 3, 1980) ................................................................. 65-66

*Intimate Bookshop, Inc.* v. *Barnes & Noble, Inc.*, 88 F. Supp. 2d 133
    (S.D.N.Y. 2000)............................................................................................................40

*J.S. Serv. Ctr. Corp.* v. *Gen. Elec. Technical Servs.*, 937 F. Supp. 216
    (S.D.N.Y. 1996)............................................................................................................19

*J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U.S. 557 (1981)...............................42

*Jacobsen* v. *Cooper*, 882 F.2d 717 (2d Cir. 1989)...........................................................31

*James Cape & Sons Co.* v. *PCC Constr. Co.*, No. 05-3894,
    2006 U.S. App. LEXIS 16184 (7th Cir. June 28, 2006)...................................... *passim*

*Jayco Sys., Inc.* v. *Savin Bus. Mach. Corp.*, 777 F.2d 306 (5th Cir. 1985) .......................54

*Jerome M. Sobel & Co.* v. *Fleck*, No. 03 Civ.1041 (RMB) (GWG), 2003 WL
    22839799 (S.D.N.Y. Dec. 1, 2003)................................................................................6

*Joblove* v. *Barr Labs., Inc.*, 429 F.3d 370 (2d Cir. 2005)..................................................24

*Jordan (Bermuda) Inv. Co., Ltd.* v. *Hunter Green Invs. Ltd.*,
    154 F. Supp. 2d 682 (S.D.N.Y. 2001)..........................................................................21

*K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123
    (2d Cir. 1995)...............................................................................................................58

**Page(s)**

*Katzman* v. *Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y. 1996) ......................6

*Klinghoffer* v. *S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)......................................63

*LaSalle Nat'l Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071
  (S.D.N.Y. 1996) ........................................................................................................32

*Laverpool* v. *New York City Transit Auth.*, 760 F. Supp. 1046 (E.D.N.Y. 1991) .............34

*Lewis* v. *Philip Morris Inc.*, 355 F.3d 515 (6th Cir. 2004) .................................................45

*Levine* v. *Torino Jewelers, Ltd.*, 05 Civ. 3159 (DLC), 2006 U.S. Dist. LEXIS
  11932 (S.D.N.Y. Mar. 22, 2006) ...............................................................................24

*Linens of Eur., Inc.* v. *Best Mfg., Inc.*, No. 03 Civ. 9612 (GEL), 2004 U.S. Dist.
  LEXIS 18575 (S.D.N.Y. Sept. 16, 2004)....................................................................25

*Lomar Wholesale Grocery, Inc.* v. *Dieter's Gourmet Foods, Inc.*, 824 F.2d 582
  (8th Cir. 1987)............................................................................................................41

*Maddaloni Jewelers, Inc.* v. *Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293
  (S.D.N.Y. 2004) ...................................................................................................26, 33

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................61

*May Dep't Store* v. *Graphic Process Co.*, 637 F.2d 1211 (9th Cir. 1980) .......................66

*McElderry* v. *Cathay Pac. Airways, Ltd.*, 678 F. Supp. 1071 (S.D.N.Y. 1988)..........64, 65

*McGlinchy* v. *Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988)............................................64

*McKeel* v. *Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983)...................................63

*McLaughlin* v. *Anderson*, 962 F.2d 187 (2d Cir. 1992)......................................................21

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Young*, 91 Civ. 2923 (CSH),
  1994 U.S. Dist. LEXIS 2929 (S.D.N.Y. Mar. 15, 1994) ............................................22

*Mid-West Paper Prods., Co.* v. *Cont'l Group, Inc.*, 596 F.2d 573
  (3rd Cir. 1979) ...........................................................................................................46

*Miller* v. *Helmsley*, 745 F. Supp. 932 (S.D.N.Y. 1990).....................................................18

*Mohawk Indus., Inc.* v. *Williams*, 126 S. Ct. 2016 (2006).................................................32

*Moll* v. *US Life Title Ins. Co. of N.Y.*, 710 F. Supp. 476 (S.D.N.Y. 1989).......................25

*NL Indus., Inc.* v. *Gulf & W. Indus., Inc.*, 650 F. Supp. 1115 (D. Kan. 1986) .................40

*NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128 (1998)..........................................................51

*Nat'l Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679 (1978)..................................49

*Natsource LLC.* v. *GFI Group, Inc.*, 332 F. Supp. 2d 626 (S.D.N.Y. 2004)....................59

*Ocean View Capital, Inc.* v. *Sumitomo Corp. of Am.*, No. 98 Civ. 4067 (LAP),
   1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ..............................................................46

*Old Republic Ins. Co.* v. *Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361
   (S.D.N.Y. 1997)..............................................................................................................21

*Optimum, S.A.* v. *Legent Corp.*, 926 F. Supp. 530 (W.D. Pa. 1996) ................................64

*Optivision, Inc.* v. *Syracuse Shopping Ctr. Assocs.*, 472 F. Supp. 665
   (N.D.N.Y. 1979) .............................................................................................................61

*People* v. *Wolf*, 98 N.Y.2d 105 (2002) .............................................................................24

*Pepsico, Inc.* v. *Coca-Cola Co.*, No. 98 Civ. 3282 (LAP), 1998 WL 547088
   (S.D.N.Y. Aug. 27, 1998)...............................................................................................56

*Phillips Getschow Co.* v. *Green Bay Brown County Prof'l Football Stadium Dist.*,
   270 F. Supp. 2d 1043 (E.D. Wis. 2003)..............................................................44, 52

*Precision Printing Co., Inc.* v. *Unisource Worldwide, Inc.*, 993 F. Supp. 338
   (W.D. Pa. 1998) ..............................................................................................................66

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) .................56

*Re-Alco Indus., Inc.* v. *Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387
   (S.D.N.Y. 1993)..............................................................................................................53

*Rebel Oil Co.* v. *Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).............................60

*Reves* v. *Ernst & Young*, 507 U.S. 170 (1993) ........................................................ *passim*

*Reynolds* v. *E. Dyer Dev. Co.*, 882 F.2d 1249 (7th Cir. 1989) ...........................................7

*Roorda* v. *Am. Oil Co.*, 446 F. Supp. 939 (W.D.N.Y. 1978).............................................66

*Rossi* v. *Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998) .........................................49

**Page(s)**

*Rotec Indus., Inc.* v. *Mitsubishi Corp.*, 348 F.3d 1116 (9th Cir. 2003) ............................66

*Rutman Wine Co.* v. *E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987) ........................45

*S&M Materials Co.* v. *S. Store Co., Inc.*, 1980-1 Trade Cases P63,194
    (5th Cir. 1980).................................................................................................................66

*Schmidt* v. *Fleet Bank*, 16 F. Supp. 2d 340 (S.D.N.Y. 1998) .............................................32

*Schwimmer* v. *Sony Corp. of Am.*, 637 F.2d 41 (2d Cir. 1980) .........................................42

*Seville Indus. Mach. Corp.* v. *Southmost Mach. Corp.*, 567 F. Supp. 1146
    (D.N.J. 1983)....................................................................................................................7

*Shaw* v. *Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674 (S.D.N.Y. 1987) ............................55

*Smith & Johnson, Inc.* v. *Hedaya Home Fashions, Inc.*, 125 F.3d 844
    (2d Cir. 1997)..................................................................................................................53

*Smith & Johnson, Inc.* v. *Hedaya Home Fashions Inc.*, No. 96 Civ. 5821 (MBM),
    1996 WL 737194 (S.D.N.Y. Dec. 26, 1996) ................................................................57

*Stamatakis Indus.* v. *King*, 965 F.2d 469 (7th Cir. 1992) ...........................................43, 48

*Standard Oil Co. of N.J.* v. *United States*, 221 U.S. 1 (1911) ...........................................48

*State* v. *Mobile Oil Corp.*, 38 N.Y.2d 460 (1976) .............................................................67

*Sterling Interiors Group, Inc.* v. *Haworth, Inc.*, 94 Civ. 9216 (CSH),
    1996 U.S. Dist. LEXIS 10756 (S.D.N.Y. July 30, 1996) .............................................21

*Suthers* v. *Amgen*, 05 Civ. 4158 (PKC), 2006 U.S. Dist. LEXIS 22102
    (S.D.N.Y. Apr. 20, 2006)...............................................................................................24

*Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506 (2002)....................................................24, 53

*T. Harris Young & Assocs., Inc.* v. *Marquette Elecs., Inc.*, 931 F.2d 816
    (11th Cir. 1991)..............................................................................................................56

*Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320 (1961) ..........................................51

*The 'In' Porters, S.A.* v. *Hanes Printables, Inc.*, 663 F. Supp. 494
    (M.D.N.C. 1987).............................................................................................................64

*Todd* v. *Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ..........................................................54

**Page(s)**

*Town of W. Hartford* v. *Operation Rescue*, 915 F.2d 92 (2d Cir. 1990) ...........................7

*Twombly* v. *Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005)............................................60

*United Magazine Co.* v. *Murdoch Magazines Distrib.*, 146 F. Supp. 2d 385
    (S.D.N.Y. 2001).......................................................................................................60, 61

*United Phosphorus, Ltd.* v. *Angus Chem. Co.*, 131 F. Supp. 2d 1003
    (N.D. Ill. 2001).............................................................................................................64

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999)..........................................................32

*United States* v. *Dinero Express, Inc.*, 313 F.3d 803 (2d Cir. 2002)..........................27, 28

*United States* v. *Grinnell*, 384 U.S. 563 (1966)...............................................................54

*United States* v. *Heffernan*, 43 F.3d 1144 (7th Cir. 1994)................................................49

*United States* v. *Huber*, 603 F.2d 387 (2d Cir. 1979)......................................................32

*United States* v. *One 1997 E35 Ford Van*, 50 F. Supp. 2d 789 (N.D. Ill. 1999)...............28

*United States* v. *Persico*, 832 F.2d 705 (2d Cir. 1987)......................................................7

*United States* v. *Portsmouth Paving Corp.*, 694 F.2d 312 (4th Cir. 1982).......................49

*United States* v. *Sargent Elec. Co.*, 785 F.2d 1123 (3d Cir. 1986)..............................49, 51

*United States* v. *Viola*, F.3d 37 (2d Cir. 1994) .................................................................33

*United States* v. *Waste Mgmt., Inc.*, 743 F.2d 976 (2d Cir. 1984).....................................59

*Weizmann Inst. of Sci.* v. *Neschis*, 229 F. Supp. 2d 234 (S.D.N.Y. 2002) .........................7

*W. 79th St. Corp.* v. *Congregation Kahl Minchas Chinuch*, 03 Civ. 8606 (RWS),
    2004 U.S. Dist. LEXIS 19501 (S.D.N.Y. Sept. 30, 2004)...........................................28

*Williams Elec. Games, Inc.* v. *Garrity*, 366 F.3d 569 (7th Cir. 2004)...............................50

*In re Wireless Tel. Servs. Antitrust Litig.*, No. 02 Civ. 2637(DLC), 2003 WL
    21912603 (S.D.N.Y. Aug. 12, 2003) ..........................................................................54

*World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*, 425 F. Supp. 2d 484
    (S.D.N.Y. 2006)............................................................................................................51

**Page(s)**

*Yankess Entm't & Sports Network LLC* v. *Cablevision Sys. Corp.*, 224 F. Supp.
2d 657 (S.D.N.Y. 2002) ...................................................................................67

*Yellow Page Solutions, Inc.* v. *Bell Atl. Yellow Pages Co.*, No. 00 Civ. 5663, 2001
WL 1468168 (S.D.N.Y. Nov. 19, 2001) ...............................................57, 60

*Zito* v. *Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352
(S.D.N.Y. Sept. 30, 2003) ...............................................................................20

## STATUTES

Agreement Between the United Nations and the United States of America
Regarding The Headquarters of the United Nations, Dec. 14, 1946,
22 U.S.C. § 287 .................................................................................................63

Clayton Act, 15 U.S.C. §§ 14, 15 .......................................................... *passim*

Donnelly Act, N.Y. Gen. Bus. Law § 340 .........................................................66

Fed. R. Civ. P. 9(b) ...........................................................................................21

Fed. R. Civ. P. 12(b)(6) ............................................................................1, 2, 24

Foreign Trade Antitrust Improvements Act ("FTAIA"), 96 Stat. 1246,
15 U.S.C. § 6a .................................................................................................62

Money Laundering Control Act, 18 U.S.C. § 1956 ....................................27, 29

N.Y. Penal Law § 180.03 ...................................................................................24

Racketeering Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. §§ 1961-1962 ............................................................... *passim*

Robinson-Patman Act, 15 U.S.C. § 13(c) ................................................ *passim*

Sherman Act, 15 U.S.C. §§ 1, 2 .............................................................. *passim*

Travel Act, 18 U.S.C. § 1952 ............................................................................30

## MEMORANDUM OF LAW IN SUPPORT OF THE COMPASS DEFENDANTS' MOTION TO DISMISS ES-KO'S AND SUPREME'S RICO AND ANTITRUST CLAIMS

Defendants Compass Group PLC, ESS Support Services Worldwide, Eurest Support Services (Cyprus) International Limited ("ESS"), Steve Kemp, Len Swain and Steve Bickerstaff[1] (collectively, "the Compass Defendants") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the RICO and antitrust claims asserted by ES-KO International Group, Inc. ("ES-KO") and by Supreme Foodservice AG ("Supreme"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### Preliminary Statement

Both complaints make allegations of serious misconduct by the Compass Defendants involving the misappropriation of confidential information. Although the Compass Defendants believe the claims to be unfounded and that, in any event, plaintiffs did not suffer damages, ES-KO and Supreme each have several traditional common law remedies that will make them whole if their claims are proven. Thus, the Compass Defendants have not moved to dismiss the claims for tortious interference with prospective advantage, unfair competition or misappropriation of trade secrets.

This motion is directed solely to the legal sufficiency of plaintiffs' claims under the antitrust and RICO statutes. Lured by the prospect of treble damages and attorneys' fees, plaintiffs have sought to invoke two statutes that simply do not apply to the conduct at issue.

Just last month, the Supreme Court held that RICO is unavailable to remedy the sort of indirect competitor injury asserted here, *see Anza* v. *Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006), and that ruling has already been held to warrant dismissal of allegations strikingly similar to

---

[1]    Steve Bickerstaff contests the Court's exercise of personal jurisdiction over him, but joins in the Compass Defendants' Motion to Dismiss ES-KO's and Supreme's RICO and Antitrust Claims without waiving his defense of lack of personal jurisdiction.

ES-KO and Supreme's, where government contractors obtained confidential bidding information in order to underbid their competitor. *See James Cape & Sons Co.* v. *PCC Constr. Co.*, No. 05-3894, 2006 U.S. App. LEXIS 16184 (7th Cir. June 28, 2006) (Flaum, C.J.). The RICO claims are defective for numerous other reasons as well. (*See infra* pp. 6-35.)

With respect to plaintiffs' claims under section 2(c) of the Robinson-Patman Act, this Court should not find commercial bribery actionable in light of the statute's legislative intent and history. And, in any event, plaintiffs have not suffered antitrust injury, as *James Cape* makes clear. (*See infra* pp. 35-47.)

Supreme, but not ES-KO, has also asserted a variety of claims under sections 1 and 2 of the Sherman Act and under New York's Donnelly Act. These claims, too, are fatally defective as a matter of law. (*See infra* pp. 47-61, 67.)

## Statement of Facts[2]

### A.    U.N. Food Rations Contracts

The U.N. has established a bidding process to award contracts for the supply of food rations to U.N. peacekeepers in harsh and remote locations. ES-KO, Supreme and ESS are among the vendors that compete for these bids. All have expertise in supplying goods and services to workers in such harsh and remote locations. (*See e.g.* Supreme Am. Compl. ¶ 31 (Supreme "specializ[es] in the provision of foodservice to organizations in regions of crisis"); *id.* at ¶ 35 (ESS "specializes in providing services to remote sites, defense locations and off-shore locations"); ES-KO Compl. ¶ 42 ("ES-KO is expert in selecting, purchasing, transporting, warehousing, and

---

[2]    Solely for the purposes of this motion to dismiss under Rule 12(b)(6), the Compass Defendants necessarily accept as true the factual allegations of the complaints. *See Gant* v. *Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).

distributing food items to the [U.N.] and other multi-national clients in remote and difficult regions.").)

When the U.N. establishes a peacekeeping mission that requires food and catering services, the Procurement Division requests vendors to submit "proposals that include information sufficient in scope and detail to allow the [U.N.] to evaluate whether the company has the necessary capability, experience, knowledge, expertise and financial strength to perform the contract satisfactorily." (ES-KO Compl. ¶ 286.)  The bids include detailed information such as "the most efficient and cost-effective supply and storage points for deliveries of food to [U.N.] missions." (*Id.* at ¶ 48.)

The contracts are generally for multi-year periods and the U.N. requires each prospective vendor to submit proposed fixed prices that cover the supply of food and related services to hundreds or thousands of personnel. (*See, e.g., id.* at ¶¶ 112, 134, 137, 138, 148, 221, 224, 251.)

After receiving proposals, the complex technical information is evaluated by the Logistics Support Division. (*See id.* at ¶ 37.)  Ultimately, the U.N. Headquarters Committee on Contracts ("HCC") is responsible for the decision to award a contract, and "may either approve the recommendation of the Procurement Officer or ask for further clarifications." (*Id.*)

Not surprisingly, many factors can, over the course of the contract, turn a winning bid into a losing financial proposition.  The U.N. maintains peacekeeping missions in such forbidding environments as the Sudan, Liberia, and Eritrea, many of which lack infrastructure and all of which – by the nature of the U.N.'s task – lack a stable political climate.  Challenges include "substantial costs of mobilization," (*id.* at ¶ 86) maintaining operational warehouses, obtaining adequate supplies and avoiding spoilage. (*See, e.g., id.* at ¶ 216.)  Numerous factors peculiar to each peacekeeping

3

mission, often difficult to predict in advance, will naturally bear on whether a given food service contract will be profitable to the vendor.

