**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SUPREME FOODSERVICE AG,

                                Plaintiff,

                -v-                                          **06  Civ. 1759 (PKC)**

COMPASS GROUP PLC, ESS (A/K/A
EUREST SUPPORT SERVICES), IHC
SERVICES, INC., PETER HARRIS,
ANDREW SEIWERT, ALEXANDER
YAKOVLEV, MOXYCO, LTD., DOUG
KERR, STEVE KEMP, LEN SWAIN,
VLADIMIR KUZNETSOV, NIKAL, LTD.,
EZIO TESTA, DMITRY YAKOVLEV AND
OLGA YAKOVLEV,

                                Defendants.

---

ES-KO INTERNATIONAL, INC.,

                                Plaintiff,

                -v-                                          **06 Civ. 2422 (PKC)**

COMPASS GROUP PLC, ESS SUPPORT
SERVICES WORLDWIDE, EUREST
SUPPORT SERVICES (CYPRUS)
INTERNATIONAL LIMITED, PETER
HARRIS, ANDREW SEIWERT, STEVE
KEMP, LEN SWAIN, STEVE
BICKERSTAFF, DOUG KERR, IHC
SERVICES, INC., EZIO TESTA,
ALEXANDER YAKOVLEV, DMITRY
YAKOVLEV, VLADIMIR KUZNETSOV,
and JOHN DOES 1 TO 100.

                                Defendants.

**SUPREME'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE**
**MOTIONS TO DISMISS OF THE COMPASS DEFENDANTS,**
**THE IHC DEFENDANTS, AND PETER HARRIS**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.      U.N. Food Rations Market ....................................................................................... 2

II.     Supreme's Proven Credentials ................................................................................ 3

III.    Compass Gains Market Share at Unprecedented Rate ........................................... 3

IV.     The Conspiracy is Revealed .................................................................................... 4

        A.  Defendant Yakovlev Pleads Guilty .............................................................. 4

        B.  World Community Condemns Compass
            and Other Co-Conspirators .......................................................................... 5

        C.  Documentary Evidence of the Bribery
            and Bid Manipulation Conspiracy ............................................................... 6

            1.  The Liberia Email ............................................................................. 6

            2.  The Burundi Email ............................................................................ 7

V.      Supreme Files Suit ................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

I.      Standard of Review .................................................................................................. 8

II.     SUPEME HAS PROPERLY ALLEGED RICO CLAIMS ..................................... 8

        A.  Legal Standard .............................................................................................. 8

        B.  The Movants' Bribery and Bid Manipulation Scheme
            Proximately Caused Supreme's Losses ........................................................ 9

            1.  Supreme was Directly Injured by the Conspiracy ........................... 9

            2.  *Ideal Steel* and *James Cape* are Inapposite to the
                Proximate Cause Inquiry in this Case ............................................ 11

3.  The Movants Cannot Escape Liability for Supreme's
RICO Claims Even if the U.N. Suffered a Direct and
Substantial Injury ....................................................................................... 15

C.  Supreme Properly Alleged that Each of the Movants
Committed at Least Two Predicate Acts ............................................................ 17

1.  Supreme Sufficiently Alleged Non-Fraud  Predicate
Acts Committed by Each of the Principal Movants ................................. 17

a.  Supreme Sufficiently Alleged Acts of Bribery
Committed by Each of the Principal Movants ................................. 18

(i)  Supreme's Allegations of Bribery are Sufficient
to Meet RICO's Generic Pleading Requirements
for State-Based Predicate Acts ........................................... 18

(ii)  Even if a Specific Allegation of Economic Harm
Were Required When Pleading Bribery Under
New York Law as a Predicate Act, the Complaint
Sufficiently Asserts Such Harm ........................................... 19

(iii)  Supreme Sufficiently Alleged Involvement
in the Bribery Scheme by the IHC Defendants
and Defendant Harris .......................................................... 22

b.  Supreme Sufficiently Alleged Money Laundering
by Each of the Principal Movants ................................................... 22

2.  Supreme Sufficiently Alleged Wire Fraud by Each of the Movants ....................... 24

3.  Supreme Sufficiently Alleged Travel Act Violations ............................................... 27

D.  The U.N. Bid-Rigging Enterprise Is a Valid, Sufficiently Distinct Enterprise............. 28

E.  Defendants Kemp and Swain Conducted the Affairs of the Enterprise........................ 29

F.  Supreme Sufficiently Alleged a RICO Conspiracy ...................................................... 30

III.  SUPREME ADEQUATELY PLED COMMERCIAL BRIBERY
UNDER SECTION 2(c) OF THE ROBINSON-PATMAN ACT ...................................... 31

A.  Supreme Is Not Required to Allege Price Discrimination in Favor of a Buyer ........... 31

B.  Supreme Pled Antitrust Injury Under Section 2(c)...................................................... 35

C.  Supreme is not Required to Allege Injury to the U.N....................................................... 38

IV.  SUPREME SUFFICIENTLY PLED SHERMAN ACT CLAIMS .................................... 39

A.  Supreme Adequately Pled a Violation of Sherman Act § 1........................................... 39

1.  Supreme Adequately Pled a Per Se Violation of the Sherman Act ........................ 39

2.  Supreme Adequately Pled Injury to Competition................................................... 40

3.  Supreme Adequately Pled Antitrust Injury............................................................. 42

4.  Supreme Adequately Pled a Relevant Market ........................................................ 43

B.  Supreme Adequately Pled an Attempt to Monopolize Claim....................................... 44

C.  Supreme Adequately Pled a Conspiracy to Monopolize Claim.................................... 47

D.  Supreme Adequately Pled Antitrust Claims Against the IHC Defendants.................... 48

V.  THIS COURT HAS JURISDICTION OVER
SUPREME'S ANTITRUST CLAIMS ............................................................................... 49

A.  This Court has Jurisdiction Over Supreme's Sherman Act Claims.............................. 49

B.  This Court has Jurisdiction Over Supreme's Robinson-Patman Claims ...................... 53

VI.  SUPREME SUFFICIENTLY PLED DONNELLY ACT CLAIMS ................................... 54

VII.  IHC'S MOTION TO STRIKE IS WITHOUT MERIT ...................................................... 55

CONCLUSION .......................................................................................................................... 57

## TABLE OF AUTHORITIES

**Federal Cases**                                                                 **Page No.**

*Alco Standard Corp. v. Schmid Bros., Inc.*,
    647 F. Supp. 4 (S.D.N.Y. Jan. 27, 1986) ............................................................. 48

*AMEC E & C Services, Inc. v. Nu-West Industries, Inc.*,
    395 F. Supp. 2d 957 (D. Idaho 2005) ........................................................... 40, 43

*Anza v. Ideal Steel Supply Corp.*,
    126 S. Ct. 1991 (2006) ...................................................................... passim

*Associated Radio Serv. Co. v. Page Airways, Inc.*,
    624 F.2d 1342 (5th Cir. 1980) ...................................................................... 43

*Astech-Marmon, Inc. v. Lenoci*,
    349 F. Supp. 2d 265 (D. Conn. 2004) ......................................................... 9-10

*Augusta News Co. v. Hudson News Co.*,
    269 F.3d 41 (1st Cir. 2001) .......................................................................... 34

*Baisch v. Gallina*,
    346 F.3d 366 (2d Cir. 2003) ........................................................................ 30

*Benedict v. Amaducci*,
    No. 92 Civ. 5239 (KMW), 1995 WL 702444 (S.D.N.Y. Nov. 28, 1995) ........................ 20, 22

*Bernstein v. Misk*,
    948 F. Supp. 228 (E.D.N.Y. 1997) ................................................................ 27

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004) ........................................................................ 38

*Brass v. Am. Film Techs., Inc.*,
    987 F.2d 142 (2d Cir. 1993) ........................................................................ 25

*Brennan v. United States*,
    867 F.2d 111 (2d Cir. 1989) ..................................................................... 27-28

*Bunker Ramo Corp. v. Cywan*,
    511 F. Supp. 531 (N.D. Ill. 1981) ................................................................. 33

*Cabble v. Rollieson*,
    No. 04 Civ. 9413 (LTS) (FM), 2006 WL 464078 (S.D.N.Y. Feb. 27, 2006) ...................... 56

*California Mobil Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) ........................................................................... 31

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
532 F.2d 674 (9th Cir. 1976) ............................................................. 32

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ........................................................................... 28

*Chambers Development Co. v. Browning-Ferris Industries*,
590 F. Supp. 1528 (W.D. Pa. 1984) ................................................... 40

*City of Atlanta v. Ashland-Warren, Inc.*,
No. C 81-106A, 1981 WL 2187 (N.D. Ga. Aug. 20, 1981)................. 40

*City of New York v. Joseph L. Balkan, Inc.*,
656 F. Supp. 536 (E.D.N.Y. 1987) ..................................................... 21

*Cobell v. Norton*,
224 F.R.D. 1 (D.D.C. 2004)................................................................ 57

*Commercial Cleaning Serv., L.L.C. v. Colin Serv. Sys., Inc.*,
271 F.3d 374 (2d Cir. 2001) ............................................................... 11

*Conley v. Gibson*,
355 U.S. 41 (1957)................................................................................ 8

*De Luca v. United Nations Org.*,
841 F. Supp. 531 (S.D.N.Y. 1994)...................................................... 17

*DeLong Equip. Co. v. Wash. Mills Electro Minerals Corp.*,
990 F.2d 1186 (11th Cir. 1993) .......................................................... 43

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
423 F. Supp. 2d 173 (S.D.N.Y. 2006).................................................. 42

*Edison Elec. Inst. v. Henwood*,
832 F. Supp. 413 (D.D.C. 1993) ......................................................... 31

*Environmental Tectonics v. W.S. Kirkpatrick, Inc.*,
847 F.2d 1052 (3d Cir. 1988), *aff'd on other grounds*, 493 U.S. 400 (1990) ..................... 35-36

*Excel Handbag Co. v. Edison Bros. Stores*,
630 F.2d 379 (5th Cir. 1980) ....................................................... 34, 39

*Expert Masonry, Inc. v. Boone County, Kentucky,*
  440 F.3d 336 (6th Cir. 2006) ............................................................... 39

*F. Buddie Contracting v. Seawright,*
  595 F. Supp. 422, (N.D. Ohio 1984) ..................................................... 42

*F. Hoffmann-LaRoche Ltd. v. Empagran S.A.,*
  542 U.S. 155 (2004) .............................................................................. 50

*Federal Paper Bd. Co., Inc. v. Amata,*
  693 F. Supp. 1376 (D. Conn. 1988) .......................................... 33, 37, 38, 41

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
  385 F.3d 159 (2d Cir. 2004) .................................................................. 29

*First City Nat'l Bank & Trust Co. v. FDIC,*
  730 F. Supp. 501 (E.D.N.Y. 1990) ........................................................ 56

*Fitch v. Ky.-Tenn. Light & Power Co.,*
  136 F.2d 12 (6th Cir. 1943) ................................................................... 31

*Forschner Group, Inc. v. B-Line A.G.,*
  943 F. Supp. 287 (S.D.N.Y. 1996) ........................................................ 56

*Frazier v. Coughlin,*
  850 F.2d 129 (2d Cir. 1988) .................................................................... 8

*FTC v. Henry Broch & Co.,*
  363 U.S. 166 (1960) .............................................................................. 31

*FTC v. Simplicity Pattern Co.,*
  360 U.S. 55 (1959) ................................................................................ 31

*Goldman v. Belden,*
  754 F.2d 1059 (2d Cir. 1985) ................................................................... 8

*Grace v. E.J. Kozin Co.,*
  538 F.2d 170 (7th Cir. 1976) ................................................................. 32

*Grumman Corp. v. LTV Corp.,*
  527 F. Supp. 86 (E.D.N.Y.), aff'd, 665 F.2d 10 (2d Cir. 1981) .............. 44

*Gulf Oil Corp. v. Copp Paving Co.,*
  419 U.S. 186 (1974) ......................................................................... 53, 54

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ................................................................ 17

*Hayden Publ'g Co. v. Cox Broadcasting Corp.*,
  730 F.2d 64 (2d Cir. 1984) ...................................................... 46

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992) ............................................................... 9-10

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
  425 U.S. 738 (1976) ................................................................. 37

*In re Am. Honda Motor Co. Dealerships Relations Litig.*,
  941 F. Supp. 528 (D. Md. 1996) ........................................... 10, 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. C 02-1486 PJH, C 05-3026 PJH, 2006 WL 515629, at *3 (N.D. Cal. Mar. 1, 2006) ........ 50

*In re Gas Reclamation, Inc. Sec. Litig.*,
  659 F. Supp. 493 (S.D.N.Y. 1987) ......................................... 24

*In re Reciprocal of Am. (ROA) Sales Practices Litig.*,
  Nos. MDL 1551, 04-2313, 04-2078, 2006 WL 1627802, (W.D. Tenn. June 12, 2006) .......... 10

*In re Sumitomo Copper Litig.*,
  995 F. Supp. 451 (S.D.N.Y. 1998) ......................................... 24

*In Town Hotels Ltd. P'ship v. Marriott Int'l, Inc.*,
  246 F. Supp. 2d 469, 480 (S.D. W. Va. 2003) ....................... 37

*Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*,
  88 F. Supp. 2d 133 (S.D.N.Y. 2000) .................................... 34-35

*James Cape & Sons Co. v. PCC Constr. Co.*,
  453 F.3d 396 (7th Cir. 2006), *aff'g* 2005 WL 2176965 (E.D. Wis. 2005) ...................... passim

*Jerome M. Sobel & Co. v. Fleck*,
  No. 03 Civ. 1041 (RMB) (GWG), 2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ................. 24

*Klinghoffer v. S.N.C. Achille Lauro*,
  937 F.2d 44 (2d Cir. 1991) ....................................................... 52

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999) ................................................ 12-13

*Linens of Europe, Inc. v. Best Manufacturing, Inc.*,
   No. 03 Civ. 9612 (GEL), 2004 WL 2071689, (S.D.N.Y. Sept. 16, 2004)..........................19-20

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)...................................................................................... 56

*Litton Sys., Inc. v. AT&T Co.*,
   700 F.2d 785 (2d Cir. 1983)...................................................................................... 11

*LoPresti v. Citigroup, Inc.*,
   No. 02 Civ. 6492 (SJ), 2005 WL 195521 (E.D.N.Y. Jan. 18, 2005) ....................................... 49

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
   354 F. Supp. 2d 293 (S.D.N.Y. 2004)................................................................. 20, 21, 22

*McKeel v. Islamic Republic of Iran*,
   722 F.2d 583 (9th Cir. 1983) .................................................................................... 52

*McLaughlin v. Anderson*,
   962 F.2d 187 (2d Cir. 1992)................................................................................. 17, 25

*Meridian Project Systems v. Hardin Constr. Co.*,
   No. Civ. S-04-2728 FCDAD, 2005 WL 2615523 (E.D. Cal. Oct. 14, 2005)......................... 47

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
   No. 91 Civ. 2923 (CSH), 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994)............................ passim

*Metromedia Co.*,
   983 F.2d 350 (2d Cir. 1992)...................................................................................... 17

*MM Global Servs., Inc. v. Dow Chem. Co.*,
   329 F. Supp. 2d 337 (D. Conn. 2004)........................................................................... 53

*Moll v. US Life Title Ins. Co. of N.Y.*,
   710 F. Supp. 476 (S.D.N.Y. 1989)........................................................................... 20, 22

*Moses v. Martin*,
   360 F. Supp. 2d 533 (S.D.N.Y. 2004).......................................................................... 28

*Mylan Labs., Inc. v. Akzo, N.V.*,
   770 F. Supp. 1053 (D. Md. 1991) ............................................................................... 10

*New York v. Julius Nasso Concrete Corp.*,
   202 F.3d 82 (2d Cir. 2000)....................................................................................... 11

*NL Industries Inc. v. Gulf & Western Industries, Inc.*,
    650 F. Supp. 1115 (D. Kan. 1986) ...................................................... 34

*Pharmacare v. Caremark*,
    965 F. Supp. 1411 (D. Haw. 1996) ...................................................... 36

*Philip Morris v. Grinnell Lithographic Co.*,
    67 F. Supp.2d 126 (E.D.N.Y. 1999) ................................................. 32, 38

