UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUPREME FOODSERVICE AG, <br><br> Plaintiff, <br><br> -v- <br><br> COMPASS GROUP PLC, ESS (AKA EUREST SUPPORT SERVICES), IHC SERVICES, INC., PETER HARRIS, ANDREW SEIWERT, ALEXANDER YAKOVLEV, MOXYCO, LTD., DOUG KERR, STEVE KEMP, LEN SWAIN, VLADIMIR KUZNETSOV, NIKAL, LTD., EZIO TESTA, DMITRY YAKOVLEV AND OLGA YAKOVLEV. <br><br> Defendants. | Case No. 06 CV 1759 (PKC) |
| ES-KO INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> -v- <br><br> COMPASS GROUP PLC, ESS SUPPORT SERVICES WORLDWIDE, EUREST SUPPORT SERVICES (CYPRUS) INTERNATIONAL LIMITED, PETER HARRIS, ANDREW SEIWERT, STEVE KEMP, LEN SWAIN, STEVE BICKERSTAFF, DOUG KERR, IHC SERVICES, INC., EZIO TESTA, ALEXANDER YAKOVLEV, DMITRY YAKOVLEV, VLADIMIR KUZNETSOV, AND JOHN DOES 1 TO 100. <br><br> Defendants. | Case No. 06 CV 2422 (PKC) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE COMPASS DEFENDANTS' MOTION TO DISMISS ES-KO'S AND SUPREME'S RICO AND ANTITRUST CLAIMS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Richard A. Rosen
Kenneth A. Gallo
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

Argument ........................................................................................................................... 1

I. PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED ........................................ 1

    A.    Plaintiffs' RICO Claims Should Be Dismissed For Failing To Allege
    Proximate Cause ..................................................................................................... 1

        1.    *Ideal Steel* Instructs Courts to Dismiss Cases at the Pleading Stages
            If They Do Not Adequately Allege Proximate Causation ......................... 1

        2.    Plaintiffs' Injuries Are As Indirect As Those At Issue In *Ideal Steel*
            and Its Progeny .......................................................................................... 3

            (a)    Courts Dismiss Cases Where the RICO Violation Allegedly
                    Enabled Competitors to Divert Business from Plaintiffs ............... 3

            (b)    Courts Dismiss Cases Where Independent Decision-Makers
                    Break The Chain of Causation ....................................................... 8

        3.    The Complexity of Plaintiffs' Damages Calculation Further
            Demonstrates The Lack of Proximate Cause .............................................. 9

        4.    The U.N. Is The More Direct Victim Than Either Plaintiff ..................... 11

    B.    Plaintiffs Have Failed To Allege That Each of the Compass Defendants
    Committed Two Predicate Acts ............................................................................ 12

        1.    Plaintiffs Failed to Plead The Predicate Act of Commercial Bribery
            Because They Do Not Allege Economic Harm to the U.N. ..................... 12

             (a)    RICO Plaintiffs Must Plead The Element of Economic
                    Harm ............................................................................................ 12

            (b)    The Harm Plaintiffs Allege Related to ESS's Performance
                    of the Contracts Does Not Qualify As Economic Harm ............... 12

        2.    Plaintiffs Fail to Plead The Predicates of Mail or Wire Fraud ................ 14

        3.    Plaintiffs Fail to Allege Money Laundering As to Each of the
            Compass Defendants ................................................................................ 16

    C.    Plaintiffs Plead the Existence of Enterprises That Are Not Distinct .................... 17

i

D.   Plaintiffs Do Not Allege That Kemp, Swain or Bickerstaff Managed or Conducted the Enterprise .................................................................................. 18

E.   Plaintiffs Have Failed to Allege RICO Conspiracy Under Section 1962(d) ........ 19

II. ALL ANTITRUST CLAIMS SHOULD BE DISMISSED ...................................................... 19

A.   Plaintiffs Do Not State a Claim Under Section 2(c) of the Robinson-Patman Act .............................................................................................................. 19

1.   Plaintiffs' Allegations of Commercial Bribery Do Not State a Claim Under Section 2(c) of the Robinson-Patman Act ........................... 19

2.   Plaintiffs Do Not Have Standing Under Section 4 of the Clayton Act Because They Have Not Alleged They Sustained Antitrust Injury In Connection With Their Section 2(c) Claim ................................ 21

3.   This Court Does Not Have Jurisdiction Over The Robinson-Patman Act Claim ................................................................................... 23

B.   Supreme Does Not State Claims Under the Sherman Act ..................................... 24

1.   Supreme Has Not Alleged a *Per Se* Violation of the Sherman Act .......... 24

2.   Supreme Has Not Alleged a Relevant Product Market ............................. 25

3.   Supreme Has Not Pled Adequately that Defendants Attempted to Monopolize the Relevant Market or Conspired to Monopolize the Market ..................................................................................................... 27

4.   The Court Has No Jurisdiction to Hear Supreme's Sherman Act Claim ........................................................................................................ 28

Conclusion .............................................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

Page(s)

*AMEC E & C Servs., Inc.* v. *Nu-West Indus., Inc.*, 395 F. Supp. 2d 957 (D. Idaho 2005)........... 25

*Alco Standard Corp.* v. *Schmid Bros., Inc.*, 647 F. Supp. 4 (S.D.N.Y. 1986)............................... 28

*Anza* v. *Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006).....................................................*passim*

*Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328 (1990) ....................................... 21, 22, 23

*Baisch* v. *Galina*, 346 F.3d 366 (2d Cir. 2003)............................................................................. 2

*Bernstein* v. *Misk*, 948 F. Supp. 228 (E.D.N.Y. 1997) ................................................................ 16

*Blue Tree Hotels Inc.* v. *(Canada), Ltd.* v. *Starwood Hotels*, 369 F.3d 212 (2d Cir. 2004)... 21, 23

*Brass* v. *Am. Film Techs., Inc.*, 987 F.2d 142 (2d Cir. 1993) ....................................................... 16

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ........................................... 22

*Burrowes* v. *Combs*, 312 F. Supp. 2d 449 (S.D.N.Y. 2004)......................................................... 17

*Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717 (1988) .................................................... 24

*C.A. Westel de Venezuela* v. *AT&T Co.*, 90 Civ. 6665, 1994 U.S. Dist. LEXIS 14481
(S.D.N.Y. Oct. 11, 1994) ............................................................................................... 17

*Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158 (2001)................................................. 17

*Chambers Dev. Co., Inc.* v. *Browning-Ferris Indus.*, 590 F. Supp. 1528 (W.D. Pa. 1984) ......... 25

*City of Atlanta* v. *Ashland-Warren, Inc.*,
1982-1 Trade Cases P 64,527, 1981 WL 2187 (N.D. Ga. Aug. 20, 1981) ...................... 25

*City of New York* v. *Cyco.net, Inc.*, 383 F. Supp. 2d 526 (S.D.N.Y. 2005)................................... 17

*City of New York* v. *Joseph L. Balkan, Inc.*, 656 F. Supp. 536 (E.D.N.Y. 1987) ......................... 13

*City of New York* v. *Liberman*, 232 A.D.2d 42, 660 N.Y.S.2d 872
(N.Y. App. Div. 1st Dep't 1997) ................................................................................... 14

*Colony at Holbrook, Inc.* v. *Strata G.C., Inc.*, 928 F. Supp. 1224 (E.D.N.Y. 1996)................... 17

*Commercial Cleaning Servs., L.L.C.* v. *Colin Serv. Sys., Inc.*, 271 F.3d 374 (2d Cir. 2001)......... 2

**Page(s)**

*Computer Statistics, Inc.* v. *Blair*, 418 F. Supp. 1339 (S.D. Tex. 1976) ...................................... 22

*Cont'l T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36 (1977) ......................................................... 24

*Corporate Healthcare Fin., Inc.* v. *BCI Holdings Co.*, Civ. No. CCB-05-3391,
2006 U.S. Dist. LEXIS 59075 (D. Md. Aug. 10, 2006) ............................................. *passim*

*Ctr. Cadillac, Inc.* v. *Bank Leumi Trust Co. of New York*, 808 F. Supp. 213
(S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995) ................................................... 15, 16

*Cullen* v. *Margiotta*, 811 F.2d 698 (2d Cir. 1987) ....................................................................... 17

*DeCanas* v. *Bica*, 424 U.S. 351, 356-57 (1976) ............................................................................ 6

*Donemar, Inc.* v. *Molloy*, 252 N.Y. 360 (1930) ........................................................................... 14

*Doron Precision Sys., Inc.* v. *FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) ....................... 23

*Downstream Envtl., L.L.C.* v. *Gulf Coast Waste Disposal Auth.*, Civ. No. H-05-1865,
2006 WL 1875959 (S.D. Tex. July 5, 2006) ............................................................. 2, 4, 5

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2006-1 Trade Cases P 75,163, 2006 WL 515629 (N.D. Cal. Mar. 1, 2006) .................... 29

*Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer*, 1996-2 Trade Cases P 71,570,
1996 WL 455011 (S.D.N.Y. Aug. 13, 1996), *aff'd*, 129 F.3d 240 (2d Cir. 1997) ........... 27

*Envtl. Tectonics* v. *W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir. 1988) .................................... 22

*Excel Handbag Co.* v. *Edison Bros. Stores*, 630 F.2d 379 (5th Cir. 1980) ................................... 21

*Expert Masonry Inc.* v. *Boone County, Ky.*, 440 F.3d 336 (2006) ............................................... 25

*F. Buddie Contracting* v. *Seawright*, 595 F. Supp. 422 (N.D. Ohio 1984) ............................ 23, 25

*FTC* v. *Henry Broch & Co.*, 368 U.S. 360 (1962) ....................................................................... 20

*FTC* v. *Simplicity Pattern Co.*, 360 U.S. 55 (1959) ..................................................................... 20

*Falstaff Brewing Corp.* v. *Philip Morris, Inc.*, 1979-2 Trade Cases P 62,184,
1979 WL 1665 (N.D. Cal. May 10, 1979) ...................................................................... 22

*Fed. Paper Bd. Co.* v. *Amata*, 693 F. Supp. 1376 (D. Conn. 1988) ............................................ 25

*Grumman Corp.* v. *LTV Corp.*, 527 F. Supp. 86 (E.D.N.Y. 1981) .............................................. 26

*Gulf Oil Corp.* v. *Copp Paving Co., Inc.*, 419 U.S. 86 (1974) ..................................................... 24

*Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) ......................................... 2

Page(s)

*Holmes* v. *Secs. Investor Prot. Corp.*, 503 U.S. 258 (1992) ............................................................ 10

*In Town Hotels Ltd. P'ship* v. *Marriot Int'l, Inc.*, 246 F. Supp. 2d 469 (S.D. W. Va. 2003) ....... 22

*Intimate Bookshop, Inc.* v. *Barnes & Noble, Inc.*, 88 F. Supp. 2d 133 (S.D.N.Y. 2000) ............. 21