**B.    The Complaints in This Consolidated Action**

ES-KO's complaint, filed on March 28, 2006, asserts six claims under RICO (Counts 1-6), two claims under section 2(c) of the Robinson-Patman Act (Counts 7-8), and five claims under New York state law: tortious interference with prospective advantage (Count 9), unfair competition (Count 10), misappropriation of trade secrets (Count 11), unjust enrichment (Count 12), and commercial bribery (Count 13).

Supreme's original complaint dated March 6, 2006 asserted five causes of action, including two claims under RICO (Counts 1-2), a violation of section 1 of the Sherman Act (Count 3), a Donnelly Act violation (Count 6), and a claim for intentional interference with prospective business advantage and business relations (Count 9). Supreme filed its First Amended Complaint on June 1, 2006, and added various claims, including attempted monopolization under section 2 of the Sherman Act (Count 4), conspiracy to monopolize in violation of section 2 of the Sherman Act (Count 5), attempted monopolization in violation of the Donnelly Act (Count 7), conspiracy to monopolize in violation of the Donnelly Act (Count 8), violations of the Robinson-Patman Act (Counts 10-11), and unjust enrichment (Counts 13-14).

**C.    Alleged Wrongdoing**

The gravamen of both complaints is that Alexander Yakovlev, a former U.N. Procurement Officer, assisted ESS in winning U.N. contracts in exchange for bribes by providing ESS with information that gave it a competitive advantage in the bidding process. Significantly, the complaints do not and could not allege that Yakovlev had the authority to award the contracts, or even that he was a member of the HCC. As for the information supplied, although in some instances it allegedly included competitors' pricing data, in other instances the information was limited to

4

reports on performance failings on a contract that ESS was already performing (*see* ES-KO Compl. ¶ 181) or suggestions about what might be included in a new bid in order best to meet the U.N.'s needs in the Sudan. (*See id.* at ¶ 209.)

### 1.    ES-KO's Complaint

ES-KO alleges that it was not awarded contracts for the provision of food and related services to U.N. peacekeeping forces in nine different countries over a six-year period, including Liberia, Cyprus, East Timor, Eritrea, Syria, Lebanon, Burundi, Kosovo, and the Sudan, and that these contracts were awarded to ESS as a result of bribery. (*See* ES-KO Compl. ¶ 6.) ES-KO seeks damages of approximately $86 million, pre-trebling, in lost profits, in connection with these contracts. (*See id.*)

ES-KO also claims additional damages of approximately $37 million, pre-trebling, as a result of being forced to reduce its bids – thus ultimately impacting its profit margins – on food contracts for U.N. peacekeeping forces that it actually *won* in several countries, including Kosovo, Sierra Leone, Congo, Eritrea, Cyprus, Liberia, Burundi, and Haiti. (*See id.* at ¶ 7.) ESS did not bid on these contracts, and ES-KO alleges no misconduct in connection with these contracts.

### 2.    Supreme's Complaint

The gravamen of Supreme's complaint is similarly that Yakovlev assisted ESS in winning U.N. contracts in exchange for bribes. Five of the same contracts won by ESS are at issue in its complaint: the Sudan, East Timor, Liberia, Burundi and Eritrea. (*See* Supreme Am. Compl. ¶ 57.) Supreme claims that these contracts "could be worth in excess of $350 million," (*id.* at ¶ 59), and seeks damages of approximately $125 million, excluding pre-judgment interest. (*Id.* at Prayer for Relief ¶ 1.) Although Supreme claims damages as a result of the alleged scheme to rig bids, it does not allege that it was the next lowest bidder on any of these contracts, or that it would have won the contracts but for ESS's alleged misconduct.

Much of the Supreme complaint concerns schemes that are unrelated to the Compass Defendants, and are not alleged to be connected factually to the contracts at issue or to involve wrongdoing by the Compass Defendants. Supreme relies heavily on allegations referring to Yakovlev and his fellow U.N. official, Vladimir Kuznetsov's role in the U.N.'s Oil-for-Food program, including Paul Volcker's investigation, Yakovlev's guilty plea before Judge Pauley, and Kuznetsov's indictment. (*See id.* at ¶¶ 74-77.) However, none of the Compass Defendants or the contracts at issue in this litigation are implicated in any way in the Oil-for-Food program, and Supreme's complaint does not in fact say otherwise.

## Argument

## I.
## PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED

### A.    Civil RICO Claims Require Careful Scrutiny at the Outset

Courts must be skeptical of "traditional state court actions cast in terms of RICO violations simply to gain access to treble damages and attorneys fees in federal court." *Jerome M. Sobel & Co.* v. *Fleck*, No. 03 Civ. 1041 (RMB) (GWG), 2003 WL 22839799, at *3 (S.D.N.Y. Dec. 1, 2003) (Gorenstein, Mag. J.) (internal quotations and citation omitted). Courts in this District "look[] with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purposes intended by Congress." *Goldfine* v. *Sichenzia*, 118 F. Supp. 2d 392, 397 (S.D.N.Y. 2000) (MacMahon, J.); *Katzman* v. *Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (Sweet, J.) ("Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device …. Because the mere assertion of a RICO claim … has an almost inevitable stigmatizing effect on those named as defendants, … courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.") (internal quotation and citation omitted).

This Court should not expand the scope of the RICO statute to convert state law claims into a new federal law of "unfair competition." As the court noted in *City of New York* v. *Cyco.net, Inc.*, 383 F. Supp. 2d 526, 545 (S.D.N.Y. 2005) (Batts, J.), "an alleged RICO violation must be reviewed carefully and with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorney's fees in federal courts simply because they are cast in terms of RICO violations." (internal quotation and citation omitted).[3]

## B.    The Elements of a RICO Claim

Courts in this District have held that in order to survive a motion to dismiss, RICO plaintiffs must satisfy "two pleading burdens":

> *First*, a plaintiff must establish: (1) that the defendant (2) through the commission of two or more predicate acts (3) constituting a 'pattern' (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce. *Second*, a plaintiff must allege causation, i.e., that he or she was injured in his [or her] business or property by reason of a violation of section 1962.

> \* \* \*

> These requirements ... must be established as to each individual defendant.

*Weizmann Inst. of Sci.* v. *Neschis*, 229 F. Supp. 2d 234, 254-55 (S.D.N.Y. 2002) (Berman, J.) (internal quotations and citations omitted and emphasis added); *see also United States* v. *Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of

---

[3]    *See also Town of W. Hartford* v. *Operation Rescue*, 915 F.2d 92, 104 (2d Cir. 1990) ("the purpose of civil RICO liability does not extend to deterring any illegal act ... for which there are state and common law remedies" (citing *Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990))); *Reynolds* v. *E. Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) ("Not all conduct that strikes a court as sharp dealing or unethical conduct is a scheme to defraud [within the meaning of RICO]." (quotations and citations omitted)); *Seville Indus. Mach. Corp.* v. *Southmost Mach. Corp.*, 567 F. Supp. 1146, 1157 (D.N.J. 1983) ("It is clear that the civil provisions of RICO were not enacted for the purpose of imposing federal liability for state business fraud claims.").

racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).").

**C.     ES-KO and Supreme Have Failed To Allege That the Compass Defendants Proximately Caused Them To Lose Money on U.N. Food Service Contracts**

RICO only authorizes a private right of action for treble damages by a "person injured in his business or property by reason of a violation of section 1962 of [Title 18]." 18 U.S.C. § 1964(c). To plead a RICO claim adequately, a plaintiff must allege that a "the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes* v. *Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). By "proximate cause," the Court means the "label" that is generally applied to the "judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* One such tool, the Court noted, "was a demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

Just last month, the Supreme Court applied this principle to an injured competitor in *Anza* v. *Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1998 (2006), and held by an 8-1 vote that "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." The Court further explained that "[t]he element of proximate causation recognized in *Holmes* is meant to prevent ... intricate, uncertain inquiries from overrunning RICO litigation. It has particular resonance when applied to claims brought by economic competitors...." *Id.*

In *Ideal Steel*, the Court dismissed a RICO claim that alleged an injury far more direct than ES-KO and Supreme allege. Two businesses located within minutes of each other in the Bronx and Queens sold simple and fungible steel products, and competed directly with one another on the basis of price. Plaintiff alleged that the defendant was its principal direct competitor, that the market for the products in question was extremely localized, and its competitor was able to lower prices and

8

therefore divert customers by evading New York State sales taxes. Plaintiff alleged that there was a direct correlation between a drop in its sales and a corresponding rise in defendants' sales during the period that defendant did not charge sales tax.[4]

The Court held that plaintiff could not maintain its claim based on § 1962(c), because the alleged scheme did not proximately cause plaintiff's injury. The Court considered the rationale for the directness requirement, noting that "[o]ne motivating principle is the difficulty that can arise when a court attempts to ascertain damages caused by some remote action." *Id* at 1997. Applying this factor, the Court reasoned that defendant "could have lowered its prices for any number of

---

[4]   To underscore the contrast between the starkly simple facts in *Ideal Steel* and the facts at issue here, it is worth quoting at length from the opinions of the District Court and the Second Circuit. The District Court in *Ideal Steel* explained:

> Ideal and National distribute and sell steel mill products and related hardware, supplies, and services, including steel bars and sheets, in a "lumber yard" setting to ornamental ironworkers, small steel fabricators, and do-it-yourself homeowners. (AC¶¶ 2, 16.) Ideal and National each have two store locations, one in the Bronx and one in Jamaica, Queens. (AC¶¶ 3, 19-20.) Each one of Ideal's stores is located within a few minutes of each of National's stores. (AC¶¶ 19-20.)
>
> National is Ideal's principal competitor in New York City for the products it sells. (AC¶ 15.) No other business in the Bronx or Queens sells "the same or a similar comprehensive array of products and services or compete[s] for the same customers." (AC¶¶ 3, 16, 19-20.) "As Ideal and National sell at nearby locations similar product lines of general commodities, they compete principally on the basis of price." (AC¶¶ 3, 21.) Demand in the market does not fluctuate based on price, but on the robustness of the construction industry. (AC¶ 22.) Accordingly, Ideal and National can not increase demand by reducing prices or aggressively marketing their products. (AC¶ 22.) Increases in sales at one of the competitor's stores—if not caused by overall market demand—generally occurs with concomitant decreases in the other's sales. (AC¶ 22.)

*Ideal Steel*, 254 F. Supp. 2d 464, 465 (S.D.N.Y. 2003) (Berman, J.).

Similarly, the Second Circuit's opinion noted that:

> Ideal and National are the only substantial competitors in the Bronx or Queens for sales of the steel products they carry. No businesses in those areas other than Ideal and National carry "the same or a similar comprehensive array of products and services or compete for the same customers." (Complaint ¶ 3.) Given the similarity of their product lines (which comprise "generic commodities," *id.*) and the proximity of their retail outlets to each other in each Borough, Ideal and National compete against one another "primarily on the basis of price" (Complaint ¶ 21); "differences in prices charged by Ideal and National affect customers' decisions to purchase from one or the other" (Complaint ¶ 22).

*Ideal Steel*, 373 F.3d 251, 254 (2d Cir. 2004).

reasons unconnected to the asserted pattern of fraud." *Id.* The Court also pointed to the "discontinuity between the RICO violation and the asserted injury." *Id.* With respect to this factor, the Court explained that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost sales were the product of [defendant's] decreased prices." *Id.*

In his dissent, Justice Thomas observed that "the relationship between the alleged RICO violation and the alleged injury is clear: Petitioners underpaid sales tax, permitting them to undercharge sales tax, inflicting competitive injury on respondent." *Id.* at 2002. Justice Thomas found it significant that the defendant "simply *ceased charging tax* on cash sales ... because it had ceased reporting those sales and accordingly was not itself paying sales tax on them." *Id.* (emphasis in original). These straightforward facts, Justice Thomas argued, "render[ed] the damages more ascertainable than in the typical case of lost business." *Id.* at 2003.

In spite of this evident simplicity, the majority concluded that ascertaining damages would require "a complex assessment," and that plaintiff had failed to allege proximate cause. *Id.* at 1997. It therefore reversed the Second Circuit's decision to sustain the complaint.

The Seventh Circuit recently applied *Ideal Steel* to facts that are strikingly similar to the allegations here, where defendants obtained confidential bidding information in order to underbid their competitor. *See James Cape & Sons Co.* v. *PCC Constr. Co.*, No. 05-3894, 2006 U.S. App. LEXIS 16184 (7th Cir. June 28, 2006) (Flaum, C.J.). Defendants in *James Cape* "plead guilty to collaborating to rig bids for construction projects for, among others, the State of Wisconsin Department of Transportation ('WisDOT')," *id.* at *2, and, as here, their competitor brought RICO and antitrust claims against them. Defendants obtained confidential information "[t]hrough a series of in-person and telephonic meetings ... sometimes mere minutes before the companies submitted

10

their bids. This allowed the conspirators to lower or raise their bids to just under the amount that [plaintiff] was going to bid." *Id.* at *3. As a result of this scheme, plaintiff claimed that "it lost millions of dollars of business because its share of the market was reduced and it was awarded fewer contracts than it otherwise would have been." *Id.* at *4.

Chief Judge Flaum affirmed dismissal of the complaint because plaintiff "ha[d] not properly alleged that the RICO violation was the proximate cause of its damages." *Id.* at *16. The Seventh Circuit found that "[t]his case poses similar concerns" as *Ideal Steel*, and reasoned that

> [a] court could never be certain whether Cape would have won any of the contracts
> that were the subject of the conspiracy "for any number of reasons unconnected to
> the asserted pattern of fraud." ... It is entirely possible that Defendants would have
> won some bids absent the bid-rigging scheme, even if making less profits in the
> meantime. Furthermore, Cape cannot show what portion of its "lost market share" is
> attributable to the bids lost to the bid-rigging scheme.

*Id.* at *19 (citing *Ideal Steel*, 126 S. Ct. at 1997).[5]

### 1.    Plaintiffs' Alleged Injuries Are Too Indirect to Satisfy *Ideal Steel*

The causal links that ES-KO and Supreme would have to establish in order to prove economic injury are far more complex than in *Ideal Steel*. Whether ES-KO or Supreme would have in fact been awarded any given U.N. contract and then actually earned a profit is dependent upon establishing each link in a long chain of highly contingent events outside the plaintiffs' control, including unilateral decisions made by HCC, as well as myriad unpredictable variables affecting contract performance over a multi-year period, all of which would have to be litigated at any trial.

---

[5]    *Ideal Steel* has also been held to require dismissal of a competitor's RICO claims in *Downstream Environmental, L.L.C. v. Gulf Coast Waste Disposal*, Civ. No. H-05-1865, 2006 WL 1875959 (S.D. Tex. July 5, 2006). There, plaintiff operated a commercial waste disposal facility, and sued a competitor for "disposing of grease and grit trap without the necessary permit and by illegal dumping, allowing it to charge lower prices, which caused [plaintiff] competitive injury." *Id* at *7. Plaintiff alleged that, "[a]s a result of [defendant's] illegal disposal operation, ... [plaintiff] suffered the direct harm of loss of customers and sales, collapse of the market price, and loss of revenue." *Id.* (citations and quotations omitted). The court concluded that "[plaintiff] cannot state a claim under § 1962(c) because it cannot meet the proximate-cause requirement," reasoning that, "[a]s in *Ideal*, the cause of [plaintiff's] asserted injury is that [defendant] charged lower prices, which is distinct from the alleged RICO violations of operating without a required permit and improperly dumping waste." *Id.*

To begin with the most elementary point, as in *Ideal Steel*, ESS made no misrepresentation to ES-KO or Supreme, neither of which claims to have relied on anything ESS said.

*Second*, in *Ideal Steel*, there was a direct link between the prohibited act (lowering the price of the generic commodity by failing to charge an 8.25% sales tax) and the corresponding loss of that sale by the defendant's only competitor. Here, by contrast, there is no comparable link between the prohibited act (allegedly bribing a U.N. official to obtain information of greater or lesser utility to the formulation of a bid) and the alleged injury (the opportunity to win the multi-year contract and to attempt to perform it at a profit). Instead, the claim is that ESS procured information that aided it in formulating bid proposals, which, in turn, were considered by the U.N.'s HCC, the decision-making body that determined which competitor should win any given contract. Neither complaint alleges that ESS bribed or corrupted the HCC, which wields the ultimate authority on contract awards and "may either approve the recommendation of the Procurement Officer or ask for further clarifications." (ES-KO Compl. ¶ 37.)

Two concrete examples will illustrate why there is no direct link between the alleged misconduct of ESS and the injury for which damages are sought. With respect to the Burundi and Sudan Contracts, neither complaint alleges that ESS ever received any information concerning its competitor's bids. Instead, all that is asserted is that ESS received information about how the U.N. assessed ESS's *own* performance in Burundi, and information about some of its prospective customer's future needs in the Sudan.

ES-KO alleges that Yakovlev leaked information about ESS's performance failures on the Burundi Contract in order to allow ESS to correct its performance and retain its contract. (*See* ES-KO Compl. ¶ 181.) Leaving aside the fact that there is nothing improper about a supplier's

12

learning whether its customer is satisfied with its performance and seeking to improve (*see infra* pp. 22-23), plaintiffs cannot tie the receipt of such information in any direct way to an injury they suffered. At best, they would ask the trier of fact to speculate that: (1) ESS would not have otherwise been informed of the U.N.'s concerns about its performance; (2) ESS would have been unable satisfactorily to address the U.N.'s concerns; (3) the U.N. would have decided to re-tender the contract; (4) ES-KO and Supreme would have bid on the contract; (5) ES-KO or Supreme would have been the next-lowest bidder and would have satisfied the technical requirements such that it would have been awarded the contract; and (6) once awarded the contract, ES-KO or Supreme would have performed the contact in such a way as to earn a profit from it. These are the same concerns the Seventh Circuit expressed in *James Cape*, where "[a] court could never be certain whether [plaintiff] would have won any of the contracts that were the subject of the conspiracy for any number of reasons unconnected to the asserted pattern of fraud." 2006 U.S. App. LEXIS 16184, at *19 (internal quotations and citations omitted).