*Philip Morris v. Heinrich*,
    No. 95 Civ. 0328 (LMM), 1996 WL 363156 (S.D.N.Y. Jun. 25, 1996) ................. 48

*Ray v. Gen. Motors Acceptance Corp.*,
    No. 92 Civ. 5043 (DGT), 1995 WL 151852 (E.D.N.Y. Mar. 28, 1995) ............. 22-23

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ....................................................................... 29

*Richard Hoffman Corp. v. Integrated Building Systems, Inc.*,
    581 F. Supp. 367 (N.D. Ill. 1984) ................................................... 41, 42

*Roorda v. Am. Oil Co.*,
    446 F. Supp. 939 (W.D.N.Y. 1978) ...................................................... 54

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
    348 F.3d 1116 (9th Cir. 2003) ................................................... 53, 54, 55

*Schmuck v. United States*,
    489 U.S. 705 (1989) ....................................................................... 24

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ......................................................................... 9

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
    985 F.2d 102 (2d Cir. 1993) ......................................................... 12, 13

*Stearns Airport Equip. Co. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) ............................................................ 42

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
    903 F.2d 988 (4th Cir. 1990) ............................................................ 32

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ....................................................................... 18

*Top's Markets, Inc. v. Quality Markets, Inc.,*
    142 F.3d 90 (2d Cir. 1998)..................................................................... 46, 47

*Tower Air, Inc. v. Fed. Express Corp.,*
    956 F. Supp. 270 (E.D.N.Y. 1996) ........................................................ 44

*Trollinger v. Tyson Foods, Inc.,*
    370 F.3d 602 (6th Cir. 2004) ................................................................ 16

*2600 Woodley Rd. Joint Venture v. ITT Sheraton Corp.,*
    369 F.3d 732 (3d Cir. 2004).................................................................. 16-17

*Twombly v. Bell Atlantic Corp.,*
    425 F.3d 99 (2d Cir. 2005)..................................................................... 37

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3,*
    No. 00 Civ. 4763(RMB), 2002 WL 91625 (S.D.N.Y. Jan. 23, 2002) ...................................... 55

*United States v. Anderson,*
    326 F.3d 1319 (11th Cir 2003) .............................................................. 50

*United States v. Bortnovsky,*
    879 F.2d 30 (2d Cir. 1989)..................................................................... 24-25

*United States v. Jenkins,*
    943 F.2d 167 (2d Cir 1991)................................................................... 27

*United States v. McCarthy,*
    271 F.3d 387 (2d Cir. 2001)................................................................... 23

*United States  v. Melekh,*
    190 F. Supp. 67 (S.D.N.Y. 1960)........................................................... 51, 52

*United States v. Miller,*
    116 F.3d 641 (2d Cir. 1997).................................................................. 18

*United States v. Paone,*
    782 F. 2d 386 (2d Cir. 1986).................................................................. 20

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,*
    44 F.3d 1082 (2d Cir. 1995)................................................................... 15

*United States v. Rastelli,*
    870 F.2d 822 (2d Cir. 1989)................................................................... 26, 30

*United States  v. Reale*,
   No. S4 96 Cr. 1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) ............................ 18

*United States v. Zichettello*,
   208 F.3d 72 (2d Cir. 2000)....................................................................................... 30

*Virgin Atl. Airways v. British Airways PLC*,
   872 F. Supp. 52 (S.D.N.Y. Dec. 30, 1994) ..................................................... 47, 48

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
   857 F.2d 55 (2d Cir. 1988)........................................................................... 46, 47

*Welch Foods Inc. v. Gilchrist*,
   No. 93 Civ. 0641E(F), 1996 WL 607059 (N.D.N.Y. Oct. 18, 1996) ...................................... 27

*West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*,
   No. 03 Civ. 8606 (RWS), 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004)............................. 23

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
   425 F. Supp. 2d 484 (S.D.N.Y. 2006)................................................................... 41

*Zito v. Leasecomm Corp.*,
   No. 02 Civ. 8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003)................. 22, 29, 30

## State Cases

*City of New York v. Liberman*,
   232 A.D.2d 42, 660 N.Y.S.2d 872 (1st Dept. 1997)............................................... 20

*Donemar, Inc. v. Molloy*,
   252 N.Y. 360, 169 N.E. 610 (1930)....................................................................... 20

*People v. Coumatos*,
   32 Misc. 2d 1085, 224 N.Y.S.2d 507 (N.Y. Gen. Sess. 1962),
   *aff'd*, 20 A.D.2d 850, 247 N.Y.S.2d 1000 (1st Dept. 1964)...................................... 52

*People v. Reynolds*,
   174 Misc.2d 812, 667 N.Y.S.2d 591 (N.Y.Sup.Ct.1997) ........................................ 20

*People v. Schwartz*,
   160 A.D.2d 964, 554 N.Y.S.2d 686 (2d Dept. 1990) ............................................. 55

*People v. Weiner*,
   85 Misc.2d 161 (N.Y. City Crim. Ct. 1976) ........................................................... 52

**Federal Statutes**

15 U.S.C. § 6(a) ...................................................................................................... 50

18 U.S.C. § 1956(a)(2) .......................................................................................... 23

18 U.S.C. § 1956(c) ............................................................................................... 23

18 U.S.C. § 1962(c) ........................................................................................... 8, 30

18 U.S.C. § 1962(d) .............................................................................................. 30

**Federal Rules**

Federal Rule of Civil Procedure 9(b) ............................................................. 24, 25

Federal Rule of Civil Procedure 12(f) ................................................................. 56

Federal Rule of Civil Procedure 12(b)(6) ...................................................... passim

**Legislative Authorities**

74 Cong. Rec. 7759-60 (1936) .............................................................................. 32

H.R. Rep. No. 1549, 91st Cong., 2d Sess. 56 (1970) ........................................... 18

**State Statutes**

N.Y. Penal Law § 180.03 ................................................................................. 32-33

**Other Authorities**

5C Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure § 1380 (3d ed. 2006) ............................................ 55

2 Moore's Federal Practices 3d § 12.37[3] ........................................................... 57

Restatement (Third) of the Foreign Relations Law of the United States § 466 (1987) ............... 52

## PRELIMINARY STATEMENT

The RICO, Robinson-Patman, and Sherman Acts were designed to provide civil remedies against those who engage in corrupt and anticompetitive practices.  If ever there were a case for the application of these statutes, this case is it.  The Defendants participated in a commercial bribery and bid manipulation scheme to corrupt the United Nations.  The very purpose of the conspiracy was for Defendant Compass Group PLC and its subsidiary, Defendant ESS, to obtain contracts for the provision of food rations to U.N. peacekeeping missions across the globe.  The conspiracy was successful.  Defendant Compass and its co-conspirators rigged the award of at least five U.N. contracts over a five-year period, contracts which would otherwise have been awarded to Supreme.  During this period, Defendant Compass "earned" undetermined profits from contracts that may have been worth in excess of $350 million dollars.  The conspiracy ended in the summer of 2005, only after Defendant Alexander Yakovlev pled guilty in this District to crimes relating to his receipt of bribes in his capacity as a high ranking U.N. official and the U.N. de-listed Compass from its registry of vendors.

As a result of the criminal and anticompetitive acts of the Defendants' conspiracy, Defendants Compass and ESS, assisted by their co-conspirators, corrupted the U.N.'s bidding process, provided services of lesser value than Plaintiff Supreme would have provided, and attempted to monopolize and conspired to monopolize the market for food rations to U.N. peacekeepers.

Defendants Compass, ESS, Kemp, Swain, Harris, IHC, and Testa have moved to dismiss Supreme's Complaint under Federal Rule of Civil Procedure 12(b)(6); Defendants IHC and Testa have moved to strike pursuant to Rule 12(f).  Supreme submits that its Complaint meets all

pleading requirements.  In the event this Court concludes there are material shortcomings in the

Complaint, Plaintiff Supreme requests the opportunity to amend.

Supreme respectfully submits this memorandum in opposition to the pending motions.

## STATEMENT OF FACTS[1]

### I.    U.N. FOOD RATIONS MARKET

The business of providing food rations to U.N. peacekeepers is an enormous enterprise.

The U.N. spent more than $41 million on food rations and catering services in 2003 alone.  (Am.

Compl. ¶ 21.)  The U.N.'s Procurement Service, located at U.N. Headquarters in New York City,

is responsible for food rations purchases for peacekeeping missions worldwide.  (*Id*. ¶ 20.)

To become a food rations vendor to the U.N., a company must meet the U.N.'s strict

standards.  (*Id*. ¶ 90.)  Applications to register as a U.N. vendor are sent to, and evaluated by, the

Procurement Service in New York.  (*Id*. ¶ 22.)  From its New York office, the Procurement

Service solicits bids for multi-year food rations contracts only from approved, registered U.N.

vendors.  (*Id*. ¶¶ 23, 28, 29.)  Bidders submit their two-part bids (technical and financial) to the

Procurement Service in New York.  (*Id*. ¶ 24.)  The Procurement Service evaluates these bids in

New York and awards contracts from New York.  (*Id*. ¶¶ 24, 27, 78.)  U.N. food rations contracts

are managed in New York, and the U.N. releases payment to food rations vendors from a New

York bank account.  (*Id*. ¶¶ 26-27.)

Providing food service to U.N. peacekeepers is an exceedingly difficult job.  Vendors

must deliver food to remote locations in Asia, the Middle East, and Africa that have been

devastated by years of war and conflict.  (*Id*. ¶¶ 31, 51, 56.)  Due to the inherent difficulties in

delivering massive amounts of food to distant, war-torn locations and the highly technical nature

---

[1] All capitalized terms not expressly defined herein shall have the meanings attributed to them in Supreme's
Amended Complaint, filed on June 1, 2006 (the "Complaint").

of the U.N.'s food rations requirements, few firms are capable of becoming registered vendors. (*Id.* ¶ 90.)

Given the risks of inadequate service (an army marches on its stomach), the U.N. is hesitant to award contracts to unproven vendors.  (*Id.* ¶ 50.)

## II.    SUPREME'S PROVEN CREDENTIALS

Supreme is the successor-in-interest to Supreme Sales GmbH, an entity that began providing food rations to U.S. military forces stationed in Germany in the late 1950s.  (*Id.* ¶ 32.) Supreme is a world leader in food supply for military and multinational forces and specializes in providing foodservice to organizations in regions of crisis.  (*Id.* ¶ 31.)  Supreme is a U.N.-registered vendor that has been offering foodservice to the U.N. since the 1970s.  (*Id.* ¶¶ 31, 51.) In recent years, Supreme has provided foodservice to U.N. missions in Mozambique, Croatia, Bosnia-Herzegovina, Lebanon, and to a U.N. agency in East Timor. (*Id.* ¶ 51.)  Supreme is currently providing foodservice to the U.N. in the Ivory Coast and Afghanistan.  (*Id.* ¶ 51.)

Supreme is a signatory to the U.N. Global Compact.  (*Id.* ¶ 31.)  Participants in the Compact affirm their commitment to its anti-corruption principle, which reads, "Business should work against all forms of corruption, including extortion and bribery." (*Id.* ¶ 64.)

## III.    COMPASS GAINS MARKET SHARE AT UNPRECEDENTED RATE

Compass Group PLC, a U.K.-based company, and ESS (a/k/a Eurest Support Services), a division of Compass, entered the U.N. food rations market when ESS became a registered U.N. vendor in 2000 and won the very first bid it submitted, a food rations contract for East Timor.[2] (*Id.* ¶ 52.)  From that date forward, Compass, a signatory to the U.N.'s Global Compact, accumulated market share in the U.N. food rations business at an unprecedented rate, winning

---

[2] Compass Group PLC, ESS, and all of Compass Group's divisions, affiliates, and subsidiaries are herein collectively referred to as "Compass."

food rations contracts for peacekeeping missions in Sudan, East Timor, Liberia, Burundi, Eritrea, Lebanon, Cyprus, and Syria.  (*Id.* ¶¶ 52, 56, 64.)  To facilitate its bid submissions, Defendant Compass hired Defendant IHC Services, Inc. ("IHC"), a New York-headquartered corporation, to be its so-called "vendor intermediary."  (*Id.* ¶¶ 25, 152.)  The legitimacy of vendor intermediaries is highly suspect.  (*Id.* ¶ 54.)  The U.N. issued the following warning concerning the use of intermediaries:

> There are indications that certain parties have approached prospective vendors offering to act as intermediaries in dealings with the United Nations.  Some of these intermediaries purport to have various arrangements with the United Nations, or to possess support facilities within U.N. missions or projects which can place a vendor in a more advantageous position in a competitive bidding exercise.
>
> Vendors are advised that the U.N. prefers to deal directly with principals to the extent possible. Vendors are therefore urged to consult with the Procurement Service before deciding to submit offers or negotiate contracts through any intermediary.

(*Id.* ¶ 54.)

Despite its vast experience, Supreme's bids for contracts in the Sudan, East Timor, Liberia, Burundi, and Eritrea were all unsuccessful.  (*Id.* ¶ 57.)  Instead, these contracts were awarded to Compass, a recent entrant into the U.N. food rations market.  As of October 2005, Compass controlled approximately 50% of the market, having won contracts that could be worth in excess of $350 million.  (*Id.* ¶ 56.)

## IV.   THE CONSPIRACY IS REVEALED

### A.   Defendant Yakovlev Pleads Guilty

From at least 1998 through June 2005, Defendant Alexander Yakovlev ("Yakovlev") played a major role within the U.N. as a senior procurement officer.  (*Id.* ¶ 39.)  He possessed

substantial authority to affect not only the U.N.'s selection of a winning bidder, but also its response to allegations of service problems by a vendor.  (*Id.*)  Defendant Yakovlev was responsible for the U.N.'s award to Defendant Compass of food rations contracts for Liberia and Burundi, as well as other, if not all, of the food rations contracts awarded to Compass.  (*Id.* ¶ 40.)

In June 2005, Defendant Yakovlev resigned from the U.N. after the news media reported that he had obtained a job for his son, Defendant Dmitry Yakovlev, at IHC's headquarters in New York at the same time that he had been overseeing IHC's performance on a U.N. contract. (*Id.* ¶ 73.)  Soon after, on August 8, 2005, former Federal Reserve Chairman Paul Volcker, leader of the independent investigation into the U.N.'s Oil-for-Food program, alleged that Defendant Yakovlev had taken at least approximately $1 million in bribes relating to U.N. procurement contracts and the Oil-for-Food program.  (*Id.* ¶ 8.)  That same day, Defendant Yakovlev pled guilty before Judge Pauley to charges of wire fraud, conspiracy to commit wire fraud, and money laundering in connection with his role as a U.N. procurement officer from 1993 through 2005.  (*Id.* ¶ 8.)

Following Defendant Yakovlev's guilty plea, the United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with conspiracy to commit money laundering in connection with the receipt of hush money from Defendant Yakovlev.  (*Id.* ¶ 70.) Defendant Kuznetsov's case is pending before Judge Batts.  (*Id.* ¶ 77.)

### B.    World Community Condemns Compass and Other Co-Conspirators

In October 2005, Compass's market dominance came to a grinding halt when the U.N. de-listed Defendants Compass and IHC from its approved vendor list and opened an investigation into the relationship between Defendants Compass, IHC and Yakovlev (among other U.N. officials), following news reports that Compass had illegally obtained highly-confidential U.N. information from Defendant Yakovlev to "win" a Liberia food rations contract

valued in excess of $62 million.  (*Id*. ¶ 10.)  At roughly the same time, Defendant Compass launched  an internal investigation into the circumstances surrounding its procurement of U.N. contracts, hiring Freshfields Bruckhaus Deringer and Ernst & Young to lead the investigation. (*Id*. ¶ 11.)  Less than one month into its investigation, Defendant Compass fired Defendants Peter Harris, Andrew Seiwert, and Doug Kerr because they participated in Defendant Compass's scheme to bribe Defendant Yakovlev to obtain U.N. contracts for Defendant Compass.  (*Id*.) Defendant Harris had been a member of Defendant Compass Group PLC's senior management team and sat on the Board of Defendant Compass Group as a director.  (*Id*. ¶ 37.)  He was the CEO of Defendant Compass Group's United Kingdom and Ireland, Middle East and Africa divisions, and he was also the CEO of Defendant ESS.  (*Id*. ¶ 37.)