*James Cape & Sons Co.* v. *PCC Constr. Co.*, 453 F.3d 396 (7th Cir. 2006) ....................... *passim*

*Kelco Disposal* v. *Browning-Ferris Indus. of Vt.*, 845 F.2d 404 (2d Cir. 1988) ......................... 27

*LaSalle Nat'l Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071
(S.D.N.Y. 1996) ................................................................................................................ 18

*Lerner* v. *Fleet Bank, N.A.*, No. 05-5106CV, 2006 WL 2260822 (2d Cir. Aug. 8, 2006) ............ 2

*Linens of Eur., Inc.* v. *Best Mfg., Inc.*, No. 03 Civ. 9612, 2004 U.S. Dist. LEXIS 18575
(S.D.N.Y. Sept. 16, 2004) .............................................................................................. 12

*Lockheed Martin Corp.* v. *Boeing Co.*, 314 F. Supp. 2d 1198 (M.D. Fla. 2004) ......................... 26

*MHB Distrib., Inc.* v. *Parker Hannifin Corp.*, 800 F. Supp. 1265 (E.D. Pa. 1992) .................... 25

*MM Global Servs., Inc.* v. *Dow Chem. Co.*, 329 F. Supp. 2d 337 (D. Conn. 2004).................... 29

*Maddaloni Jewelers, Inc.* v. *Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293
(S.D.N.Y. 2004) ................................................................................................................ 13

*Manhattan Telecomms. Corp.* v. *DialAmerica Mktg.*, 156 F. Supp. 2d 376
(S.D.N.Y. 2001) ................................................................................................................ 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Young*, No. 91 Civ. 2923,
1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ............................................................. *passim*

*Mid Atl. Telecom Inc.* v. *Long Distance Servs., Inc.*, 18 F.3d 260 (4th Cir. 1994) ....................... 2

*Moll* v. *US Life Title Ins. Co. of New York*, 710 F. Supp. 476 (S.D.N.Y. 1989) ......................... 12

*Optimum, S.A.* v. *Legent Corp.*, 926 F. Supp. 530 (W.D. Pa. 1996) ........................................... 24

*Orteck Int'l Inc.* v. *Transpacific Tire & Wheel*, Civ. A. No. DKC 2005-2882,
2006 U.S. Dist. LEXIS 67702 (D. Md. Sept. 5, 2006) ................................................ 2, 6

*People* v. *Reynolds*, 174 Misc. 2d 812, 667 N.Y.S.2d 591 (N.Y. Sup. Ct. 1997) ....................... 14

*People* v. *Wolf*, 98 N.Y.2d 105, 772 N.E.2d 1124, 745 N.Y.S.2d 766 (2002) ............................ 12

*Pharmacare* v. *Caremark*, 965 F. Supp. 1411 (D. Haw. 1996).................................................... 22

**Page(s)**

*Redtail Leasing, Inc.* v. *Bellezza*, 95 Civ. 5191,
2001 U.S. Dist. LEXIS 863556 (S.D.N.Y. July 31, 2001) .............................................. 18

*Richard Hoffman* v. *Integrated Bldg. Sys.*, 581 F. Supp. 367 (N.D. Ill. 1984)...................... 23, 25

*Rotec Indus., Inc.* v. *Mitsubishi Corp.*, 163 F. Supp. 2d 1268 (D. Or. 2001) ............................... 24

*Rotec Indus., Inc.* v. *Mitsubishi Corp.*, 348 F.3d 1116 (9th Cir. 2003) ........................................ 23

*Schmidt* v. *Fleet Bank*, 16 F. Supp. 2d 340 (S.D.N.Y. 1998) ....................................................... 18

*Smith* v. *Multi-Flow Dispensers of Ohio, Inc.*, 1999-1 Trade Cases P 72,535,
1999 WL 357784 (6th Cir. May 14, 1999) ..................................................................... 26

*Soanes* v. *Empire Blue Cross/Blue Shield*, 970 F. Supp. 230 (S.D.N.Y. 1997) .......................... 18

*Spanish Broad. Sys., Inc.* v. *Clear Channel Commc'ns*,
242 F. Supp. 2d 1350 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1065 (11th Cir. 2004)............... 25

*Sperber* v. *Boesky*, 849 F.2d 60 (2d Cir. 1988).............................................................................. 2

*Standard Oil Co.* v. *FTC*, 340 U.S. 231 (1951)............................................................................ 24

*Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883 (1984) .............................................................................. 6

*T. Harris Young & Assocs., Inc.* v. *Marquette Elecs.*, 931 F.2d 816 (11th 1991) ........................ 26

*Tops Mkts., Inc.,* v. *Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) ...................................... 23, 28

*Tower Air, Inc.* v. *Fed. Express Corp.*, 956 F. Supp. 270 (E.D.N.Y. 1996)................................. 26

*United States* v. *Anderson*, 326 F.3d 1319 (11th Cir. 2003)........................................................ 29

*United States* v. *Ashland-Warren*, 537 F. Supp. 433 (M.D. Tenn. 1982).................................... 25

*United States* v. *Caplinger*, 339 F.3d 226 (4th Cir. 2003)........................................................... 17

*United States* v. *Dinero Express, Inc.*, 313 F.3d 803 (2d Cir. 2002)........................................... 16

*United States* v. *Kramer*, 73 F.3d 1067 (11th Cir. 1996)............................................................. 17

*United States* v. *Melekh*, 190 F. Supp. 67 (S.D.N.Y. 1960) ........................................................ 28

*United States* v. *Miller*, 116 F.3d 641 (2d Cir. 1997) .................................................................. 12

*United States* v. *Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994).......................................................... 14

*United States* v. *Paccione*, 738 F. Supp. 691 (S.D.N.Y. 1990) .................................................... 17

|  | Page(s) |
|---|---|

*United States* v. *Paone*, 782 F.2d 386 (2d Cir. 1986)...............................................12

*United States* v. *Reale*, No. S4 96 Cr. 1069, 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997).........12

*United States* v. *Sargent Elec. Co.*, 785 F.2d 1123 (3rd Cir. 1986).............................................25

*United States* v. *Viola*, 35 F.3d 37 (2d Cir. 1994) .......................................................................18

*United States* v. *Zichettello*, 208 F.3d 72 (2d Cir. 2000) .............................................................19

*Vavro* v. *Albers*, No. 2:05CV321, 2006 WL 2547350 (W.D. Pa. Aug. 31, 2006) .................2, 8-9

*Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256 (2d Cir. 2001)...........................23

*Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir. 1988) ...............28

*Welch Foods Inc.* v. *Gilchrist*, No. 93-CV-0641E(F), 1996 WL 607059
(W.D.N.Y. Oct. 18, 1996)..................................................................................................16

*Williams* v. *Mohawk Indus., Inc.*, No. 04-13740, 2006 U.S. App. LEXIS 24306
(11th Cir. Sept. 27, 2006)......................................................................................................6

*Zachair, Ltd.* v. *Driggs*, 965 F. Supp. 741 (D. Md. 1997)...........................................................25

*Zavala* v. *Wal-Mart Stores*, C.A. No. 03-5309 (JAG), 2006 WL 2468513
(D.N.J. Aug. 28, 2006)................................................................................................*passim*

## STATUTES

Fed. R. Civ. P. 8(a) .........................................................................................................................16

Fed. R. Civ. P. 12(b)(6).............................................................................................................7, 28

International Antibribery and Fair Competition Act, 15 U.S.C. §§ 78a, 78dd..............................29

Racketeering Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. §§ 1961-1962 ..............................................................................................*passim*

Robinson-Patman Act, 15 U.S.C. § 2(c)................................................................................*passim*

Sherman Act, 15 U.S.C. §§ 1, 2.............................................................................................*passim*

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE
COMPASS DEFENDANTS' MOTION TO DISMISS ES-KO'S AND
SUPREME'S RICO AND ANTITRUST CLAIMS**

The Compass Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss the RICO and antitrust claims asserted by ES-KO International Group, Inc. ("ES-KO") and by Supreme Foodservice AG ("Supreme").

**Argument**

**I.**

**PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED**

**A.**     **Plaintiffs' RICO Claims Should Be Dismissed For Failing To Allege Proximate
Cause**

  **1.**     ***Ideal Steel* Instructs Courts to Dismiss Cases at the Pleading Stages If They
Do Not Adequately Allege Proximate Causation**

Courts applying *Anza* v. *Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006) have consistently dismissed RICO claims at the pleading stage despite factual allegations that there is a direct link between the misconduct that violates RICO and the economic loss suffered by plaintiff. Most strikingly, courts have repeatedly dismissed claims by plaintiffs alleging that their competitors gained a competitive advantage by violating RICO.

Plaintiffs are dead wrong when they assert that their allegations of directness of injury immunize their complaints from dismissal, and that courts must construe liberally allegations that their injuries were proximately caused by the alleged RICO violation. (*See* ES-KO Opp. Br. at 13-15; Sup. Opp. Br. at 15.) To the contrary, the Supreme Court clearly instructed courts not to accept plaintiffs' legal conclusions with respect to allegations of directness. In *Ideal Steel*, the Court did *not* accept plaintiff's theory of directness:

> To be sure, Ideal asserts it suffered its own harms when the Anzas failed to charge customers for the applicable sales tax. The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the state).

*Id.* at 1997.

In the short time since *Ideal Steel* was decided, numerous courts have dismissed RICO claims for failing to plead proximate causation, even where the RICO violation is alleged to have been a "but for" cause of the plaintiffs' injuries. *See James Cape & Sons Co.* v. *PCC Constr. Co.*, 453 F.3d 396 (7th Cir. 2006); *Downstream Envtl., L.L.C.* v. *Gulf Coast Waste Disposal Auth.*, Civ. No. H-05-1865, 2006 WL 1875959 (S.D. Tex. July 5, 2006); *Corporate Healthcare Fin., Inc.* v. *BCI Holdings Co.*, Civ. No. CCB-05-3391, 2006 U.S. Dist. LEXIS 59075 (D. Md. Aug. 10, 2006); *Zavala* v. *Wal-Mart Stores*, C.A. No. 03-5309 (JAG), 2006 WL 2468513 (D.N.J. Aug. 28, 2006); *Vavro* v. *Albers*, No. 2:05CV321, 2006 WL 2547350 (W.D. Pa. Aug. 31, 2006); *Orteck Int'l Inc.* v. *Transpacific Tire & Wheel*, Civ. A. No. DKC 2005-2882, 2006 U.S. Dist. LEXIS 67702 (D. Md. Sept. 5, 2006). These courts have dismissed RICO claims where (1) competitors claimed that they lost business due to the alleged RICO violation, but the courts found that other factors could have intervened; and (2) independent parties made decisions that contributed to plaintiff's injury and broke the chain of causation.