Similarly, with respect to the Sudan Contract, ES-KO alleges that, before the contract was awarded, an ESS employee communicated with U.N. rations officers who suggested ways in which ESS could better meet the U.N.'s needs. (*See* ES-KO Compl. ¶¶ 205-09.) Specifically, the U.N. official recommended that ESS express an interest in "assist[ing in the] develop[ment of] the country ... in such way as training of local suppliers and farmers on food production, ... transport of goods, etc." (*Id.* at ¶ 209.)

Once again, there is nothing improper about a supplier's communicating with a prospective customer about how to win its business. That is called market research. In order to establish compensable damages with respect to the Sudan Contract, the plaintiff would have to prove, among other things, that: (1) ESS would not have learned this information otherwise;

13

(2) ES-KO and Supreme had no way to learn this information themselves (e.g., that if they had asked the U.N. how best to satisfy its goals in the Sudan, they would have been refused access to the information); (3) ESS would have lost the bid had it not learned this information; (4) ES-KO or Supreme would have been the next-lowest bidder and would have satisfied the technical requirements such that it would have been awarded the contract; (5) once awarded the contract, ES-KO or Supreme would have been better able to deal with the problems of the sort described in the audit with respect to ESS's performance of this contract (*see* ES-KO Compl. ¶ 216); and (6) in spite of all the difficulties associated with performing the contract that ES-KO sets forth in its Complaint, ES-KO or Supreme would have profited from it. Again, the same concerns the Seventh Circuit expressed in *James Cape* apply here.

Even as to those contracts in which it is alleged that competitive pricing information was illicitly procured, virtually all the same steps above would need to be established.

*Third*, and also very different from *Ideal Steel*, each of two disappointed competitors is claiming that, had it not been for the misconduct of ESS, *it* would have been awarded the contracts at issue. Each of ES-KO and Supreme would, at any trial, advance a series of reasons in support of its hypothesis that, in a "but for" world in which ESS had not improperly procured confidential U.N. information, it is the competitor that would have prevailed. The fact that there will be a protracted and costly trial on the question of *which* competitor was the one who sustained the injury squarely refutes any contention that the injury is sufficiently direct to satisfy *Ideal Steel*.

Simply put, if eight justices of the Supreme Court thought that it was excessively complicated to ascertain, for purposes of the RICO statute, whether a loss of sales of a fungible commodity product to a single competitor in Queens was attributable to the defendant's illicit failure to charge sales taxes, it follows ineluctably that the proof in injury exercise implicated by these

claims also fails the *Ideal Steel* test of "directness." As we now show, the same is true with respect to calculation of damages arising out of any injury.

### 2.    The Complexity of Calculating ES-KO's and Supreme's Alleged Damages Further Demonstrates the Indirectness of Their Injury

One of the principal reasons that our Supreme Court has rejected indirect injury claims under RICO is "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Ideal Steel*, 126 S. Ct. at 1997 (citing *Holmes*, 503 U.S. at 269 ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.")). For this reason, the *Holmes* Court explained that "'[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Holmes*, 503 U.S. at 271-72 (quoting *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U.S. 519, 534 (1983)).

If ES-KO and Supreme were permitted to maintain their claims, the trier of fact would have to resolve highly complex economic issues in order to ascertain whether any damages had been sustained. The damages calculation in *Ideal Steel* would have been quite straightforward in comparison. In that case, all the fact finder would have had to decide was how much taxes defendant evaded, and to what extent this enabled defendant to lower its prices. As Justice Thomas explained, "under the facts as alleged ... [defendant] did not generally lower its prices, so the Court need not inquire into 'any number of reasons,' ... that it might have done so." *Ideal Steel*, 126 S. Ct. at 2002.

Unlike the "generic commodities" at issue in *Ideal Steel*, as to which it would have been a straightforward task to calculate the profits that plaintiff would have enjoyed had it been able to sell incremental units of steel bars or sheets, there is no simple way to determine whether a given contract would have been performed profitably by a given firm. Each U.N. contract at issue,

15

performed in harsh and remote unstable environments over a multi-year period, is unique. ES-KO's complaint recognizes the inherently risky nature of providing food and related services in these conditions, explaining that a vendor must "overcom[e] the difficulties in delivering and handling large quantities of perishable food stocks, including operating the necessary kitchen and canteen equipment, hygienic storage of food and water on site and the distribution of these goods to multiple site locations within a single project." (ES-KO Compl. ¶ 45.) For the contracts at issue, a vendor must "overcome[] logistical problems and accomodat[e] peacekeeping troops' needs." (*Id.* at ¶ 46.) In addition to the general problems that ES-KO describes, contracts were sometimes renegotiated due to price fluctuations. (*See, e.g., id.* at ¶ 146.) Problems arose with respect to maintaining operational warehouses, obtaining adequate supplies, and avoiding food spoilage. (*See id.* at ¶ 216.) In some cases, a contract might "call[] for the continuation of services [the contractor] would be providing pursuant to [an] [i]nterim [c]ontract," thereby lessening mobilization costs. (*Id.* ¶ 86.) In other cases, presumably the opposite was true and mobilization would be especially challenging.

The factfinder will also need to confront the question of how ES-KO's or Supreme's performance of the contracts would have compared to that of ESS, which actually lost money on most of the contracts and earned quite modest profits on the others. To be sure, ES-KO *alleges* that it was in a superior position to deal with the difficulties encountered in performing these contracts. (*See* ES-KO Compl. ¶¶ 44-46; *see also* Supreme Am. Compl. ¶ 52.) However, ESS is also acknowledged to be experienced, as a subsidiary of "the largest food services company in the world, with business operations in over ninety countries," (ES-KO Compl. at ¶ 13) that "specializes in providing services to remote sites, defense locations and off-shore locations, including areas patrolled by U.N. peacekeeping forces." (Supreme Am. Compl. at ¶ 35; *see also id.* at ¶ 56 ("As of

16

October 2005, [ESS] serviced approximately 50% of the market for peacekeeping rations contracts.").)

Plaintiffs appear to contemplate that the trier of fact would calculate their lost profits by looking at how they fared on other contracts they did win. But it will be the Compass Defendants' position that one cannot directly extrapolate from the profitability that ES-KO realized on a three-year contract in the Congo to the profitability that it might have realized had it won contracts in East Timor or Lebanon. A battle of experts will be required, who will undoubtedly quarrel over how – and whether it is even in principle possible – to extrapolate from the financial results on one contract to that of another.

In short, these are precisely the type of "intricate, uncertain inquiries" that the "[t]he element of proximate causation ... is meant to prevent." *Ideal Steel*, 126 S. Ct. at 1998. Applying this principle to facts similar to the case at bar, the Seventh Circuit concluded that "[plaintiff] cannot show what portion of its 'lost market share' is attributable to the bids lost to the bid-rigging scheme." *James Cape*, 2006 U.S. App. LEXIS 16184, at *19.

### 3. ES-KO's Alleged Injury with Respect to Contracts That It Won Is Even More Indirect Than Damages for Contracts That ES-KO Lost

The highly contingent and indirect nature of the alleged injuries in this case is also evident with respect to ES-KO's claims for damages on U.N. contracts that it *was* awarded. For starters, of course, ES-KO would have to establish that it would have won the contracts even if it had put in a bid at higher prices than those with which it was successful, even though multiple vendors submitted bids for each contract at issue. (Perhaps this is why Supreme makes no claim for damages on U.N. contracts it did obtain.)

Next, ES-KO would have to prove that its decision to offer a particular price to the U.N. was attributable, not to the specific features of the proposed contract at issue or other factors,

but rather to the prices ESS had proposed on unrelated contracts for *other* countries to which the U.N. was sending peacekeeping forces. After all, there is no reason to hypothesize that a bid for supplying food to peacekeepers in East Timor (the first contract ESS won in 1999) (*see* ES-KO Compl. ¶¶ 123-32) implicates precisely the same cost projections as a bid to supply peacekeepers in Kosovo, the next contract in the sequence, which was won by ES-KO. (*See id.* at ¶¶ 220-26.) As the Court in *Ideal Steel* explained, competitors "lower[] [their] prices for any number of reasons unconnected to the asserted pattern of fraud." *Ideal Steel*, 126 S. Ct. at 1997.

   ES-KO's theory that it reduced margins as a result of ESS's misconduct fails in any event as a matter of law because ES-KO does not allege any illicit conduct. (*See* ES-KO Compl. ¶ 7.) ES-KO does not even allege that ESS bid for those contracts. As this Court explained in *Hollander* v. *Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 459 (S.D.N.Y. 2004) (Castel, J.), *aff'd*, 2006 U.S. App. LEXIS 2781 (2d Cir. Feb. 3, 2006), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Apr. 20, 2006) (No. 05-10635), "[a] RICO pattern or predicate act has proximately caused a plaintiff's injury if it is 'a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.'" (citing *Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990) (emphasis in original)). *See also Miller* v. *Helmsley*, 745 F. Supp. 932, 938, 939 (S.D.N.Y. 1990) (Conboy, J.) (dismissing RICO claim, the court found that the alleged RICO injury "'trickled down' to [plaintiff] … [and was] too remote from the alleged predicate acts to support [a] RICO [claim]," reasoning that "the injury must be the result of a predicate act"); *J.S. Serv. Ctr. Corp.* v. *Gen. Elec. Technical Servs.*, 937 F. Supp. 216, 225 (S.D.N.Y. 1996) (Conner, J.) (finding that wrongful termination was "only a by-product of the alleged scheme to secure contracts through bribery of foreign officials").

4.    **If There Is Any Direct Victim, It Is the U.N., Not ES-KO**

The *Holmes* Court concluded that wrestling with difficult questions of causation and apportionment "is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269-70.

The Court in *Ideal Steel* found it significant that "[t]he direct victim of this conduct was the State of New York, not [plaintiff]. It was the State that was being defrauded and the State that lost tax revenue as a result." *Ideal Steel*, 126 S. Ct. at 1997. Even in *James Cape*, where plaintiff did not allege that any government insider had been bribed, the Seventh Circuit found "compelling ... the Court's holding that a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims," and concluded that "WisDOT is fully capable of pursuing appropriate remedies, much like the State of New York in *Anza*." *James Cape*, 2006 U.S. App. LEXIS 16184, at *19-20 (quoting *Ideal Steel*, 126 S. Ct. at 1998). *See also Downstream Envtl.*, 2006 WL 1875959, at *7 (finding that "the direct victim of [defendant's] alleged regulatory violations is the State of Texas, which issues the [waste disposal] permits, and the municipality operating the sewer treatment facilities," the court concluded that "[a]s in *Ideal*, there are public authorities charged with enforcing such violations.") (citing *Ideal Steel*, 126 S. Ct. at 1998 ("[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.")).

Although the Compass Defendants do not believe that the U.N. was injured by the conduct at issue, but actually benefited from lower prices, plaintiffs are proceeding on the theory that the U.N. did suffer harm here. ES-KO alleges that the U.N. paid "hundreds of millions of dollars to [ESS] as compensation under contracts which should not, in accordance with [U.N.] rules and

procedures, have been awarded to [ESS] and which [ESS] was unable to perform satisfactorily." (ES-KO Compl. ¶ 396.)  If there is any merit to this claim, then the U.N. can be counted on to vindicate the laws by pursuing its own claims. *See Holmes*, 503 U.S. at 269-70.[6]

**D.      The Complaints Do Not Allege That Each of the Compass Defendants Committed Two Predicate Acts**

In order to state a claim under section 1962(c), a plaintiff "must allege that *each defendant* participated in the conduct of the enterprise through a pattern of racketeering, which pattern must consist of at least two racketeering acts that exhibit the necessary continuity and relatedness to constitute a pattern." *Zito* v. *Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352, at *17 (S.D.N.Y. Sept. 30, 2003) (Lynch, J.) (emphasis added); *see also DeFalco* v. *Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  For the reasons set forth below, ES-KO and Supreme fail to plead violations by the Compass Defendants of the mail or wire fraud, money laundering, commercial bribery statutes, or the Travel Act.  And, while ES-KO's allegations provide far more detail than Supreme's, even those pleadings are insufficient to allege the requisite predicate acts.

**1.      Supreme and ES-KO Fail To Allege Mail or Wire Fraud with the Specificity Required by Rule 9(b)**

"To plead claims for mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, a plaintiff must allege:  (1) the existence of a scheme to defraud; (2) that defendant used the United States mails or interstate wires to further that scheme; (3) that defendant did so with specific intent to defraud." *Sterling Interiors Group, Inc.* v. *Haworth, Inc.*, 94 Civ. 9216 (CSH), 1996 U.S. Dist. LEXIS 10756, at *16 (S.D.N.Y. July 30, 1996) (Haight, J.).  "In addition, a complaint alleging mail or wire fraud must allege that the defendant acted with scienter (*i.e.*, knowingly participated in the

---

[6]      In fact, the U.N. has launched an investigation of the underlying events and barred ESS from bidding on new contracts, pending the outcome of the U.N.'s investigation.  (*See* ES-KO Compl. ¶ 271.)

scheme), and that the misrepresentations were material." *Jordan (Bermuda) Inv. Co., Ltd.* v. *Hunter Green Invs. Ltd.*, 154 F. Supp. 2d 682, 691 (S.D.N.Y. 2001) (Sweet, J.) (citation omitted).

Further, it is well-established that plaintiffs' wire and mail fraud allegations must be pled with the particularity required by Rule 9(b), which requires that, "[i]n all averments of fraud … the circumstances constituting fraud or mistake shall be stated with particularity." *See Old Republic Ins. Co.* v. *Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 382 (S.D.N.Y. 1997) (Edelstein, J.) ("When the fraud alleged is mail or wire fraud, the Second Circuit clearly has set forth the specific pleading requirements under Rule 9(b).") (citing *McLaughlin* v. *Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *First Capital Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."). As explained below, neither plaintiff's mail and wire fraud allegations are pled with the specificity required by Rule 9(b).

> **(a)    Plaintiffs' General Allegations of Mail and Wire Fraud as to Six of the Contracts Fail To Meet the Heightened Pleading Standard Under Rule 9(b)**

Both plaintiffs allege in conclusory terms that the Compass Defendants used the mail and wires in furtherance of the alleged scheme. (*See* ES-KO Compl. ¶¶ 292, 310, 327 (mail fraud), 294 (wire fraud); Supreme Am. Compl. ¶¶ 1, 99 (wire fraud).) For six contracts, however, ES-KO alleges only that "IHC and/or the Yakovlevs provided Compass Group/ESS with non-public material information," but does not allege any specific use of the mail or wires in furtherance of a scheme: Cyprus (UNFICYP II Main), East Timor, Eritrea (UNMEE II Main), Syria, Lebanon, and Kosovo (Main) Contracts. (*See* ES-KO Compl. ¶¶ 118, 128, 143, 153, 163, 230.) Likewise, Supreme's Complaint alleges no specific facts with respect to the Sudan, East Timor and Eritrea Contracts. (*See* Supreme Am. Compl. ¶ 57 (alleging merely that Supreme submitted bids for these contracts).)

21

These generalized pleadings fail as a matter of law because they do not specify which defendant committed mail or wire fraud, and do not allege specific communications made with an intent to defraud. *See Crab House of Douglaston, Inc.* v. *Newsday, Inc.*, 418 F. Supp. 2d 193, 211 (E.D.N.Y. 2006) (dismissing RICO claim where plaintiff alleged that defendants committed "multiple, repeated and continuous instances of mail fraud," the court noted that "failure [to provide any specifics] … can warrant dismissal of a RICO claim …. Parroting statutory language while generally referring the reader back to the previous one-hundred paragraphs in a complaint is inadequate.") (internal quotations and citations omitted); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Young*, 91 Civ. 2923 (CSH), 1994 U.S. Dist. LEXIS 2929, at *21 (S.D.N.Y. Mar. 15, 1994) (Haight, J.) ("The essence of Rule 9(b) pleading is that each defendant is entitled to be advised of the fraud claims against him.").

### (b)   Plaintiffs Do Not Allege Any Improper Use of the Mail or Wires with Respect to the Sudan or Burundi Contracts

With respect to the Sudan and Burundi Contracts, by contrast, ES-KO and Supreme do not allege anything *improper* about the use of the mail or wires. Although ES-KO's pleadings contain more detail than Supreme's, plaintiffs simply cannot allege mail or wire fraud on the basis of the communications alleged in connection with those two contracts.

As to the Sudan Contract, ES-KO alleges that Bickerstaff met with Terry Allen, the U.N. Ration Contracts Officer for peacekeepers in Sudan, and summarized his meeting in an email dated November 27, 2004. (*See* ES-KO Compl. ¶ 205.) The email reported that "the contract was divided into regions due to certain companies having 'very good' plans for some regions. He particularly indicated [ES-KO] here for the South." (*Id.* at ¶ 207.) Bickerstaff's email also recounted a conversation with another U.N. official who "stated that it would be received very well in the [U.N.] if we put an additional appendix to our bid stating that we wish to assist [in the]

22

develop[ment of] the country and can assist in such ways as training of local suppliers and farmers on food production, HSE standard, transport of goods, etc." (*Id.* at ¶ 209.) On the basis of these emails, ES-KO concludes that "Bickerstaff knew or should have known that it was highly inappropriate for Robertson to coach ESS as to what should be included in its bid." (*Id.* at ¶ 210.) Significantly, there is no allegation that Bickerstaff or anyone else at Compass or ESS learned anything about its competitors' bids, nor is it alleged that the information imparted was confidential or unavailable to any other prospective bidder who sought it out.