Defendant Seiwert, a senior executive for business development at Defendant ESS, was Defendant Compass's main liaison at the U.N.  (*Id*. ¶ 38.)  In November 2005, Scotland Yard's Serious Fraud Office ("SFO") commenced an investigation into Compass's business practices. (*Id*.)  Currently, Defendant Compass faces investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the SFO, and the U.N. (*Id.* ¶ 12.)

### C.     Documentary Evidence of the Bribery and Bid Manipulation Conspiracy

To date, two emails tracking Defendant Compass's bribery and bid manipulation conspiracy have been discovered.

### 1.     The Liberia Email

As of November 6, 2003, the U.N. had not yet decided who would be awarded the coveted food rations contract for Liberia.  (*Id*. ¶ 79.)  Yet, on that date, Defendant Ezio Testa, IHC's CEO, and Defendant Seiwert received via email (the "Liberia Email") three highly confidential U.N. documents concerning the Liberia contract: (1) a draft official recommendation

from the U.N. Procurement Service to the U.N. Headquarters Committee on Contracts to award

the $62 million Liberia contract to Compass; (2) an evaluation of the technical abilities of the

food supply firms bidding for the Liberia contract (which indicated that Supreme met the

technical requirements); and (3) a document showing that the U.N. had chosen Supreme to be a

finalist in the competition for the Liberia food rations contract and providing a cost description

for each of the finalists' bids.  (*Id*. ¶¶ 80-82).[3]  Approximately one week later, the U.N.

Headquarters Committee on Contracts approved the award of the Liberia contract to Compass,

per the Procurement Service's recommendation.  (*Id*. ¶ 83.)

### 2.    The Burundi Email

On April 27, 2005, Defendant Yakovlev leaked secret U.N. information via email (the

"Burundi Email") to Defendant Seiwert concerning Compass's performance failings with respect

to the Burundi contract.  (*Id*. ¶ 85.).[4]  Defendant Yakovlev sent Defendant Seiwert the secret

information contained in the Burundi Email to enable Defendant Compass to correct service

problems in Burundi before the U.N. terminated the Burundi contract and perhaps other U.N.

contracts because of Defendant Compass's poor performance.  (*Id*. ¶¶ 13, 66, 88, 154.)  The

Burundi contract was worth as much as $111 million and all of Defendant Compass's food

rations contracts may have been worth in excess of $350 million.  (*Id*. ¶¶ 13, 56.)

## V.    SUPREME FILES SUIT

Supreme filed its initial complaint on March 6, 2006 and filed its First Amended

Complaint (the "Complaint") on June 1, 2006.  Supreme has filed this consolidated brief in

opposition to the separate motions to dismiss filed by the "Compass Defendants" (Compass,

ESS, Kemp and Swain), the "IHC Defendants" (IHC and Testa) and Defendant Harris

---

[3] *See* http://www.foxnews.com/story/0,2933,171558,00.html.

[4] *See* http://www.foxnews.com/projects/pdf/un_documents.pdf.

(collectively, the "Movants") and in furtherance of its action seeking damages in connection with every food rations contract it lost to Defendant Compass as a result of the Defendants' commercial bribery and bid manipulation conspiracy: Sudan, East Timor, Liberia, Burundi, and Eritrea. (*Id*. ¶ 57.) [5]

## ARGUMENT

## I.     STANDARD OF REVIEW

A court should not grant a motion to dismiss "unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir. 1985) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  On a motion to dismiss under Rule 12(b)(6), "[t]he factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff."  *Frazier v. Coughlin*, 850 F.2d 129, 129 (2d Cir. 1988).

## II.    SUPREME HAS PROPERLY ALLEGED RICO CLAIMS

### A.     Legal Standard

RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

---

[5] The following events occurred after Supreme filed its Complaint and would be added to any subsequent amended complaint.  In June 2006, when the U.N. re-tendered seven contracts being performed by Defendant Compass, Supreme submitted bids for five of those contracts (Syria, Eritrea, Liberia, Lebanon, and Sudan).  In August 2006, the U.N. indicated that it would award Supreme the Syria, Eritrea, and Liberia contracts, that it would award ES-KO International, Inc. ("ES-KO") a limited Sudan contract (withholding the award related to food rations to Darfur, the bulk of the Sudan work), and that it would require additional time before awarding the Lebanon contract (though it indicated that it could award the contract to Supreme).  Additionally, the U.N. indicated that it would renew a contract with Supreme for the Ivory Coast.  As for the contracts for which Supreme did not submit a bid, the U.N. indicated that it would permit Defendant Compass to retain the Burundi contract (because it will expire in December 2006) and that it would award ES-KO the Western Sahara contract, a small contract servicing some three hundred people.  With these contracts in place, Supreme will hold approximately 50% of the U.N. food rations business.

The Supreme Court has instructed that "RICO is to be read broadly" and "liberally construe to effectuate its remedial purposes."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) (citations and quotation marks omitted).  "A RICO claim should be dismissed only 'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923 (CSH), 1994 WL 88129, at *5 (S.D.N.Y. Mar. 15, 1994) (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989)).

**B.     The Movants' Bribery and Bid Manipulation Scheme Proximately Caused Supreme's Losses**

**1.     Supreme was Directly Injured by the Conspiracy**

Supreme lost several U.N. contracts because of Defendants' corruption of U.N. officials in furtherance of a commercial bribery and bid manipulation scheme.  (Am Compl. ¶ 1.) Supreme's injuries were not derivative of any third party, nor were they remote from the criminal acts of Defendants.  Supreme's injuries were directly and immediately caused by the conspiracy.

When a plaintiff alleges, as Supreme does, that a defendant won contracts by bribing a buyer's disloyal employee to corrupt a bid evaluation process, courts have consistently held that proximate cause is properly pled.  In *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 269 (D. Conn. 2004), the court concluded that the alleged bid manipulation scheme, which included bribing disloyal city officials to obtain city contracts, sufficiently pled proximate causation. Foreshadowing *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006), the court noted that the Supreme "Court has required a '*direct relation* between the injury asserted and the injurious conduct alleged,' and precluded recovery by a 'plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts.'"  *Astech-Marmon*, 349 F. Supp. 2d at 269 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268

(1992)) (emphasis added by district court).  Relying on Supreme Court and Second Circuit

precedent, the court held that defendants' commercial bribery bore a direct relationship to the

plaintiff's alleged injury:

> These acts include, among other things, paying bribes and kickbacks to City
> officials to obtain municipal contracts . . . .  These allegations, when viewed as
> part of the complaint, charge Defendants with subverting the municipal bidding
> process and denying Astech-Marmon, the sole Bridgeport-based asbestos
> contractor with bid preferences, the opportunity to bid on and perform City work.
> These acts of wrongdoing directly caused Astech-Marmon's alleged injury . . . .

*Id.*; *see also In re Am. Honda Motor Co. Dealerships Relations Litig.*, 941 F. Supp. 528, 537 (D.

Md. 1996) (plaintiffs adequately pled proximate causation under RICO with allegation that "the

plaintiff dealers lost profits because bribe-paying dealers received unfair allotments of cars");

*Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1084 (D. Md. 1991) (finding proximate

causation properly alleged under RICO where "bribes given and received were allegedly

received for the purpose of advancing the bribing company's [interests] at the expense of other

companies . . . .  Thus, the injury caused those other companies . . . is a foreseeable recognizable

result of the predicate actions").

Contrary to the Movants' argument, (Compass Br. at 15),[6] *Ideal Steel* did not hold that

the difficulty of determining damages is a ground to dismiss a RICO claim.  Rather, the Court

held that the *indirectness* of an injury is a ground to dismiss a RICO claim and that the difficulty

of determining damages is one of the reasons that *indirect* injuries cannot satisfy the requirement

of proximate causation.  *Ideal Steel*, 126 S. Ct. at 1996-97; *see also In re Reciprocal of Am.*

*(ROA) Sales Practices Litig.*, Nos. MDL 1551, 04-2313, 04-2078, 2006 WL 1627802, at *17

---

[6] References to "Compass Br." are to the Memorandum of Law in Support of the Compass Defendants' Motion to
Dismiss ES-KO's and Supreme's RICO and Antitrust Claims.  References to "IHC Br." are to the Memorandum of
Law in Support of the IHC Defendants' Motion to Dismiss ES-KO's and Supreme's RICO and Antitrust Claims.
References to "Harris Br." are to the Memorandum of Law in Support of Motion to Dismiss Plaintiff Supreme
Foodservice AG's and ES-KO International, Inc.'s Claims Against Defendant Peter Harris.

(W.D. Tenn. June 12, 2006) (noting *Ideal Steel* would not bar a claim of direct injury asserted by the target of a competitor's fraud); *Commercial Cleaning Serv., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 384 (2d Cir. 2001) ("We have stated a plaintiff has standing where the plaintiff is the direct target of the RICO violation.").

Here, Supreme alleges direct injury from the Movants' illegal acts. Therefore, this case does not raise any difficulties associated with determining damages from indirect injuries. While it may have been a complex task to determine precisely which sales the *Ideal Steel* plaintiff lost as a result of the alleged scheme, 126 S. Ct. at 1997, no such difficulty exists here because a discrete and specific number of sales are at issue – the U.N. contracts awarded to Defendant Compasss instead of Supreme.

The Movants complain that calculating Supreme's damages based on lost profits would result in "a battle of experts." (Compass Br. at 17.) Determination of lost profits is a common and unremarkable occurrence in commercial cases, and courts have consistently held that such damage calculations are perfectly feasible. For example, in *American Honda* the court stated:

> The complexity of quantifying any given plaintiff dealer's loss will be of central concern later in this litigation, but plaintiffs have alleged injury to their businesses caused by the bribery scheme. That is enough to survive defendants' motion to dismiss for lack of standing.

941 F. Supp. at 538; *see also New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000) (plaintiff "need only provide the court with some relevant data from which the district court can make a reasonable estimated calculation of the harm suffered"); *Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 823 (2d Cir. 1983).

## 2. *Ideal Steel* and *James Cape* are Inapposite to the Proximate Cause Inquiry in this Case

The Movants mistakenly rely on *Ideal Steel* and *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396 (7th Cir. 2006), *aff'g* 2005 WL 2176965 (E.D. Wis. 2005), for their argument

11

that Supreme's RICO claims should be dismissed for lack of proximate causation.  (Compass Br. at 8-11.)

In *Ideal Steel*, the Supreme Court held that the plaintiff failed to state a RICO claim because its alleged injury was not directly caused by the alleged RICO violation.  The plaintiff alleged that the defendant, who was a competitor of plaintiff's, engaged in a scheme to evade payment of taxes.  The plaintiff alleged that this evasion of taxes resulted in injury to plaintiff's business because the defendant used "the proceeds from the fraud to offer lower prices designed to attract more customers." *Ideal Steel*, 126 S. Ct. at 1997.  The Court held that plaintiff had failed to allege proximate causation because its decreased sales were not directly caused by the evasion of taxes.  "The cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id*.  As the Court explained, a company's evasion of taxes does not directly lead to lost sales for its competitor.  *Id.* at 1998.  By contrast, Supreme sustained injuries directly from Defendants' corrupt scheme.

The Second Circuit has explained that the "rule [of proximate causation] is intended to preclude recovery by plaintiffs who 'complain [ ] of harm flowing merely from the misfortunes visited upon a third person . . . .'" *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104 (2d Cir. 1993) (quoting *Holmes*, 503 U.S. at 268).  Thus, under the RICO test of proximate causation, "a direct injury has been found when the plaintiff's injuries are not derivative of damage to a third party." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 237 (2d Cir. 1999).  According to the Second Circuit,

> the critical question posed by the direct injury test is whether the damages a plaintiff  sustains are derivative of an injury to a third party.  If so, then the injury is indirect; if not, it is direct.

*Laborers Local 7*, 191 F.3d at 238-39.

In *Standardbred Owners*, the Second Circuit reversed the district court's dismissal of a RICO claim where the plaintiffs were "suing for injuries that were a direct and *inevitable result* of defendants' conduct and must have been anticipated by the defendants."  *Standardbred Owners*, 985 F.2d at 104 (emphasis added).  The *Ideal Steel* plaintiffs did not pass this "inevitable result" test because the defendant's lowering of its prices was not the inevitable result of evading taxes.  As the Supreme Court noted, the defendant could have used the proceeds from its tax evasion for any number of things other than lowering its prices, "from asset acquisition to research and development to dividend payouts."  *Ideal Steel*, 126 S. Ct. at 1997.  Unlike the plaintiff in *Ideal Steel*, Supreme passes this "inevitable result" test because the Defendants' bribery and bid manipulation scheme inevitably prevented Supreme from winning any contracts.  While "the fact that a company commits tax fraud does not mean the company will lower its prices," *id.*, when a company bribes a buyer's agent to manipulate a bidding process, the intention is to take business from that company's competitors.  There is no other reason to bribe.

In *James Cape*, the plaintiff alleged that defendants, its competitors, conspired with a disloyal employee of plaintiff's who gave defendants confidential bid information that enabled defendants to undercut plaintiff's bids.  *James Cape* did not involve any bribery of officials.  The Seventh Circuit dismissed plaintiff's RICO claim on the ground that its allegations did not establish control of a RICO enterprise.[7]  As an alternative ground, even assuming plaintiff had

---

[7] The Seventh Circuit expressly stated that if plaintiff had pled that defendants bribed state officials, it would have stated a RICO claim.  *See James Cape*, 453 F.3d at 403 ("If the defendants had bribed a WisDOT employee to override the computer's recommendation, or enter a false bid into the computer, they would have controlled the enterprise.").  Following the reasoning of *James Cape*, Supreme has alleged a RICO claim, because Defendants did not remain "purposeful outsiders throughout the bid rigging scheme," *James Cape*, 2005 WL 2176965, at *4 – they were direct and active participants in a commercial bribery and bid manipulation conspiracy designed to prevent Supreme from winning U.N. contracts.

13

sufficiently alleged control, the Seventh Circuit, citing *Ideal Steel*, dismissed the RICO claim for failure to plead proximate causation.  Movants rely only on the alternative ground.

The Seventh Circuit had "concerns" over whether plaintiff James Cape could ever show that its injuries were proximately caused by defendants' RICO violations.  *James Cape*, 453 F.3d at 403.  The court's first concern was that a "court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'"  *Id.* (quoting *Ideal Steel*, 126 S. Ct. at 1997).[8] This concern was appropriate in *James Cape* because the award went automatically to the lowest eligible bidder.  As the court noted, James Cape could have "won some bids absent the bid rigging scheme . . . . "  *James Cape*, 453 F.3d at 404.

Since the *James Cape* defendants could have legitimately won contracts, the court could not have been "certain" that the plaintiff would have won any.  This is not true here.  Unlike in *James Cape*, here, price is not the only criterion.  Technical expertise and track record are also considerations for awarding rations contract.  (Am. Compl. ¶¶ 50, 78.)  Compass would not have won any of the food rations contracts if not for its bribery scheme because it was a new entrant into a field which required extensive expertise.  (*Id.* ¶¶ 50, 52.)  The very fact that it bribed its way into U.N. business shows it seriously questioned its own qualifications to be awarded contracts legitimately.  In any event, Supreme should have the opportunity to show, as recent events have established, that in a very small universe of competitors for U.N. food rations contracts, Supreme would have won the awards but for Defendants' bribery.  *See supra* note 5.

---

[8]  The second concern – that James Cape could not show what portion of its lost market share was due to the scheme – is subject to the same analysis as the first concern.  The final concern – which party is the proper vindicator of the law – is considered in the next section.

Supreme can make this showing by meeting the usual preponderance-of-the-evidence standard that prevails in civil RICO cases. *See United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1089 n.8 (2d Cir. 1995). We doubt that the Seventh Circuit meant to create a new "certainty" standard for RICO litigation. If it did, the decision would be clear error and should not be followed by this Court. Under the circumstances of this case, there is no reason to deprive Supreme of the opportunity to show at trial by a preponderance of the evidence that Supreme would have been the successful bidder.