Further, the Second Circuit has recently held that "[a] plaintiff must make a different showing of proximate cause – one that is often more difficult to make – when bringing suit under ... RICO ... than when bringing a common-law cause of action." *Lerner* v. *Fleet Bank, N.A.*, No. 05-5106CV, 2006 WL 2260822, at *1 (2d Cir. Aug. 8, 2006).[1]

---

[1]    The authority plaintiffs cite for the proposition that lawsuits should not be dismissed at the pleading stages pre-dates *Ideal Steel* and is therefore not good law. The Supreme Court specifically overturned the Second Circuit's *Ideal Steel* opinion, along with all of the authority cited therein. Plaintiffs nonetheless rely on much of this authority to bolster their proximate cause argument. *See, e.g., Commercial Cleaning Servs., L.L.C.* v. *Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001) (cited in Sup. Opp. Br. at 11); *Sperber* v. *Boesky*, 849 F.2d 60 (2d Cir. 1988) (cited in ES-KO Opp. Br. at 9); *Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) (cited in ES-KO Opp. Br. at 41); *Baisch* v. *Galina*, 346 F.3d 366 (2d Cir. 2003) (cited in ES-KO Opp. Br. at 39; Sup. Opp. Br. at 30); *Mid Atl. Telecom Inc.* v. *Long Distance Servs., Inc.*, 18 F.3d 260 (4th Cir. 1994) (cited in ES-KO Opp. Br. at 17).

2.    **Plaintiffs' Injuries Are As Indirect As Those At Issue In *Ideal Steel* and Its Progeny**

Plaintiffs' theory here is that the RICO violation – alleged commercial bribes to one U.N. employee – enabled ESS to procure information that it used to submit more competitive bids. Plaintiffs concede, as they must, that the ultimate decision as to which bid to accept was made by a U.N. body, the Headquarters Committee on Contracts ("HCC"), based on an array of information supplied by each bidder.   (*See* ES-KO Compl. ¶ 37 ("The HCC may either approve the recommendation of the Procurement Officer or ask for further clarifications.").)  Indeed, Supreme affirmatively asserts that price is not the only factor on which the U.N. based its decision (*see* Sup. Opp. Br. at 14) – a proposition confirmed by the guidelines posted on the U.N.'s website.[2]  Thus, plaintiffs' injuries here were not caused directly by acts that violate RICO; instead, the alleged RICO violations were, at most, one link in a chain of causation that enabled ESS to formulate a bid that was more likely to be successful than it would have been without access to the information illicitly procured.

(a)    **Courts Dismiss Cases Where the RICO Violation Allegedly Enabled Competitors to Divert Business from Plaintiffs**

Plaintiffs' allegations that ESS's bribes caused it to lose business are insufficient to plead proximate causation.  Post-*Ideal Steel* courts have dismissed claims where plaintiff's lost business *could have* resulted from factors other than the fraud, and looked outside the pleadings to

---

[2]    The U.N. describes Requests for Proposals as follows:

Specifications can be so complex that evaluations of proposals take significantly longer than evaluations of bids, and criteria other than price are likely to be the determining factors.  Such criteria may include delivery speed, availability and quality of on-site support services, clarity of technical manuals, ability to understand local languages and culture, and ability to dispatch troubleshooters to a field mission as required.  Contracts are typically awarded to the offer that presents the best value in accordance with the evaluation criteria.

("UN Agencies & Business – How To Do Business With the UN," at http://www.un.org/partners/business/ otherpages/una-usa.htm ("How To Do Business With the UN").) (*See also id.* (for Invitations To Bid, "an award is made to the lowest priced, technically acceptable bidder or best value bidder").)

3

identify such factors. The Supreme Court held in *Ideal Steel* that "[t]he injury Ideal allege[d] is its own loss of sales resulting from National's decreased prices for cash-paying customers." *Ideal Steel*, 126 S. Ct. at 1997. The Court recognized that while avoiding income taxes enabled defendant to charge lower prices, and might have been a "but for" cause, it was not the *proximate* cause of plaintiff's injury.[3]

The plaintiff in *James Cape* alleged that defendants won government contracts through a series of RICO violations that enabled conspirators to underbid it. However, the Seventh Circuit concluded that "[a] court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy for any number of reasons unconnected to the asserted pattern of fraud," and "[i]t [was] entirely possible that Defendants would have won some bids absent the bid-rigging scheme, even if making less profits in the meantime." *James Cape*, 453 F.3d at 403 (citing *Ideal Steel*, 126 S. Ct. at 1997).[4]

The *Downstream* court held that the act of disposing of waste illegally was not the proximate cause of plaintiff's injury under the *Ideal Steel* test, even though the court accepted as true that it was the illegal conduct that made it possible for the defendant to charge lower prices, and that those lower prices are what ultimately injured the competitor by taking business away from it. *See Downstream*, 2006 WL 1875959, at *7. Relying on *Ideal Steel*, the court nonetheless rejected plaintiff's claim that its "loss of customers and sales, collapse of market price, and loss of revenue"

---

[3]    ES-KO mischaracterizes *Ideal Steel* by arguing that Justice Breyer's concurring opinion set forth a test adopted by the majority. (*See* ES-KO Opp. Br. at 10, 23.) This is not the standard that the Court adopted.

[4]    Plaintiffs make much of the fact that the defendants in *James Cape* did not bribe a WisDOT official. (*See* ES-KO Opp. Br. at 18-19; Sup. Opp. Br. at 13-14.) ES-KO focuses on the court's alternate holding that, had defendants "bribed a WisDOT employee to override the computer's recommendation, or enter a false bid into the computer," they would have "controlled" the enterprise. *James Cape*, 453 F.3d at 402-03. The Seventh Circuit made clear, however, that, "[e]ven assuming that Cape had shown that defendants 'managed or controlled' WisDOT, *its claim would still fail because it has not properly alleged that the RICO violation was the proximate cause of its damages*." *Id.* at 403 (emphasis added).

was proximately caused by defendant's failure to obtain the necessary permits and engage in illegal dumping. *Id.*[5]

*Corporate Healthcare* also involved a scheme to divert business from the plaintiff through a pattern of racketeering activity. Plaintiff BCI competed with NAHP for contracts awarded by defendant Performax. BCI alleged that Performax diverted business from BCI to NAHP in exchange for kickbacks. The court concluded that "BCI likely has not presented a sufficient factual basis for asserting that Performax's decision to remove it from certain cases was a direct result of its refusal to acquiesce to the extortion, rather than 'for any number of reasons unconnected to the asserted pattern of fraud.'" *Corporate Healthcare*, 2006 U.S. Dist. LEXIS 59075, at *26 (citing *Ideal Steel*, 126 S. Ct. at 1997). Analogizing to cases that "deny RICO standing to employees claiming they were terminated because they refused to cooperate with their employers' alleged racketeering scheme," the court reasoned that the proximate cause of BCI's injury would not be Performax's efforts to enlist BCI to participate in the kickback scheme, but rather Performax's subsequent decision to divert business from BCI. *Id.* at *26-27.

In *Zavala*, undocumented immigrants who performed janitorial services for Wal-Mart alleged that Wal-Mart and its contractors violated the immigration laws in order to secure workers that Wal-Mart could underpay. The court explained that "Wal-Mart may have underpaid wages for reasons other than the workers' immigration status, and the workers might have worked for low wages for reasons other than their immigration status." *Zavala*, 2006 WL 2468513, at *7. In

---

[5]    ES-KO argues that *Downstream* is inapposite because, like *Ideal Steel*, "plaintiffs' injuries arose from having to compete with a defendant whose failure to abide by applicable industry licensing requirements and other regulations reduced its costs and thus enabled it to charge its customers lower prices." (ES-KO Opp. Br. at 19.) However, ES-KO misses the point. The alleged RICO violation enabled the *Ideal Steel* and *Downstream* defendants to lower prices, and yet the complaints were dismissed even though the plaintiffs claimed, as plaintiffs do here, that their injury was direct in nature.

reaching the conclusion that proximate cause had not been alleged, in satisfaction of *Ideal Steel*, the

court considered numerous factors that were *not* referenced in the complaint:

> Moreover, the Court would have to consider broader economic questions. To what extent was the wage underpayment caused by conditions in the general labor market? To what extent was the wage underpayment driven by an oversupply of workers in the market, unconnected to immigration status? Was English language competence an intervening variable?

*Id.*[6]

In *Orteck*, plaintiff Orteck contracted with defendant GT China to be its exclusive

wholesale distributor for certain products, and claimed that defendant schemed to eliminate Orteck

and obtain Orteck's business for itself by using misrepresentations to procure plaintiff's proprietary

customer list "so that they could sell directly to Orteck's customers at a cost lower than Orteck could

charge, which they did." 2006 U.S. Dist. LEXIS 67702, at *5. Thus, defendant allegedly made

direct misrepresentations to the plaintiff, and those misrepresentations were an essential step in its

scheme illicitly to obtain plaintiff's trade secret information, as a result of which defendants diverted

business by lowering prices. "Orteck claim[ed] that most of its customers no longer buy GT tires

from Orteck because [defendant] now 'undersells' Orteck." *Id.* Nevertheless, the court held that

plaintiff had failed to plead proximate causation: "The overwhelming majority of Plaintiffs' claims

---

[6]    As of the date of this brief, only one court has held that RICO plaintiffs adequately plead proximate causation under *Ideal Steel*, in circumstances that are distinguishable from this case. *See Williams* v. *Mohawk Indus., Inc.*, No. 04-13740, 2006 U.S. App. LEXIS 24306 (11th Cir. Sept. 27, 2006). The plaintiffs in *Williams* were employees of defendant Mohawk Industries who alleged that Mohawk's employment of illegal workers allowed Mohawk to reduce labor costs by hiring illegal workers. The court held that plaintiffs' injury was sufficiently direct based on well established precedent compelling that result in this factual context. *See, e.g., DeCanas* v. *Bica*, 424 U.S. 351, 356-57 (1976) (explaining that "acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens"); *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 892-93 (1984) (quoting *DeCanas*, and adding that a "primary purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are therefore admitted to work in this country only if they 'will not adversely affect the wages and working conditions of the workers in the United States similarly employed.'") (citation omitted)). *Williams* is also distinguishable because plaintiffs in that case were not defendant's competitors, but rather defendant's own employees, and the court therefore recognized that (1) "[*Ideal Steel*'s] concern about blurring the line between RICO and antitrust laws [wa]s wholly missing here," *id.* at *31, and (2) there was no more direct victim than the employees themselves.

... fail to allege that a misrepresentation caused Plaintiffs' injury or that Plaintiffs' reliance on the misrepresentations was justified." *Id.* at \*53 (citing *Ideal Steel*, 126 S. Ct. at 1996-99).

Proximate cause is absent here as a matter of law even though the alleged commercial bribery can be assumed for purposes of this Rule 12(b)(6) motion to have facilitated, or been a "but for" cause, of plaintiffs' competitive injury.