As to the Burundi Contract, both plaintiffs allege that, on April 27, 2005, Yakovlev leaked information about ESS's *own* performance failures in order to allow ESS to correct its performance and retain its contract. (*See* ES-KO Compl. ¶¶ 182-85; Supreme Am. Compl. ¶¶ 66, 85, 88.) However, there is nothing fraudulent or improper about communications between a contractor and its customer concerning performance of the contract. There is no allegation of "deception," nor is there any allegation that ESS obtained confidential information through this use of the mail or wires.[7]

---

[7]    The mail and wire fraud allegations should be dismissed for the independent reason that they fail to allege plaintiffs' reliance on the alleged misrepresentations. In *Holmes*, the Court held that the phrase "by reason of" "carries a [common-law] proximate cause requirement within it." 503 U.S. at 266 n.12. At common law, it was well accepted that in an action for fraud or deceit, whether by misrepresentation or omission, the plaintiff was required to prove reliance. *See, e.g.,* W. Page Keeton, *et al., Prosser & Keeton on the Law of Torts* 728 (5th ed. 1984) (elements of tort action in deceit that have "emerged from this [common-law] process of development" include "intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation."); RESTATEMENT (SECOND) OF TORTS § 525 (1977). While the Second Circuit has rejected this theory, *see Ideal Steel*, 373 F.3d at 264, the Supreme Court cast doubt on whether this is the correct answer to this "substantial issue," *see Ideal Steel*, 126 S. Ct. at 1998.

2.   **ES-KO and Supreme Fail To Plead a Violation of the Commercial Bribery Statute as a RICO Predicate Act**[8]

Both ES-KO and Supreme allege, as an additional predicate act under RICO, that the Compass Defendants violated the New York commercial bribery statute, New York State Penal Code § 180.03 (2006), which makes it illegal for a person to "confer[] ... any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal," where the "benefit conferred ... causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars." (*See* ES-KO Compl. ¶¶ 326, 396; Supreme Am. Compl. ¶ 99.) The RICO claims, insofar as they are based on predicate acts of commercial bribery, should be dismissed because no economic harm to the U.N. is properly alleged in either complaint.

Bribery only violates the New York commercial bribery statute if it inflicts economic harm on the bribe receiver's employer, which somehow results in higher prices. *See People* v. *Wolf*, 98 N.Y.2d 105, 110 (2002) ("The primary purpose of the legislation was to deter through enhanced punishment the kind of commercial bribery that results in monetary or property loss that would be

---

[8]   Even though the allegations of these predicate acts are not subject to the heightened Rule 9(b) standard – unlike the fraud predicates discussed above (*see supra* pp. 20-23) – it is entirely consistent with the more permissive pleading standard of Rule 8(a), as interpreted by *Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 512 (2002), to find these pleadings insufficient as a matter of law. The Second Circuit and courts in this District have not hesitated to dismiss complaints that are legally insufficient to state claims for relief. *See, e.g., Joblove* v. *Barr Labs., Inc.*, 429 F.3d 370 (2d Cir. 2005) (upholding dismissal of antitrust claim, notwithstanding *Swierkiewicz*, because (*inter alia*) plaintiff failed to allege antitrust injury); *Suthers* v. *Amgen*, 05 Civ. 4158 (PKC), 2006 U.S. Dist. LEXIS 22102, at *2 (S.D.N.Y. Apr. 20, 2006) (Castel, J.) (dismissing complaint because New York law does not impose the type of duty on which plaintiffs predicated their claim, and observing that "[p]ost-*Swierkiewicz*, the Supreme Court has upheld the grant of a motion to dismiss under Rule 12(b)(6) where the allegations of the complaint were inconsistent with the existence of a viable claim on the part of the plaintiff.").

Several courts in this District have dismissed RICO claims for pleading deficiencies, post-*Swierkiewicz*. Indeed, this Court has dismissed a RICO claim for failure to plead the legally required elements, even as to a pro se litigant, notwithstanding *Swierkiewicz*, holding that, "to [plead both injury and causation, plaintiff] *must allege facts* demonstrating both that plaintiff's injury is to his business or property ... and that plaintiff's injury is proximately caused by the acts constituting the RICO violation." *Hollander*, 340 F. Supp. 2d at 458 (emphasis added); *Levine* v. *Torino Jewelers, Ltd.*, 05 Civ. 3159 (DLC), 2006 U.S. Dist. LEXIS 11932, at *18 (S.D.N.Y. Mar. 22, 2006) (Cote, J.) (granting a motion to dismiss a RICO claim because plaintiff failed to allege a distinct enterprise); *Dibbs* v. *Roldan*, 356 F. Supp. 2d 340, 349 (S.D.N.Y. 2005) (Sprizzo, J.) (dismissing RICO claims because plaintiff "utterly failed to allege facts demonstrating the statutory elements of a civil RICO claim.").

passed on to consumers in the form of higher prices."). Thus, while "[p]roof that the employer of a bribe receiver paid an amount greater than it would have otherwise paid to consummate a transaction as a result of the bribe would establish the requisite economic harm," *id.*, paying lower prices does not. Even in *James Cape*, plaintiffs alleged that "WisDOT was overcharged by almost two million dollars over the life of the scheme," *James Cape*, 2006 U.S. App. LEXIS 16184, at *4. Plaintiffs here allege nothing of the sort. Instead, they allege that the U.N. actually paid *lower* prices. Moreover, ES-KO alleges that the U.N. paid lower prices on contracts for which ESS did not bid.

Courts in this District regularly dismiss RICO claims based on the predicate act of commercial bribery where economic harm to the employer or principal is not alleged. *See, e.g., Linens of Eur., Inc.* v. *Best Mfg., Inc.*, No. 03 Civ. 9612 (GEL), 2004 U.S. Dist. LEXIS 18575, at *52-53 (S.D.N.Y. Sept. 16, 2004) (Lynch, J.) (dismissing RICO claim because plaintiff failed to plead the elements of commercial bribery, court reasoned that "no facts [alleged] suggest[ed] any harm to the employers of the persons allegedly bribed"); *Benedict* v. *Amaducci*, No. 92 Civ. 5239 (KMW), 1995 U.S. Dist. LEXIS 17684, at *22-24 (S.D.N.Y. Nov. 28, 1995) (Wood, J.), *aff'd* 1996 U.S. App. LEXIS 20878 (2d Cir. Aug. 15, 1996) (finding that plaintiff failed to allege commercial bribery as a RICO predicate because employer's lack of consent was not alleged); *Moll* v. *US Life Title Ins. Co. of N.Y.*, 710 F. Supp. 476, 481-82 (S.D.N.Y. 1989) (Leisure, J.) (where purchasers of title insurance alleged that title insurance company paid "kickbacks" to their attorney, court dismissed their RICO claims based on predicate acts of commercial bribery, reasoning that, "as the title insurance premium was non-negotiable, plaintiffs have not alleged that [defendant] caused each of them economic harm in excess of $250," and rejected plaintiffs' theory that economic harm was established "by an agent's failure to turn over a bribe to his principal.").

Thus, harming a competitor does not violate the New York Commercial Bribery statute. In *Maddaloni Jewelers, Inc.* v. *Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 297 (S.D.N.Y. 2004) (Castel, J.), the plaintiff was an official dealer of Rolex watches who alleged that Rolex's national sales managers refused to supply watches, delayed shipments, and ultimately terminated plaintiff as an "Official Rolex Jeweler" when plaintiff refused to make "under the table payments." This Court granted summary judgment to the defendant, holding that "it does not necessarily follow that Rolex would suffer a loss if the inventory were directed by [the sales manager] from one retailer of Rolex's products to another." *Id.* at 300-01.

Neither ES-KO nor Supreme allege the sort of "economic harm" that is actionable under the New York commercial bribery statute and thus they fail to plead the requisites of this predicate act under RICO. ES-KO parrots the statutory requirement by alleging in a conclusory manner that "economic harm" to the U.N. "include[ed], inter alia, payment by the [U.N.] of hundreds millions of dollars to Compass Group/ESS as compensation under contracts which should not, in accordance with [U.N.] rules and procedures, have been awarded to [ESS] and which [ESS] was unable to perform satisfactorily." (ES-KO Compl. ¶ 396.) The only discernable harm to the U.N. that Supreme alleges is that "[t]he U.N. [has] been deprived of the benefits of free and fair competition in its bidding process." (Supreme Am. Compl. ¶ 92.)

However, these are not the types of harms that courts in this District find actionable. In *City of New York* v. *Joseph L. Balkan, Inc.*, 656 F. Supp. 536 (E.D.N.Y. 1987), for instance, the City of New York alleged that it suffered a RICO injury when its sewer inspectors accepted bribes by the contractors who sought to avoid inspections and forge certificates. The City of New York alleged that, as a result of the work performed on its sewer systems without the proper inspections, "defendants' conduct damaged the integrity of the [sewer] system." *Id.* at 542. Defendants argued

that, "because the City claims defendants schemed to defraud it of the honest conduct of government affairs and faithful sewer inspector performance, its damages are only intangible and non-pecuniary, not … 'injury to business or property' which RICO requires." *Id.*[9] The court held that the City did plead "tangible damage to its sewer system …. because corrupted inspectors did not detect or report improper tie-ins between private sewer lines and the City sewer system." *Id.* at 543. No comparable harm to the U.N. is alleged in either complaint, which only allege intangible harms to the U.N., if at all.

Plaintiffs' failure to allege "concrete harm" to the U.N.'s business or property is fatal to their RICO claim based on predicate acts of commercial bribery.

### 3. Plaintiffs Do Not Adequately Plead Money Laundering as a RICO Predicate Act

Although both complaints allege violations of the federal money laundering statute as an additional RICO predicate act, (*see* ES-KO Compl. ¶ 292; Supreme Am. Compl. ¶ 99) these allegations are legally insufficient. 18 U.S.C. § 1956(a)(2) prohibits the transmittal of funds "from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States … with the intent to promote the carrying on of specified unlawful activity" or "knowing that the … funds … represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer … is designed … to conceal or disguise … the source of the proceeds … or to avoid a transaction reporting requirement under State or Federal law." 18 U.S.C. § 1956(a)(2) (2005).[10] Under the relevant

---

[9]  While the RICO predicate alleged in *Balkan* was New York Penal Law § 200.00, (bribery involving public servants), the analysis of "concrete harm" is applicable here insofar as the *Balkan* court analyzed the question of "injury to business or property" under the RICO statute.

[10]  While plaintiffs do not specify the money laundering statute in its complaint, the relevant statute is 18 U.S.C. § 1956(a)(2), also known as the "international money laundering statute." *United States* v. *Dinero Express, Inc.*, 313 F.3d 803, 805 (2d Cir. 2002).

provision of the money laundering statute, "[l]iability attaches ... for transporting, transmitting, or transferring funds overseas, even if those funds were lawfully derived, if the intent was to promote the carrying on of specified unlawful activity." *United States* v. *One 1997 E35 Ford Van*, 50 F. Supp. 2d 789, 797 (N.D. Ill. 1999). *See also United States* v. *Dinero Express, Inc.*, 313 F.3d 803, 807 (2d Cir. 2002) ("a course of conduct that begins with a sum of money located in one country and ends with a related sum of money located in another may constitute a 'transfer' for purposes of § 1956(a)(2)").

Courts in this District regularly dismiss RICO claims based on predicate acts of money laundering where the requisite elements arc not pled. *See, e.g., W. 79th St. Corp.* v. *Congregation Kahl Minchas Chinuch*, 03 Civ. 8606 (RWS), 2004 U.S. Dist. LEXIS 19501, at *31 (S.D.N.Y. Sept. 30, 2004) (Sweet, J.) ("In the absence of adequate allegations as to the existence of a specified unlawful activity, [plaintiff] has failed to adequately plead money laundering as a predicate racketeering activity with regard to its civil RICO claim."); *Casio Computer Co.* v. *Sayo*, No. 98 Civ. 3772 (WK), 2000 WL 1877516, at *16-17 (S.D.N.Y. Oct. 13, 2000) (Knapp, J.) (holding that RICO plaintiffs "must plead all elements of the offense" in order to adequately plead money laundering as a predicate act under RICO and withstand motions to dismiss, court dismissed RICO claim because "there is no factual support to show that defendants ... knew that the money involved in the transaction represented a form of specific unlawful conduct, or that the transaction involved the proceeds of unlawful activity"); *see also Bernstein* v. *Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997) ("Plaintiffs' money laundering charges pursuant to 18 U.S.C. §§ 1956 and 1957 are so vague it is difficult to find factual support for them in the complaint or attribute them to the defendants. While plaintiffs need not plead money laundering with great particularity, they must nonetheless plead all essential elements of the offenses.").

Supreme's money laundering pleadings make no substantive allegations with respect to the Compass Defendants, and refer only to Yakovlev, Kuznetsov, and IHC. (*See* Supreme Am. Compl. ¶¶ 9, 67-72, 75-77.) While ES-KO's pleadings provide slightly more detail, they allege only that "[ESS] continued as a client of IHC, paying it substantial sums of money, supposedly for 'intermediary' services," and that "substantial portions of the fees paid by [ESS] to IHC were passed on as bribe or kick-back money to Yakovlev ... to Vladimir Kuznetsov, and/or to the John Doe Defendants..." (ES-KO Compl. ¶ 66; *see also id.* at ¶¶ 67, 77.) These allegations fail to plead money laundering for the following reasons:

*First*, ES-KO fails to allege that the intent was to promote unlawful activity, as defined by 18 U.S.C. § 1956(c)(7), or to disguise the source of allegedly ill-gotten proceeds.

*Second*, ES-KO fails to allege that the Compass Defendants actually "caused" the transfer of funds. ES-KO alleges merely that "substantial portions of the fees paid by [ESS] to IHC were passed on as bribe or kick-back money to Yakovlev." (ES-KO Compl. ¶ 66.)

*Third*, ES-KO fails to allege that money flowed from outside the United States to a place inside the United States, or from a place inside the United States to a place outside the United States. To the contrary, ES-KO alleges that Yakovlev established a secret account in Antigua (*see* ES-KO Compl. ¶ 56), and that ESS and Compass are both based overseas as well.

### 4.    ES-KO Does Not Allege Any Predicate Acts with Respect to Contracts That It Was Awarded

ES-KO does not allege any mail or wire fraud or commercial bribery (or any other RICO predicate act) with respect to contracts that ES-KO was awarded, but for which ES-KO was

forced to reduce its profit margins.[11]   Because there are no predicate acts alleged as to these contracts, the RICO claim should be dismissed.

      **5.**      **Supreme Fails To State a Violation of the "Travel Act" as a RICO Predicate Act**

      Supreme's complaint also refers in passing to 18 U.S.C. § 1952, also known as the "Travel Act." (*See* Supreme Am. Compl. ¶ 99.)   Under the statute, it is illegal to "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with intent to … (1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."[12] *Id.* Supreme fails to plead a RICO predicate act under this statute because the complaint does not "give[] adequate notice to defendants of what facility of interstate commerce was used by [defendants] nor identified the unlawful activity sought to be carried on or promoted thereby." *Bernstein*, 948 F. Supp. at 236 n.2.

**E.**      **ES-KO and Supreme Allege Associations-In-Fact That Are Not Sufficiently Distinct**

      Both complaints plead theories of association-in-fact that involve the Compass Defendants.   ES-KO alleges the existence of "Bid-Rigging Enterprise II" (ES-KO Compl. ¶ 332) while Supreme alleges the existence of a "U.N. Bid-Rigging Enterprise." (Supreme Am. Compl. ¶ 96.)   To the extent the RICO claims are based on these theories of "enterprise," they should be

---

[11]   Those contracts include the Sierra Leone, Congo, Kosovo (Interim), Eritrea (UNMEE I Interim), Cyprus (UNFICYP I Interim), Liberia (Interim), Burundi (Interim) and Haiti Contracts. (*See* ES-KO Compl. ¶ 7.)

[12]   The Travel Act defines "[u]nlawful activity" as "(1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances … or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 [laundering of monetary instruments] or 1957 [engaging in monetary transactions in property derived from specified unlawful activity] of this title." 18 U.S.C. § 1952(b).

dismissed because the alleged associations-in-fact are not distinct from the defendants, and therefore fail to plead an enterprise. *See Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 161 (2001).

Under section 1962(c), a RICO defendant must conduct or participate in the conduct of a distinct enterprise. *See Reves* v. *Ernst & Young*, 507 U.S. 170, 185 (1993). For this reason, then-Judge Breyer rejected a RICO claim where the enterprise consisted of two corporations, because the allegations did not "charge that [the two corporations] were conducting some *other* unlawful enterprise." *Arzuaga-Collazo* v. *Oriental Fed. Sav. Bank*, 913 F.2d 5, 6 (1st Cir. 1990) (emphasis in original). As one court explained, "RICO ... is not a conspiracy statute," *Fitzgerald* v. *Chrysler Corp.*, 116 F.3d 225, 228 (7th Cir. 1997); rather, it only extends to "the acquisition or operation of an enterprise." *Reves*, 507 U.S. at 182.

Applying these principles, courts in this District have held that "it is possible to plead a valid § 1962(c) claim in which each of the members of an associated-in-fact enterprise are also named as defendants *so long as the overlap between the RICO persons and the RICO enterprise is only partial.*" *C.A. Westel de Venezuela* v. *AT&T Co.*, 90 Civ. 6665 (PKL), 1994 U.S. Dist. LEXIS 14481, at *16-17 (S.D.N.Y. Oct. 11, 1994) (Leisure, J.) (emphasis added) (citing *Jacobson* v. *Cooper*, 882 F.2d 717, 720 (2d Cir. 1989)).[13]

The associations-in-fact that plaintiffs plead suffer the same shortcoming: they are simply the sum of the defendants, and neither theory suggests that a legitimate organization was "infiltrat[ed] ... by racketeers." *Westel*, 1994 U.S. Dist. LEXIS 14481, at *20-21. ES-KO's "Bid-Rigging Enterprise II" alleges that "Defendants associated with each other to form an association-in-

---

[13]   *See also Fustok* v. *Conticommodity Servs., Inc.*, 618 F. Supp. 1074, 1076 (S.D.N.Y. 1985) (Lasker, J.) ("an association in fact which constitutes a RICO enterprise is not merely a synonym for the collective of 'individuals' which form the association, but instead, it is a distinct entity."); *Hudson* v. *Larouche*, 579 F. Supp. 623, 628 (S.D.N.Y. 1983) (Sweet, J.) ("The complaint ... fails to distinguish between the[] enterprises – the vehicles for the pattern of racketeering activity – from the individual defendants whose conduct RICO proscribes.").

fact which was an 'enterprise' ... within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c)..."