Indeed, a showing that Supreme would have won contracts awarded to Compass is likely. With the removal of the corrupting influence of Defendant Compass and its co-conspirators, Supreme has benefited from an open and honest bidding system. As noted in note 5, *supra*, following the de-listing of Defendant Compass as a U.N. vendor, Compass's U.N. contracts were re-tendered and Supreme will be awarded nearly all of the contracts upon which it re-bid. This, in itself, is powerful evidence that, but for the conspiracy, Supreme would have won the contracts. Thus, Supreme can establish proximate causation by a preponderance of the evidence, and the Court need not wonder whether Supreme "would have won any of the contracts that were the subject of the conspiracy." *James Cape*, 453 F.3d at 403.

### 3. The Movants Cannot Escape Liability for Supreme's RICO Claims Even if the U.N. Suffered a Direct and Substantial Injury

The Movants argue that, by virtue of the U.N.'s direct injury, it is the "direct victim" and the appropriate party to vindicate rights under RICO. (Compass Br. at 19-20.) [9] This argument is premised on the assumption that the U.N. is directly injured, while Supreme's injury is indirect

---

[9] The Movants claim that, as between the U.N. and ES-KO, the U.N. is the only party with RICO standing. (Compass Br. at 19-20.) Although the Movants do not seek dismissal of Supreme's RICO claims on these grounds, Supreme addresses this argument because the Movants' inaccurate statement of law could affect the courts' consideration of Supreme's RICO claims.

or remote.  As discussed immediately above, this is incorrect.  Here, both the U.N. and Supreme

suffered direct injuries.

The pertinent question in determining standing for RICO purposes is whether the plaintiff

has suffered direct injury. Because Supreme has alleged direct injury, the question of whether the

U.N. also suffered direct injury is, at least at the pleading stage, not relevant.  *See Trollinger v.*

*Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (indicating that as between two directly

injured parties a complaint will not be dismissed because one party's injury is supposedly more

direct).  A RICO defendant cannot escape trial merely by asserting that another party can be

expected to pursue more direct claims.  *See id.* at 618 ("[T]he law cannot count on a more

'directly injured victim[ ]' to 'vindicate the law as [a] private attorney[ ] general' because . . .

[the other victim] has not sued and it is not clear that [it] could sue."  *Id.* at 618 (quoting *Holmes*,

503 U.S. at 269-70).

If the Court were to consider at this stage whether Supreme or the U.N. were the better

vindicator of the law, the nod should go to Supreme, as Supreme suffered the most direct injury

and its damages are more straightforward.  The U.N.'s damages would be a function of the

bribes paid to its officials and the difference between the value of the superior service the U.N.

would have received if Supreme had won the contracts and the lesser value of ESS's inferior

services.  Compared to the relatively straightforward calculation of Supreme's lost profits, it

would be a far more complicated task to determine the difference in value between the services

Supreme would have provided and the substandard services ESS provided.  *See Trollinger*, 370

F.3d at 618 (finding plaintiffs to be the most direct victim of RICO violations as their lost

earnings were easier to calculate than their union's damages); *see also 2600 Woodley Rd. Joint*

*Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 741-42 (3d Cir. 2004) (stating that a vendor

blocked from competing as a result of bribes is clearly a "more direct victim[]" of a commercial bribery scheme than the buyer whose agent was bribed).  Accordingly, at the close of discovery, even if the U.N. were to bring its own suit, it is likely that the Court would find Supreme to have the most direct injury and to be a better vindicator of the law than the U.N.

Even assuming that it was appropriate to consider at this stage whether the U.N. had a "more direct injury" than Supreme (which it does not), the Court should not ignore the fact that the U.N. is unlikely to ever be a litigant in this matter.  The U.N. has an interest in maintaining its immunity.  *See, e.g.*, *De Luca v. United Nations Org.*, 841 F. Supp. 531, 533 (S.D.N.Y. 1994).  If the U.N. were to sue, it might expose itself to counterclaims based on the wrongdoing of its agents.  The fact that the U.N. has not brought its own suit underscores this conclusion.

### C.   Supreme Properly Alleged that Each of the Movants Committed at Least Two Predicate Acts[10]

#### 1.   Supreme Sufficiently Alleged Non-Fraud Predicate Acts Committed by Each of the Principal Movants[11]

Allegations of predicate acts that do not involve fraud are governed by the simplified pleading standards of Rule 8(a).  *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992); *see also*, *e.g.*, *Merrill Lynch*, 1994 WL 88129, at *12-15 (concluding that bribery, Travel Act, money laundering, and obstruction of justice predicate acts must be assessed under Rule 8(a)).  Under

---

[10] The Movants misinterpret RICO law by arguing that two predicate acts must be shown for each contract that Supreme alleges was the subject of the bribery and bid manipulation scheme.  (Compass Br. at 20-23.)  To plead a "pattern of racketeering activity," one must show a relationship between at least two predicate acts and the threat of continuing racketeering activity.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989).  Because Supreme alleges acts involving a common purpose – to influence U.N. officials so that they would award Compass food rations contracts Supreme would have won – Supreme's allegations satisfy continuity requirements because they depict a string of related predicate acts spanning a period of some five years.  *See, e.g., Merrill Lynch*, 1994 WL 88129, at *30 (finding continuity in an alleged bribery and kickback scheme where conduct occurred "within the relatively substantial period of two years."); *Metromedia Co.*, 983 F.2d 350, 369 (2d Cir. 1992) (concluding that conduct spanning approximately two years was sufficient to establish continuity).

[11] The "Principal Movants" are corporate Defendants Compass Group, ESS, and IHC and individual Defendants Harris and Testa, who were, respectively, principal officers of Compass and IHC during the bribery and bid manipulation conspiracy.  (Am. Compl. ¶¶ 37, 47.)

Rule 8(a), "a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting Rule 8(a)(2)).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  *Id.*

**a.**  **Supreme Sufficiently Alleged Acts of Bribery Committed by Each of the Principal Movants**

**(i)**  **Supreme's Allegations of Bribery are Sufficient to Meet RICO's Generic Pleading Requirements for State-Based Predicate Acts**

When pleading a predicate act arising from a state law violation, a RICO plaintiff need only plead the offense generally and is not required to plead all of the elements particular to the relevant state statute.  *See United States v. Miller*, 116 F.3d 641, 675 (2d Cir. 1997).[12]

The Movants argue that Supreme's bribery allegations are defective because "no economic harm to the U.N. is properly alleged in [Supreme's] complaint."  (Compass Br. at 24.) This precise issue was examined in *United States  v. Reale*, No. S4 96 Cr. 1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997), in which defendants moved to dismiss certain counts in an indictment alleging, among other things, a bribery/kickback scheme in violation of RICO. The defendants argued for dismissal of the RICO counts predicated on violations of New York bribery statutes on the ground that the government failed to allege essential elements of bribery under New York law, including economic harm to the employer.  *Id.* at *7.  The court held that the predicate acts were sufficiently pled because RICO requires a party only to plead "accurate generic definitions" of the crimes charged.  *Id.*

---

[12] This view is consistent with RICO's legislative history showing that "[s]tate offenses are included by generic designation."  H.R. Rep. No. 1549, 91st Cong., 2d Sess. 56 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4032.

Here, the Complaint is replete with descriptions of Defendant Compass's bribery scheme, including allegations of receipt by Yakovlev and Kuznetsov of illicit payments in return for rigging the bidding process.  (*See, e.g.*, Am. Compl. ¶¶ 1, 4-6, 8, 10, 13, 60-66, 75, 79-85, 88, 96, 99-100.)  In addition, the Complaint cites applicable New York commercial bribery statutes.  (*Id.* ¶ 99.)  Under Rule 8(a), these allegations adequately plead acts of commercial bribery.

> ### (ii)    Even if a Specific Allegation of Economic Harm Were Required When Pleading Bribery Under New York Law as a Predicate Act, the Complaint Sufficiently Asserts Such Harm

Even assuming that a party must plead economic harm to the employer when alleging bribery under New York law as a RICO predicate, Supreme has satisfied the law's minimal pleading requirements under Rule 8(a).  In *Merrill Lynch*, the plaintiff asserted RICO claims for conduct arising out of a bribery and kickback scheme involving Merrill Lynch employees and vendors.  1994 WL 88129, at *1.  Merrill Lynch claimed that its employees caused it "to pay inflated prices or prices that could have been reduced for services provided by [defendants, to] compensat[e] the [defendants] for unnecessary services, or [to] compensate them for services never rendered."  *Id.* *12.  Supreme similarly alleges that the U.N. paid higher prices for a product of lesser quality than it would have received if Compass had not bribed the U.N.  (Am. Compl. ¶¶ 13, 66, 67, 88.)  In light of Rule 8(a)'s pleading requirements, "[t]o require that the complaint identify the actual services obtained at an inflated price and the specific price differential would place an unwarranted burden on plaintiffs at this stage of this case."  *Id.* at *12.

The Movants cite several cases in support of the proposition that RICO claims must be dismissed where economic harm to the employer is not alleged.  (Compass Br. at 25.)  *Linens of Europe, Inc. v. Best Manufacturing, Inc.*, No. 03 Civ. 9612 (GEL), 2004 WL 2071689, at *15

19

(S.D.N.Y. Sept. 16, 2004), is inapposite because there the plaintiff's allegations were so muddled

that it was "impossible [for the court] to understand what the predicate acts are alleged to have

been committed by which defendants, or even clearly to understand what the predicate acts are."

In *Benedict v. Amaducci*, No. 92 Civ. 5239 (KMW), 1995 WL 702444, at *8 (S.D.N.Y. Nov. 28,

1995), the plaintiff not only failed to allege whether the employer consented to a bribe, but also

the identity of the employer and whether the bribes were made without the knowledge and

consent of the employer.  Here, Supreme alleges that the U.N. did not consent to the bribes and

was substantially harmed by them.  (Am. Compl. ¶¶ 5, 8-10, 64, 66, 84.)

The Movants rely upon two cases, *Moll v. US Life Title Ins. Co. of N.Y.*, 710 F. Supp. 476

(S.D.N.Y. 1989), and *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293

(S.D.N.Y. 2004) (Castel, J.), dismissing RICO claims after finding that the employer did not

suffer economic harm.  (Compass Br. at 25-26.)  Because the defendants in *Moll* and *Maddaloni*

had no influence on prices, those cases are inapposite to the present case, in which Defendant

Compass chose the amount to bid and, therefore, set the prices paid by the U.N.  Under New

York law, when a bidder bribes an agent, it is presumed that the amount of its bid is inflated by

at least the amount of the bribe.  *See, e.g.*, *Donemar, Inc. v. Molloy*, 252 N.Y. 360, 365, 169 N.E.

610, 611 (1930) ("If . . . a vendor bribes a purchaser's agent it must be assumed that the purchase

money is loaded by the amount of the bribe . . . ."); *City of New York v. Liberman*, 232 A.D.2d

42, 43-44, 660 N.Y.S.2d 872 (1st Dept. 1997) (same); *People v. Reynolds*, 174 Misc.2d 812, 667

N.Y.S.2d 591, 596 n.2 (N.Y. Sup. Ct. 1997) (same).[13]

---

[13] Notwithstanding its inapplicability to the instant facts, *Moll* contravenes Second Circuit precedent, which does not require that economic harm be pled when claiming bribery as a RICO predicate.  *See United States v. Paone*, 782 F. 2d 386, 393 (2d Cir. 1986) ("The [RICO] statute is meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge.").

The Movants also cite *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536 (E.D.N.Y. 1987), which, in fact, favors Supreme.  There, New York City sewer inspectors purportedly accepted bribes from plumbing and excavating contractors to circumvent City inspections.  The defendants argued that the City suffered only "intangible and non-pecuniary" harm, rather than the "injury to business or property" required by RICO.  *Balkan*, 656 F. Supp. at 542.  The City claimed that (i) the structural integrity of the sewer system was undermined, reducing the life expectancy of portions of the sewage system and causing the City to incur substantial repair and maintenance expenses; (ii) it was deprived of its employees' "faithful and loyal performance"; and (iii) it was injured by "diminished public confidence in the integrity of its sewer inspection process."  *Balkan*, 656 F. Supp. at 541.  Holding that the City adequately alleged tangible damages to its sewer system, the court concluded the City had adequately pled its claim.  *Balkan*, 656 F. Supp. at 542-43.

Here, discovery will show how the U.N. (i) suffered financial losses after the integrity of its bidding process was undermined, forcing the U.N. to cancel Compass's contracts and re-tender them to the marketplace;[14] (ii) was deprived of the loyal and faithful service of Defendants Yakovlev and Kuznetsov; and (iii) was injured by diminished public confidence in the integrity of its bidding process.  As discussed above, under New York law, it is presumed that the price paid by the U.N. was inflated by at least the amount of the bribe.  Under these circumstances – where U.N. officials took hundreds of thousands of dollars in bribes – the U.N. certainly suffered more than the statutory minimum of $250.  *Cf. Maddaloni Jewelers*, 354 F. Supp. 2d at  300-01 (granting summary judgment because plaintiff failed to present any evidence of concrete economic loss and "it [did] not necessarily follow that [the employer] would suffer a loss if the inventory were directed . . . from one retailer . . . to another").

---

[14] *See supra* note 5.

Lastly, because the RICO claims in cases relied upon by Movants were dismissed after the plaintiffs were given substantial opportunity to correct insufficiencies in their complaints, if this Court were to deem any of Supreme's allegations to be insufficient, Supreme respectfully requests that it be given the opportunity to amend its Complaint.[15]

### (iii) Supreme Sufficiently Alleged Involvement in the Bribery Scheme by the IHC Defendants and Defendant Harris

Contrary to the arguments raised by the IHC Defendants and Defendant Harris in their motions to dismiss, (IHC Br. at 5.); (Harris Br. at 4-6), the Complaint details their direct involvement in the bribery scheme. (*See, e.g.*, Am Compl. ¶¶ 5-6, 11, 37, 47, 60-63, 67, 84, 79-86, 161-167.) Furthermore, liability is fairly alleged against Defendants Harris and Testa because they were principal officers of Compass and IHC, respectively, when the bribes were made and were integral participants, if not leaders, of the scheme. *See* note 11 *supra*. "As the alleged principal officers of [two corporate entities], who are alleged to have designed the entire overall scheme and to have directed the activities of the companies at the center of the alleged enterprise, these defendants have surely been alleged to have participated in the conduct of the alleged enterprise." *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352, at *18 (S.D.N.Y. Sept. 30, 2003).

### b. Supreme Sufficiently Alleged Money Laundering by Each of the Principal Movants

"Generally, to properly state a claim under the money laundering statutes, plaintiff must allege that a defendant knowingly used the proceeds of unlawful activity in a proscribed transaction." *Ray v. Gen. Motors Acceptance Corp.*, No. 92 Civ. 5043 (DGT), 1995 WL 151852,

---

[15] *See Maddaloni*, 354 F. Supp. 2d at 298 (dismissing RICO claims after filing of third amended complaint and closure of discovery); *Benedict*, 1995 WL 702444, at *9 (dismissing second amended complaint after extensive discovery); *Moll*, 710 F. Supp. at 482 (dismissing RICO claims after plaintiffs had four opportunities to replead and court had described the complaint's deficiencies in a prior opinion).

at *6 (E.D.N.Y. Mar. 28, 1995).[17]  "In other words, a defendant must have had control and made use of funds derived from prior criminal activity."

In *West 79th Street Corp. v. Congregation Kahl Minchas Chinuch,* No. 03 Civ. 8606 (RWS), 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004), the court found the plaintiff's money laundering allegation wanting because the plaintiff failed to allege fundamental elements of money laundering, namely that the defendants either laundered money to facilitate an unlawful activity specified in the money laundering statute, *see* 18 U.S.C. § 1956(c), or that the allegedly laundered proceeds were derived from such an activity.  Here, Supreme has alleged that Defendant Compass, through Defendant IHC, bribed Yakovlev by engaging in monetary transfers designed to facilitate and conceal its bribery and bid manipulation scheme.  (*See, e.g.*, Am. Compl. ¶¶ 5-6, 67, 165, 167.)  These transfers constituted wire fraud (*see* Section II.C.2., *infra*) and violations of the Travel Act (*see* Section II.C.3., *infra*), which, in addition to bribery, are types of specified unlawful activity.  *See* 18 U.S.C. § 1956(c).  Thus, Supreme has properly alleged that each of Compass's money transfers, which were facilitated by IHC, constituted an act of money laundering by each of the Principal Movants.  *See United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001) ("Our case law consistently distinguishes between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together.").