*First*, in order to determine which bidder would have won the contract absent the alleged bribery, the trier of fact would have to recreate the HCC's complex and subjective decision-making process, and predict how it would award a contract based on many variables. As noted above (*see supra* p.3), price is not the only criterion. Thus, the U.N. could have awarded the contracts at issue to ESS for any number of reasons other than the alleged RICO violation, and the procurement of allegedly confidential information did not guarantee that ESS would have won those contracts. By the same token, even if ESS had *not* obtained any confidential information, the U.N. could have been impressed by ESS's experience in servicing other clients in harsh environments, by Compass's vast economies of scale, or awarded one or more contracts to ESS in order to "ensur[e] reliable, competitive sources of supply." (How To Do Business With the UN.)[7]

*Second*, ESS could have submitted bids lower than those of its competitors for any number of reasons other than the alleged RICO violation. At trial, for example, there will be hotly contested factual issues over what ESS would have done if it had lost the first U.N. contract for which it bid, with the Compass Defendants presenting evidence that ESS would have lowered its bids on subsequent contracts in response to the competitive environment.

---

[7] The discretionary and multifaceted nature of the U.N.'s bid award process makes Supreme and ES-KO's injury even more indirect than in *James Cape*. Although plaintiffs argue that the concern expressed in *James Cape* – that "a court could never be certain whether [defendant] would have won any contracts ... 'for any number of reasons unconnected to the asserted pattern of fraud'" – is not present here, the opposite is true. (Sup. Opp. Br. at 14; *see also* ES-KO Opp. Br. at 18-19.) The problem of proof identified in *James Cape* is thus far *more* acute in this case because in *James Cape*, a computer system was designed to accept the lowest bid automatically.

*Third*, although ES-KO alleges that it reduced profit margins on those contracts that it was awarded "[i]n response to ... 'pseudo-competition'" (ES-KO Opp. Br. at 17), ES-KO may have lowered its prices for a variety of reasons unrelated to the alleged RICO violation. ES-KO's theory hinges upon some of the "broader economic questions" described by the *Zavala* court which might have been unrelated to the alleged RICO violation. ES-KO may have decided to "mak[e] less profits," *James Cape*, 453 F.3d at 403, in order to maintain a prestigious client such as the U.N. Or, as the *Ideal Steel* Court suggested, ES-KO could have "concluded that the additional sales would justify a smaller profit margin." *Ideal Steel*, 126 S. Ct. at 1997.

Because of the myriad factors potentially at work that could attenuate or negate the causal connection alleged between the conduct that allegedly violated RICO and the injury sustained – all of which would be vigorously litigated at any trial of this action – *Ideal Steel* and its progeny dictate the conclusion that the injuries here are insufficiently direct for RICO purposes.

### (b)   Courts Dismiss Cases Where Independent Decision-Makers Break The Chain Of Causation

Courts also find proximate cause for RICO purposes lacking where independent parties make intervening decisions that directly cause the plaintiffs to lose business. *See Ideal Steel*, 126 S. Ct. at 1997 ("Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices."); *Downstream*, 2006 WL 1875959, at *7 (same); *James Cape*, 453 F.3d at 396 (plaintiff's injury caused by WisDOT's decision to accept the computer system's recommendations).

The plaintiff in *Vavro* attributed the denial of his claims to workers compensation benefits to a scheme whereby defendants conducted fraudulent medical examinations for the purpose of obtaining his medical information and publishing that information in medical journals which would help defend against plaintiff's claims. *See Vavro*, 2006 WL 2547350, at *3. The *Vavro* court

8

found plaintiff's theory too speculative due to "the existence of several independent causes for the denial of ... benefits," including: (1) the medical journals' decision to incorporate plaintiff's medical information in their articles; (2) the ALJ's reliance on evidence in the medical journals in denying plaintiff's benefits; and (3) the Workers' Compensation Appeal Board's denial of plaintiff's appeal. *Id.* at *26.

Here, the HCC's decisionmaking process similarly breaks the chain of causation. ESS is not alleged to have made a misrepresentation to plaintiff. And while plaintiffs allege that ESS illegally procured information to make its bids more attractive, ultimately those bids would have to be reviewed and accepted by the HCC (*see supra* p.3.), just as the dispute between Vavro and his employer had to be resolved by an ALJ.

### 3.     The Complexity of Plaintiffs' Damages Calculation Further Demonstrates The Lack of Proximate Cause

While ES-KO asserts "that an action will not be dismissed at the pleading stage in anticipation of possible difficulties in the proof of damages" (ES-KO Opp. Br. at 22-23), the case law makes clear that the foreseeable difficulty of proving plaintiffs' damages further indicates – at the pleading stage – the lack of proximate causation. The *Ideal Steel* Court considered the "speculative nature of the proceedings that would follow if Ideal were permitted to maintain its claim," and predicted that

> [a] court considering the claim would need to begin by calculating the portion of National's price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of Ideal's lost sales attributable to the relevant part of the price drop.

*Ideal Steel*, 126 S. Ct. at 1998. *See also Zavala*, 2006 WL 2468513, at *7 (same); *James Cape*, 453 F.3d at 403 ("Cape cannot show what portion of its 'lost market share' is attributable to the bids lost to the bid-rigging scheme."); *Corporate Healthcare*, 2006 U.S. Dist. LEXIS 59075, at *20-21 ("It

9

would be extremely difficult to calculate how much of BCI's lost profits might be directly attributable to the scheme rather than to a host of other reasons.").

The *Ideal Steel* Court specifically warned about "claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws." *Ideal Steel*, 126 S. Ct. at 1998. Those issues are especially pertinent here.

*First*, in comparison with the decision made by National and Ideal's customers, who would have no basis to differentiate between the two stores other than price, the U.N.'s task of deciding which company should perform multi-year contracts in war-torn locations is far more complex. While the parties in *Ideal Steel* sold fungible goods and competed primarily on the basis of price, the U.N.'s suppliers provide highly complex services and do not compete solely on the basis of price. (*See supra* p.3.)

*Second*, the trier of fact would have to determine what portion of plaintiffs' business was lost as a result of the alleged RICO violations. While plaintiffs maintain that calculating damages in this case would be as straightforward as any commercial matter (*see* ES-KO Opp. Br. at 20; Sup. Opp. Br. at 11), the *Corporate Healthcare* court considered precisely the sort of damages that plaintiffs characterize as routine and concluded that such a determination "would be extremely difficult." 2006 U.S. Dist. LEXIS 59075, at *20-21.

*Third*, the trier of fact would have to determine whether ESS, ES-KO, Supreme, or a different competitor that is not bringing any lawsuit would have won any given bid. The Supreme Court in *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 269 (1992) warned against "forc[ing] courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *See also*

*Zavala*, 2006 WL 2468513, at *7 ("the complexity is increased by the fact that there are two hundred claimants in the plaintiff class").

### 4.    The U.N. Is The More Direct Victim Than Either Plaintiff[8]

The Supreme Court held that "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly," and found in *Ideal Steel* that the State of New York was a more direct victim than Ideal. 126 S. Ct. at 1998. Indeed, it is undisputed that the U.N. is currently in the midst of an investigation of the underlying events and has barred ESS from bidding on new contracts, pending the outcome of the U.N.'s investigation. (*See* ES-KO Compl. ¶ 271.)[9]

This situation is the same as that presented in the post-*Ideal Steel* cases holding that public authorities charged with enforcing rules and regulations can vindicate their rights. *See Downstream*, 2006 WL 1875959, at *7 ("the direct victim of [defendant's] alleged regulatory violations is the State of Texas, which issues the [waste disposal] permits, and the municipality operating the sewer treatment facilities"); *Corporate Healthcare*, 2006 U.S. Dist. LEXIS 59075, at *21 n.14 ("although the court does not know the purpose or findings of the Department of Labor investigation, the agency also is in a position to investigate and address any wrongdoing by Performax or NAHP").

---

[8]    The Compass Defendants direct this argument at both plaintiffs, notwithstanding Supreme's suggestion to the contrary. (*See* Sup. Opp. Br. at 15 n.9.)

[9]    Plaintiffs' assertion concerning the U.N.'s inability to pursue remedies (*see* Sup. Opp. Br. at 17; ES-KO Opp. Br. at 25) is also belied by the U.N.'s policy of settling disputes "in accordance with the United Nations Commission on International Trade Law ... arbitration rules." (How To Do Business With the UN.)

**B.     Plaintiffs Have Failed To Allege That Each of the Compass Defendants Committed Two Predicate Acts**

**1.     Plaintiffs Failed to Plead The Predicate Act of Commercial Bribery Because They Do Not Allege Economic Harm to the U.N.**

**(a)     RICO Plaintiffs Must Plead The Element of Economic Harm**

Supreme misstates the law when it asserts that it need not plead concrete economic harm to the U.N. in order to plead a predicate act of commercial bribery. (*See* Sup. Opp. Br. at 18.) The RICO statute is clear that a predicate act of bribery must be a violation of state law that is "punishable for more than one year." 18 U.S.C. § 1961(1)(A).[10] Under New York law, "the felony commercial bribery legislation *requires proof of concrete economic loss* suffered by the bribe receiver's employer, which would not have been incurred in the absence of the corrupt arrangement." *People* v. *Wolf*, 98 N.Y.2d 105, 110, 772 N.E.2d 1124, 1127, 745 N.Y.S.2d 766, 769 (2002) (emphasis added).[11]

**(b)     The Harm Plaintiffs Allege Related to ESS's Performance of the Contracts Does Not Qualify As Economic Harm**

Plaintiffs concede that any harm the U.N. incurred "arose not from the award of contracts to ESS, but from ESS's abysmal contract performance, at least arguably a causal factor one

---

[10]   *See also Linens of Eur., Inc.* v. *Best Mfg., Inc.*, No. 03 Civ. 9612 (GEL), 2004 U.S. Dist. LEXIS 18575, at *52 (S.D.N.Y. Sept. 16, 2004) (Lynch, J.) ("Bribery in violation of state law … only counts as a [RICO] predicate act if it is 'punishable by imprisonment for more than one year.'") (citation omitted); *Moll* v. *US Life Title Ins. Co. of New York*, 710 F. Supp. 476, 481 (S.D.N.Y. 1989) (Leisure, J.) (same).