(ES-KO Compl. ¶ 322), while Supreme's "U.N. Bid-Rigging Enterprise" comprises the "RICO

Defendants." (Supreme Am. Compl. ¶ 96.)  Both theories are deficient as a matter of law.[14]

### F.   The Complaints Do Not Allege That Kemp, Swain or Bickerstaff "Managed or Conducted" the Affairs of the Alleged Enterprises

Section 1962(c) requires plaintiffs to plead that *each* of the defendants "conduct[ed]

or participate[d], directly or indirectly, in the conduct of such enterprise's affairs..."  18 U.S.C.

§ 1962(c). The Supreme Court has held that one is not liable under section 1962(c) "unless one has

participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 183. "As

interpreted by courts in this district and in others, the 'operation and management' test set forth ... in

*Reves* is a very difficult test to satisfy." *LaSalle Nat'l Bank* v. *Duff & Phelps Credit Rating Co.*, 951

F. Supp. 1071, 1090 (S.D.N.Y. 1996) (Knapp, J.).

To satisfy this test, "one must have some part in directing ... [the enterprise's]

affairs." *Reves*, 507 U.S. at 179. Only "actual control over an enterprise" is sufficient under the

*Reves* test, not mere "association with an enterprise in ways that do not involve control ...."

*Goldfine*, 118 F. Supp. 2d at 403 (*quoting Schmidt* v. *Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y.

1998)). Mere participation or assistance to an enterprise will not suffice. *See id.* at 403-04.[15] Both

---

[14]   Even if the associations-in-fact described in both complaints were distinct from the defendants, such definition of enterprise should fail as to ESS and Compass because only "groups of individuals," not corporations, are included in the "association-in-fact" component of the definition of "enterprise" in 18 U.S.C. § 1961(4). This issue was argued in the Supreme Court in *Mohawk Industries, Inc.* v. *Williams*, 126 S. Ct. 2016 (2006). The Supreme Court remanded without addressing the issue; we are aware that the Second Circuit has held that corporations *can* be part of an association-in-fact, *see United States* v. *Huber*, 603 F.2d 387, 393-94 (2d Cir. 1979), but we respectfully raise the issue here to preserve it for appeal.

[15]   *See also Baisch* v. *Gallina*, 346 F.3d 366, 376 (2d Cir. 2003) (noting that participation requires either "discretionary authority in carrying out the instructions of the [conspiracy's] principals" or "played some part in directing the affairs of the enterprise."); *United States* v. *Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) ("the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c).") (citing *United States* v. *Viola*, F.3d 37, 41 (2d Cir. 1994)); *Crab House of Douglaston*, 418 F. Supp. 2d at 207 (dismissing complaint where allegations of "conduct" were conclusory, court noted that "disjunctive allegations are inadequate").

complaints fails to allege that Kemp, Swain or Bickerstaff exercised actual control or direction of the affairs of *any* of the "enterprises" identified in the complaints; the RICO claims against them should therefore be dismissed.

## G.   Plaintiffs Have Failed To Allege RICO Conspiracy Under Section 1962(d)

Both plaintiffs allege that the Compass Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). (*See* ES-KO Compl. Counts 2, 4 and 6; Supreme Am. Compl. Count 2.) These claims should be dismissed as to the Compass Defendants because the complaints fail to plead a substantive RICO violation against the Compass Defendants. In the alternative, these claims should be dismissed because neither plaintiff has pled that the Compass Defendants conspired to commit any RICO violations.

### 1.   Plaintiffs Cannot Plead RICO Conspiracy Without Also Adequately Pleading Substantive Violations of RICO

Because plaintiffs' RICO claims under 18 U.S.C. § 1962(c) fail for the reasons discussed above, their RICO conspiracy claims under § 1962(d) also fail. As this Court explained in *Maddaloni Jewelers*, "a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met." 354 F. Supp. 2d at 300 (quoting *Citadel Mgmt., Inc.* v. *Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000) (Sweet, J.)).

### 2.   In the Alternative, the Claim Under § 1962(d) Should Be Dismissed Because ES-KO and Supreme Do Not Adequately Plead That the Compass Defendants Conspired to Violate RICO

Even if this Court finds that ES-KO or Supreme did plead a substantive RICO violation against the Compass Defendants, this Court should nonetheless dismiss their RICO conspiracy claims. To state a claim under section 1962(d), plaintiffs must plead "with specific facts that *each of the individual defendants*, by words or actions, manifested an agreement to commit two or more of the predicate acts." *Laverpool* v. *New York City Transit Auth.*, 760 F. Supp. 1046, 1060

33

(E.D.N.Y. 1991), *aff'd*, 41 F.3d 1501 (2d Cir. 1994) (dismissing section 1962(d) count because, in part, "[i]t is not clear from the face of the pleading how, or even if, each defendant participated in the alleged conspiracy to violate RICO, and the extent and nature of the roles of each of the defendants.").

Under 18 U.S.C. § 1962(d), such a claim "should be more than a conclusory add-on at the end of a complaint. It should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." *FD Prop. Holding, Inc.* v. *US Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (citation and quotation omitted); *see also Dietrich* v. *Bauer*, 76 F. Supp. 2d 312, 349 (S.D.N.Y. 1999) (Sweet, J.). Conclusory allegations will not suffice. *See Heffernan* v. *HSBC Bank USA*, No. 1:99CV07891, 2001 WL 803719, at *8 (E.D.N.Y. Mar. 29, 2001) (holding that the "complaint may not merely incorporate by reference the allegations of the remainder of the complaint and then state in a conclusory manner that the defendants conspired to commit them").

The complaints contain only conclusory allegations of conspiracy. (*See, e.g.*, ES-KO Compl. ¶ 48 ("numerous bids by ES-KO for contracts from the [U.N.] were unsuccessful as a result of the active criminal conspiracy among the Defendants described herein"); Supreme Am. Compl. ¶ 1 ("[defendants'] conspiracy corrupted the [U.N.] and defrauded the U.N.'s member states").) Supreme's 1962(d) claim consists of eight paragraphs tacked onto the end of the Complaint, with paragraph 106 referring to the primary RICO violation, and the remaining allegations merely parroting the legal standards. (*See* Supreme Am. Compl. ¶¶ 108-12.) Similarly, ES-KO's 1962(d) claims consist of three counts tacked on after each civil RICO claim, each five paragraphs long, with paragraphs 298, 316 and 333 merely incorporating by reference the rest of the complaint, and the remaining allegations merely parroting the legal standards. (*See* ES-KO Compl. ¶¶ 299-302, 317-20,

334-37.) Nowhere does either complaint allege "what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." *FD Prop. Holding,* 206 F. Supp. 2d at 373. ES-KO's and Supreme's RICO conspiracy claims should therefore be dismissed in their entirety.

**II.**
**ES-KO AND SUPREME FAIL TO STATE A**
**CLAIM UNDER THE ROBINSON-PATMAN ACT**

Plaintiffs' claims under section 2(c) of the Robinson-Patman Act must be dismissed for five reasons.

*First,* plaintiffs fail to state a claim for relief under section 2(c) because they do not allege that the Compass Defendants bribed a U.N. buying agent for the purpose or with the effect of engaging in price discrimination between favored and disfavored buyers. Here, the complaints do not and cannot allege that the U.N. benefited over other buyers as a result of price discrimination related to the Compass Defendants' alleged commercial bribery. These allegations are insufficient as a matter of law because section 2(c), properly construed, does not provide relief for claims of commercial bribery in the absence of such price discrimination.

*Second,* the allegations in the complaints make it clear that ES-KO and Supreme have not suffered antitrust injury because the Compass Defendants' alleged conduct did not prevent ES-KO from competing for U.N. business. To the contrary, the complaints admit that the alleged bribes caused plaintiffs to offer the U.N. *lower* prices than they otherwise would have offered and that, whenever plaintiffs offered the lowest bid, they won. Any harm plaintiffs may have suffered in the form of lost business is not the type of injury the antitrust laws are intended to prevent because it is attributable to price competition among the plaintiffs, defendants, and other bidders.

*Third,* plaintiffs have failed to allege the requisite elements of a claim for commercial bribery and, thus, have failed to plead that claim as a basis for a violation of section 2(c).

35

*Fourth*, as a matter of law, plaintiffs' claims under section 2(c) must be dismissed to the extent they seek to recover damages for lost profits with respect to U.N. contracts that were *not* the subject of alleged bribery.

## A.    Plaintiffs' Allegations of Commercial Bribery Do Not State a Claim Under Section 2(c) of the Robinson-Patman Act Because There Is No Allegation of Price Discrimination Favoring a Buyer

Whether commercial bribery falls within the ambit of section 2(c) of the Robinson-Patman Act is a question that has not been definitively answered by the United States Supreme Court or by this Court. *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 221 (2d Cir. 2004). Plaintiffs essentially contend that Congress intended to create a federal cause of action for a seller under the antitrust laws providing for treble damages and attorney fees whenever a competing seller pays a bribe to an agent of a potential customer. Although some courts have so held, the better view is that the intention of Congress in passing the Robinson-Patman Act was to prevent breakdowns in competitive conditions caused by price discrimination in favor of large powerful buyers over smaller ones.

Simply put, Congress did not intend to provide a separate antitrust cause of action for commercial bribery in the absence of price discrimination. *See Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1388 (D. Conn. 1988) ("Even though there is evidence in the legislative history that Congress may have additionally intended for section 2(c) to prohibit commercial bribery, it appears that the main purpose of section 2(c) was to close the 'brokerage' loophole in the laws regulating price discrimination.") (citations omitted); *Bunker Ramo Corp. v. Cywan*, 511 F. Supp. 531, 533 (N.D. Ill. 1981). Here, there are no allegations that the U.N. benefited from price discrimination as a result of the alleged commercial bribery.

The Robinson-Patman Act was enacted in 1936 as an amendment to the Clayton Act, and is designed to eliminate price discrimination. *See Fed. Trade Comm'n v. Broch*, 363 U.S. 166,

168 (1960). The primary – if not the only – purpose for amending the Clayton Act was "to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *Id.*

Section 2(c) of the Robinson-Patman Act is designed to address a particular form of price discrimination – namely, the use of brokerage fees to effectuate price discrimination.[16] After conducting a lengthy investigation, Congress determined section 2(c) was necessary because large retail chain buyers were able to obtain competitive advantages through brokerage fees that avoided the purview of the Clayton Act. *Id.* at 168-69. As described by the Supreme Court:

> One of the favorite means of obtaining an indirect price concession was by setting up 'dummy' brokers who were employed by the buyer and who, in many cases, rendered no services. The large buyers demanded that the seller pay 'brokerage' to these fictitious brokers who then turned it over to their employer. This practice was one of the chief targets of § 2(c) of the Act.

*Id.* at 169.

Of course, this was not the only abusive tactic utilized by large retailers; the Supreme Court recognized that "Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to *effect price discrimination.*" *Id.* (emphasis added).

It is true that the Supreme Court noted, in dictum in a footnote, that "the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer." *Broch*, 363 U.S. at 169 n.6; *California Motor Transp. Co.* v. *Trucking*

---

[16]    Section 2(c), codified at 15 U.S.C. § 13(c) (2000) states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

37

*Unlimited*, 404 U.S. 508, 513 (1972) ("bribery of a public purchasing agent *may* constitute a

violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act") (emphasis added).

The Supreme Court, however, appears to have been of the opinion that a violation of section 2(c)

only occurs when such a payment results in price discrimination.

In *Broch*, the defendant worked as a seller's broker and normally received a

commission of 5% on sales. *Broch*, 363 U.S. at 167. In order to effectuate a deal with a particularly

large buyer, however, the defendant agreed to accept a commission of 3%. *Id.* The Court noted that

"[t]here is no difference in economic effect between the seller's broker splitting his brokerage

commission with the buyer and his yielding part of the brokerage to the seller to be passed on to the

buyer in the form of a lower price." *Id.* at 174-75. Thus, the Court held that the defendant had

violated section 2(c). Significantly, however, the Court noted that "[h]ad [Broch], for example,

agreed to accept a 3% Commission on all sales to all buyers there plainly would be no room for

finding that the price reductions were violations of § 2(c) .... Here, however, the reduction in

brokerage was made to obtain this particular order and this order only and therefore was clearly

discriminatory." *Id.* at 176. Thus, the payment in *Broch* was "illegal ... not on any absolute basis,

but solely because, on the specific facts, it was discriminatory." Louis Altman, *Callmann on Unfair*

*Competition, Trademarks and Monopolies* § 7.41 (4th ed. 1983).

The legislative history of section 2(c) also shows Congress's intent to provide a cause

of action only extended to those situations in which consideration paid to a buyer's agent was

designed to disguise price discrimination. Both the Senate[17] and House Reports[18] make this clear.

---

[17]   The Senate Report states in pertinent part:

> Among the prevalent modes of discrimination at which this bill is directed, is the practice of certain large
> buyers to demand the allowance of brokerage direct to them upon their purchases, or its payment to an
> employee, agent, or corporate subsidiary *whom they set up in the guise of a broker*, and through whom they
> demand that sales to them be made. Whether employed by the buyer in good faith to find a source of

Those courts that have held that Congress intended to create a cause of action for commercial bribery absent a showing of price discrimination have relied upon little authority — i.e., dictum from two Supreme Court opinions and out-of-context legislative history.[19] In this regard, the First Circuit has noted that decisions allowing Robinson-Patman claims for commercial bribery constitute a questionable expansion upon the dictum contained in the *Broch* decision. *See Augusta News Co.* v. *Hudson News Co.*, 269 F.3d 41, 45 (1st Cir. 2001) ("Admittedly, some courts have read the statute to apply to outright commercial bribery whereby one party to the transaction corrupts an agent of the other. This view builds on, but obviously goes somewhat beyond, a statement by the Supreme Court that congressional debates on section 2(c) show it to proscribe other practices such as the 'bribing' of a seller's broker by a buyer.") (footnote omitted) (citing *Broch*, 363 U.S. at 169 n.6).

---

supply, or by the seller to find a market, the broker so employed discharges a sound economic function and is entitled to appropriate compensation by the one in whose interest he so serves. But to permit its payment or allowance *where no such service is rendered*, where in fact, if a "broker," so labeled, enters the picture at all, it is one whom the buyer points out to the seller, rather than one who brings the buyer to the seller, is but to permit the corruption of this function *to the purposes of competitive discrimination*. The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him; is a violation of that relationship; and *to protect those who deal in the streams of commerce* against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume.

S Rep. No. 74-1502, at 7 (1936) (emphasis added).

[18] Similarly, the House Report states:

[This section] deals with the abuse of the brokerage function *for purposes of oppressive discrimination....* [The] positions of buyer and seller are by nature adverse, and it is a contradiction in terms incompatible with his natural function for an intermediary to claim to be rendering services for the seller when he is in fact for or under the control of the buyer, and no seller can be expected to pay such an intermediary so controlled for such services *unless compelled to do so by coercive influences in compromise of his natural interest.*

H.R. Rep. No. 74-2287, pt. 1, at 14 (1936) (emphasis added).

[19] At least four circuits have concluded that commercial bribery is within the ambit of section 2(c). *See Harris* v. *Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272, 1274 n.3 (9th Cir. 1991); *Envtl. Tectonics* v. *W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir. 1988); *Grace* v. *E.J. Kozin Co.*, 538 F.2d 170, 173 (7th Cir. 1976); *Fitch* v. *Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12, 15-16 (6th Cir. 1943).

One court in this District has concluded that the Robinson-Patman Act does not apply outside the brokerage context. *See Intimate Bookshop, Inc.* v. *Barnes & Noble, Inc.*, 88 F. Supp. 2d 133, 140 (S.D.N.Y. 2000) (Pauley, J.). That court, in dismissing the complaint, noted that "the case law and legislative history of Section 2(c) make it clear that Section 2(c) was not intended to apply outside of the brokerage context." *Id. See also Broch*, 363 U.S. at 169-70 (brokerage abuses mean obtaining indirect price concessions by setting up "dummy brokers" who are paid a commission in lieu of a brokerage).

Plaintiffs here are required to plead that the Compass Defendants paid a bribe or commission in lieu of a brokerage fee to price discriminate. *See Intimate Bookshop, Inc.*, 88 F. Supp. 2d at 140 ("Courts have routinely dismissed claims under Section 2(c) when the plaintiff has not alleged that a discount or payment is in lieu of a brokerage or commission."). *See also Excel Handbag Co.* v. *Edison Bros. Stores*, 630 F.2d 379, 387 (5th Cir. 1980) (declining to assume commercial bribery could violate section 2(c)); *NL Indus., Inc.* v. *Gulf & W. Indus., Inc.*, 650 F. Supp. 1115, 1124 (D. Kan. 1986) (dismissing section 2(c) claim where complaint "fail[ed] to establish a nexus between the alleged commercial bribery and the competitive injury"). Plaintiffs' failure to do so mandates dismissal.

**B.     Plaintiffs Do Not Have Standing Because They Did Not Suffer Antitrust Injury**

The Robinson-Patman claims under section 2(c) must be dismissed for an independent reason. Plaintiffs do not have standing to assert such a claim because they have not suffered *antitrust* injury. Here, neither plaintiff alleges the bribes restrained its ability to compete. Instead, the gravamen of plaintiffs' antitrust claim is that they lost business because the defendants caused the U.N. to enter into contracts at *lower* bids than plaintiffs offered. These allegations are insufficient to support a claim because the Supreme Court has made it clear that – absent

40

extraordinary circumstances that are not and cannot be alleged here – an antitrust plaintiff does not have standing to sue for injury caused by a customer's paying lower prices.