---

[17] The Movants assert that the statute relevant to Supreme's money laundering claims is 18 U.S.C. § 1956(a)(2), the "international money laundering statute."  (Compass Br. at 27 n.10.)  While § 1956(a)(2) is surely relevant – Defendant Compass, a U.K.-based corporation, used IHC, a New York-based corporation, to pay bribes to Defendant Yakovlev, by, among other methods, funneling money from IHC to Yakovlev's bank account in Antigua (Am. Compl. ¶¶ 5, 41, 67, 96) – other aspects of sections 1956 and 1957 are also relevant.  *See Ray v. Gen. Motors Acceptance Corp.*, No. 92 Civ. 5043(DGT),1995 WL 151852, at *6 (E.D.N.Y. Mar. 28, 1995) (stating that the elements of money laundering under 18 U.S.C. § 1956 and § 1957 are sufficiently similar to be stated together).  These other sections do not require an international component.

## 2.      Supreme Sufficiently Alleged Wire Fraud by Each of the Movants

Rule 9(b)'s particularity requirement does not apply to wire fraud allegations "where the . . . wire transmissions themselves are not false or misleading." *Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ. 1041 (RMB) (GWG), 2003 WL 22839799, at *5 (S.D.N.Y. Dec. 1, 2003).  Where a plaintiff alleges the "wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves.  In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (citing *Schmuck v. United States*, 489 U.S. 705, 715 (1989)).

To plead wire fraud as a predicate act, a plaintiff must allege that "(1) the defendant devised a scheme to defraud; (2) the defendant used the United States . . . interstate wires to further the fraudulent scheme; and (3) the defendant did so with the specific intent to defraud." *Merrill Lynch*, 1994 WL 88129, at *8.  "Each separate use of the interstate . . . wires in furtherance of a scheme to defraud constitutes a separate crime under the . . . wire fraud statutes." *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493 (S.D.N.Y. 1987).

"A scheme to defraud is a plan whose object is to deprive one of property through fraudulent or deceptive means, such as material misrepresentations or concealment." *Merrill Lynch*, 1994 WL 88129, at *9 (internal quotation marks, brackets and citation omitted).  Even if the information transmitted through the wires is not fraudulent, use of the wires is fraudulent so long as the transmission of such information is "'incident to an essential part of the scheme'" or "'a step in the plot.'" (quoting *Schmuck*, 489 U.S. at 711).  Liability for wire fraud can be imposed on a defendant who did not personally wire anything, as long as the defendant could

have reasonably foreseen that the wires would be used as a result of the defendant's fraudulent acts. (citing *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989)).

Each transmission of either the Liberia Email or the Burundi Email constituted an act of wire fraud against each of the Defendants because each transmission, which crossed interstate wires, furthered Compass's scheme to obtain the Liberia food rations contract through a bribery and bid manipulation conspiracy. (*See, e.g.,* Am. Compl. ¶ 83.) *See also McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (to satisfy Rule 9(b), complaint must identify the purpose of the mailing within the defendant's fraudulent scheme).[18] Alternatively, each transmission constituted an instance of wire fraud because it furthered the Defendants' scheme to willfully conceal from the U.N. the bribes paid to Defendants Yakovlev and Kuznetsov at a time when Compass was in, or entering into, privity with the U.N. (*See, e.g.,* Am. Compl. ¶ 5.)[19] Thus, each of the Movants is liable for the following acts:

- November 6, 2003 transmission of Liberia Email to Defendant Testa;

- November 6, 2003 transmission of Liberia Email to Defendant Seiwert;

- April 27, 2005 transmission of Burundi Email from Defendant Yakovlev to Defendant Seiwert;

- transmission of Burundi Email from Defendant Seiwert to

---

[18] The Movants' assertion that, with respect to the Burundi food rations contract, "[t]here is no allegation of 'deception,' nor is there any allegation that ESS obtained confidential information through this use of the mail or wires" is patently false. (Compass Br. at 23.) The Complaint not only described information contained in the Burundi Email as confidential, but the Complaint also described the dissemination of the Burundi Email as an act in furtherance of Compass's bribery and bid manipulation scheme. (*See* Am. Compl. ¶¶ 13, 66, 85, 88.)

[19] Under New York law, fraud may occur when a party knowingly conceals superior knowledge and is aware that the other party is relying on a misapprehension relating to such knowledge. *Merrill Lynch*, 1994 WL 88129, at *10 (citing, *inter alia, Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). The U.N. would not have entered into a contract with Defendant Compass if it was aware of the Movants' bribery scheme. (*See, e.g.,* Am. Compl. ¶ 64); *supra* note 5. *See also Merrill Lynch*, 1994 WL 88129, at *9 (describing allegation of fraud by Merrill Lynch vendors who concealed knowledge of bribes paid to Merrill Lynch employees while vendors entered into transactions with Merrill Lynch).

Defendant Kemp;

- transmission of Burundi Email from Defendant Seiwert to Defendant Swain;

- transmission of Burundi Email from Defendant Seiwert to Defendant Testa.

(Am. Compl. ¶¶ 5, 13, 66, 79-82, 85, 88.)

In light of the fact that Compass terminated the employment of Defendant Harris, then-CEO of ESS, because of his complicity in the bribery and bid manipulation scheme, (Am. Compl. ¶ 11), Defendant Harris is personally responsible for the above-referenced acts of wire fraud, which, incidentally, are surely attributable to Defendants Compass, ESS and IHC, because he either knew of and approved of those transmissions or could have reasonably foreseen their occurrence. *See Merrill Lynch*, 1994 WL 88129, at *9 (noting that wire fraud liability can be imposed on defendants who could have reasonably foreseen use of mails as a result of their actions). Similarly, Defendants Kemp and Swain are liable for all such acts of wire fraud, in light of their participation in the bribery scheme and their high-ranking status within ESS's U.N. operations. (*See* Am. Compl. ¶¶ 5, 13, 43-44, 63, 85). At the very least, Defendants Kemp and Swain aided and abetted wire fraud through their silence. (*Compare* Am. Compl. ¶ 85 (asserting that Defendants Kemp and Swain received urgent Burundi Email in April 2005) *with id.* ¶ 10 (noting public disclosure of bribery scandal in October 2005)). *See United States v. Rastelli*, 870 F.2d 822, 832 (2d Cir. 1989) (holding aiding and abetting commission of predicate act can constitute commission of a predicate act and citing cases).

Lastly, each of the Movants committed wire fraud each time Defendant Dmitry Yakovlev – an IHC employee during the time of the bribery and bid manipulation scheme – used his cell

26

phone to relay confidential U.N. information between Defendants Yakovlev, IHC, and Testa in furtherance of Compass's fraudulent scheme.  (Am. Compl. ¶ 62.)

### 3.    Supreme Sufficiently Alleged Travel Act Violations

"The necessary elements to plead a violation of the Travel Act are that a person used the mail or a facility of interstate commerce – such a facility including a telephone – with the intent either to distribute the proceeds of enumerated unlawful acts proscribed by State law – *e.g.*, bribery – or to facilitate the carrying on of any such unlawful act and thereafter performed an additional act in furtherance of such unlawful act."  *Welch Foods Inc. v. Gilchrist*, No. 93 Civ. 0641E(F), 1996 WL 607059, at *6 (N.D.N.Y. Oct. 18, 1996) (citing 18 U.S.C. § 1952(a); *United States v. Jenkins*, 943 F.2d 167, 172 (2d Cir 1991)).  "To constitute a Travel Act violation, the interstate travel or use need not be indispensable to the illegal activity, it is enough that the use facilitates the illegal activity." *Merrill Lynch*, 1994 WL 88129, at *13 (internal quotation marks and citation omitted).

In *Bernstein v. Misk*, 948 F. Supp. 228 (E.D.N.Y. 1997), cited by the Movants, the court found that the plaintiffs' Travel Act allegations were fatally vague because the plaintiffs did not identify the facility of interstate commerce used or the unlawful activity allegedly conducted through such facility.  *Bernstein*, 948 F. Supp. at 236 n.2.  Here, however, Supreme alleges that Compass paid Yakovlev hundreds of thousands of dollars in bribes.  (Am. Compl. ¶ 5.)  Rather than vaguely alleging a violation of the Travel Act, Supreme has alleged several types of Travel Act violations.  Because Supreme has sufficiently pled commercial bribery and money laundering pursuant to Rule 8(a) and wire fraud pursuant to Rule 9(b) against the various Movants, it has sufficiently pled a Travel Act violation in connection with each of those other violations.  *See, e.g.*, *Brennan v. United States*, 867 F.2d 111, 116 (2d Cir. 1989) ("[T]he finding of any wire fraud predicate act necessarily require[s] a finding of a corresponding Travel Act

27

predicate act."); *Merrill Lynch*, 1994 WL 88129, at *13 ("Because a violation of the Travel Act is a substantive offense in itself, it can constitute a predicate act under RICO separate from the underlying 'unlawful activity.'") (citation omitted).

### D.      The U.N. Bid-Rigging Enterprise Is a Valid, Sufficiently Distinct Enterprise

The Movants, citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001), challenge the U.N. Bid-Rigging Enterprise on the ground that this enterprise is not distinct from the Defendants.  (Compass Br. at 31-32.)  However, *Cedric* plainly supports the view that the U.N. Bid-Rigging Enterprise *is* distinct.  All other cases cited by the Movants to support their assertion that the U.N. Bid-Rigging Enterprise is an invalid enterprise predate *Cedric*, and case law subsequent to *Cedric* leads to the conclusion that the U.N. Bid-Rigging Enterprise is valid.

In *Cedric*, the Supreme Court ruled that boxing promoter Don King and Don King Productions were separate from one another for the purposes of RICO.  *Cedric*, 533 U.S. at 163.[20]  According to the Supreme Court:

> The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.  The Court can find nothing in [the statute] that requires more 'separateness' than that.

*Id*. at 158.

Following *Cedric*, a subsequent court in this District ruled that a "person," comprised of the owner of a corporation and certain employees, is distinct from an "enterprise," which was the corporation itself.  *Moses v. Martin*, 360 F. Supp. 2d 533, 546 (S.D.N.Y. 2004).  Thus, an association-in-fact enterprise and the defendants that comprise that enterprise are legally

---

[20] RICO makes it "unlawful for any *person* employed by or associated with any *enterprise* . . . to conduct or participate . . . in the conduct of such *enterprise's* affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added).

distinct.[21]  Indeed, "in perhaps its least developed form, an enterprise may be found where there is simply a 'discrete economic association existing separately from the racketeering activity.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir. 1980)).  In the instant case, the Defendants that comprise the U.N. Bid-Rigging Enterprise were bound by an otherwise legitimate association that was linked by each such defendant's involvement in the U.N.'s food rations business.  Thus, those Defendants, which includes all of the Movants, were bound by a discrete economic association that existed separately from their racketeering activity.

### E.     Defendants Kemp and Swain Conducted the Affairs of the Enterprise

 "[T]o state a cause of action against any particular defendant, a complaint under § 1962(c) must charge each named defendant with engaging in specific racketeering acts, constituting a pattern within the meaning of the statute, committed by that defendant in the course of conducting the affairs of the enterprise."  *Id.* at *10.   RICO claims can be pursued against lower-rung participants as long as they "*participate* in the management or operation of the enterprise, since to 'conduct' the affairs of an enterprise 'one must have some part in directing those affairs.'"  *Zito*, 2003 WL 22251352, at *17 (emphasis added) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)).  "[T]here is no heightened pleading requirement for the 'conduct' element of a RICO claim."  *Id.* at *18.

Defendants Kemp and Swain were leaders of Compass's U.N. food rations business. (Am. Compl. ¶¶ 43-44.)  The fact that Defendant Seiwert, one of the masterminds of the bribery and bid manipulation conspiracy, forwarded Kemp and Swain the Burundi Email and asked them to act with urgency on its information evidences their role as trusted co-conspirators.  "It is hard

---

[21] The Movants do not challenge the validity of the U.N. Crony Enterprise or the U.N. Procurement Fraud Enterprise.

to imagine what more plaintiff[] could allege at this stage, when the precise role of these defendants is information peculiarly within their knowledge and not the plaintiff['s]."  *Zito*, 2003 WL 22251352 at *18.

### F.    Supreme Sufficiently Alleged a RICO Conspiracy

Section 1962(d) makes it unlawful to conspire to violate 18 U.S.C. § 1962(c).  "If a defendant agrees personally to commit, or to aid and abet the commission of, two predicate acts he may be convicted of a RICO conspiracy violation."  *United States v. Rastelli*, 870 F.2d 822, 832 (2d Cir. 1989).  To be liable for a RICO conspiracy, a conspirator need only be aware of the "general contours" of the conspiracy and that it existed beyond his individual role.  *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000).

Supreme has alleged that the Movants participated in a bribery and bid manipulation scheme lasting approximately five years that involved the corruption of U.N. officials and affected the award of contracts that could be valued in excess of $350 million. (Am. Compl. ¶ 1.)  The agreement by each of the Movants to participate in this conspiracy is evidenced by the predicate acts, described herein, performed by each of the Movants.  Even if this Court were to deem Supreme's allegations insufficient to plead at least two predicate acts for each Movant, the allegations are nonetheless sufficient to show an agreement by each Movant to commit two predicate acts.  *See Baisch v. Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003) (stating that the pleading requirements for a Section 1962(d) conspiracy claim are less demanding than the pleading requirements for a Section 1962(c) claim).

III.   **SUPREME ADEQUATELY PLED COMMERCIAL BRIBERY UNDER SECTION 2(C) OF THE ROBINSON-PATMAN ACT**

A.   **Supreme Is Not Required to Allege Price Discrimination in Favor of a Buyer**

The Movants argue that Supreme's commercial bribery claim under section 2(c) of the Robinson-Patman Act should be dismissed because Supreme has not alleged price discrimination favoring a particular buyer.  (Compass Br. at 36.)  This argument should be rejected because section 2(c) does not focus only on price discrimination, which is not at issue here; section 2(c) also redresses competitive harm caused by corruption of agents in the marketplace, which is at issue.

Although the Movants point out that neither the Supreme Court nor the Second Circuit has decided whether commercial bribery is covered by section 2(c) of the Robinson-Patman Act, the Movants do not appear to argue that Supreme's claims should be dismissed because commercial bribery is beyond the purview of section 2(c).[22]  Instead, they argue that "Congress did not intend to provide a separate antitrust cause of action for commercial bribery in the absence of price discrimination."  (Compass Br. at 36.)  This argument is meritless.

The Supreme Court held that section 2(c) "unqualifiedly" outlawed "certain business practices other than price discrimination."  *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959).  The law is thus well-established that section 2(c) extends beyond price discrimination to reach numerous other forms of unlawful payments designed to disadvantage competitors in the

---

[22] Even if the Movants were to argue that Supreme's claim should be dismissed as not coming within section 2(c) of the Robinson-Patman Act, cases stretching back more than 60 years have held that commercial bribery is covered by section 2(c).  *See, e.g., Fitch v. Ky.-Tenn. Light & Power Co.*, 136 F.2d 12, 15-16 (6th Cir. 1943); *Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*, 67 F. Supp. 2d 126, 130-131 (E.D.N.Y. 1999); *Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413, 418 (D.D.C. 1993) ("clear majority of authorities" hold that section 2(c) prohibits commercial bribery).  Indeed, the Movants acknowledge that the Supreme Court has twice noted that section 2(c) is directed against bribery, *FTC v. Henry Broch & Co.*, 363 U.S. 166, 169 n. 6, including bribery of public officials, *California Mobil Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).  Given this precedent, this Court should find that section 2(c) applies to the commercial bribery alleged in the Complaint.

marketplace.[23]  In particular, cases have recognized that section 2(c) prohibits payments, such as bribes, made in violation of an agent's fiduciary duty to its principal.  "In Section 2(c) of the Robinson-Patman Act, Congress concluded that under certain circumstances it is an unfair trade practice for an agent to serve two masters. . . .  One of the purposes of this Section is to protect the integrity of the principal-agent relationship where a violation has an anti-competitive effect." *Grace v. E.J. Kozin Co.*, 538 F.2d 170, 173 (7th Cir. 1976) (footnote and citations omitted);  *See also Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 696 (9th Cir. 1976); *Philip Morris v. Grinnell Lithographic Co.*, 67 F. Supp.2d 126, 130-31 (E.D.N.Y. 1999).