[11]   Supreme cites three criminal cases for the proposition that RICO plaintiffs "need only plead the offense generally." (*See* Sup. Opp. Br. at 18, 20 n.13.) However, those cases involved criminal indictments in which the courts determined that the prosecution had alleged serious criminal law violations under New York law, and rejected defendants' procedural or technical arguments concerning those violations. *See United States* v. *Miller*, 116 F.3d 641, 675 (2d Cir. 1997) (rejecting technical argument about criminal facilitation, where defendant "plainly performed an act that directly concerns murder"); *United States* v. *Reale*, No. S4 96 Cr. 1069 (DAB), 1997 WL 580778, at *8 (S.D.N.Y. Sept. 17, 1997) (Batts, J.) (rejecting argument that bribe receivers "were not acting in their capacity as public servants," where defendants were charged with "conduct … typical of serious criminal law violations under New York law."); *United States* v. *Paone*, 782 F.2d 386, 393 (2d Cir. 1986) ("Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute."). The shortcomings in plaintiffs' pleadings go beyond such technical and procedural issues.

step further removed from the RICO violations." (ES-KO Opp. Br. at 25.) However, plaintiffs do not assert that the bribes somehow caused the allegedly poor performance; nor do they contend that Yakovlev or ESS misrepresented ESS's abilities to the HCC. Indeed, Supreme recognizes the "inherent difficulties in delivering massive amounts of food to distant, war-torn locations." (Sup. Opp. Br. at 2.)

ES-KO argues that the allegations in *City of New York* v. *Joseph L. Balkan, Inc.*, 656 F. Supp. 536 (E.D.N.Y. 1987) "strongly resemble the allegations made here." (ES-KO Opp. Br. at 31 n.29.) In *Balkan*, however, defendants specifically bribed inspectors so that they would not report damage to the sewer system.[12] While the court did not require "[s]pecific evidence of the way improper work damaged the city sewer system," the court did find a proximate causal connection between the misconduct and the alleged injuries: "the complaint alleges that damage occurred because corrupted inspectors did not detect or report improper tie-ins between private sewer lines and the City sewer system." *Id.* at 542-43. Plaintiffs allege no similar facts here.[13]

Supreme also attempts to draw an analogy between its claims and those in *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Young*, No. 91 Civ. 2923 (CSH), 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) (Haight, J.). (*See* Sup. Opp. Br. at 19.) Defendants in that case were Merrill Lynch employees whose positions enabled them to influence the award of contracts in the construction and

---

[12]   Supreme mistakenly cites *Balkan* for the proposition that intangible harms are actionable under the New York law. (*See* Sup. Opp. Br. at 21.) However, the *Balkan* plaintiffs survived a motion to dismiss on the grounds that the City alleged more than intangible harm; indeed, the court did not need to rule on the allegations of "deprivation of [the City's] inspectors' loyal performance or diminution of public confidence" precisely because the court found that other tangible harms were pled. 656 F. Supp. at 543.

[13]   ES-KO attempts to distinguish *Maddaloni Jewelers* on the grounds that the reasoning "does not extend to the steering of a contract for the performance of complex services and requiring economic resources and expertise to a less qualified contractor rather than one more qualified and experienced." (ES-KO Opp. Br. at 32.) However, the point here is that the alleged bribes did not cause the alleged performance failings. By contrast, in *Maddaloni*, the alleged scheme caused the retailer "delays in receiving products, refusals to supply certain Rolex products, and limited promotional support from Rolex," and even that was held not to have harmed Rolex. *Maddaloni Jewelers, Inc.* v. *Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 297 (S.D.N.Y. 2004) (Castel, J.)

maintenance of Merrill Lynch facilities.   Judge Haight found that commercial bribery was

adequately plead for reasons that are not present in this case:

> Defendants committed acts of unlawful bribery which resulted in Merrill Lynch
> having to pay inflated prices or prices that could have been reduced for services
> provided by the ... Defendants, compensating the ... Defendants for unnecessary
> services, or compensating them for services never rendered.

*Id.* at *12. In stark contrast to *Merrill Lynch*, neither plaintiff here alleges that ESS inflated prices,

performed unnecessary services, or charged the U.N. for fictional services.

Finally, Supreme argues that New York law presumes economic harm in the amount

of the alleged bribe.[14]  (*See* Sup. Opp. Br. at 20.)  However, there is no argument here that the

amount of the alleged bribes inflated the contract prices, because the net result of the alleged scheme

was *lower* prices for the U.N.[15]

### 2.   Plaintiffs Fail to Plead The Predicates of Mail or Wire Fraud

ES-KO argues that the pleading standard is relaxed with respect to mail or wire fraud.

(*See* ES-KO Opp. Br. at 26.)  However, the authority ES-KO cites clearly holds that "fraudulent

intent may be averred generally, as long as the complaint provides a factual basis that gives rise to a

---

[14]  The cases Supreme cites all involve defendants "kicking back" their employer's money.  *See Donemar, Inc.* v. *Molloy*, 252 N.Y. 360, 362-63 (1930) (where plaintiff's employee adjusted a disputed claim for merchandise sold to customer, who paid employee a bribe "as a gratuity or compensation for [the employee's] efforts to obtain a settlement favorable to [the customer]," plaintiff brought action "to recover the amount of the secret commissions"); *City of New York* v. *Liberman*, 232 A.D.2d 42, 43-44, 660 N.Y.S.2d 872 (N.Y. App. Div. 1st Dep't 1997) (New York City sued a government official charged with entering into leases on behalf of the City who solicited bribes from landlords in exchange for more favorable terms, seeking to recover the cost of the leases to the extent they were "loaded" by the amount of the bribes the official received); *People* v. *Reynolds*, 174 Misc. 2d 812, 667 N.Y.S. 2d 591, 594 (N.Y. Sup. Ct. 1997) (where personal injury plaintiffs attorneys kicked back a designated percentage of their settlement fees, the People argued that "when the bribe is a kickback, and therefore paid with the employer's own money, then the bribe itself also constitutes the harm").

[15]  The Second Circuit has indicated that where competitors pay kickbacks in order to win government contracts, concrete harm is not established if the government did not pay an inflated price.  *See United States* v. *Mittelstaedt*, 31 F.3d 1208, 1220 (2d Cir. 1994) (noting that "an act of bribery can be mail fraud if – and only of – it is part of a scheme to deprive someone of 'money or property,'" the court held that "[t]he bribe to [the town official] theoretically could support a mail fraud conviction *if the bribe inflated the cost of the property to the town*.") (emphasis added).

strong inference of intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."

*Ctr. Cadillac, Inc.* v. *Bank Leumi Trust Co. of New York*, 808 F. Supp. 213, 229 (S.D.N.Y. 1992)

(Motley, J.), *aff'd*, 99 F.3d 401 (2d Cir. 1995). Plaintiffs provide no factual basis that gives rise to a

strong inference of intent to defraud.

*First*, ESS's communications with respect to the Burundi and Sudan contracts are not

adequately alleged to have been fraudulent. The U.N. recommends that "[p]otential suppliers should

approach the United Nations procurement market as they would any other business venture. They

should thoroughly research the market and develop relationships with potential United Nations

partners prior to committing to a contract." (*See* How To Do Business With the UN.) This conduct

is also consistent with the U.N.'s expectations that service providers

> commit ... to establishing long-term relationships with U.N. officials and
> procurement officers at an agency's headquarters and field offices. Frequently, these
> relationships provide valuable additional information to suppliers about upcoming
> contracts, technical specifications for these contracts, and existing competition for a
> contract award that would not otherwise be available.

(*Id.*)

*Second*, even if ES-KO had provided a factual basis that gives rise to a strong

inference of intent to defraud, its allegations would fail as to the six contracts – including East

Timor, Cyprus, Eritrea, Syria, Lebanon and Kosovo – for which ES-KO alleges only generally that

ESS procured "non-public material information." (*See* Compass Defs. Mov. Br. at 21-22.) Supreme

likewise alleges no specific facts with respect to contracts in East Timor, the Sudan and Eritrea. (*See*

*id.*) Courts in this District have held that "[a] complaint sounding in fraud may not rely on sweeping

references to acts by all or some of the defendants because each named defendant is entitled to be

apprised of the facts surrounding the alleged fraud." *Ctr. Cadillac*, 808 F. Supp. at 230 (citation omitted). Plaintiffs have improperly relied on such "sweeping references."[16]

### 3. Plaintiffs Fail to Allege Money Laundering As to Each of the Compass Defendants[17]

Plaintiffs argue that they satisfied the notice pleading requirements of Rule 8(a) by alleging generally that the Compass Defendants transferred money to IHC knowing that the funds would be used to pay bribes. (*See* ES-KO Opp. Br. at 32-35; Sup. Opp. Br. at 22-23.) However, plaintiffs fail to plead the elements of the offense, such as the source and destination of the fund transfers. They also fail to meet the minimal requirements of Rule 8(a) notice pleading by failing to allege which defendant conducted these transfers, or which defendant was aware that the proceeds were used for illegal means. As in *Bernstein* v. *Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997), "[t]he complaint[s] do[] not describe which defendants or transactions violated this statute."[18]

---

[16]   Supreme's argument that Kemp and Swain committed wire fraud through their "silence" is also unavailing. (*See* Sup. Opp. Br. at 26.) Under New York law, the failure to disclose a material fact rises to the level of fraud only where there is a duty of disclosure, which can arise in three circumstances:  (1) where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; (2) when the parties stand in a fiduciary or confidential relationship with each other; and (3) where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. *See Brass* v. *Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (quotations and citations omitted); *see also Merrill Lynch*, 1994 WL 88129, at *11 (rejecting wire fraud allegations based on a theory of omissions where "[p]laintiffs d[id] not argue that the Vendor Defendants owed Merrill Lynch a fiduciary duty."). Plaintiffs plead no facts giving rise to such a duty.

[17]   Supreme argues that it has pled a violation of the "Travel Act" on the basis of its commercial bribery and money laundering allegations. (*See* Sup. Opp. Br. at 27.) However, for all the reasons described above, Supreme has failed to adequately plead violations of those predicate acts, or that the Compass Defendants "performed an additional act in furtherance of [an] unlawful act." *Welch Foods Inc.* v. *Gilchrist*, No. 93-CV-0641E(F), 1996 WL 607059, at *6 (W.D.N.Y. Oct. 18, 1996).

Even if Supreme had adequately pleaded those other predicate acts – which it has not – the alleged violation of the Travel Act "[is] repetitive of the [other alleged RICO predicates] and should not be counted again to create a pattern." *Bernstein* v. *Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997) (citation omitted).