### 1.    Plaintiffs Must Allege Antitrust Injury To Recover for a Violation of Section 2(c)

Before a plaintiff may avail itself of the treble damages provision of the Clayton Act, 15 U.S.C. § 15(a) (2000), it must demonstrate some injury that the antitrust laws were designed to prevent. This requirement derives not from the express language of section 2(c) but, rather, from the antitrust injury requirement of section 4 of the Clayton Act. *See id.*

Section 2(c), by its terms, creates no private cause of action. *See Blue Tree Hotels*, 369 F.3d at 220 ("a private litigant seeking treble damages for such a violation under § 4 of the Clayton Act must nevertheless allege an antitrust injury"); *Fed. Paper Bd. Co.*, 693 F. Supp. at 1386 ("Section 2(c) of the Robinson-Patman Act defines certain conduct as illegal. It does not, however, create a private right of action to sue for damages caused by violations of the act."). While a technical violation of the terms of section 2(c) might give rise to a Federal Trade Commission enforcement action, it does not, without more, provide relief to a private plaintiff. *See Lomar Wholesale Grocery, Inc.* v. *Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 600 (8th Cir. 1987) (for purposes of standing analysis under section 4 of the Clayton Act, "citations to Federal Trade Commission enforcement actions are clearly inapposite").[20]

---

[20]    *See Fed. Paper Bd. Co.*, 693 F. Supp. at 1387 ("Even though, as *Biddle* and *Simplicity Pattern* demonstrate, defendants' conduct might support a Federal Trade Commission cease and desist order, an additional inquiry into standing is necessary if Federal's claim for damages is to survive dismissal. For purposes of standing analysis, cases like *Biddle* and *Simplicity Pattern* are irrelevant. Those cases involved Federal Trade Commission enforcement actions in which the standing limitations on private plaintiff claims do not apply."). Thus, a private plaintiff who wishes to sue for a violation of Section 2(c) must meet the requirements of Section 4 of the Clayton Act. *See, e.g., Genesco Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840, 853 (2d Cir. 1987) (§ 2(c) makes certain business practices unlawful while § 4 of the Clayton Act "provides for an express private right of action for treble damages to any person injured in his business or property as a result of any antitrust violation").

Section 4 of the Clayton Act, as amended by the Robinson-Patman Act, provides that "[e]xcept as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything *forbidden in the antitrust laws* may sue therefore in any district court of the United States. 15 U.S.C. § 15(a) (emphasis added).

Both the Supreme Court and the Second Circuit have held that, in an action for treble damages under section 4 of the Clayton Act, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981); *Schwimmer* v. *Sony Corp. of Am.*, 637 F.2d 41, 46 (2d Cir. 1980) (standing to raise a claim under section 2(a) of the Robinson-Patman Act "is derived from Section 4 of the Clayton Act"). *See also Envtl. Tectonics*, 847 F.2d at 1066; *Fed. Paper Bd. Co.*, 693 F. Supp. at 1388; *Haff* v. *Jewelmont Corp.*, 594 F. Supp. 1468, 1471 (N.D. Cal. 1984) ("Whether a party's interests are protected by the antitrust laws is analytically distinct from whether that party has standing to sue under the antitrust laws.").

In *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328 (1990), the "respondent maintain[ed] that any loss flowing from a *per se* violation ... automatically satisfies the antitrust injury requirement." *Id.* at 335 (discussing *per se* violation of the antitrust laws in the context of section 1 of the Sherman Act). The court held that "[t]he *per se* rule is a method of determining whether [the antitrust laws] ha[ve] been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act." *Id.* at 341-42. An "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Id.* at 334.

42

2.    **Loss Flowing From Continued Competition and Lower Prices Does Not Constitute Antitrust Injury**

"[A] plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Id.* at 344. As courts have repeatedly noted, "[t]he antitrust laws ... were enacted for 'the protection of *competition* not *competitors*.'" *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co.* v. *U.S.*, 370 U.S. 294, 320 (1962)). The antitrust laws, accordingly, do not protect a business from a loss of profits to a competitor related to continued or increased competition. *See Stamatakis Indus.* v. *King*, 965 F.2d 469, 471 (7th Cir. 1992) ("[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other.").

In *Atlantic Richfield*, the Supreme Court held that lower customer prices cannot give rise to antitrust injury as long as they are above predatory levels. 495 U.S. at 339-40. As the Court stated:

> Although a vertical, maximum-price-fixing agreement is unlawful under § 1 of the Sherman Act, it does not cause a competitor antitrust injury unless it results in predatory pricing. Antitrust injury does not arise for purposes of § 4 of the Clayton Act, until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

*Id.* (citations omitted) (emphasis added).

Dismissal of plaintiff's bid-rigging allegations for failure to plead the bids resulted in higher prices accords with well-settled law. For example, the Seventh Circuit recently upheld dismissal of a bid-rigging allegation in *James Cape*, 2006 U.S. App. LEXIS 16184, because the alleged conduct had resulted in lower prices and therefore could not have caused antitrust injury. In that case, plaintiff alleged that defendants violated the antitrust laws

by obtaining a competitor's bids and using that information to submit the lowest bid and win government contracts. *See id.* at *2. The district court dismissed plaintiff's antitrust claim because it found that plaintiff had not properly alleged an antitrust injury. *Id.* The court held that antitrust injury must involve "loss [that] comes from acts that reduce output or raise prices to consumers." *Id* at *5. (quoting *Chicago Prof'l Sports Ltd. P'ship* v. *Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992)). The Seventh Circuit agreed with the district court that by providing *lower* bids to the consumer the conduct actually *increased*, rather than restricted, competition, albeit in an illegal manner, and consequently there could be no antitrust injury and dismissal was appropriate. *See James Cape*, 2006 U.S. App. LEXIS 16184 at *6.

Here, ES-KO's complaint in particular admits that the alleged bribes did not restrain its ability to compete for the U.N.'s business. Rather, it alleges that the bribes forced it to submit lower bids and that it won the business when it submitted lower bids. (*See* ES-KO Compl. ¶¶ 23, 247, 263.) Neither complaint alleges that the defendants' lower prices are predatory, nor could they.[21] Consequently, plaintiffs do not have standing to assert a claim for damages under section 4 of the Clayton Act and dismissal is required. *See, e.g., Goold Elecs. Corp.* v. *Galaxy Elecs., Inc.*, 1991 WL 281744, at *1-2 (N.D. Ill. Dec. 30, 1991) (dismissing allegation that defendant violated section 2(c) by taking kickbacks in exchange for selling goods below price for failure to allege antitrust injury); *Phillips Getschow Co.* v. *Green Bay Brown County Prof'l Football Stadium Dist.*, 270 F. Supp. 2d 1043 (E.D. Wis. 2003) (holding plaintiff did not have standing to assert an allegation that bids violated section 1 of the Sherman Act because the alleged bribes lowered prices); *see also Lewis* v. *Philip Morris Inc.*, 355 F.3d 515, 525 n.13 (6th Cir. 2004) (citing *Rutman Wine Co.*

---

[21]    The Supreme Court has defined predatory pricing as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc.* v. *Montfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986).

v. *E. & J. Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987)) (noting that a plaintiff must allege an "actual injury attributable to something the antitrust laws were designed to prevent" and that its "failing to receive a promotional allowance ... adversely affected its ability to compete with favored competitors").

### C.   Even if Commercial Bribery Is Actionable Under Section 2(c), Dismissal Is Warranted Because Plaintiffs Fail To Allege Injury to the U.N.

Even assuming that a section 2(c) claim could be based on commercial bribery, a necessary requirement for stating such a claim would be allegations sufficient to establish commercial bribery. *See, e.g., Blue Tree Hotels*, 369 F.3d at 221 (dismissing case for failure to allege predicate act of bribery); *Excel Handbag Co.,* 630 F.2d at 387-88 (dismissing a section 2(c) claim based on commercial bribery for insufficient proof of commercial bribery). As explained above, *see supra* pp. 24-27, plaintiffs fail to allege a key element of a commercial bribery claim, namely an economic injury to the employer of the corrupted employee. Consequently, dismissal is warranted.

### D.   The Robinson-Patman Act Claims Must Be Dismissed as to Those Contracts in Which ES-KO Does Not Allege Bribery To Have Occurred

Section 2(c), by its terms, does not apply to transactions other than the ones in which any person "paid or granted ... anything of value as a commission, brokerage, or other compensation ... in connection with the sale or purchase of goods." 15 U.S.C. § 13(c). Indeed, the provision expressly limits violations to "such transaction." *Id.* Thus, section 2(c) has no applicability to contracts ES-KO won, as to which there is no claim that ESS paid bribes or even submitted bids. Notably, Supreme does not advance this theory of liability at all.

In any event, ES-KO's allegations with respect to the contracts that it won amounts to an umbrella damages theory of damages, which, under well-settled law, does not confer antitrust

standing.[22] *See, e.g, Ocean View Capital, Inc.* v. *Sumitomo Corp. of Am.*, No. 98 Civ. 4067 (LAP), 1999 WL 1201701, at \*7 (S.D.N.Y. Dec. 15, 1999) (Preska, J.) (dismissing claim based on umbrella theory of damages); *Gross* v. *New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246 (S.D.N.Y. 1997) (Sweet, J.) (same): *Mid-West Paper Prods. Co.* v. *Cont'l Group Inc.*, 596 F.2d 573, 587 (3d Cir. 1979) (same); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1340-41 (9th Cir. 1982) (same).

For example, in *Ocean View*, 1999 WL 1201701, at \*1, the plaintiff alleged that it was injured despite the fact it had not purchased directly from the defendant because the defendant's conduct increased the price of copper across the entire market. The court rejected this theory on the grounds that: (1) the injury suffered by the plaintiff was not a direct result of the defendants' contracts but rather was an indirect result of a general price increase caused by the copper contracts between defendants; (2) there may have been intervening causative factors rendering attenuated the link between the defendants' conduct and the plaintiff's injury; (3) there were more direct victims than the plaintiff, such as those who purchased copper directly from the defendants; and (4) the determination of damages would be complex because the plaintiff would have to show what portion of the inflated copper price was a result of the defendants' conspiracy and not the result of some other factor. *See id.* at \*7; *see also Gross*, 955 F. Supp. at 246-47.[23]

---

[22]    Under a theory of umbrella liability, an antitrust plaintiff seeks damages for purchases from the defendants' competitors because the defendants, as a result of their conspiracy, created a "price umbrella" under which nonconspiring competitors could charge artificially high prices. *See Mid-West Paper Prods., Co.* v. *Con'l Group, Inc.*, 596 F.2d 573, 583 (3rd Cir. 1979).

[23]    Although umbrella damage claims have been analyzed with respect to Sherman Act claims, the analysis should apply equally to Robinson-Patman Act claims.

## III.
## SUPREME'S SHERMAN ACT CLAIMS MUST BE DISMISSED

Supreme, but not ES-KO, also asserts claims under sections 1 and 2 of the Sherman Act. Supreme's Sherman Act claims should be dismissed for several reasons.

*First*, Supreme's complaint fails to state a claim for a *per se* violation of section 1 because it does not plead a *horizontal* conspiracy between competitors to engage in commercial bribery or refuse to compete for the business of the U.N.

*Second*, the complaint does not even purport to plead a rule of reason violation of section 1 and it fails to articulate any coherent theory of harm to competition that could support antitrust liability under the rule of reason. Put simply, there is no allegation that the alleged vertical agreement between ESS, on the one hand, and the U.N. employee who was allegedly bribed, on the other hand, increased prices to the U.N. or caused Supreme not to compete for the U.N. contracts. The complaint, thus, fails to allege harm to competition.

*Third*, even if the complaint alleged either a *per se* or rule of reason violation under section 1 of the Sherman Act, Supreme would lack standing to assert such claim because it has not suffered "antitrust injury." The complaint alleges that Supreme was injured because it lost business when the U.N. agreed to pay *lower* bids to ESS than it would have paid to Supreme absent the allegedly unlawful conduct. The antitrust laws are not intended to protect competitors from lost business due to price competition, and the alleged injury to Supreme caused by the U.N. paying *lower* bids cannot confer antitrust standing on Supreme.

*Fourth*, the complaint does not allege any facts to establish a plausible relevant antitrust market in which harm to competition could occur. Pleading a plausible antitrust market is a pre-requisite to stating a claim for relief under the rule of reason.

47

*Fifth*, as to Supreme's claim for attempt to monopolize in violation of section 2 of the Sherman Act, plaintiff has not sustained antitrust injury, fails to allege a cognizable product market, and fails to allege that there was a dangerous probability that ESS would obtain monopoly power.

*Sixth*, as to Supreme's claim for conspiracy to monopolize, apart from the same defects that plague its other Sherman Act claims, there is no claim that the Compass Defendants had the specific intent to monopolize. Alleging an agreement to pay commercial bribes to win specific U.N. contracts is plainly not enough.

## A. Supreme's Section 1 Sherman Act Claim Should Be Dismissed

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal." 15 U.S.C. § 1 (2000). Although the language of the statute is broad, the Supreme Court has held that section 1 prohibits only certain unreasonable restraints of trade that cause harm to a properly defined, relevant antitrust market. *See Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988).

"[T]he 'rule of reason' [is] the prevailing standard of analysis" under section 1. *Cont'l T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). Under the rule of reason, a court examines the alleged restraint, taking into account all surrounding circumstances, including the structure of the relevant market, to determine whether its net effect is to harm consumer welfare through higher prices and reduced output. *See Standard Oil Co. of N.J.* v. *United States*, 221 U.S. 1, 58 (1911) (reasonableness of restraint depends on whether it "restrain[s] the free flow of commerce and tend[s] to bring about the … enhancement of prices"). Harm to a competitor, as opposed to harm to competition, is not sufficient to state a claim under the rule of reason. *See, e.g., Stamatakis Indus.*, 965 F.2d at 471 ("[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other.").

48

The Supreme Court has carved out a narrow exception to the rule of reason for certain types of agreements among competitors that are so plainly anticompetitive that they should conclusively be presumed illegal *per se* without further examination. *See Nat'l Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679, 692 (1978). To state a claim under the *per se* rule, Supreme must also allege facts showing that the concerted action is "horizontal" – i.e., is between firms that are actual or potential competitors, *see United States* v. *Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986), and that the conduct at issue is a type that "would always or almost always tend to restrict competition and decrease output." *Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979). If the concerted action is not horizontal, or if the type of conduct at issue does not fall within the categories of conduct that is *per se* illegal, Supreme may still state a claim under the rule of reason only if it alleges facts to show that the conspiracy "produced adverse, anti-competitive effects within the relevant product and geographic market." *Rossi* v. *Standard Roofing, Inc.*, 156 F.3d 452, 464 (3d Cir. 1998); *see also Advanced Power Sys., Inc.* v. *Hi-Tech Sys., Inc.*, 801 F. Supp. 1450, 1460 (E.D. Pa. 1992); *Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002).

### 1. Commercial Bribery Does Not Constitute Bid-Rigging or a *Per Se* Violation of the Sherman Act

Under well-established law, Supreme's allegation that ESS bribed a U.N. procurement official so that it could underbid Supreme does not state a claim for bid-rigging and is not a *per se* violation of the Sherman Act. Bid-rigging is "[a]ny agreement *between competitors* pursuant to which contract offers are to be submitted to or withheld from a third party." *United States* v. *Portsmouth Paving Corp.*, 694 F.2d 312, 325 (4th Cir. 1982) (emphasis added); *United States* v. *Heffernan*, 43 F.3d 1144, 1146-47 (7th Cir. 1994). Supreme simply has not alleged an agreement between competitors. Rather, Supreme has alleged purely vertical agreements between

49

(1) ESS and a purchasing agent of the U.N., and (2) ESS and its vendor intermediary, IHC. (*See* Supreme Am. Compl. ¶¶ 57-62.)

Nor has Supreme more generally alleged any *per se* violation of the antitrust laws. It is settled law that vertical nonprice restrictions – such as those alleged here – are not illegal *per se*. *See, e.g., Cont'l T.V., Inc.*, 433 U.S. at 57-59; *Bus. Elecs. Corp.*, 485 U.S. at 735-36 ("a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels"). Courts have specifically held that an alleged conspiracy between a purchasing entity, such as the U.N., and a successful bidder, such as ESS, is not a *per se* violation of the Sherman Act. *See Expert Masonry, Inc.* v. *Boone County, Ky.*, 440 F.3d 336, 345 (6th Cir. 2006) (alleged conspiracy between purchasing entity and winning private bidder is not a *per se* violation of the Sherman Act).[24] Thus, Supreme's *per se* claim under section 1 of the Sherman Act should be dismissed.

### 2. The Complaint Fails to Plead a Rule of Reason Violation Because There Is No Alleged Injury to Competition

Supreme's complaint does not purport to state a claim under the rule of reason, either. Undoubtedly this is because, even if proved, the payment of a bribe by a supplier to a purchasing agent or customer does not, by itself, establish injury to competition as required to establish a rule of reason claim under section 1 of the Sherman Act. *See, e.g., Fed. Paper Bd. Co.*, 693 F. Supp. at 1382. The existence of bribes simply "does not support an inference that the bribes restrained competition." *Id.* at 1383. "On the contrary, bribery could have been consistent with intense competition among the suppliers – some of which resorted to [bribery] to gain an advantage." *Id.*

---

[24]   *Accord, e.g., Williams Elec. Games, Inc.* v. *Garrity*, 366 F.3d 569, 578 (7th Cir. 2004) (commercial bribery without horizontal collusion among competitors is not price fixing); *Calnetics Corp.* v. *Volkswagen of Am., Inc.*, 532 F.2d 674, 687 (9th Cir. 1976) (no Sherman Act violation where commercial bribery alleged but no allegations of horizontal price-fixing or bid-rigging); *Bunker Ramo Corp.* v. *United Bus. Forms, Inc.*, 713 F.2d 1272, 1284-85 (7th Cir. 1983) (bribing an agent as part of a scheme to defraud does not constitute a *per se* violation of the Sherman Act).