Legislative history confirms that section 2(c) was designed to combat commercial bribery.  As Senator Patman, one of the Act's authors, stated, "This bill . . . will prohibit one party from bribing the representative of the other under the guise of brokerage allowances or commissions."  74 Cong. Rec. 7759-60 (1936), quoted in *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988, 993 (4th Cir. 1990); *see also Henry Broch & Co.*, 363 U.S. at 169 n.6 (citing Senator's Patman's statement to support conclusion that section 2(c) reaches bribery).  As recognized in *Stephen Jay Photography*, "These statements refer to the corruption of an agency relationship. . . .  In harmony with these examples from the Congressional Record, circuit court cases finding commercial bribery in violation of section 2(c) all involve the corruption of an agency or employment relationship."  *Stephen Jay Photography*, 903 F.2d at 993; *accord Grace*, 538 F.2d at 173; *Calnetics*, 532 F.3d 674 at 696.

Commercial bribery fits well within section 2(c)'s avowed purpose to prevent the corruption of an agency relationship.  New York's commercial bribery law prohibits corrupting

---

[23] The Movants attempt to corral section 2(c) to proscribe only price discrimination, citing *Broch*, is thus not well-founded.  The Supreme Court in *Broch* sought to prevent an attempt to engage in price discrimination that might have eluded section 2(a); it did not hold that section 2(c) applies only to efforts to hide price discrimination.

and improperly influencing an agent in favor of the third-party and against the agent's principal. S*ee* N.Y. Penal Law § 180.03.   Section 2(c) addresses this precise harm.

Supreme's Complaint alleges that Compass, through their employees and agent, bribed Defendant Alexander Yakovlev.  (Am. Compl. ¶¶ 60, 66, 96, 101.)  The Complaint specifically alleges that Defendant Yakovlev accepted the payments as bribes, in breach of his fiduciary duty to the U.N., his employer.  (Am. Compl. ¶ 179.)  Supreme has alleged the corruption of the agency relationship by the Defendants and has stated a claim under section 2(c).

None of the cases cited by the Movants call for a different conclusion.  For example, Movants cite *Federal Paper Board. Co. v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988) (Compass Br. at 36), but that case does not require a showing of price discrimination as an element of a section 2(c) claim.  The court expressly held that "[t]he language of section 2(c) of the Robinson-Patman Act is broad enough to encompass the alleged payments to Amata from the [defendants]. Payments were made to Amata, an agent of the buyer Federal, that were not for services rendered."  *Id.* at 1385-86 (citations omitted).[24]  Like the plaintiff in *Federal Paper Board*, Supreme has alleged that Compass made payments to Yakovlev, an employee and agent of the U.N., that were not for services rendered, allowing Compass as the favored competitor, to draw sales and profits from Supreme, the disfavored competitor.  (Am. Compl. ¶¶ 165, 169.)  These allegations are sufficient under section 2(c).

The Movants argue that Supreme's section 2(c) claims must be dismissed for failure to allege payment of a bribe or commission in lieu of a brokerage fee to price discriminate.

---

[24] Plaintiff's case failed because it lacked standing to sue as it was not a competitor of the defendants.  *Id.* at 1389 n.19.  Similarly, in *Bunker Ramo Corp. v. Cywan*, 511 F. Supp. 531, 533-34 (N.D. Ill. 1981), the plaintiff's claim was dismissed because it was not a competitor of the defendant-sellers and thus, plaintiff lacked standing to sue. Here, there is no dispute that the Defendants compete against Supreme.  *Federal Paper Board* and *Bunker Ramo* are therefore inapposite.

(Compass Br. at 40.)  The Movants cite *Excel Handbag Co. v. Edison Bros. Stores*, 630 F.2d 379

(5th Cir. 1980), *NL Industries Inc. v. Gulf & Western Industries, Inc.*, 650 F. Supp. 1115 (D.

Kan. 1986), and *Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 88 F. Supp. 3d 133 (S.D.N.Y.

2000), in support of this proposition, but none of these cases state such a rule of law.

In *Excel Handbag*, 630 F.2d at 387, the Robinson-Patman claim failed because there was

insufficient evidence at trial to support the commercial bribery defense.  The case has no bearing

here because it does not address pleading requirements under section 2(c).

Neither *Intimate Bookshop* nor *NL Industries* require a plaintiff to allege payment for the

purpose of price discrimination to state a claim under section 2(c).  In *NL Industries*, plaintiff's

complaint was dismissed, not for failing to allege that the commercial bribery was in furtherance

of price discrimination, but for failing to allege that its injury was caused by commercial bribery.

*NL Indus.*, 650 F. Supp. at 1125.  By contrast, Supreme has expressly alleged that its injuries

were caused by loss of business opportunities resulting from the bribes paid to Yakovlev.  (Am.

Compl. ¶¶ 169-171.)[25]

The Movants argue that section 2(c) should not be construed to reach outside of the

brokerage context, citing *Intimate Bookshop* and *Augusta News Co. v. Hudson News Co.*, 269

F.3d 41 (1st Cir. 2001).  These cases, however, both deal with types of payments not at issue

here.  Neither case involved commercial bribes.  In *Augusta News*, the First Circuit recognized

that some courts have held that commercial bribery states a claim under section 2(c), but noted

that "Augusta does not claim that any agent was bribed or corrupted."  *Augusta News*, 269 F.23d

at 46.  Similarly, the plaintiff in *Intimate Bookshop* did not allege commercial bribery under

section 2(c).  Instead, it alleged "secret discounts, rebates and deductions through brokerage

---

[25] Although *NL Industries* dismissed the section 2(c) claim for reasons not applicable here, the case stated that "[i]t has been clearly established that commercial bribery may constitute a violation of § 2(c)."  *NL Indus.*, 650 F. Supp. at 1123 (citations omitted).

fees" and payments to defendants for advertising and promotional services that were not
provided, which allegations the court found insufficient.  *Intimate Bookshop*, 88 F. Supp. 2d at
140.  Both cases reflected the courts' reluctance to expand section 2(c) to cover payments to
retailers made in connection with the distribution of magazines and books, and plaintiffs in those
cases alleged nothing to bring such payments within the proscription of section 2(c).

### B.      Supreme Pled Antitrust Injury Under Section 2(c)

The Movants argue that Supreme's section 2(c) claim should be dismissed because
Supreme purportedly lacks standing for failing to allege that it sustained any antitrust injury.
(Compass Br. at 40.)  The Movants are wrong;  Supreme has alleged the requisite antitrust injury
and has standing to sue under section 2(c).

The Movants' argument mischaracterizes Supreme's claim as one for lost business
stemming from the Compass Defendants causing the U.N. to enter into contracts
at prices lower than those offered by plaintiffs.  (Compass Br. at 40.)  On the contrary,
Supreme's business losses were caused by the Compass Defendants' corruption of the
competitive bidding process through their bribery of Yakovlev to obtain confidential information
about Supreme's bids.  (Am. Compl. ¶¶ 169-170.)  The prices paid by the U.N. to Compass are
not the source of the injury.[26]  Supreme sustained antitrust injury because the Defendants'
bribery undermined a procurement process designed to give the vendors a fair opportunity to bid
for the U.N.'s business.

At this stage of the litigation, Supreme's allegations that it lost significant business
opportunities due to the Defendants' commercial bribery are sufficient to allege antitrust injury.
*Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir. 1988), *aff'd on*

---

[26] The Movants ignore Supreme's allegations that price is not the sole factor upon which the U.N. makes its
decisions to award bids.  (Am. Compl. ¶¶ 50, 90, 154.)

*other grounds*, 493 U.S. 400 (1990), cited by the Movants, is instructive on this point.  That case

involved two companies bidding to supply aeromedical equipment to the Nigerian government.

Plaintiff ("ETC"), the losing bidder, learned that defendants won their bid through bribery of

Nigerian government officials.  In sustaining the lower court's finding that ETC had pled a claim

under section 2(c), the Third Circuit noted, "it is generally agreed that a direct competitor of a

company that obtains a contract through commercial bribery has standing to press a 2(c) claim

against the briber."  *Envtl. Tectonics*, 847 F.2d at 1067 (citations omitted).  The Third Circuit

found that ETC had pled that it was directly competing against the defendants for the same

government contracts.  "[S]hort of alleging that it was next in line for the Nigerian contact, ETC

could not have pleaded a more direct injury from defendants' alleged violation of section 2(c)."

*Id*.

  Here, Supreme, like ETC, alleged that it competed directly against Compass and that

their commercial bribery destroyed and injured competition in the relevant market, causing

substantial losses to Supreme.  (Am. Compl. ¶¶ 163, 169.)  These allegations sufficiently plead

antitrust injury under section 2(c).

  Similarly, the court in *Pharmacare v. Caremark*, 965 F. Supp. 1411 (D. Haw. 1996),

found that plaintiffs had sufficiently alleged economic injury under section 2(c) based on

allegations that defendants' behavior "caused them 'lost sales which they otherwise would have

made and, as a result, have been injured in their business or property and have suffered multi-

million dollar damages.'"  *Pharmacare*, 965 F. Supp. at 1424.  These general allegations were

adequate at the pleading stage, particularly because, as noted by the Supreme Court, "in antitrust

cases, where the 'proof is largely in the hands of the alleged conspirators,' dismissals prior to

giving the plaintiff ample opportunity for discovery should be granted very sparingly . . . .'"  *Id.,*

(citing *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).  *See also Twombly v.*

*Bell Atlantic Corp.*, 425 F.3d 99, 109 (2d Cir. 2005) (same).

Supreme's pleading of antitrust injury is further supported by its allegations that

Compass corrupted the agency relationship between the U.N. and its employee, Defendant

Alexander Yakovlev.  "[I]n the context of a claim under section 2(c), the antitrust injury standing

requirement is met when a plaintiff alleges an injury flowing from 'the corruption of an agency

relationship.'"  *In Town Hotels Ltd. P'ship v. Marriott Int'l, Inc.*, 246 F. Supp. 2d 469, 480 (S.D.

W. Va. 2003) (citation omitted).

Against this backdrop, the Compass Defendants cite primarily Sherman Act cases to

argue that Supreme lacks standing to sue because it has failed to allege injury to competition.

(Compass Br. at 43.)[27]  The Compass Defendants ignore their own authority which held that

antitrust injury for Robinson-Patman purposes is different from antitrust injury under the

Sherman Act.  *Federal Paper Board*, 693 F. Supp. at 1383 n.8.  As the court there explained:

> Section 1 of the Sherman Act is intended to protect free competition, . . . so that a
> plaintiff's Sherman Act injury must reflect the anticompetitive consequences of
> the defendants' conduct . . . .  Section 2(c) of the Robinson-Patman Act, on the
> other hand, was enacted to close a loophole in the price discrimination laws. . . .
> To establish antitrust injury for purposes of standing to sue for a violation of
> section 2(c), a plaintiff must show that the violation "adversely affected his ability
> to compete with favored competitors."

---

[27] For example, the Movants cite *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396 (7th Cir. 2006), to
argue that "the alleged conduct resulted in lower prices and therefore could not have caused antitrust injury."
(Compass Br. at 43.)   *James Cape* addresses only antitrust injury under the Sherman Act, not the Robinson-Patman
Act and, as established above, the standards for antitrust injury under the Robinson-Patman Act are not the same as
those under the Sherman Act.  In any event, *James Cape* does not support the Movants' argument under either the
Sherman Act or the Robinson-Patman Act because, as alleged in the Complaint, the U.N.'s decisions to award
contracts were not based solely on price and the source of Supreme's injuries did not stem from the prices paid by
the U.N.  Supreme was injured by Defendant Compass's successful exclusion of competition from superior vendors
such as Supreme.

*Id.* (citations omitted).  Consistent with *Federal Paper Board*, Supreme has alleged that Compass impaired Supreme's ability to compete by corrupting the bidding process through commercial bribery.  (Am. Compl. ¶ 169.)[28]

The Movants' focus on Sherman Act standards for antitrust injury in the Robinson-Patman context is incorrect because it seeks to impose a competitive injury requirement on Supreme.  The case law is clear that section 2(c) contains no such requirement.  As explained by the Second Circuit in *Blue Tree Hotels*:

> Antitrust injury and competitive injury are conceptually distinct.  While competitive injury concerns the potential effect certain conduct may have "on competition generally" or "on the business opportunities of a defined class of competitors," the focus of "antitrust injury" is on whether the challenged conduct has actually caused harm to the plaintiff.

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004) (citations omitted), *Accord Philip Morris*, 67 F. Supp. 2d at 136-137; *Edison Elec. Inst.*, 832 F. Supp. at 419.  Therefore Supreme has alleged antitrust injury sufficient to confer standing.

### C.    Supreme is not Required to Allege Injury to the U.N.

The Movants argue that Supreme's section 2(c) claim must be dismissed because it fails "to allege a key element of a commercial bribery claim, namely an economic injury to the employer of the corrupted employee."  (Complaint Br. at 45.)  The law imposes no such requirement, and neither of the cases cited by the Movants, *Blue Tree Hotels* and *Excel Handbag*, stands for that proposition.  In *Blue Tree Hotels*, the Second Circuit upheld dismissal of the section 2(c) claim because plaintiffs failed to allege that improper payments had been made.  369 F.3d at 222.  Similarly, in *Excel Handbag*, the jury found no evidence of any bribery

---

[28] These allegations are also sufficient for antitrust injury and standing under the Sherman Act, as established *infra* in section IV. A.3.

to sustain a defense based on the Florida law against commercial bribery and thus no counterclaim for commercial bribery under section 2(c) would lie.  630 F.2d at 387.

As established above, to state a claim under section 2(c), Supreme needs only allege that it was in competition with Compass, and that the Defendants bribed Defendant Yakovlev, a U.N. official, causing him to breach his fiduciary duty to the U.N.  This breach led to a breakdown in the competitive process for U.N. food contracts, resulting in Supreme losing significant business from the U.N.  Supreme has therefore stated a claim under section 2(c).[29]

## IV.    SUPREME SUFFICIENTLY PLED SHERMAN ACT CLAIMS

### A.    Supreme Adequately Pled a Violation of Sherman Act § 1

#### 1.    Supreme Adequately Pled a Per Se Violation of the Sherman Act

Contrary to the Movants' argument, Supreme has alleged more than just a commercial bribery scheme.  Supreme has alleged a scheme that manipulated the U.N.'s bidding process for the purpose of eliminating Supreme as a competitor.  Federal courts have held that such allegations plead a violation of the Sherman Act, regardless of whether it is treated as a per se or rule-of-reason violation.

The main case on which the Movants rely is *Expert Masonry, Inc. v. Boone County, Kentucky*, 440 F.3d 336 (6th Cir. 2006), in which the plaintiff alleged a conspiracy between the purchasing entity and the winning bidder.  Unlike here, there were no allegations that an unfaithful agent of the purchasing entity deprived the entity of the opportunity to select the best bidder.  *Expert Masonry*, 440 F.3d at 347.  The decision in *Expert Masonry* is inapposite because Supreme has alleged that the U.N. was deprived of the benefits of free and fair competition by the conspiracy – not that it was one of the conspirators.

---

[29] In any event, as discussed *supra,* Section II.C.1.a.ii., the U.N. suffered economic injury as a result of the commercial bribery.

By contrast, courts have held that a per se violation is alleged when a plaintiff pleads that a bribery scheme has manipulated a bidding process to eliminate competition from the plaintiff. In *Chambers Development Co. v. Browning-Ferris Industries*, 590 F. Supp. 1528 (W.D. Pa. 1984), the plaintiff alleged that it had been prevented from receiving any municipal contracts as a result of the defendant's bribery scheme, which involved paying bribes to municipal officials and rigging bids through a surrogate company it had set up.  The court held the plaintiff's allegations of such a bribery scheme sufficiently pled a per se violation of section 1.