[18]   ES-KO also argues that there is no requirement that a defendant "cause" the transfer of funds in order to be liable for money laundering. (*See* ES-KO Opp. Br. at 33-34.) This is incorrect. *See United States* v. *Dinero Express, Inc.*, 313 F.3d 803, 806 (2d Cir. 2002), *cert. denied, Beras* v. *United States*, 540 U.S. 1184 (2004) ("a person ... engage[s] in a 'transfer' of money whenever he accepts money in one location and, pursuant to an overall course of

**C.    Plaintiffs Plead the Existence of Enterprises That Are Not Distinct**

Plaintiffs argue that enterprises need not be distinct from the defendants (*see* ES-KO Opp. Br. at 36; Sup. Opp. Br. at 28-29), but do not refute the well-settled proposition that "it is possible to plead a valid § 1962(c) claim in which each of the members of an associated-in-fact enterprise are also named as defendants *so long as the overlap between the RICO persons and the RICO enterprise is only partial.*" *C.A. Westel de Venezuela* v. *AT&T Co.*, 90 Civ. 6665 (PKL), 1994 U.S. Dist. LEXIS 14481, at *16-17 (S.D.N.Y. Oct. 11, 1994) (Leisure, J.). The case ES-KO cites to support its argument, *Cullen* v. *Margiotta*, 811 F.2d 698 (2d Cir. 1987) actually undercuts it. As ES-KO explains, the Second Circuit considered an enterprise that included three of the four defendants, which was only a partial overlap between the defendants and the alleged enterprise. *See id.* at 729.[19] *See also City of New York* v. *Cyco.net, Inc.*, 383 F. Supp. 2d 526, 549 (S.D.N.Y. 2005) (Batts, J.) ("*Cullen* involved three legally separate entities that could be differentiated from the enterprise-group.").[20]

---

conduct, *causes the delivery of related money to another location*") (emphasis added); *United States* v. *Caplinger*, 339 F.3d 226, 232 (4th Cir. 2003) (same); *United States* v. *Kramer*, 73 F.3d 1067, 1073 (11th Cir. 1996) (same).

[19]    Two of the cases ES-KO cites, *Colony at Holbrook, Inc.* v. *Strata G.C., Inc.*, 928 F. Supp. 1224, 1235 (E.D.N.Y. 1996) and *United States* v. *Paccione*, 738 F. Supp. 691, 700 (S.D.N.Y. 1990) (Motley, J.) are criminal cases that permitted total overlap between the members of the alleged enterprise and the defendants named in the indictments. The better reasoned cases in the Second Circuit do not permit such a total overlap. (*See* Compass Defs. Mov. Br. at 31.)

[20]    Supreme argues that *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 161 (2001) supports the view that the U.N. Bid-Rigging Enterprise is distinct. (*See* Sup. Opp. Br. at 28.) Even after *Cedric*, courts continue to require that the defendants be distinct from the enterprise, and have dismissed pleadings just like in our case for failing to distinguish between the defendants and the association-in-fact enterprise. *See, e.g., Burrowes* v. *Combs*, 312 F. Supp. 2d 449, 452 (S.D.N.Y. 2004) (Rakoff, J.) (plaintiffs may not "conflate the defendants ... with the enterprise."); *Manhattan Telecomms. Corp.* v. *DialAmerica Mktg.*, 156 F. Supp. 2d 376, 382 (S.D.N.Y. 2001) (Scheindlin, J.) ("the RICO 'enterprise' must be distinct from the RICO 'person' – that is to say, the enterprise cannot merely consist of the named defendants."). Thus, the requirement that plaintiffs only allege "partial overlap" is consistent with *Cedric* and its progeny. In any event, the distinctness at issue in *Cedric* is completely different than the distinctness at issue here, because *Cedric* simply dealt with a sole shareholder controlling his corporation, which is a distinct entity, *see Cedric*, 533 U.S. at 161, whereas plaintiffs' theory here is that unrelated persons and entities formed an association-in-fact enterprise.

**D.    Plaintiffs Do Not Allege That Kemp, Swain or Bickerstaff Managed or Conducted the Enterprise**

Plaintiffs argue that Kemp and Swain managed or conducted the activities of the alleged conspiracy because they were responsible for ESS's food rations business, and "each received an email sent by Yakovlev" concerning the Burundi contract. (ES-KO Opp. Br. at 38; *see also* Sup. Opp. Br. at 29-30.) ES-KO also argues that Bickerstaff managed or conducted the enterprise's activities because he liaised with U.N. officers in the Sudan.[21] (*See* ES-KO Opp. Br. at 39.)

*First*, plaintiffs do not allege that Kemp, Swain or Bickerstaff directed other members of the alleged enterprise. The Second Circuit has held that "simple taking of directions and performance of tasks that are 'necessary and helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States* v. *Viola*, 35 F.3d 37, 41 (2d Cir. 1994).[22]

*Second*, plaintiffs allege nothing fraudulent about Kemp and Swain's communications with the U.N. concerning ESS's performance in Burundi, or about Bickerstaff's act of liaising with the U.N. mission in the Sudan. Contrary to ES-KO's assertion, the U.N. actually encourages its suppliers "to appoint a company representative to its [U.N.] account, with the responsibility for

---

[21]  ES-KO takes issue with the height of the hurdle to satisfy the "manage and conduct" test. (*See* ES-KO Opp. Br. at 37 n.35.) Regardless of how stringent the test is, numerous courts have dismissed RICO claims on this basis. *See Schmidt* v. *Fleet Bank*, 16 F. Supp. 2d 340, 346-47 (S.D.N.Y. 1998) (Schwartz, J.) (citing cases).

[22]  *See also Redtail Leasing, Inc.* v. *Bellezza*, 95 Civ. 5191 (JFK), 2001 U.S. Dist. LEXIS 863556, at *5 (S.D.N.Y. July 31, 2001) (Keenan, J.) (dismissed allegations that defendant engaged in an insider trading ring, even where plaintiffs alleged that defendants passed on inside information to others, received and traded on insider information, and received kickbacks for illegal trades, because plaintiffs "clearly fail[ed] to allege that [defendants] directed the conduct of the other members of the [enterprise]."); *Soanes* v. *Empire Blue Cross/Blue Shield*, 970 F. Supp. 230, 240 (S.D.N.Y. 1997) (Sprizzo, J.) (where defendant's participation was limited to negotiating and procuring a contract there was no RICO liability); *LaSalle Nat'l Bank* v. *Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996) (Knapp, J.) ("...simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable as a result.") (citations omitted).

researching the [U.N.] market and maintaining relationships with U.N. officials and procurement officers," and to learn about "upcoming contracts and projects and .... what a supplier's comparative advantage may be in relation to the marketplace and other suppliers." (How To Do Business With the UN.)

## E.    Plaintiffs Have Failed to Allege RICO Conspiracy Under Section 1962(d)

Plaintiffs contend that their RICO Conspiracy pleadings are sufficient because they provide an adequate basis from which the Court can infer an agreement to conspire RICO. (*See* ES-KO Opp. Br. at 40-41; Sup. Opp. Br. at 30.)  Plaintiffs have not met this pleading standard because they do not allege that any of the Compass Defendants were aware of a larger scheme. *See United States* v. *Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (the relevant inquiry is "whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise'") (citations omitted).[23] Given that plaintiffs fail to allege the fraudulent nature of the activities attributed to the Compass Defendants – many of which activities were consistent with U.N. policy – the allegations do not support an inference that the Compass Defendants were aware of an illegal scheme.

## II.
## ALL ANTITRUST CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs Do Not State a Claim Under Section 2(c) of the Robinson-Patman Act

#### 1.    Plaintiffs' Allegations of Commercial Bribery Do Not State a Claim Under Section 2(c) of the Robinson-Patman Act

Dismissal of plaintiffs' Robinson-Patman claim is warranted because the legislative history clearly shows that Congress enacted section 2(c) to deal with a particular form of "secret"

---

[23]   Further, "[g]rouping defendants is no more permissible in a RICO conspiracy claim, which must allege that *each* defendant agreed to commit at least two predicate acts, as it is in a substantive RICO claim." *Merrill Lynch*, 1994 WL 88129, at *31 (emphasis in original).

price discrimination that is not alleged here – namely the use of brokerage fees (including bribery) to effectuate price discrimination. Both plaintiffs assert that this issue was resolved in their favor by the Supreme Court in *FTC* v. *Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959). (*See* ES-KO Opp. Br. at 41-42; Sup. Opp. Br. at 31.) But this assertion is incorrect. In *Simplicity*, the Court explained that Congress amended the Robinson-Patman Act by passing 2(c) to address particular forms of price discrimination not previously covered by 2(a), namely "secret discriminations" that result from improper payment of brokerage fees. *Id.* at 68, n.12. Thus, the Court's statement (on which plaintiffs rely) that section 2(c) was intended to "make unlawful certain business practices other than price discrimination," *id.* at 65, cannot properly be understood to read the requirement of discrimination totally out of that section. Rather, the Court specifically explained that section 2(c) was passed to fill a gap in section 2(a) that was permitting certain large buyers to continue to engage in so-called "secret discriminations."[24]

Supreme additionally seeks to rely on a statement by Senator Patman that is cited in footnote 6 in *FTC* v. *Henry Broch & Co.*, 368 U.S. 360 (1962) to support its claim that section 2(c) reaches bribery unrelated to price discrimination. (*See* Sup. Opp. Br. at 32.) But that statement and footnote actually describe section 2(c) as dealing "with the abuse of the brokerage function for purposes of oppressive discrimination." *Id.* (citing H.R. Rep. No. 74-2287 at 14 (1936)).

Not surprisingly, plaintiffs also cite cases from other circuits, which held that conduct of the sort alleged here is actionable. As the Compass Defendants explain in their opening brief, those courts have relied upon little authority – dicta from two Supreme Court opinions and out-of-

---

[24]   "[T]he Federal Trade Commission disclosed that several large chain buyers were effectively avoiding section 2 by taking advantage of gaps in its coverage. Because of their enormous purchasing power, these chains were able to exact price concessions ... which far exceeded any related cost savings to the seller. Consequently, the seller was forced to raise prices even further on smaller quantity lots ... lacking purchasing power to demand comparable advantages, the small independent stores were at a hopeless competitive disadvantage." *Simplicity Pattern Co.*, 360 U.S. at 69.

context legislative history – to expand section 2(c) far beyond its intended reach. (*See* Compass Defs. Mov. Br. at 39.) Moreover, it remains undisputed that the Second Circuit has not decided the question of whether and under what circumstances commercial bribery can form the basis of a claim under section 2(c). (*See* ES-KO Opp. Br. at 52, n.39; *Blue Tree Hotels Inc.* v. *(Canada), Ltd.* v. *Starwood Hotels,* 369 F.3d 212, 221 (2d Cir. 2004)). And the better reasoned cases are those which decline to assume that commercial bribery – absent price discrimination – could violate section 2(c). *See Excel Handbag Co.* v. *Edison Bros. Stores,* 630 F.2d 379, 387 (5th Cir. 1980); *see also Intimate Bookshop, Inc.* v. *Barnes & Noble, Inc.,* 88 F. Supp. 2d 133, 140 (S.D.N.Y. 2000) (Pauley, J.). Consequently, we respectfully request the Court to consider the legislative history of section 2(c) and conclude that it is intended to reach commercial bribery only to the extent it effectuates secret price discriminations.