Stated differently, commercial bribery is generally not actionable under the Sherman Act because although bribery might adversely affect a competitor, it does not harm the market. *See, e.g., Advanced Power Sys., Inc.*, 801 F. Supp. at 1463 ("agreements to rig bids among persons who are not actual or potential competitors 'is [sic] meaningless for Sherman Act purposes' because they have no market impact") (citing *United States* v. *Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986)).[25]

In this case, the complaint does not allege harm to competition. It lacks allegations demonstrating that the U.N. paid higher prices as a result of the bribes or that the losing suppliers (including Supreme) were precluded from taking competitive actions to secure the U.N.'s future business. *See NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 135 (1998) (allegations of harm to competition necessary to state a claim under section 1 of the Sherman Act); *Advanced Power Sys., Inc.*, 801 F. Supp. at 1463 (dismissing "vertical sham bidding conspiracy" between the biddee and one bidder for failure to allege harm to the market); *Bunker Ramo Corp.*, 713 F.2d at 1285 (bribing an agent as part of a scheme to defraud was deficient under the rule of reason for lack of any anticompetitive effect).

In such circumstances, courts routinely dismiss allegations of commercial bribery for failure to state a claim under section 1 of the Sherman Act. *See World Wrestling Entm't, Inc.* v.

---

[25]    The very meaning of this Court's repeated insistence that the Sherman Act protects "competition, not competitors," *see Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *Brown Shoe Co.* v. *U.S.*, 370 U.S. 294, 320 (1962), is that an agreement, to be condemned as anticompetitive, must make purchasers in the market worse off by significantly limiting the overall range of existing as well as potential sellers, or their ability to compete, so as to subject purchasers to reduced output and raised prices. In the absence of such a marketwide contraction, purchasers can turn to alternatives, whether existing sellers or new entrants, and any harm is only to competitors, not competition. *See, e.g., Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (foreclosure of "competition" under Section 3 of the Clayton Act, 15 U.S.C. § 14, requires marketwide inquiry); *id.* at 335 (applying result to section 1 of the Sherman Act). Thus, a section 1 plaintiff challenging a vertical nonprice agreement must prove -- and, at the complaint stage, must make allegations from which reasonable inferences may be drawn -- that the agreement has harmed or will harm marketwide competition to the detriment of the buyers in that market. Failure to do so mandates dismissal.

*Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 521 (S.D.N.Y. 2006) (Karas, J.) (dismissing complaint because plaintiff failed to demonstrate how the bribery prevented competitive bids from being offered to, or accepted by World Wrestling Entertainment's management); *Fed. Paper Bd. Co.*, 693 F. Supp. at 1383 (granting motion to dismiss on the grounds there was no antitrust injury because there was no allegation that non-bribing suppliers could not compete, or that plaintiff could not purchase from non-bribing suppliers).

The complaint's failure to allege injury to competition through increased prices or a reduction in competitive alternatives for the U.N. requires dismissal of the section 1 claim brought under the rule of reason.

### 3. Supreme Does Not Have Standing To Bring a Sherman Act Claim Because It Has Not Alleged Antitrust Injury

The antitrust claim must be dismissed for another independent reason. Supreme does not have standing to assert either *per se* or rule of reason claims because it has not suffered antitrust injury. Ironically, the gravamen of Supreme's antitrust claim is that it lost business because defendants caused the U.N. to enter contracts at *lower* bids than Supreme offered. As explained above, *supra* p. 51, the Supreme Court has made it clear that – absent extraordinary circumstances that are not and cannot be plead here – an antitrust plaintiff does not have standing to sue for injury caused by a customer's paying lower bids. *See Atl. Richfield*, 495 U.S. at 339-40 (holding lower customer prices cannot give rise to antitrust injury as long as they are above predatory levels); *see also James Cape*, 2006 U.S. App. LEXIS 16184, at *11-12 (upholding dismissal for failure to plead antitrust injury because conduct resulting in *lower* bids to the consumer actually *increased*, rather than restricted, competition, albeit in an illegal manner). The complaint does not allege that ESS's lower bids are predatory, nor could it. Consequently, Supreme does not have standing to assert a rule of reason claim and dismissal is required. *See,*

*e.g., Phillips Getschow Co.*, 270 F. Supp. 2d at 1047-48 (holding plaintiff did not have standing to assert an allegation that bids violated section 1 of the Sherman Act because the alleged bribes lowered prices).

**4.    Dismissal of Supreme's Sherman Act Claim Is Warranted Because Supreme Fails To Plead Adequately a Relevant Market**

Even if Supreme's complaint had alleged that the Compass Defendants' conduct constituted a rule of reason violation with anticompetitive consequences, it would still have to be dismissed because it fails to allege that the alleged conduct adversely impacted a relevant antitrust market. To state a claim under the rule of reason, a complaint must allege that allegedly unlawful conduct "had an actual adverse effect on competition *as a whole in the relevant market*." *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis altered). Here, the complaint fails to plead a legally cognizable product market. *See Smith & Johnson, Inc.* v. *Hedaya Home Fashions, Inc.*, 125 F.3d 844 (2d Cir. 1997) (upholding dismissal for failure to plead adequately a relevant market); *Chapman* v. *New York State Div. for Youth*, No. 1:04-CV-867, 2005 WL 2407548, at *8-9 (N.D.N.Y. Sept. 29, 2005) (dismissal for failure to plead adequately a relevant market); *E. & G. Gabriel* v. *Gabriel Bros., Inc.*, No. 93 CIV. 0894 (PKL), 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (Leisure, J.) (same).

To survive a motion to dismiss, a plaintiff must properly plead a product market that (1) "includes all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand," *Re-Alco Indus., Inc.* v. *Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (Mukasey, J.); and (2) is plausible, *Hack* v. *President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000), *abrogated on other grounds by Swierkiwicz* v. *Sorema N.A.*, 534 U.S. 506 (2002).

As Judge Hellerstein explained, "[i]n the context of a [Fed. R. Civ. P. 12(b)(6)] motion to dismiss, [an antitrust complaint] must either allege facts regarding substitute products, distinguish among comparable products, or allege facts relating to cross-elasticity of demand; otherwise, dismissal is appropriate." *Intellective, Inc.* v. *Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 609 (S.D.N.Y. 2002).  Where a "market definition fails to bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or cross elasticity of demand,' dismissal is appropriate." *In re Wireless Tel. Servs. Antitrust Litig.*, No. 02 Civ. 2637 (DLC), 2003 WL 21912603, at *10 (S.D.N.Y. Aug. 12, 2003) (Cote, J.) (quoting *Todd* v. *Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)).

Supreme's complaint purports to define the relevant product market as "the market for the supply of food rations to U.N. peacekeeping missions." (Supreme Am. Compl. ¶ 30.)  But this "market" fails the applicable test – it is so artificially narrow that it must be rejected as a matter of law. *See e.g., Intellective, Inc.*, 190 F. Supp. at 611 (noting that a market definition must be rejected if it falls into the "strange red-haired, bearded, one eyed man-with-a-limp classification" (quoting *United States* v. *Grinnell*, 384 U.S. 563, 590-591 (1966) (Fortas, J., dissenting))).

Supreme's market definition is legally defective, to begin with, because it is based on a single purchaser, namely the U.N., which purchases bids for food products.  Under well-established law, a single purchaser cannot constitute a relevant product market absent exceptional market conditions, which do not apply here. *See, e.g., Fed. Paper Bd. Co.*, 693 F. Supp. at 1382 n.6 (except in unusual circumstances a single purchaser cannot constitute a relevant market); *Apani Southwest, Inc.* v. *Coca-Cola Enters., Inc.*, 300 F.3d 620, 629 (5th Cir. 2002) ("as a matter of common sense a single purchaser of a product cannot generally be considered a relevant market, lest

we wish to clothe each and every sale with an antitrust suit" (quoting *Jayco Sys., Inc.* v. *Savin Bus. Mach. Corp.*, 777 F.2d 306, 320 (5th Cir. 1985))).[26]

Indeed, the Supreme complaint itself alleges that Supreme is "a world leader in food supply for military and multinational forces," (Supreme Am. Compl. ¶ 2), thus belying any assertion that the relevant market is restricted to only one of the numerous purchasers of food for military and multinational forces. Similarly, the ES-KO complaint explicitly alleges the close similarity and overlap between the task of supplying food to U.N. troops and to other civil and military clients. Certainly, nothing in the Supreme or ES-KO complaints indicates that the food products and related services sold to the U.N. are somehow distinct from what is sold to other purchasers, including, without limitation, the military, other multinational forces, and private commercial enterprises such as oil companies, mining companies, and others whose employees are working in remote locations throughout the world.[27]

---

[26]   As Judge Marrero held, in rejecting a one-supplier market in *Mathias* v. *Daily News, L.A.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001):

> Several cases in this Circuit confirm the difficulty in delineating a relevant market based on artificially narrow boundaries or a single brand name product. *See Belfiore* v. *New York Times Co.*, 826 F.2d 177 (2d Cir. 1987) ("general interest daily newspapers directed primarily to upscale readers," as a market definition trying to isolate *The New York Times*, was implausible as a theoretical matter), *cert. denied*, 484 U.S. 1067, 98 L. Ed. 2d 994, 108 S. Ct. 1030 (1988); *Shaw* v. *Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678-79 (S.D.N.Y. 1987) (market for Rolex watches cannot support claim under § 2); *H.L. Moore Drug Exch.* v. *Eli Lilly & Co.*, 1978 U.S. Dist. LEXIS 17371, No. 76 Civ. 2817, 1978 WL 1347, *2 (S.D.N.Y. [June 6,] 1978) (market for patented Lilly pharmaceuticals which have no competitive or generic equivalent in the industry fails to set forth legally relevant market).

[27]   ES-KO's description of the relevant product market is directly on point and is therefore worth quoting at length:

> ES-KO has been providing a wide range of products and services to hundreds of commercial and other clients, including the United National, NATO and multinational corporations in difficult regions around the world for over fifty years, and has been a qualified vendor with the Procurement Division since 1988.

> ES-KO is expert in selecting, purchasing, transporting, warehousing and distributing food items to the United Nations and other multi-national clients in remote and difficult regions. ES-KO specializes in food supply, camp construction, maintenance, infrastructures and utilities; supply

Supreme also does not plead adequately a relevant product market because its complaint does not plead any facts related to the availability of reasonably interchangeable substitutes or cross-elasticity of demand for the food products it supplies.[28] There is nothing distinctive or unique about the food products themselves; a chicken is a chicken whether consumed by a peacekeeper in Burundi or an oil rig worker in the North Sea. *See T. Harris Young & Assocs., Inc.* v. *Marquette Elecs., Inc.,* 931 F.2d 816, 824 (11th Cir. 1991) ("While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the product sold to those customers." (emphasis omitted)); *see also Pepsico, Inc.* v. *Coca-Cola Co., Inc.,* No. 98 Civ. 3282 (LAP), 1998 WL 547088, at *8 (S.D.N.Y. Aug. 27, 1998) (Preska, J.) (citing *T.*

---

and erection of pre-fabricated buildings and mobile camp facilities, catering, laundry and housekeeping services; and operation of duty free retain shops.

ES-KO's business is to provide rapid, realistic and effective solutions to logistical problems in the world's harshest environments, including Africa, the Balkans, Southeast Asia, Iraq and Afghanistan.

ES-KO originally specialized in the provision of catering services to large oil and construction companies operating in remote areas of the world, with an international workforce made up of multinational managerial staff and laborers of various nationalities.

Thus, ES-KO acquired the skills of operating in remote locations, overcoming the difficulties in delivering and handling large quantities of perishable food stocks, including operating the necessary kitchen and canteen equipment, hygienic storage of food and water on site and the distribution of these goods to multiple site locations within a single project. With experience gained over many years, ES-KO has been able to offer its services to an increasing and ever-wider international clientele and to expanded its knowledge and know-how of the various regions in which it operates to become a major provider of food and related services to United Nations peacekeeping missions.

(ES-KO Compl. ¶¶ 41-45.)

[28]  Defining a relevant market requires identifying a group of products that are reasonably interchangeable and for which there is a high cross-elasticity of demand. *See Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir. 1997) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." (quoting *Brown Shoe Co.* v. *United States,* 370 U.S. 294, 325 (1962))). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put[.]" *Queen City Pizza, Inc.,* 124 F.3d at 437 (quoting *Allen-Myland, Inc.* v. *IBM Corp.,* 33 F.3d 194, 206 (3d Cir. 1994)). Thus, products that are reasonable substitutes for one another should be included in the same market.

*Harris*, 931 F.2d at 824); *Barr Labs., Inc.* v. *Abbott Labs.*, Civ. No. 87-4764 (AET) 1991 WL 259788, at *3 (D.N.J. Dec. 2, 1991) (same).

**B.     Supreme's Attempt To Monopolize Claim Under Section 2 of the Sherman Act Must Be Dismissed**

Dismissal of Supreme's claim under section 2 of the Sherman Act that ESS attempted to monopolize the market is required for at least two of the same reasons that apply to its section 1 claim: (1) Supreme has not sustained antitrust injury, *Atl. Richfield Co.*, 495 U.S. at 334 (dismissing attempted monopolization claim because suits brought under section 4 of the Clayton Act require plaintiff to allege antitrust injury); and (2) Supreme has not alleged a relevant market, *Yellow Page Solutions, Inc.* v. *Bell Atl. Yellow Pages Co.*, No. 00 CIV. 5663 (MBM), 2001 WL 1468168, at *12 (S.D.N.Y. Nov. 19, 2001) (Mukasey, J.) (dismissing an attempted monopolization claim under section 2 because "a complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed").

Supreme's attempt to monopolize claim should be dismissed for an independent reason, as well – namely, Supreme has not alleged (and could not allege) that there is a dangerous probability that ESS will achieve monopoly power over the supply of food service contracts to the U.N. *See Smith & Johnson, Inc.* v. *Hedaya Home Fashions Inc.*, No. 96 Civ. 5821 (MBM), 1996 WL 737194, at *5 (S.D.N.Y. Dec. 26, 1996) (Mukasey, J.) (dismissing attempt to monopolize claim for failing to allege a dangerous probability of success).[29]

As a threshold matter, Supreme's failure to plead adequately a relevant market is fatal to its attempt to monopolize claim because it necessarily follows that Supreme cannot prove a dangerous probability of successful monopolization. *See B.V. Optische Industrie De Oude Delft* v.

---

[29]     *E. & G. Gabriel*, 1994 WL 369147, at*5 (same); *Arbitron Co.* v. *Tropicana Prod. Sales, Inc.*, No. 91 Civ. 3697 (PKL), 1993 WL 138965, *8 (S.D.N.Y. Apr. 28, 1993) (Leisure, J.) (same).

*Hologic, Inc*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (Leisure, J.) ("Because the relevant market has

not been adequately defined, it is impossible for the Court to assess the anticompetitive effects of

defendants procurement of the patents in issue."); *E. & G. Gabriel*, 1994 WL 369147, at *4-5

(holding dismissal of plaintiff's attempt to monopolize claim was warranted given its failure to

allege a dangerous probability of success).

      Second, the allegations here utterly fail to plead facts indicative of a dangerous

probability that ESS will attain monopoly power. Nothing in the complaint indicates that ESS had

the ability "(1) to price substantially above the competitive level *and* (2) to persist in doing so for a

significant period without erosion by new entry or expansion." *AD/SAT, Div. of Skylight, Inc.* v.

*Associated Press*, 181 F.3d 216, 226-27 (2d Cir. 1999) (quoting 2A Phillip E. Areeda *et al., Antitrust*

*Law* ¶ 501, at 86 (1999) (emphasis in original)). The facts alleged in this case, to the contrary,

indicate that if ESS had tried to price above competitive levels, the U.N. could and would have

awarded the contract to someone else; ESS would merely have lost the bid and market share. *See*

*CDC Techs., Inc.* v. *IDEXX Labs, Inc.*, 186 F.3d 74, 81 (2d Cir. 1999) ("'Market power' is 'the

ability to raise price significantly above the competitive level without losing all of one's business.'"

(quoting *K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995))).[30]

Indeed, as Supreme's and ES-KO's own version of events, ESS has only been able to win bids by

systematically *underbidding* its competitors. (*See* ES-KO Compl. ¶ 71.)

      Supreme alleges that it is a world leader in food supply for military and multinational

forces, continues to compete in the alleged relevant market (*see* Supreme Am. Compl. ¶ 31) and

---

[30] ESS could only exercise monopoly power by forcing Supreme, ES-KO and other firms to exit the market and by preventing them from re-entering. But Supreme does not allege that it or any other firm has ceased, or will sometime in the future cease, to bid on U.N. contracts. Nor does Supreme allege that ESS is capable of preventing firms from bidding on U.N. contracts. The only "barriers to entry" Supreme alleges are that a firm must be a U.N. qualified vendor to bid on U.N. contracts. (Supreme Am. Compl. ¶ 90). Both Supreme and ES-KO affirmatively allege that they are so qualified. (*See* ES-KO Compl. ¶ 12; Supreme Am. Compl. ¶ 35.)

would have won the bids ESS won but for ESS's alleged bribes. (*See id.* at ¶ 87.) Supreme is currently providing food service and catering services to U.N. peacekeepers in the Ivory Coast, and catering and retail services to U.N. staff in Afghanistan. (*See id.* at ¶ 51.)

Similarly, ES-KO continues to compete in the alleged relevant market (*see* ES-KO Compl. ¶ 12), claims to have substantial expertise in the cost-effective provisioning of food and services to multinational missions (*see id.* at ¶ 48), and alleges that it would have won the contracts won but for ESS's alleged bribes. (*See id.*) ES-KO was able to win contracts to provide services to peacekeepers in at least eight countries by submitting the lowest bid between 2000 and 2004. (*See id.* at ¶ 7.)