In *AMEC E & C Services, Inc. v. Nu-West Industries, Inc.*, 395 F. Supp. 2d 957 (D. Idaho 2005), the court held that the plaintiff had pled a per se violation of section 1 by alleging that a successful bidder and another company that was not a competitor had conspired to exclude a competitor of the successful bidder from bidding.  Even though the bid manipulation was between non-competitors, "the exclusion of a competitor would be *per se* illegal conduct."  *Id*. at 960; *see also City of Atlanta v. Ashland-Warren, Inc.*, No. C 81-106A, 1981 WL 2187, at *3 (N.D. Ga. Aug. 20, 1981).

Like all of the above cases, Supreme has alleged that Defendants' bribery and bid manipulation scheme was designed to eliminate competition from Supreme. (Am. Compl. ¶¶ 118-120.)  Supreme has thus adequately pled a section 1 per se violation.

## 2.    Supreme Adequately Pled Injury to Competition

The Movants' argument that Supreme has failed to plead injury to competition, an essential element of a rule of reason claim (Compass Br. 50-52), should be rejected because Supreme has alleged a per se violation of section 1, as discussed above.  Even if this Court analyzes Supreme's section 1 claim under the rule of reason, however, it would pass muster as Supreme has alleged injury to competition.

40

In support of its argument that Supreme has not adequately alleged injury to competition, the Movants again rely on commercial bribery cases that did not contain allegations, like Supreme's, that the Defendants' bribery and bid manipulation scheme eliminated competition from Supreme.  The Movants cite *Federal Paper Board Co. v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988), a case in which a manufacturer sued various suppliers for engaging in a bribery scheme with the manufacturer's purchasing agent.  In *Federal Paper Board*, however,

> Amata [the purchasing agent] did not control Federal [the manufacturer], nor is there any allegation that Amata and the suppliers paying him bribes could have prevented any other supplier from dealing with Federal had Federal attempted to purchase from such other supplier. A fair reading of the amended complaint indicates that the potential existed for Federal to obtain competitive prices from a wide range of suppliers.

*Id*. at 1383-84.  The Movants also rely on *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 425 F. Supp. 2d 484, 521 (S.D.N.Y. 2006), a case "virtually identical" to *Federal Paper Board*.  As in *Federal Paper Board*, the plaintiff failed to demonstrate how the bribery scheme could have "prevented competitive bids from being offered to, or accepted by, [plaintiff's] management."  *Id*.

In contrast, Supreme has alleged that Defendant Yakovlev had sufficient control over the U.N. bidding process to cause the U.N. to award contracts to Compass and not to fairly consider Supreme's superior bids, thus eliminating competition.  (Am. Compl. ¶¶ 4, 10, 13, 39, 40, 66, 87, 88, 92.)  Federal courts have repeatedly found such allegations sufficient to allege injury to competition.  For example, in *Richard Hoffman Corp. v. Integrated Building Systems, Inc*., 581 F. Supp. 367 (N.D. Ill. 1984), the court found allegations of a bid manipulation scheme that discouraged competitive bidding to sufficiently allege injury to competition:

> We therefore believe that *allegations of an anticompetitive effect may be inferred* from Hoffman's complaint: a firm which prepares specifications and specifies the use of a particular product which it distributes may indeed be able to tailor the

specifications to its advantage for purposes of subsequent bidding, which might in turn *discourage competitive bidding* by other parties.

*Id*. at 374 (emphases added).

The *Hoffman* decision was followed by the court's opinion in *F. Buddie Contracting*, which found sufficient antitrust injury "where a firm succeeds in tampering with the competitive bidding process in such a manner that competitive bidding becomes a farce, the Court believes that an unreasonable restraint of trade has occurred." *F. Buddie Contracting v. Seawright,* 595 F. Supp. 422, 437 (N.D. Ohio 1984); *see also Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 526 (5th Cir. 1999) (because "[b]ribery and threats are not competition on the merits," "courts have found that an exclusionary claim can lie when the monopolist has bribed the officials evaluating the contracts"); *Doron Precision Sys., Inc. v. FAAC, Inc*., 423 F. Supp. 2d 173, 185 (S.D.N.Y. 2006) (noting that the Sherman Act is implicated "where the plaintiff alleges bribery, fraud, or improper selling methods that robbed the ultimate purchaser of the opportunity to choose its product").

### 3.    Supreme Adequately Pled Antitrust Injury

The Movants' argument that Supreme has failed to plead that it suffered antitrust injury is based on a misreading of Supreme's Complaint, which alleges that Supreme was eliminated from competition, a classic antitrust injury.  The Movants inaccurately claim that "the gravamen of Supreme's antitrust claim is that it lost business because defendants caused the U.N. to enter contracts at *lower* bids than Supreme offered."  (Compass Br. at 52.)

In actuality, the gravamen of Supreme's antitrust claim is that the Defendants' corruption of Defendant Yakovlev prevented the U.N. from fairly considering Supreme's superior bids. (Am. Compl. ¶¶ 4, 10, 13, 39, 40, 66, 87, 88, 92.)  Defendant Yakovlev was able to eliminate competition from Supreme because the U.N. bidding process did not automatically award

contracts to the lowest bidder.  Instead, the U.N. evaluated technical factors other than price, which enabled Defendant Yakovlev to cause the U.N. to choose the bids of Compass over the superior bids of Supreme.  (Am. Compl. ¶¶ 4, 39, 40, 66, 78-83, 88, 92.) [30]  Thus, the Defendants deprived the U.N. of the opportunity to choose the vendor with the best value and robbed Supreme of the opportunity to compete.

Federal courts have consistently held that a competitor suffers antitrust injury when it is excluded from competing as a result of a commercial bribery or bid manipulation scheme.  *See, e.g., DeLong Equip. Co. v. Wash. Mills Electro Minerals Corp.*, 990 F.2d 1186, 1198-99 (11th Cir. 1993) (plaintiff that "was not allowed to participate in the competitive market" sustained antitrust injury); *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1355 (5th Cir. 1980) (monopolist's bribery can be exclusionary under Sherman Act Section 2 when it has a significant impact on the competitive vitality of its rival); *AMEC E & C*, 395 F. Supp. 2d at 960 ("exclusion of a competitor would be *per se* illegal conduct").

### 4.      Supreme Adequately Pled a Relevant Market

The Movants' argument that Supreme has failed to plead a relevant market ignores the principle that a market can be based on competitively bid contracts.

Supreme has alleged that the "relevant product market for antitrust purposes is the market for the supply of food rations to U.N. peacekeeping missions."  (Am. Compl. ¶ 30.)  Contrary to the Movants' argument (Compass Br. at 53), Supreme does allege that the market for the supply of food rations to U.N. peacekeeping forces is distinct.  Supreme alleges that companies can

---

[30] Movants' reliance on cases, such as *James Cape*, for the proposition that lower prices paid by consumers will not give rise to antitrust injury, (Compass Br. at 52), is thus misplaced.  Furthermore, contrary to *James Cape*, the U.N. paid higher prices, not lower prices, for a product of lesser quality than it would have received if Compass had not bribed the U.N.  See *supra*, section II.C.1.a.ii.

supply such food rations only if they are awarded contracts after a bidding process that is limited to companies that satisfy the high standards to become U.N.-approved vendors.

(Am. Compl. ¶¶ 28-30, 90.)

Federal courts have regularly found such allegations to sufficiently state relevant markets that are limited to specialized contracts.  Contracts to provide products or services to a government can be a relevant market when there are "practical indicia" of a market, such as industry or public recognition of the market as a separate economic entity, the products or services have peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors.  *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 90 (E.D.N.Y.), *aff'd*, 665 F.2d 10 (2d Cir. 1981).  Even a single government contract can be a relevant market, as explained in *Tower Air, Inc.*:

> The Court rejects Federal Express's argument that no market can exist under a single government contract. In other cases involving antitrust allegations in connection with the award of government contracts, the courts have found or assumed that the contract itself can be the relevant market. The fact the Government is the sole domestic purchaser and regulates this sale does not mean that no market exists.

*Tower Air, Inc. v. Fed. Express Corp.*, 956 F. Supp. 270, 281 (E.D.N.Y. 1996) (citations omitted); *see also F. Buddie Contracting*, 595 F. Supp. at 437-38 (plaintiff alleging bid manipulation scheme could proceed on theory that single contract was relevant market).

Under this authority, Supreme has sufficiently alleged a relevant market that has the practical indicia of unique aspects of specialized and certified vendors providing food rations to peacekeeping forces pursuant to a bidding process controlled by the U.N.

### B.    Supreme Adequately Pled an Attempt to Monopolize Claim

The Movants argue that Supreme's claim for attempted monopolization should be dismissed on the same grounds that the section 1 claim should be dismissed: failure to allege

44

antitrust injury and failure to allege a relevant market. (Compass Br. at 57.) For the reasons stated above, this argument fails because Supreme has pled both.

The Movants additionally argue that Supreme's attempted monopolization claim should be dismissed for failure to allege facts to support a dangerous probability of successfully achieving monopolization. (Compass Br. at 57.)[31] Yet the Movants cite no allegations from Supreme's complaint in support of this argument and rely instead on one paragraph from ES-KO's complaint to argue that Compass was only able to win bids by "systematically *underbidding*" their competitors. (Compass Br. at 58; emphasis in the original.) ES-KO does not allege any claims under the Sherman Act and any reference to ES-KO's complaint in support of an argument to defeat Supreme's claims under Sherman Act section 2 should be rejected.

Moreover, Supreme's claim of attempted monopolization – contrary to the Movants' mischaracterization – has nothing to do with any allegations that Compass won U.N. contracts by underbidding the competition. Instead, Supreme has alleged a scheme designed to eliminate Supreme as a competitor for U.N. foodservice contracts. As alleged in the Complaint, starting in the year 2000, Compass as a new entrant with no prior experience in U.N. contracts managed to win a significant number of contracts over the next five years. During that time period, Compass rapidly gained approximately 50% of the market. Supreme alleges that Compass achieved this feat through commercial bribery. (Am. Compl. ¶ 126.)

Supreme has more than adequately alleged the elements of an attempted monopolization claim: (i) anticompetitive or exclusionary conduct; (ii) specific intent to monopolize; and (iii) dangerous probability that the attempt will succeed. *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 73-74 (2d Cir. 1988). Proof of the first element, together

---

[31] The Movants' threshold argument, that Supreme's purported failure to allege a relevant market dooms the attempted monopolization claim (Compass Br. at 57), is easily disposed of because Supreme has alleged a relevant market, *supra* at section IV.A.4.

with the existence of monopoly power, supports an inference of a dangerous probability of

success.  *Id*. at 74.  Supreme has alleged anticompetitive conduct in the form of commercial

bribes and bid manipulation that successfully excluded competitors, including Supreme, from

winning U.N. foodservice contracts.  (Am. Compl. ¶¶ 116, 118-119, 121, 125-126.)   Supreme

has alleged monopoly power in the form of market share that in a relatively short span of time

went from nothing to nearly half the relevant market. (Am. Compl. ¶¶ 93, 127.)

 The Movants argue that Supreme has not alleged that competition has been excluded

because both Supreme and ES-KO continue to participate in bidding for U.N. foodservice

contracts.  (Compass Br. at 58-59.)  This argument ignores Supreme's allegations that it has been

deprived of a fair opportunity to participate in an honest bidding process, untainted by

Defendants' corruption.  (Am. Compl. ¶¶ 126.)

 The Movants also argue that Supreme's allegation of a 50% market share is insufficient

to support monopoly power.  (Compass Br. at 59.)  The law is to the contrary.  First, in an

attempted monopolization case, a lesser degree of market power may be sufficient.  *Top's*

*Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 100 (2d Cir. 1998).  Also, a party with less

than 50% market share may have monopoly power.  *Hayden Publ'g Co. v. Cox Broadcasting*

*Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984).  Indeed, market shares of 50% or lower can support a

finding of monopoly power if other indicia of monopoly power exist, such as high entry barriers

and anticompetitive conduct. *See Virgin Atl. Airways v. British Airways PLC*, 872 F. Supp. 52,

63-64 (S.D.N.Y. Dec. 30, 1994) (existence of monopoly power depends on a variety of factors,

finding that market shares between 39% and 52% could demonstrate a dangerous probability of

acquiring monopoly power); *Meridian Project Systems v. Hardin Constr. Co.*, No. Civ. S-04-

2728 FCDAD, 2005 WL 2615523 (E.D. Cal. Oct. 14, 2005), at *4 (37% market share combined

with allegations of high entry barriers or anticompetitive conduct sufficient to state claim for attempted monopolization).

Here, Supreme has alleged a 50% market share achieved through anticompetitive conduct – commercial bribery and bid manipulation – in a market where the entry barriers are high because the U.N. sets strict requirements on the types of vendors that can bid and because the missions themselves are fraught with danger and serious logistical challenges. (Am. Compl. ¶¶ 28-29, 50, 90, 93.)   Under these circumstances, more than a fair inference can be drawn that Compass had a dangerous probability of successfully monopolizing the relevant market.

### C.      Supreme Adequately Pled a Conspiracy to Monopolize Claim

As in their arguments to dismiss the attempted monopolization claim, the Movants rely on Supreme's purported failure to allege antitrust injury and a relevant market as grounds for dismissal of the conspiracy to monopolize claim.  As set forth above, Supreme has pled antitrust injury and a relevant market and, thus, the Movants' arguments to the contrary are unavailing.

The Movants seek to dismiss the conspiracy claim on the additional ground that Supreme has failed to allege specific intent.  A finding of specific intent for attempted monopolization has been found sufficient to support the same element in a conspiracy to monopolize claim.  *Volvo N. Am. Corp.*, 857 F.2d at 74.  Specific intent can be inferred from allegations of anticompetitive or exclusionary conduct.  *Id.*; *see also Tops Markets,* 142 F.3d at 101 (specific intent to destroy competition may be inferred from defendant's conduct).  Supreme's complaint contains ample allegations of the Compass Defendants' anticompetitive and exclusionary acts in the form of commercial bribery and bid manipulation.  These allegations more than support an inference of specific intent to support a conspiracy to monopolize claim.

A plaintiff's pleading burden for conspiracy to monopolize is not a heavy one:  "It is not necessary to plead either the evidence or the facts upon which antitrust conspiracy claims are based in order for a complaint to withstand a motion to dismiss pursuant to Rule 12(b)(6). Plaintiff has identified the co-conspirators and described the nature and effect of the alleged conspiracy.  This is sufficient to state a claim" *Alco Standard Corp. v. Schmid Bros., Inc.,* 647 F. Supp. 4, 6 (S.D.N.Y. Jan. 27, 1986) (citations omitted); *accord Philip Morris v. Heinrich*, No. 95 Civ. 0328 (LMM), 1996 WL 363156 (S.D.N.Y. Jun. 25, 1996), at *13.  Supreme has done precisely that (*see, e.g.* Am. Compl. ¶¶ 129, 132) and its conspiracy claim should be sustained.

The Movants essentially contend that Supreme's allegations of conspiracy are implausible because Compass "had no reasonable prospect of obtaining monopoly power . . . ." (Compass Br. at 60.)  When the inquiry is as fact-intensive as the existence of monopoly power, such arguments have no place in a motion to dismiss.  *See Virgin Atl. Airways,* 872 F. Supp. at 63-64 (all relevant factors necessary to conclude whether defendant can acquire monopoly power cannot be determined on face of complaint).  "A perceived unlikelihood that [plaintiff] can actually prove the allegations of the [complaint] is no basis for dismissing [it] under Rule 12(b)(6)." *Alco Standard Corp.*, 647 F. Supp. at 6 (citation and internal quotations omitted).

Finally, the Movants argue that because Supreme has failed to allege a dangerous probability of success, it cannot allege the requisite specific intent to support the conspiracy to monopolize claim.  As set forth above, Supreme has alleged a dangerous probability of success; therefore, this ground for dismissing the conspiracy to monopolize claim must fail.

### D.    Supreme Adequately Pled Antitrust Claims Against the IHC Defendants

The IHC Defendants separately move to dismiss the antitrust claims on the ground that they are not competitors of Supreme in the market for U.N. foodservice contracts.  This argument should be rejected.  Supreme has alleged the IHC Defendants' participation and

involvement in a commercial bribery and bid manipulation scheme.  (Am. Compl. ¶¶ 60-62, 67, 79.)  The IHC Defendants served as the agents of Compass in furthering this conspiracy to violate the antitrust laws and to exclude competition from Supreme.  The antitrust claims are thus properly pled against the IHC Defendants.