2.    **Plaintiffs Do Not Have Standing Under Section 4 of the Clayton Act Because They Have Not Alleged They Sustained Antitrust Injury In Connection With Their Section 2(c) Claim**

The Supreme Court has plainly held that losses flowing from lower prices cannot constitute antitrust injury so long as those prices are above predatory levels. *See, e.g., Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 341 (1990). ES-KO's complaint should be dismissed because it alleges that the bribes allowed ESS to underbid plaintiffs. (*See* ES-KO Compl. ¶¶ 23, 247, 263).[25] Supreme's complaint also is subject to dismissal as it is noticeably silent on whether its alleged injury flows from lower, non-predatory prices, but Supreme's answering brief concedes that "the prices the U.N. paid to Compass are not the source of the injury." (Sup. Opp. Br. at 35.) Therefore, whatever injury Supreme may have suffered is not addressed by the federal antitrust laws.

---

[25]    ES-KO does not even respond to the Compass Defendants' demonstration that any injury ES-KO suffered with respect to contracts it won is "umbrella injury" that is not cognizable under the antitrust laws. (*See* Compass Defs. Mov. Br. at 45.)

Plaintiffs are reduced to arguing that they necessarily suffered antitrust injury because they allegedly lost business opportunities due to the alleged bribes. (*See* ES-KO Opp. Br. at 56; Sup. Opp. Br. at 35.) But "lost business" does not necessarily constitute antitrust injury, even if sales were lost due to anticompetitive conduct. *See Atl. Richfield*, 495 U.S. at 338; *see also Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (holding that not every injury causally linked to unlawful conduct is antitrust injury). None of the cases cited by plaintiffs hold that a company that lost business because a competitor used bribes to submit lower bids suffered antitrust injury.[26]

Plaintiffs next argue that *Atlantic Richfield* has no bearing here because it addressed antitrust injury in the context of the Sherman Act rather than section 2(c) of the Robinson-Patman Act. (*See* ES-KO Opp. Br. at 54; Sup. Opp. Br. at 42-43.) This is wrong. *Atlantic Richfield* held: "We have adhered to this principle [that low prices do not give rise to antitrust injury] *regardless of the type of claim involved*." 495 U.S. at 640 (applying same test for antitrust injury under Clayton Act section 7 and Sherman Act section 1) (emphasis added). In *Blue Tree Hotels*, 369 F.3d at 200 (2d Cir. 2004) the Second Circuit relied on *Atlantic Richfield* to define antitrust injury with respect to a section 2(c) claim.

---

[26] The cases Supreme cites are all readily distinguishable. Three involved bribes that induced the purchaser to pay higher prices, *Computer Statistics, Inc.* v. *Blair*, 418 F. Supp. 1339, 1347 (S.D. Tex. 1976) ("principal purpose of the payments … was to induce [purchasing agents] to influence their employers to do business with defendants and at prices acceptable to defendants"), *In Town Hotels Ltd. P'ship* v. *Marriot Int'l, Inc.*, 246 F. Supp. 2d 469, 484 (S.D. W. Va. 2003) ("plaintiffs … allege that as a result of the secret payments … In Town Hotels paid a higher price for goods") and *Envtl. Tectonics* v. *W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1056 (3d Cir. 1988) (plaintiff "decided to investigate the Nigerian government's award of the Kaduna contract to Kirkpatrick … after learning that its bid had been far lower than Kirkpatrick's."). The issue is not raised in the other two cases. *See Falstaff Brewing Corp.* v. *Philip Morris, Inc.*, 1979-2 Trade Cases P 62,184, 1979 WL 1665, at *1 n.1 (N.D. Cal. May 10, 1979) is simply a case about whether the statute of limitations had been tolled and contains no analysis of any issue in controversy here. Defendants in *Pharmacare* v. *Caremark*, 965 F. Supp. 1411 (D. Haw. 1996), did not raise the antitrust injury issue at all, but rather contended that plaintiff lacked standing and advanced other arguments not relevant here.

Finally, plaintiffs suggest the Court must *presume* a competitor of a company that obtains a contract through commercial bribery has suffered antitrust injury. (*See* ESS Opp. Br. at 45; Sup. Opp. Br. at 36.) The Supreme Court rejected this argument in *Atlantic Richfield* where it held that a court *may not* presume an injured plaintiff has suffered antitrust injury even if *per se* unlawful conduct caused the injury. 495 U.S. at 342-43.[27]

### 3. This Court Does Not Have Jurisdiction Over The Robinson-Patman Act Claim

Plaintiffs' opposition briefs do not dispute the crucial point that none of the goods at issue here is alleged to have crossed a state line. ES-KO argues that *Gulf Oil*'s jurisdictional test for section 2(a) is not applicable to a section 2(c) claim, theorizing that the Court has jurisdiction under section 2(c) if just the *bribery payments* crossed a state line. (*See* ES-KO Opp. Br. at 59-60.) But no law supports plaintiffs' theory that the jurisdictional reach of section 2(c) is broader than that of section 2(a). *Rotec Industries, Inc.* v. *Mitsubishi Corp.*, 348 F.3d 1116 (9th Cir. 2003), the sole case plaintiffs rely upon, expressly stated that the 'in commerce' requirement of sections 2(c) and 2(a) are

---

[27] For these same reasons, Supreme lacks standing to assert a claim under sections 1 or 2 of the Sherman Act. (*See* Compass Defs. Mov. Br. at 52-53.) Supreme also does not purport to state a rule of rule of reason claim under section 1 of the Sherman Act because it has not alleged an adverse effect on competition. "The fact that the defendant's actions prevent a plaintiff from competing in a market is not enough, standing alone," to establish injury to competition. *Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (citing *Tops Mkts., Inc.*, v. *Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)). Supreme could recover under the Sherman Act only if it were able to show that ESS's actions had harmed the U.N., which it does not allege. *See Atl. Richfield*, 495 U.S. at 340 ("low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition").

Even the cases Supreme cites support dismissal of the Sherman Act claims for lack of injury to competition. They stand for the proposition that the Sherman Act is implicated "[o]nly where the plaintiff alleges bribery, fraud, or improper selling methods that robbed the ultimate purchaser of the opportunity to choose its product." *Doron Precision Sys., Inc.* v. *FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) (Crotty, J.). *See also Richard Hoffman* v. *Integrated Bldg. Sys.*, 581 F. Supp. 367, 374 (N.D. Ill. 1984) (finding that plaintiff adequately alleged adverse effect on competition where private firm had prepared bid specifications and wrote bid specifications to conform to its own product so it would win the bid, thereby denying the public agency independent judgment in its choice of product); *F. Buddie Contracting* v. *Seawright*, 595 F. Supp. 422 (N.D. Ohio 1984) (finding adverse affect on competition where plaintiff had alleged bribery precluded purchaser from awarding contract to the lowest bidder).

"co-extensive in scope." *Id.* at 1120-21.[28] Moreover, ES-KO's broader test cannot be correct because it would contravene *Gulf Oil*, which made crystal clear that jurisdiction under the Robinson-Patman Act is narrower than jurisdiction under the Sherman Act. *See Gulf Oil Corp.* v. *Copp Paving Co., Inc.*, 419 U.S. 186, 194 (1974). ES-KO's test would turn this result on its head by granting jurisdiction for a section 2(c) claim where there would be no jurisdiction for a Sherman Act claim.[29]

Finally, Supreme incorrectly argues that the Court has jurisdiction because its products were in the "flow of commerce." The law is clear, however, that goods which have never crossed a state border cannot satisfy the "flow of commerce" test any more than they can meet the "in commerce" test.[30]

## B.    Supreme Does Not State Claims Under the Sherman Act

### 1.    Supreme Has Not Alleged a *Per Se* Violation of the Sherman Act

It is settled law that vertical, non-price restraints – such as those alleged here – are not illegal *per se*. *See, e.g., Cont'l T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 57-59 (1977); *Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717, 735-36 (1988) ("a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels"). Supreme ignores a legion of

---

[28]    ES-KO also argues that *Rotec* supports its theory because "the Ninth Circuit found it irrelevant that the contract at issue, to be performed overseas, required equipment to come from the United States." (ES-KO Opp. Br. at 59-60.) But, the equipment at issue there was supplied by a third party, not the plaintiff or defendant, and was wholly incidental to the contract issue. *See Rotec Indus., Inc.* v. *Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1275 (D. Or. 2001). The Ninth Circuit did not hold that interstate movement of goods is irrelevant to section 2(c) jurisdiction.

[29]    According to ES-KO, for example, a U.S. court would have jurisdiction under section 2(c) with respect to a bribe paid between two foreign companies in a foreign country involving foreign goods if the bribe was paid with money transferred from a bank account located in the United States. A court would not have jurisdiction over a Sherman Act claim based on such conduct because bank transfers do not have a significant effect on domestic commerce. *See, e.g., Optimum, S.A.* v. *Legent Corp.*, 926 F. Supp. 530, 533 (W.D. Pa. 1996) ("allegation that income flows between corporations is insufficient to establish the requisite domestic effect").

[30]    The "flow of commerce" test was first enunciated in *Standard Oil Co.* v. *FTC*, 340 U.S. 231, 237-38 (1951). The Court held a temporary storage of goods within a state did not remove those goods from the flow of commerce where they had previously been transported across a state boundary. Plaintiffs' reliance on *Rotec* is unpersuasive because there the Ninth Circuit simply used the phrase "flow of commerce" imprecisely to refer to the general "in commerce" jurisdictional test. *Rotec*, 348 F.3d at 1122.

cases holding that vertical, non-price agreements are not subject to *per se* analysis,[31] as well as numerous cases (cited in its own brief) that evaluate alleged bribery under the rule of reason.[32] None of the cases Supreme cites contradict this well-settled law,[33] and Supreme's attempt to distinguish *Expert Masonry Inc. v. Boone County, Kentucky*, 440 F.3d 336 (2006) also fails.[34]

### 2.    Supreme Has Not Alleged a Relevant Product Market

Supreme cannot avoid the conclusion that it also has no rule of reason claim under the Sherman Act because it has not adequately alleged a relevant product market. Its assertion that it has pled a relevant market comprised of a single purchaser is baseless. (*See* Sup. Opp. Br. at 44.) While it is theoretically possible under exceptional circumstances to plead a single purchaser market, Supreme pleads no facts supporting the conclusion that such circumstances are present in this case.[35]

---

[31]   *See, e.g., United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3rd Cir. 1986) ("An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes [an act without consequence]"); *Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns*, 242 F. Supp. 2d 1350, 1361 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1065 (11th Cir. 2004) (non-competitor only violates section one if it enters a conspiracy already existing between two or more competitors"); *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741 747 (D. Md. 1997) (bid "rigging claim" not a *per se* violation where purported conspirators were not actual or potential competitors); *MHB Distrib., Inc. v. Parker Hannifin Corp.*, 800 F. Supp. 1265, 1268 (E.D. Pa. 1992) ( "bid rigging" claim not a *per se* violation because it was not horizontal and there was no agreement on price of price levels); *United States v. Ashland-Warren*, 537 F. Supp. 433, 445 (M.D. Tenn. 1982) (bid rigging schemes are useless unless the offending group consists of competitors).