Supreme's only apparent basis for alleging a dangerous probability that ESS will achieve monopoly power is that there was a particular moment in time at which ESS was performing half of the U.N.'s peacekeeping contracts. (*See* Supreme Am. Compl. ¶ 93.) But such a "snapshot" establishes nothing, especially where there is no indication that its market share has persisted for a protracted period or that the holder of that share has the ability to use its market power to exclude competitors. *See Natsource LLC* v. *GFI Group, Inc.*, 332 F. Supp. 2d 626, 635 (S.D.N.Y. 2004) (Sweet, J.) ("Even market shares of approximately 50% are insufficient to demonstrate market power where other factors such as low barriers to entry and strong competition, both of which are present here, exist." (citing *United States* v. *Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir. 1984))).

## C.   Supreme Has Failed To State a Claim for Conspiracy to Monopolize

Dismissal of Supreme's claim under section 2 of the Sherman Act that ESS conspired with the other defendants to monopolize the market is warranted for at least two of the same reasons that undercut the section 1 claim:   (1) Supreme has not sustained antitrust injury, *see Granite Partners, L.P.* v. *Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 244-45 (S.D.N.Y. 1999) (Sweet, J.) (dismissing conspiracy claim where "the injuries ostensibly suffered by the Funds do not 'flow' from

that which would render the Brokers' collusion illegal under the Sherman Act" and "no plausible connection between that collusion and market injury has been alleged"); *Yellow Page Solutions, Inc.*, 2001 WL 1468186, at *11 (dismissing section 2 conspiracy to monopolize claim, court held that "plaintiffs fail to allege antitrust injury"); *Rebel Oil Co.* v. *Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("causal antitrust injury ... is an element of all antitrust suits brought by private parties"); and (2) Supreme has not alleged a relevant market, *Granite Partners, L.P.*, 58 F. Supp. at 238 ("To withstand a motion to dismiss, a plaintiff making a Sherman Act conspiracy claim must ... do more than merely allege that a conspiracy exists ... [it] must identify the relevant product market ...") (internal quotations and citations omitted).

Supreme's conspiracy to monopolize claim should be dismissed for an independent reason, as well – namely, that Supreme has not alleged and could not allege that the parties had the specific intent to monopolize the market. For starters, the complaint is entirely devoid of any factual allegation of such a specific intent. Of course, the complaint alleges that there was a conspiracy to effect the payment of commercial bribes to Yakovlev to facilitate ESS's obtaining specific U.N. contracts – but those allegations by themselves don't have anything to do with an effort to achieve monopoly power, and still less do they allege a "specific intent" to do so. *See Twombly* v. *Bell Atl. Corp.*, 425 F.3d 99, 111 (2d Cir. 2005), *cert. granted*, 2006 WL 1725627 (U.S. Jun. 26, 2006) (No. 05-1126) ("If a pleaded conspiracy is implausible on the basis of the facts as pleaded – if the allegations amount to no more than 'unlikely speculations' – the complaint will be dismissed.").

Moreover, Supreme does not profess to have any direct evidence of a conspiracy. But when a plaintiff's conspiracy claim relies on circumstantial evidence, the Supreme Court has instructed that if the conspiracy is economically irrational, and that defendants had no reasonable prospect of obtaining monopoly power, such circumstantial evidence does not give rise to an

inference of conspiracy. *See, e.g., United Magazine Co.* v. *Murdoch Magazine Distrib.,* 146 F. Supp. 2d 385, 401-02 (S.D.N.Y. 2001) (Schwartz, J.) (granting 12(b)(6) motion to dismiss because "plaintiffs' alleged conspiracy to engage in predatory pricing is entirely unnecessary and makes no economic sense, plaintiffs fail to state a claim under section 1") (citing *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. 574 (1986)); *see also DM Research, Inc.* v. *Coll. of Am. Pathologists,* 170 F.3d 53, 56 (1st Cir. 1999) (affirming Rule 12(b)(6) dismissal where complaint alleged "highly implausible" conspiracy); *Cancall PCS, LLC* v. *Omnipoint Corp.,* No. 99-CIV-3395 (AGS), 2000 WL 272309, at *7 n.4 (S.D.N.Y. Mar. 10, 2000) (Schwartz, J.) ("Although Matsushita involved a motion for summary judgment, not a motion to dismiss, here, the plaintiffs have pled facts which, even if true and viewed in the light most favorable to plaintiffs, cannot support a claim for predatory pricing, and the Court will therefore dismiss any such claim at this stage.").

        As demonstrated above, Supreme has not alleged that there was a dangerous probability of success. Although this is not an independent element of a claim for conspiracy to monopolize in this Circuit, it bears directly on the adequacy of the allegations of specific intent to monopolize. *See Hudson Valley Asbestos Corp.* v. *Tougher Heating & Plumbing Co.,* 510 F.2d 1140, 1144 (2d Cir. 1975) ("absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed"); *Hunt-Wesson Foods, Inc.* v. *Ragu Foods, Inc.,* 627 F.2d 919, 926-27 (9th Cir. 1980); *Optivision, Inc.* v. *Syracuse Shopping Ctr. Assocs.,* 472 F. Supp. 665, 680 (N.D.N.Y. 1979) ("the absence of any serious likelihood of successfully achieving monopolization is evidence that can be used to support a finding of lack of specific intent").

**IV.**
## THE SHERMAN AND ROBINSON-PATMAN ACTS DO NOT CONFER SUBJECT MATTER JURISDICTION OVER THE ALLEGED CONDUCT

Dismissal of plaintiffs' antitrust claims is mandated for an independent reason. Under well established law, this Court does not have jurisdiction to hear plaintiffs' Sherman Act and Robinson-Patman Act claims.

### A.    This Court Does Not Have Jurisdiction To Hear Plaintiff's Sherman Act Claims

Supreme's claim that this Court has jurisdiction to hear the Sherman Act Claim under the Foreign Trade Antitrust Improvements Act ("FTAIA") is without merit. (*See* Supreme Am. Compl. ¶ 17.) The FTAIA excludes from the Sherman Act's reach anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations." 96 Stat. 1246, 15 U.S.C. § 6a. There is an exception to the general rule for conduct that "'(1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim,'" applicable where that conduct significantly harms imports, domestic commerce, or American exporters. *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 159 (2004) (quoting 15 USC. §§ 6a(1)(A), (2)) (brackets in original).

Both complaints fail adequately to plead the alleged bribes had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. The Supreme complaint, for example, makes the conclusory allegation that "Defendant's anti-competitive and unlawful conduct, *described more fully below*, had a direct, substantial and reasonably foreseeable effect on trade and commerce occurring in this District and such effect gives rise to Supreme's Sherman Act claim *set forth below*." (Supreme Am. Compl. ¶ 27 (emphasis added).) The complaint actually alleges no facts in support of this conclusory allegation, whether one looks "below," "above," or elsewhere.

Similarly, the ES-KO complaint alleges that "ES-KO's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Defendants Compass Group/ESS and IHC on United States and/or foreign commerce," (ES-KO Compl. ¶ 349; *see also id.* at ¶¶ 285, 304, 322, 363 (same)) but alleges no facts in support of this conclusory allegation.

The only facts actually alleged in the complaints show that the commerce at issue is foreign and there is no impact on domestic commerce. The complaints allege that ESS is a Cyprus company (*see* ES-KO Compl. ¶ 15), that ES-KO is a Monaco corporation (*see id.* at ¶ 12) and that Supreme is a Swiss company (*see* Supreme Am. Compl. ¶ 31), all engaged in the business of selling to the U.N., a foreign entity. The goods were supplied outside the United States, in locales ranging from East Timor to Burundi. (*See* ES-KO Compl. ¶¶ 1, 6, 7, 12, 13, 14; Supreme Am. Compl. ¶¶ 1, 30, 31, 33, 35.)

Further, the alleged conduct occurred at the U.N. headquarters, which is not U.S. territory. (*See* ES-KO Compl. ¶¶ 30-38; Supreme Am. Compl. ¶¶ 22-27.) *See e.g.,* Agreement Between the United Nations and the United States of America Regarding The Headquarters of the United Nations, art. 3, § 7(a), Dec. 14, 1946, 22 U.S.C. § 287 ("The [U.N.] headquarters district shall be inviolable"); *Klinghoffer* v. *S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (holding that the U.N. Headquarters in New York "is not really United States territory at all, but is rather neutral ground over which the United States has ceded control"); *McKeel* v. *Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir. 1983) (holding that embassy property "remains the territory of the receiving state, and does not constitute territory of the United States").[31]

---

[31]   Supreme alleges that individual vendors from the United States apply to become U.N.-approved vendors. (*See* Supreme Am. Compl. ¶ 22.) But Supreme does not allege that any U.S. vendors bid on the contracts at issue here, much less whether any U.S. vendors were injured because they would have won the contracts but for the

The only potential nexus with commerce in the United States that plaintiffs allege is the possibility that payment from the U.N. to plaintiffs was made through New York bank accounts. (*See* ES-KO Compl. ¶ 40 ("Payments to vendors providing goods and services, including vendors providing food rations, are *generally* made through banking facilities and accounts in New York.") (emphasis added); Supreme Am. Compl. ¶ 26 ("The U.N. releases payments to vendors ... from an account in New York.").) This alleged nexus, however, is plainly insufficient to confer subject matter jurisdiction under the FTAIA.

Even if the court found that the alleged conduct occurred in the U.S., the jurisdictional analysis would not be affected. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 814 (9th Cir. 1988) (finding FTAIA exempts from U.S. antitrust laws conduct lacking domestic effects, "even where such conduct originates in the United States" and "regardless of whether there was anticompetitive conduct in the United States" (internal quotations omitted)); *McElderry v. Cathay Pac. Airways*, 678 F. Supp. 1071, 1077 (S.D.N.Y. 1988) (Lasker, J.) ("An anticompetitive effect on [U.S.] commerce is required for jurisdictional nexus, regardless of whether there was anticompetitive [sic] conduct in the United States."); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 500-01 (M.D.N.C. 1987) (finding no subject matter jurisdiction arising from exclusive distribution agreement between U.S. manufacturer and French distributor despite a "bulk" of negotiations occurring in the United States). Under the FTAIA, the proscriptions of the Sherman Act apply to trade or commerce with foreign nations, other than import transactions, only when the conduct providing the basis for the claim has a direct, substantial and reasonably foreseeable anticompetitive effect on United States domestic commerce. The amendment was clearly intended to exempt from United States antitrust law conduct that lacks the requisite domestic effect such as

---

alleged conduct. Moreover, Supreme has not alleged how any harm to U.S. vendors would have had a direct and substantial effect on domestic commerce.

the conduct here, "even where the antitrust [sic] conduct originates in the United States or involves American-owned entities operating abroad." *United Phosphorus, Ltd.* v. *Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1009 (N.D. Ill. 2001) (quoting *Optimum, S.A.* v. *Legent Corp.*, 926 F. Supp. 530, 532 (W.D. Pa. 1996)).

Plaintiffs' failure to allege facts that demonstrate a direct, substantial and reasonably foreseeable anticompetitive effect on United States domestic commerce mandates dismissal of Supreme's Sherman Act claims. *See McElderry*, 678 F. Supp. at 1077 ("Although McElderry's second amended complaint does allege that Cathay Pacific's acts have a direct anticompetitive effect on United States commerce, the complaint presents no facts in support of those allegations.").

**B.     This Court Does Not Have Jurisdiction To Hear Plaintiffs' Robinson-Patman Act Claims**

Dismissal of Supreme's Sherman Act claims for lack of jurisdiction also mandates dismissal of plaintiffs' Robinson-Patman Act claims. Jurisdiction under the Robinson-Patman Act is narrower than jurisdiction under the Sherman Act and "extends only to persons and activities that are themselves 'in commerce.'" *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U.S. 186, 194 (1974). Unlike the Sherman Act, jurisdiction under the Robinson-Patman Act is not established "merely by showing that allegedly anticompetitive acquisitions and activities *affect* commerce." *Id.* at 195 (emphasis added). Rather, the "in commerce" language of the Clayton and Robinson-Patman Acts denotes only "persons or activities within the flow of interstate commerce." *Id.*

"With almost perfect consistency, the Courts of Appeals have read the language requiring 'either or any of the purchases involved in such discrimination (be) in commerce' to mean that § 2(a) applies only where 'at least one of the two transactions which, when compared, generate discrimination ... cross(es) a state line.'" *Id.* at 200 n.14 (quoting *Hiram Walker, Inc.* v. *A&S Tropical, Inc.*, 407 F.2d 4, 9 (5th Cir. 1969)). Thus, for a transaction to be "in commerce" among

65

the states, the product must physically cross a state boundary.[32] *See, e.g., Interstate Cigar Co.* v. *Sterling Drug Inc.*, No. 79 Civ. 3547 (CBM), 1980 WL 1862, at *3 (S.D.N.Y. July 3, 1980) (Motley, J.) ("the state of being 'in commerce' under § 2(a) requires physical movement of the relevant product across a state line" (quoting *S & M Materials Co.* v. *S. Store Co., Inc.*, 612 F2d 198, 200 (5th Cir. 1980))).[33]

Plaintiffs do not and cannot allege that the subject transactions occurred among the states or between a state and a foreign nation. *See, e.g., May Dep't. Store* v. *Graphic Process Co.*, 637 F.2d 1211 (9th Cir. 1980). Accordingly, this court does not have jurisdiction to hear plaintiffs' Robinson-Patman claims and dismissal is warranted. *See Rotec Indus., Inc.* v. *Mitsubishi Corp.*, 348 F.3d 1116 (9th Cir. 2003), *cert. denied*, 541 U.S. 1063 (2004) (dismissing section 2(c) claim of summary judgment for failure to satisfy "in commerce" requirement where sales occurred overseas, was executed overseas, and was to be paid overseas).[34]

---

[32]   The only exception is the "flow of commerce" test that determines whether intrastate discriminatory sales were "in commerce," *Roorda* v. *Am. Oil Co.*, 446 F. Supp. 939, 941-42 (W.D.N.Y. 1978), which is inapplicable here. The requirement that the product must physically cross a state boundary is based on solid grounds. The physical location of the buyer of seller should not inform the "in commerce" analysis. Otherwise all sales to companies that are registered to do business out of state or that have a principal place of business in another state would qualify as interstate commerce. This would decimate the "in commerce" requirement. Similarly, the location of the bank account used to pay for the transaction should not affect the jurisdictional analysis. Otherwise every transaction where a participant used an out of state bank would be "in commerce."

[33]   *See also Precision Printing Co., Inc.* v. *Unisource Worldwide, Inc.*, 993 F. Supp. 338, 347-48 (W.D. Pa. 1998) (holding no subject matter jurisdiction because none of the goods the plaintiff purchased physically crossed a state line between their shipment by the defendant and their receipt by the plaintiff). Although these cases were decided under Section 2(a) of the Robinson-Patman Act, their jurisdictional analysis applies equally to a Section 2(c). *See Rotec Indus.*, 348 F.3d at 1121 n.2 (finding the "in commerce" requirement of Section 2(c) is not broader than the "in commerce" requirement of Section 2(a)).

[34]   While Supreme alleges various events that took place in New York (*see, e.g.*, Supreme Am. Compl. ¶¶ 6, 60, 62, 73), none of these involve the flow of goods into or out of the United States, as required by the antitrust laws. Moreover, Supreme's references to "domestic and foreign commerce," (*id.* at ¶¶ 164, 170, 177, 183) and "global market" (*id.* at ¶¶ 160, 175) are conclusory and likewise fail to allege the flow of goods into or out of the United States.

Because this Court lacks subject matter jurisdiction, plaintiffs' Sherman Act and Robinson-Patman Act claims should be dismissed.

## V.
## SUPREME'S DONNELLY ACT CLAIMS FAIL FOR THE SAME REASONS THAT THE SHERMAN ACT CLAIMS SHOULD BE DISMISSED

Supreme's Donnelly Act claim should be dismissed for the same reasons that its federal antitrust claims cannot stand. (Revealingly, ES-KO asserts no such claim.)

The Donnelly Act, N.Y. Gen. Bus. Law § 340, states that "'[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained' is illegal." N.Y. Gen. Bus. Law § 340(1). "The Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act." *Yankees Entm't & Sports Network, LLC* v. *Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 677 (S.D.N.Y. 2002) (Batts, J.) (citing *State* v. *Mobil Oil Corp.*, 38 N.Y.2d 460, 463 (1976)); accord *Great Atl. & Pac. Tea Co., Inc.* v. *Town of E. Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998) (holding that the Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent). A party asserting a violation of the Donnelly Act must: (1) identify the relevant product market; (2) describe the nature and effects of the purported conspiracy; (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question; and (4) show a conspiracy or reciprocal relationship between two or more entities. *See Great Atl. & Pac. Tea Co., Inc.*, 997 F. Supp. at 352. As explained above, Supreme has not identified a relevant product or alleged anticompetitive effects. The Donnelly Act claims should therefore be dismissed.

## Conclusion

For all of the reasons stated above, the Compass Defendants' Motion to Dismiss

ES-KO's and Supreme's RICO and Antitrust Claims should be granted.

Dated:  New York, New York
        July 17, 2006

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____

Richard A. Rosen (RR-5132)
Kenneth A. Gallo (member of D.C. bar; not admitted in
U.S.D.C.-S.D.N.Y.)
Amir Weinberg (AW-3368)
Jonathan M. Lave (member of D.C. bar; not admitted in
U.S.D.C.-S.D.N.Y.)
Ayanna S. Williams (not admitted in U.S.D.C.-S.D.N.Y.)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000


*Attorneys for the Compass Defendants*
*Compass Group PLC, ESS Support Services Worldwide, Eurest*
*Support Services (Cyprus) International Limited, Steve Kemp, Len*
*Swain* and *Steve Bickerstaff*

68