The IHC Defendants' citation to *LoPresti v. Citigroup, Inc.*, No. 02 Civ. 6492 (SJ), 2005 WL 195521 (E.D.N.Y. Jan. 18, 2005), lends no support to their argument.  *LoPresti* involved a dispute surrounding the defendant customer's decision to switch from an annuity plan, sold by plaintiff, to annuity and retirement plans sold by another defendant.  Defendant Buck Consultants wrote the plan documents.  The court granted Buck's motion to dismiss the antitrust claims because plaintiff failed to allege facts indicating that Buck competed against plaintiff.  *LoPresti*, 2005 WL 195521, *6.  Plaintiff attempted to argue that Buck was liable as an agent of the co-defendants.  *Id.*, at *3.  However, the court found that plaintiff failed to allege any agency relationship.  *Id.*, at *3, 6.  Although the decision is unclear on the details of the alleged antitrust violations, what is clear is the lack of Buck's participation in the wrongdoing alleged against the co-defendants who did compete with plaintiff.  Here, by contrast, Supreme alleges that the IHC Defendants served as Compass's agent and that they were actively and directly involved in the antitrust violations.  Therefore, *LoPresti* is entirely distinguishable.

## V.    THIS COURT HAS JURISDICTION OVER SUPREME'S ANTITRUST CLAIMS

### A.    This Court has Jurisdiction over Supreme's Sherman Act Claims

The Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, exempts from antitrust liability "conduct involving trade or commerce . . . with foreign nations."  The Act contains an exception for conduct that has (1) "a direct, substantial, and reasonably foreseeable effect" on domestic commerce, and where (2) that effect also "gives rise to a claim" under the

Sherman Act.  15 U.S.C. § 6a; *see F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004).

The conduct at issue here had an effect on both domestic and foreign commerce, and caused harm both here and abroad.  A domestic consumer, the U.N., paid supra-competitive prices for the inferior quality goods and services it received, the effect of which was felt both in domestic and foreign commerce by U.N. peacekeepers who received the inferior quality goods and services.  The FTAIA's exception clearly applies here as both Paragraph (1) and Paragraph (2) of section 6(a) of the Act are satisfied.

Paragraph (1) is applicable because Compass's conduct eliminated competition from Supreme in a bidding and contracting process that occurred in New York, and thus was domestic commerce.  When significant aspects of a transaction occur in the United States – such as the solicitation, negotiation or awarding of a contract – that transaction occurs in domestic commerce.  *See United States v. Anderson*, 326 F.3d 1319, 1330 (11th Cir 2003) (dicta); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 02-1486 PJH, C 05-3026 PJH, 2006 WL 515629, at *3 (N.D. Cal. Mar. 1, 2006) (relying in part on the fact that "at least two defendants have already pled guilty" to price-fixing in the U.S. to conclude that plaintiffs alleged the requisite effect on domestic commerce).

Supreme's allegations of a corrupted bidding process that largely occurred and was financed in New York are sufficient to establish a direct and substantial effect on domestic commerce.  The relevant product market is the market for the supply of food rations to U.N. peacekeeping missions.  The only consumer in this market is the U.N. – an international person located and doing business in New York.  *See United States  v. Melekh,* 190 F. Supp. 67, 87 n.1 (S.D.N.Y. 1960).  Competition takes place in New York in the form of competing suppliers

providing bids to the U.N. to win contracts.  The solicitation of bids, bidding, consideration and evaluation of bids, awarding of contracts and payments by the U.N. on the contracts are all made in New York.  (Am. Compl. ¶¶ 22-27.)  Defendant IHC, the "vendor intermediary," operates from mid-town Manhattan.  In light of the essential functions of the U.N. bidding process centered in New York, the Compass Defendants' conduct in eliminating Supreme's competition from this market clearly had a substantial effect on domestic commerce for purposes of Paragraph (1) of the FTAIA.

Although neither the anticompetitive conduct nor the domestic effect of that conduct was limited solely to U.N. Headquarters, Defendant Compass urges that there was no effect upon domestic commerce because U.N. Headquarters "is not United States territory."  (Compass Br. at 63.)  Compass is simply wrong.  The U.N. Headquarters is in the territory of the United States and the antitrust laws apply to transactions there.

The U.N. Headquarters Agreement is explicit regarding the applicability of federal law to the headquarters district.  Article 3 of the Agreement, entitled "Law and Authority in the Headquarters District," states that, "[e]xcept as otherwise provided in this agreement or in the General Convention, the federal, state and local law of the United States shall apply within the headquarters district."  Art. 3, § 7(b).  The Agreement also explicitly states that "federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws."  Art. 3, § 7(c).

Courts have applied the U.N. Headquarters Agreement to establish jurisdiction over acts occurring at U.N. headquarters.  In *People v. Weiner*, 85 Misc.2d 161 (N.Y. City Crim. Ct. 1976), a defendant charged with spraying paint on an outside wall of the U.N. claimed that as

51

"the property involved is internationally owned, the court does not have the jurisdiction nor is it empowered to hear this case." *Id*. at 164.  Citing Section 7 of the Agreement, the court denied defendant's motion to dismiss holding that "for jurisdictional purposes, [the offense] is to be considered solely as a crime committed against property located in New York County." *Id*. at 165; *see also People v. Coumatos*, 32 Misc. 2d 1085, 224 N.Y.S.2d 507 (N.Y. Gen. Sess. 1962), *aff'd*, 20 A.D.2d 850, 247 N.Y.S.2d 1000 (1st Dep't 1964).[32]

Defendants cite *McKeel v. Islamic Republic of Iran*, 722 F.2d 583 (9th Cir. 1983), for the proposition that "embassy [property] remains the territory of the receiving state, and does not constitute territory of the United States." *Id*. at 588.  This statement supports Supreme's point. In this case, the receiving state is the United States and the "embassy" property is the U.N. Therefore, the U.N. Headquarters remains the territory of the United States.  *McKeel* is in accord with the Restatement (Third) of the Foreign Relations Law of the United States § 466 (1987), which states that "[a]cts committed on [diplomatic and consular] premises are within the *territorial jurisdiction* of the receiving state, and the mission is required to observe local law . . . ." (emphasis added).

When faced with similar allegations of plaintiff's injury being caused by the domestic effects of the defendants' conspiracy, federal courts have found jurisdiction under the FTAIA. *See MM Global Servs., Inc. v. Dow Chem. Co.*, 329 F. Supp. 2d 337, 342 (D. Conn. 2004) (claiming jurisdiction on grounds that the "complaint properly alleges that the defendants' conduct had an effect on competition in and from the United States and the plaintiffs were injured as a result of that effect.").

---

[32] Movants' only authority for their claim that the U.N. is not United States territory is *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991).  That case is inapposite here as it deals with the court establishing a "legal fiction that the UN Headquarters is not really United States territory" for the limited purpose of granting personal (rather than subject matter) jurisdiction immunity to PLO members participating in U.N. operations.  *Id*. at 51.

Jurisdiction exists under Paragraph (2) of the FTAIA when a plaintiff alleges a direct link between the domestic effect caused by the defendant's anticompetitive conduct and the plaintiff's antitrust injury.  Here, the requirements of Paragraph (2) are satisfied because the domestic effect caused by Defendants' conduct – the elimination of competition from the bidding process – was inextricably linked to, and directly caused, Supreme's injury in being denied contracts it should have won.

### B.    This Court Has Jurisdiction over Supreme's Robinson-Patman Claims

All a plaintiff must show to establish subject matter jurisdiction under section 2(c) of the Robinson-Patman Act is that the facts at issue involve "persons or activities which are themselves within the flow of commerce among the states or with foreign nations . . . ."  *Rotec Indus., Inc. v. Mitsubishi Corp.,* 348 F.3d 1116, 1122 (9th Cir. 2003) (citing *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195 (1974)).

Both the persons and activities involved here are within the "flow of commerce" between New York and foreign nations.  Foreign food suppliers bid on contracts in New York and are awarded and paid for those contracts in the State.  The U.N., a consumer based in New York, purchases these services in the State, following which the suppliers deliver the food to various U.N. missions around the world.  In addition, the Defendants' commercial bribery occurred at the U.N. Headquarters in New York City.

Movants provide no case law in support of their contention that the "flow of commerce" test enunciated by the Supreme Court in *Copp Paving* and followed by the Ninth Circuit in *Rotec* is inapplicable here and that plaintiff must show that the products at issue "physically cross a state boundary," or "involve the flow of goods into or out of the United States."[33] (Compass Br.

---

[33] Contrary to the Movants' assertion (Compass Br. at 66 n.32), neither *Roorda v. Am. Oil Co.,* 446 F. Supp. 939 (W.D.N.Y. 1978), nor the court in *Copp Paving*, held that the "flow of commerce" test is "the only exception" to the

at 66 n.34.)   Instead, the Movants cite cases dealing with whether section 2(a) of the Act may reach purely local transactions in the United States where neither the persons nor the activities involved crossed any state boundaries.  The Supreme Court in *Copp Paving* explained that such cases are concerned with not "extend[ing] 2(a) beyond its clear language to reach a multitude of local activities which hitherto have been left to state and local regulation."[34]

Indeed, the holding in *Rotec* – the only case cited by the Movants that addresses the scope of the "flow of commerce" test under section 2(c) of the Act – does not support their argument.  In that case, the court dismissed the claim only because "the allegedly unlawful payments occurred completely outside the United States between a Japanese corporation, Mitsubishi, and a Chinese corporation, CRNC."  *Rotec*, 348 F.3d at 1122.  Such is not the case here.  The Defendants' corruption of a U.N. agent for the purpose of excluding competition from Supreme – conduct that is prohibited by section 2(c) – occurred in New York and affected the sale of food to U.N. missions around the world.  Both the persons and activities in this case are well within the flow of commerce between the United States and foreign nations, thereby conferring jurisdiction upon this Court under section 2(c).

## VI.    SUPREME SUFFICIENTLY PLED DONNELLY ACT CLAIMS

The Movants argue that Supreme's Donnelly Act claim should be dismissed for the same reasons as Supreme's Sherman Act claims, i.e., failure to identify a relevant market and to allege anticompetitive effects.  As set forth *supra* in Section IV, Supreme has alleged a relevant market,

---

product physically crossing a state boundary.  The "flow of commerce test" was applied by both the Supreme Court in *Copp Paving* and by the Ninth Circuit in *Rotec* to define the "in commerce" requirement under section 2 of the Robinson-Patman Act; it is precisely the test to be applied here.

[34] In addition, the Movants' claim that the cases they cite dealing with the jurisdictional requirement of section 2(a) "applies equally to Section 2(c)" is misleading.  *Rotec*, the case cited in support of their claim, held that the "in commerce" requirement of section 2(c) is not broader than the requirement of section 2(a) *only* in that neither can rely, as does the Sherman Act, on the *effects* on commerce to establish jurisdiction (which is not being argued by Supreme).  Neither *Rotec*, nor any other case cited by the Movants, held that the "in commerce" requirement of section 2(c) requires the physical movement of the product across a state boundary.

antitrust injury, restraint of trade, attempted monopolization, and conspiracy to monopolize and has therefore stated claims under the Sherman Act.  To the extent the Donnelly Act follows Sherman Act precedent, Supreme has stated claims under the Donnelly Act.  *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763(RMB), 2002 WL 91625, at *11 (S.D.N.Y. Jan. 23, 2002) (Donnelly Act claims are stated for same reasons that Sherman Act claims are stated).

Supreme's Donnelly Act claim should be sustained for the additional reason that vertical bid-rigging is a *per se* violation.  *See People v. Schwartz*, 160 A.D.2d 964, 965, 554 N.Y.S.2d 686, 687 (2d Dep't 1990) (finding *per se* violation where defendants' fictitious bids to furnish nursing homes were accepted by arrangement with nursing home administrator).  Supreme's allegations of the Defendants' bribery of Defendant Alexander Yakovlev for the purpose of improperly influencing the award of U.N. foodservice contracts constitutes vertical bid-rigging and thus states a claim under the Donnelly Act.

## VII.    IHC'S MOTION TO STRIKE IS WITHOUT MERIT

IHC argues that the Complaint is "riddled" with "gratuitous" and "scandalous" allegations and should be stricken in its entirety.  (IHC Br. at 8, 9.)  "Striking a portion of a pleading is a drastic remedy," and "motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted."  5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1380 (3d ed. 2006).  As the Second Circuit has observed, "courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

To meet this extraordinary burden, IHC must demonstrate that "it is clear that the allegations in question can have no possible bearing on the subject matter." *Forschner Group, Inc. v. B-Line A.G.*, 943 F. Supp. 287, 291 (S.D.N.Y. 1996). IHC makes no such showing.

To begin with, IHC demands the complaints be stricken "in their entirety." (IHC Br. at 9.) But Rule 12(f) speaks of excising offensive "matter" from a pleading, not wholesale dismissal. IHC points to just three specific paragraphs of Supreme's Complaint. Paragraph 1 is simply an introduction to the Complaint, alleging that Defendants engaged in a "disgraceful" scheme to use bribery to manipulate the award of U.N. procurement contracts. If these allegations are true then IHC and the other defendants were indeed complicit in "disgraceful" conduct. Supreme's precise choice of words may reflect advocacy about what Supreme seeks to prove through discovery, but hardly approaches "impertinence" or "scandal." Whether the allegations are actually true will be resolved at trial, and "[a]n informed decision on whether or not to strike material in the pleadings, including a determination of relevance, often may not be made until a trial begins to unfold." *First City Nat'l Bank & Trust Co. v. FDIC¸* 730 F. Supp. 501, 514 (E.D.N.Y. 1990) (McLaughlin, J.); *see Lipsky,* 551 F.2d at 893. There is simply no way to allege a RICO conspiracy without calling the Defendants *racketeers. See, e.g.*, *Cabble v. Rollieson*, No. 04 Civ. 9413 (LTS) (FM), 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006).

Paragraphs 8 and 74 are even less remarkable recitations of the barest facts concerning Defendant Yakovlev's guilty plea and Chairman Volcker's report to the U.N. Clearly, IHC's chief objection is that Yakovlev's prosecution and the Oil-for-Food scandal "have absolutely nothing to do with the allegations in these lawsuits." (IHC Br. at 9.) But reference to the Oil-for-Food "scandal" surely does not render any portion of the Complaint "scandalous." "Statements are to be stricken as 'scandalous' only when they contain allegations 'that

unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.'"  *Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C. 2004) (quoting 2 Moore's Federal Practice 3d § 12.37[3]).  Nothing "scandalous" in this sense is alleged here.

As for "pertinence," the U.N. Procurement Division is at the very heart of this case, and Defendant Yakovlev worked there for some *twenty years*.  (Am. Compl. ¶ 39.)  And Supreme's Complaint contains numerous specific, well-pleaded allegations – which IHC ignores – describing the links between Defendants Yakovlev, IHC, its then-President and CEO, Defendant Testa, and precisely the type of U.N. contracts at issue here.  (Am. Compl. ¶¶ 5-6, 10, 25, 47-48, 53, 55-58, 60-62, 67, 73, 79, 96, 116, 162-72.)  There is simply no basis to strike any portion of these highly relevant allegations from Supreme's Complaint.

**CONCLUSION**

In light of the foregoing, Supreme respectfully requests that this Court deny the Movants'

motions to dismiss.  In the alternative, in the event the Court finds material insufficiencies in

Supreme's Complaint, Supreme respectfully requests the opportunity to amend the Complaint to

add, *inter alia*, the facts asserted in note 5, *supra*.

Dated:   September 1, 2006
          New York, New York

Respectfully submitted,

CONSTANTINE CANNON, P.C.


By:  /s/ Yang Chen
     Robert L. Begleiter (RB-7052)
     Gary J. Malone (GM-3119)
     Yang Chen (YC-3782)
     Michael C. Rakower (MR-2914)
     A. Owen Glist (AG-9674)

     450 Lexington Avenue
     New York, New York  10017

     *Attorneys for Plaintiff*
     *Supreme Foodservice AG*