[32]   *See, e.g., Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1382 (D. Conn. 1988) (evaluating alleged bribery under rule of reasons analysis); *Hoffman*, 581 F. Supp. at 373 (same); *F. Buddie Contracting*, 595 F. Supp. at 436 (same).

[33]   *Chambers Development Co., Inc. v. Browning-Ferris Industries*, 590 F. Supp. 1528, 1542 (W.D. Pa. 1984) found the alleged bribery in that case was *per se* unlawful because it resulted in a vertical, price fixing conspiracy, which is not alleged here. *City of Atlanta v. Ashland-Warren, Inc.*, 1982-1 Trade Cases P 64,527, 1981 WL 2187, at *3 (N.D. Ga. Aug. 20, 1981) held a conspiracy was *per se* unlawful because it forced bidders to include a third party, which the court found to be analogous to the *per se* violations of reciprocal dealing or tying arrangements. Finally, *AMEC E & C Services, Inc. v. Nu-West Industries, Inc.*, 395 F. Supp. 2d 957, 960 (D. Idaho 2005) recognized that sharing information is not a *per se* violation.

[34]   In *Expert Masonry*, the Sixth Circuit held that the alleged conspiracy between a buyer and one the bidders was not a *per se* violation because it was *transparently vertical in nature* and did not fall within any of the narrow categories of *per se* unlawful conduct. 440 F.3d at 445.

[35]   The exceptional market conditions required for a single purchaser relevant market is illustrated by the cases Supreme cite. In *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 90 (E.D.N.Y. 1981), the court found aircraft-carrier based aircraft, which are made solely for the U.S. government and are distinct from aircraft made for other

Here, a single purchaser market would exist only if the food rations sold to the U.N. were distinct from the food rations sold to others and the vendors concentrated their efforts almost exclusively on the U.N. *See T. Harris Young & Assocs., Inc.* v. *Marquette Elecs.*, 931 F.2d 816, 824-825 (11th 1991); *Smith* v. *Multi-Flow Dispensers of Ohio, Inc.*, 1999-1 Trade Cases P 72,535, 1999 WL 357784, at *3 (6th Cir. May 14, 1999). Nothing plaintiffs allege indicates that products sold to the U.N. are distinct from those sold to other purchasers for delivery in harsh environments, including the military, other multinational forces, and private commercial enterprises such as oil companies, mining companies, and others whose employees are working in remote locations throughout the world. Indeed, Supreme's complaint itself identifies it as "a world leader in food supply for military and multinational forces." (Sup. Am. Compl. ¶ 2.)

The fact that only U.N. approved vendors may bid on U.N. contracts does not support a single purchaser market. The notion that a relevant market can be based on a single purchaser's unilateral and discretionary decision to restrict its suppliers is nonsense and unsupported by any law.[36] Accordingly, dismissal of Supreme's claims under sections 1 and 2 of the Sherman Act is warranted. *See Lockheed Martin Corp.* v. *Boeing Co.*, 314 F. Supp. 2d 1198 (M.D. Fla. 2004) (holding that plaintiff did not allege an evolved expendable launch vehicle ("EELV") developed for the Air Force was a relevant market because plaintiff did not allege any distinction between the EELVs sold to the government and those sold to commercial buyers of launch services).

---

aircraft purchasers, constitutes a relevant market. In *Tower Air, Inc.* v. *Fed. Express Corp.*, 956 F. Supp. 270, 281 (E.D.N.Y. 1996), the court found civilian air support to the Military Air Command to augment existing military capabilities in a time of national emergency *might* constitute a relevant market.

[36] According to Supreme's theory, for example, if a mom-and-pop grocer decided to buy bread from a single bakery, that bakery would have monopoly power in a single purchaser market even if 100 other bakeries stood ready as alternative suppliers. This would be an absurd result because the small grocer, like the U.N., could always choose to deal with a different supplier to avoid monopoly overcharges.

**3.     Supreme Has Not Pled Adequately that Defendants Attempted to Monopolize the Relevant Market or Conspired to Monopolize the Market**

Dismissal of Supreme's claim that ESS attempted to monopolize the market is also warranted because Supreme has not alleged – and cannot allege – facts supporting the conclusion that there is a dangerous probability of monopolization by ESS.

Supreme argues that it is has alleged a dangerous probability of monopolization by pleading that: (1) there is a high barrier to entry because the U.N. only purchases from companies that it certifies; and (2) ESS achieved a fifty percent market share. (*See* Sup. Opp. Br. at 53.) But this "barrier to entry" would not permit the exercise of monopoly power because the U.N. could always certify additional competitors if it experienced insufficient competition. It also could award contracts to a different company to prevent ESS from obtaining too much of its business. And a 50% market share is sufficient to support a finding of market power only if there are other indicia supporting a dangerous probability of monopolization, which plaintiff cannot allege here. *See Kelco Disposal* v. *Browning-Ferris Indus. of Vt.*, 845 F.2d 404, 409 (2d Cir. 1988) (holding that a market share above fifty-five percent is only sufficient to show a dangerous probability of monopolization if other factors are present, such as barriers to entry, weak competition, eventual developments of the market, or inelasticity of consumer demand). A plaintiff cannot, in any event, calculate a market share by cherry picking an isolated and transitory time period and ignoring all other competitive activity – which is all that Supreme has done here.

Supreme's failure to plead a dangerous probability of monopolization also requires dismissal of its conspiracy to monopolize claim because – absent a dangerous probability of success – ESS could not have had specific intent to monopolize. *See Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer*, 1996-2 Trade Cases P 71,570, 1996 WL 455011, at \*6 (S.D.N.Y. Aug. 13, 1996) (Patterson, J.), *aff'd*, 129 F.3d 240 (2d Cir. 1997) (finding that defendants could not have had the

27

specific intent to monopolize because the conspiracy could not have resulted in monopoly power).
Supreme argues that intent can be inferred solely from its allegations of anticompetitive or
exclusionary conduct.[37]    (*See* Sup. Opp. Br. at 47.)    The cases, moreover, do not support this
argument.[38]    Accordingly, dismissal is warranted.

### 4.    The Court Has No Jurisdiction to Hear Supreme's Sherman Act Claim

Contrary to Supreme's argument, the fact the U.N. is headquartered in New York
does not mean that it is a "domestic consumer" or that domestic commerce was directly,
substantially, and reasonably foreseeable affected.[39]    The U.N. is not a U.S. entity. Neither it nor its
non-U.S. employees are taxed. *See* Rev. Rul. 73-198, 1973-1 C.B. 425. And, the fact that U.S.
courts have limited legal jurisdiction over the U.N. has no bearing on whether the conduct had a
substantial effect on domestic commerce because legal jurisdiction and impact on domestic

---

[37]    Supreme cites *Alco Standard Corp.* v. *Schmid Bros., Inc.*, 647 F. Supp. 4, 6 (S.D.N.Y. 1986) (Leisure, J.), for the proposition that to withstand a motion to dismiss, a plaintiff need only identify the co-conspirators and describe the nature and effect of the alleged conspiracy. But *Alco* addressed the pleading standard for a section 1 conspiracy and does not address the pleading standard for intent to monopolize, which is required under section 2. Supreme also cites to *Alco Standard* for the proposition that "[a] perceived unlikelihood that [plaintiff] can actually prove the allegations of the [complaint] is no basis for dismissing [it] under Rule 12(b)(6)." *Id.* at 6 (citation and internal quotations omitted). But defendants are not arguing whether there is a perceived likelihood that plaintiffs will be unable to prove intent to monopolize, rather defendants are arguing plaintiffs have not alleged there is *any* possibility a monopoly could be obtained.

[38]    In *Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988), the Second Circuit held that "proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, *may be used to infer* the second element, specific intent to monopolize." (emphasis supplied). But Supreme has offered no proof of anticompetitive conduct. Moreover, any inference that could be made from Supreme's allegation of anticompetitive conduct is overridden by its failure to allege a dangerous probability of success. In *Tops Markets, Inc.* v. *Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998), the court found that plaintiffs had presented proof of specific intent, which included defendants own words that they intended to exclude plaintiff from the market. No such allegations are made here.

[39]    Supreme cites to *United States* v. *Melekh*, 190 F. Supp. 67, 87 n.1 (S.D.N.Y. 1960) (Herlands, J.) for the proposition that the U.N. is a domestic consumer. But this court simply holds that the U.N. is an international person.

commerce are two separate issues.[40]  Similarly, whether the alleged bribes occurred in New York has

no bearing on the jurisdictional analysis.[41]

---

[40]  For example, under the International Antibribery and Fair Competition Act, 15 U.S.C. §§ 78a, 78dd-1 to 78dd-3 (1998), U.S. courts have jurisdiction over U.S. companies that bribe foreign officials where there is no impact on domestic commerce and there could not be jurisdiction under the FTAIA.  *Id.* §§ 78dd-1(g)(1), 2(i)(1).

[41]  The cases Supreme relies upon do not support finding jurisdiction here.  In *United States* v. *Anderson*, 326 F.3d 1319, 1330 (11th Cir. 2003), there were significant domestic effects that do not exist here: (1) U.S. companies had submitted bids; (2) the purchaser was the U.S. government; (3) the construction projects were paid with U.S. taxpayer money; (4) the contracts provided that the equipment and materials used to complete the construction projects must be, and were indeed, purchased in the United States; and (5) the equipment and materials were shipped from New Orleans on American freighters.  In *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006-1 Trade Cases P 75,163, 2006 WL 515629, at *3 (N.D. Cal. Mar. 1, 2006), the defendants' conspiracy had a significant effect on domestic commerce because it inflated the prices for DRAM in the United States. Similarly, the court found a significant effect on domestic commerce in *MM Global Servs., Inc.* v. *Dow Chem. Co.*, 329 F. Supp. 2d 337, 342 (D. Conn. 2004) because a conspiracy among some of the largest chemical manufacturers in the world to fix minimum resale prices and other terms of sale inflated prices of goods sold into the U.S.

**Conclusion**

For all of the reasons stated above, the Compass Defendants' Motion to Dismiss

ES-KO's and Supreme's RICO and Antitrust Claims should be granted.

Dated:  New York, New York
        September 29, 2006

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____
        Richard A. Rosen (RR-5132)
        Kenneth A. Gallo (member of D.C. bar; not admitted in
        U.S.D.C.-S.D.N.Y.)
        Amir Weinberg (AW-3368)
        Jonathan M. Lave (member of D.C. bar; not admitted in
        U.S.D.C.-S.D.N.Y.)
        Ayanna S. Williams (not admitted in U.S.D.C.-S.D.N.Y.)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000


*Attorneys for the Compass Defendants*
*Compass Group PLC, ESS Support Services Worldwide, Eurest*
*Support Services (Cyprus) International Limited, Steve Kemp, Len*
*Swain* and *Steve Bickerstaff*