**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED

07 MAY 14  PM 8: 13

U.S. DISTRICT COURT
S.D.N.Y.

---

SUPREME FOODSERVICE AG,

          Plaintiff,

     v.

IHC SERVICES, INC., EZIO TESTA,
ANGELITA QUINTEROS,
GIANDOMENICO PICCO, TORNO
INTERNAZIONALE S.P.A., TORNO S.A.H.,
DARIO FISCHER, ENGELBERT
SCHREIBER, JR., ALLIANCE
INVESTMENT DEVELOPMENT LTD.,
ALEXANDER YAKOVLEV, MOXYCO,
LTD., VLADIMIR KUZNETSOV, NIKAL,
LTD., DMITRY YAKOVLEV AND OLGA
YAKOVLEV,

          Defendants.

---

**SECOND AMENDED COMPLAINT AND
JURY DEMAND**

**Case No. 06-CV-1759 (PKC)**

---

Plaintiff, Supreme Foodservice AG ("Supreme"), for its Second Amended Complaint

against Defendants, IHC Services, Inc. ("IHC"), Ezio Testa, Angelita Quinteros, Giandomenico

Picco, Torno Internazionale S.P.A., Torno S.A.H., Dario Fischer, Engelbert Schreiber, Jr.,

Alliance Development Ltd., Alexander Yakovlev ("Yakovlev"), Moxyco, Ltd. ("Moxyco"),

Vladimir Kuznetsov, Nikal, Ltd. ("Nikal"), Dmitry Yakovlev ("Dmitry") and Olga Yakovlev

("Olga") alleges on knowledge with respect to itself and its own conduct, and upon the basis of

information and belief as to all other matters:

## I.    INTRODUCTION

1.    For more than five years, Defendants engaged in an illegal scheme involving wire fraud and bribery to rig the award of U.N. ("U.N.") contracts for the provision of goods and services, including food rations to U.N. peacekeeping forces around the world.  This conspiracy corrupted the U.N. and defrauded the U.N.'s member states.  It contaminated a bidding process designed to be free and fair, and it cheated Plaintiff Supreme out of foodservice contracts that could be worth in excess of $350 million.  The Defendants' disgraceful conduct violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act and New York State's Donnelly Act, and their conduct tortiously interfered with Plaintiff Supreme's prospective economic advantage and business relations.

2.    Plaintiff Supreme, a world leader in food supply for military and multinational forces, brings this action to recover damages from Defendants' massive conspiracy.  Plaintiff also seeks injunctive relief to prevent the reoccurrence of the unlawful and criminal acts of Defendants.

3.    Defendant IHC was at the center of a web of corruption in which IHC acted as the facilitator for corrupt vendors willing to pay bribes to obtain U.N. contracts to provide goods and services.  While IHC called itself a "vendor intermediary," it was actually a bagman that arranged and facilitated millions of dollars in bribes that ensured that contracts worth hundreds of millions of dollars would be "won" by IHC's clients.

4.    One of IHC's corrupt clients was Compass Group, the largest foodservice company in the world, and a direct competitor of Supreme for U.N. contracts for the provision of food rations to peacekeeping missions around the world.  Compass Group sought and was awarded such contracts through its division ESS (a/k/a Eurest Support Services).  Compass Group, ESS and all of Compass's divisions, affiliates and subsidiaries are herein collectively

2

referred to as "Compass".

5.      From 2000 through 2005, Compass "won" U.N. contracts that could be worth in excess of $350 million by bribing Defendant Alexander Yakovlev, a U.N. official, to manipulate the U.N.'s top-secret bidding procedures in favor of Compass.

6.      Compass, by its employees, including Peter Harris, Andrew Seiwert, Doug Kerr, Steve Kemp and Len Swain, concealed from the U.N. its illegal payments to Defendant Yakovlev, amounting to at least several hundred thousand dollars, by making them through Defendant IHC.

7.      Defendant IHC gave Defendant Yakovlev cash payments to rig bids for Compass. In furtherance of the bribery and bid-rigging scheme, Defendant Ezio Testa, Defendant IHC's Chief Executive Officer ("CEO"), hired Defendant Yakovlev's son to work at Defendant IHC's headquarters in New York City.

8.      As Defendant Yakovlev amassed wealth from illegal payments, he enlisted the help of Defendant Vladimir Kuznetsov, a fellow Russian national working at the U.N. Defendant Kuznetsov received at least several hundred thousand dollars in return for his assistance, which began in approximately 2000 or earlier.

9.      Defendants' scheme to corrupt the U.N., defraud its member states and swindle Plaintiff Supreme and other U.N. vendors out of profits they otherwise would have earned was first exposed on August 8, 2005, when Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken at least approximately $1 million in bribes relating to U.N. procurement contracts and the Oil-for-Food program. That same day, U.N. Secretary-General Kofi Annan stripped Defendant Yakovlev of his diplomatic immunity and the United States

3

Attorney's Office for the Southern District of New York charged Defendant Yakovlev with conspiracy to commit wire fraud, wire fraud and money laundering in connection with Defendant Yakovlev's role as a U.N. procurement officer between the years 1993 and 2005. Defendant Yakovlev pleaded guilty to all three crimes before the Honorable William H. Pauley, United States District Judge for the Southern District of New York.

10.    Soon after Defendant Yakovlev's plea, news of Defendant Kuznetsov's complicity became public. In early September 2005, U.N. Secretary-General Kofi Annan waived Defendant Kuznetsov's diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with conspiracy to commit money laundering. In March 2007 Kuznetsov was convicted of conspiring to commit money laundering as part of a bribery and bid-rigging scheme involving Defendant Yakovlev, among others. This conviction was rendered pursuant to a jury trial before the Honorable Debra A. Batts, United States District Judge for the Southern District of New York. Defendant Yakovlev, who admitted that he accepted illegal payments from U.N. vendors, was the central witness for the prosecution at the trial.

11.    Defendants' bid-rigging conspiracy succeeded in snatching multiple U.N. contracts, including a contract worth in excess of $62 million for the provision of food rations to U.N. peacekeeping forces stationed in Liberia (the "Liberia Rations Contract"). To secure the Liberia Rations Contract, Compass used top-secret, highly-confidential U.N. information illegally obtained from Defendant Yakovlev. When the news media reported this scandal in October 2005, the U.N. removed Compass and Defendant IHC from its approved vendor list and began an investigation into the relationship between Compass, Defendant IHC and the U.N.

12.    Also in October 2005, Compass announced that it had launched a full-scale investigation into the circumstances surrounding Compass's procurement of U.N. contracts. It hired Freshfields Bruckhaus Deringer and Ernst & Young to lead the investigation. Less than one month later, Compass terminated the employment of Peter Harris, Andrew Seiwert and Doug Kerr because of their participation in Defendants' scheme to bribe Defendant Yakovlev to obtain U.N. contracts for Compass.

13.    Compass has failed to admit publicly the depth of corruption within its ranks. Compass neglected to disclose the involvement of at least two executives – Steve Kemp and Len Swain – in its fraudulent scheme. In April 2005, Seiwert forwarded an e-mail from Defendant Yakovlev to Kemp and Swain that included information labeled "strictly confidential, not for release outside of the U.N." This confidential information described Compass's poor performance on a contract for the provision of food rations to peacekeepers in Burundi (the "Burundi Rations Contract"). Defendant Yakovlev sent the confidential information to Compass so that Compass could take steps to prevent the cancellation of Compass as a supplier for the Burundi Rations Contract. The Burundi Rations Contract was worth as much as $111 million, including optional add-ons. Supreme had bid on the Burundi Rations Contract and lost it to Compass.

14.    Defendants' bribery and bid-rigging scheme violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act, New York State's Donnelly Act, the Robinson-Patman Act and the common law.

15.    Defendants, by their illegal conduct, not only corrupted the U.N. and defrauded the U.N.'s member states, including the United States, but Defendants also swindled Plaintiff

Supreme out of profits it would have earned from U.N. food rations contracts that could be worth in excess of $350 million.

## II.   JURISDICTION

16.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under 18 U.S.C. § 1964(c) of the RICO Act, which provides federal jurisdiction for injuries resulting from RICO violations.

17.   This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, because Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c) and Section 4 of the Clayton Act, 15 U.S.C. § 15, provide federal jurisdiction for claims arising under the antitrust laws.  The Sherman Act applies because the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a, makes the Sherman Act applicable to foreign trade or commerce having a direct, substantial and reasonably foreseeable effect on domestic trade or commerce.

18.   This Court also has jurisdiction pursuant to Article III, Section 7 of the Agreement between the U.N. and the United States of America Regarding the Headquarters of the U.N., 61 Stat. 758, which provides that federal courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district, as provided in applicable federal, state and local laws.

19.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), in that the RICO, Sherman Act and Robinson-Patman claims arise under the laws of the United States and the state-law claims are so related to the RICO, Sherman Act and Robinson-Patman claims that they form part of the same case or controversy.

### III.    TRADE AND COMMERCE

20.    The U.N. has established a Procurement Service at U.N. Headquarters in New York City, located at 304 East 45th Street, New York, New York.  The Procurement Service handles procurement for U.N. peacekeeping missions worldwide, the various departments and offices of the U.N. Secretariat in New York and other U.N. offices, organizations, regional commissions and departments worldwide.

21.    In 2003, the U.N. purchased more than 822 different categories of goods and services representing a total value in excess of $891 million.  Of this total, more than $41 million was spent on food rations and catering services in 2003.

22.    Vendors from around the world, including vendors located in the United States, apply to become U.N.-approved vendors.  These applications are sent to and evaluated by the Procurement Service at U.N. Headquarters in New York.

23.    The Procurement Service also solicits bids for U.N. contracts, including food rations contracts.  Requests for proposals and invitations to bid are issued from the Procurement Service at U.N. Headquarters in New York.

24.    Vendors bidding on U.N. contracts submit sealed bids to the Procurement Service at U.N. Headquarters in New York.  The Procurement Service opens these bids at the U.N. Headquarters in New York.

25.    Compass retained Defendant IHC, whose headquarters is in New York City, as its so-called "vendor intermediary" so that Defendant IHC could assist it with Compass's bid submissions to the Procurement Service at U.N. Headquarters in New York.

26.    The U.N. releases payments to vendors providing goods and services, including vendors providing food rations, from an account in New York.

27.     The submission, evaluation and award of bids and the management of procurement contracts by the U.N. at its Headquarters in New York represent substantial and significant commerce in New York City.  Defendants' anti-competitive and unlawful conduct, described more fully below, had a direct, substantial and reasonably foreseeable effect on trade and commerce occurring in this District, and such effect gives rise to Plaintiff Supreme's Sherman Act claim set forth below.  Plaintiff's injuries are not independent of the effects of Defendants' anti-competitive and unlawful conduct on United States commerce.

## IV.     RELEVANT MARKET

28.     Vendors interested in supplying food to U.N. peacekeeping missions must participate in a competitive bidding process administered by the Procurement Service at U.N. Headquarters in New York.  The U.N. sets specific requirements for its contracts, and it seeks bids to supply food rations to peacekeeping missions only from qualified vendors.

29.     No reasonable substitute exists for the supply of food rations to U.N. peacekeeping missions.  Before a food vendor may be invited to bid on a food rations contract, it must become a U.N.-approved vendor.  Before it may be awarded a U.N. food rations contract, a food vendor must be invited to bid and it must submit a response to a formal request for a proposal (an "RFP") for a food rations contract.  An entity wishing to become a U.N.-approved vendor must submit an application to the U.N. and establish that it meets the U.N.'s technical requirements.

30.     The relevant product market for antitrust purposes is the market for the supply of food rations to U.N. peacekeeping missions.  The relevant geographic market is global.

## V.    THE PARTIES

### A.    Plaintiff Supreme

31.    Plaintiff Supreme, headquartered in Switzerland, is a U.N.-registered, global foodservice company specializing in the provision of foodservice to organizations in regions of crisis. It is a world leader in food supply for military and multinational forces, and has more than 45 years of experience in the food supply business. Plaintiff Supreme has provided foodservice to numerous multinational military and governmental organizations, including the U.N., and has also provided foodservice to numerous national military forces, including the United States military. Plaintiff Supreme currently has a five-year, contract worth nearly $1.5 billion with the United States to provide food rations to military forces in Afghanistan. Plaintiff Supreme is a signatory to the U.N. Global Compact. It regularly conducts business in New York by submitting bids for food rations contracts to the U.N. Headquarters in New York City.

32.    Plaintiff Supreme is the parent and successor-in-interest of Supreme Sales GmbH, a wholly-controlled subsidiary that succeeded Alfred Orenstein Gbr, an entity that began providing deliveries of food rations to U.S. military forces stationed in Germany in the late 1950s. (Supreme, Supreme Sales GmbH and Alfred Orenstein Gbr are collectively referred to herein as "Supreme".)

### B.    Defendant IHC

33.    Defendant IHC is a corporation doing business in New York with its base of operations at 192 Lexington Avenue. While IHC has sold some goods directly to the U.N., it mainly operated as a so-called "vendor intermediary." In such capacity, IHC helped other companies obtain lucrative U.N. contracts. During the relevant period of this complaint, IHC had approximately five employees, including Defendants Testa, Quinteros, and Dmitry Yakovlev, son of U.N. procurement officer Defendant Yakovlev.

9

### C.  Defendant Ezio Testa

34.     Defendant Ezio Testa was President and CEO of IHC from approximately 2003 through approximately 2005.  Defendant Testa is currently an IHC board member.

### D.  Defendant Angelita Quinteros

35.     Defendant Angelita Quinteros, also known as Angelita Castro ("Quinteros"), was a Vice-President of IHC Services, Inc. from in or about 1998 through June 3, 2005, and actively assisted IHC in perpetrating its role in the bribery and bid-rigging scheme. Quinteros maintains a residence in Staten Island, New York.

### E.  Defendant Giandomenico Picco

36.     Defendant Giandomenico Picco ("Picco") is a veteran U.N. diplomat who worked at the U.N. initially from 1973 until 1992.  Picco then served as a Chairman of IHC's Board of Directors during the period from as early as 1997 through 2001, and he continued to assist IHC and its "clients" thereafter in matters that are the subject of this action, and actively assisted IHC in connection with IHC's bribery and bid-rigging scheme.  During part of this same period, Picco commenced a second period of U.N. employment as U.N. Under-Secretary and personal representative of U.N. Secretary-General Kofi Annan.  Picco maintains a residence in New York, New York.

### F.  Defendant Torno Internazionale S.p.A.

37.     Defendant Torno Internazionale S.p.A., formerly known as Torno S.p.A., ("Torno S.p.A.") is a national construction and civil engineering company, incorporated under the laws of Italy with an office in Milan, Italy.  In 1998, or shortly thereafter, Torno S.p.A. purchased the recently merged International Manufacturing and Equipment Company (IMECO) and Hofortech, known after merger as IHC, from its majority shareholder, Ernest Ulrich.  Prior to Torno S.p.A.'s acquisition of IHC, IHC had not done any business with the U.N.

### G.     Defendant Torno S.A.H.

38.     Defendant Torno S.A.H. ("Torno") is a corporation organized under the laws of Luxembourg, with offices in Luxembourg. Since at least June 3, 2005, Torno uses the same business address as another IHC entity, IHC Services S.r.l. in Milan. During the relevant period, Torno, which is a holding company for the owners of IHC, controlled IHC through its ownership of 100% of IHC's common stock. Prior to June 3, 2005, Torno was majority owned by Defendants Dario Fischer ("Fischer") and Engelbert Schreiber, Jr. ("Schreiber"), and/or Torno S.p.A. Both Torno and Torno S.p.A., through Defendant Dario Fischer and otherwise, were aware of the bribery and bid-rigging scheme and benefited from IHC's role in the bribery and bid-rigging scheme.

### H.     Defendant Dario Fischer

39.     Defendant Dario Fischer is an Italian lawyer and entrepreneur who, inter alia, has acted as liquidator of various Torno entities. He was a Director of IHC from in or before 1998 through June 3, 2005. During the relevant period, Fischer controlled IHC through, among other means, his ownership and control of Torno and/or Torno S.p.A., and actively assisted IHC in perpetrating its role in the bribery and bid-rigging scheme. Fischer maintains a residence in Milan, Italy.

### I.     Defendant Engelbert Schreiber, Jr.

40.     Defendant Engelbert Schreiber, Jr. controlled IHC during part or all of the relevant period through, among other means, his ownership and control of Torno and/or Torno S.p.A., and actively assisted IHC in perpetrating its role in the bribery and bid-rigging scheme. Schreiber has business ties to Ahmed Idris Nasreddin, who reportedly has served as a money launderer for Al Qaeda. Schreiber resides in Vadus, Liechtenstein.

### J.    Defendant Alliance Investment Development Ltd.

41.    Defendant Alliance Investment Development Ltd. ("Alliance"), a corporation incorporated under the laws of the British Virgin Islands, and headquartered in the British Channel Islands, acquired IHC from Torno as of June 3, 2005.  Alliance was incorporated under the name Strategic International Alliance Limited and changed its name to "Alliance Investment Development Ltd." on the date preceding its acquisition of IHC.

### K.    The IHC Defendants

42.    The Defendants named in paragraphs 33 to 41 shall be collectively referred to as the "IHC Defendants."  The IHC Defendants are named as defendants herein based, inter alia, on their control of IHC in the bribery and bid-rigging scheme, and/or their role in actively participating or assisting in the scheme, and/or their role in hiding and covering up the scheme, and/or otherwise benefiting from the scheme.

### L.    Defendant Alexander Yakovlev

43.    Defendant Yakovlev is a Russian citizen living in Yonkers, New York who was employed at the U.N. from 1985 to 2005.  Beginning in at least 1998 through June 22, 2005, Defendant Yakovlev played a major role within the U.N. as a senior procurement officer in the U.N.'s Procurement Service and possessed substantial authority to affect the U.N.'s selection of a winning bidder, the U.N.'s response to allegations of service problems by a vendor and the U.N.'s decision whether to grant advantageous price adjustments to a vendor during the performance of a contract.

44.    Defendant Yakovlev was responsible for the U.N.'s award of the Liberia Rations Contract, the Burundi Rations Contract and other, if not all, food supply contracts Compass won.

### M.    Defendant Moxyco

45.     Defendant Yakovlev established Defendant Moxyco, an off-shore company, in or about 2000.  Soon thereafter, Defendant Yakovlev opened an account for Defendant Moxyco at Antigua Overseas Bank Limited ("Antigua Overseas") to facilitate the transfer and concealment of illicit payments.

### N.    Defendant Vladimir Kuznetsov

46.     Defendant Vladimir Kuznetsov is a former U.N. official.  Beginning no later than 2000, Defendant Kuznetsov served on the U.N.'s Advisory Committee on Administrative and Budgetary Questions.  Beginning on or about January 1, 2004, he served as Chairman of this Committee.  Prior to his arrest in September 2005, Defendant Kuznetsov was the highest-ranking Russian diplomat at the U.N.  He was convicted in March 2007 of conspiring to launder illegal proceeds with Defendant Yakovlev.  Defendant Yakovlev was the central government witness at his trial.

### O.    Defendant Nikal

47.     Defendant Kuznetsov established Defendant Nikal, an off-shore company, in or about 2000.  Soon thereafter, Kuznetsov opened a bank account for Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco. Defendant Kuznetsov opened this offshore bank account as part of the bribery and bid-rigging scheme that corrupted the U.N.

### P.    Defendant Dmitry Yakovlev

48.     Defendant Dmitry is Defendant Yakovlev's son.  Defendant Dmitry lives in Yonkers, New York.  On or about May 2000, Defendant IHC hired Defendant Dmitry, pursuant to Defendant Yakovlev's request, to work in IHC's New York City headquarters.  Defendant Dmitry was employed by IHC from approximately May to August 2000 and 2001 and from

approximately December 2002 to December 2003. During his employment with IHC, Defendant

Dmitry served as a conduit through which confidential United Nation information was

transferred between and among Defendants Yakovlev, Testa and IHC.

### Q.    Defendant Olga Yakovlev

49.    Defendant Olga is the wife of Defendant Yakovlev. Defendant Olga received

transfers of cash to her Swiss bank account from Moxyco's offshore account, which is the

account Defendant Yakovlev used as the storehouse for cash he obtained through the bribery and

bid-rigging scheme described herein.

### VI.    IHC'S CO-CONSPIRATORS

50.    The IHC Defendants were assisted in their corrupt activities by IHC clients

(including those clients' officers, agents and employees) that paid bribes and committed other

overt acts in furtherance of IHC's bribery and bid-rigging scheme. These IHC clients included

the following co-conspirators of IHC, collectively referred to herein as the "Compass Co-

Conspirators." (Although Supreme had previously asserted claims against these co-conspirators,

Supreme has dismissed its claims against them pursuant to a confidential settlement agreement,

which Compass has described as amounting to a sum less than $75 million.)

### A.    Compass Group

51.    Compass Group is the twelfth largest employer in the world. It has 400,000

employees and annual revenues in excess of $21 billion. It is headquartered in the town of

Chertsey in Surrey, United Kingdom.

52.    Compass Group has foodservice contracts with the United States government –

including at least one contract to provide foodservice to a federal courthouse – and it owns

several restaurants in New York City, including The Brasserie, Sea Grille, Tropica, Naples 45,

Macy's Cellar Bar & Grill and Cucina & Co. Compass provides catering services to some of

New York City's most popular attractions, including the American Museum of Natural History, Carnegie Hall, the Central Park Zoo, the Intrepid Sea, Air and Space Museum, Lincoln Center, The Metropolitan Museum of Art and the Guggenheim Museum.

### B.    ESS

53.    ESS, also known as  Eurest Support Services, is a division of Compass Group that specializes in providing services to remote sites, defense locations and off-shore locations, including areas patrolled by U.N. peacekeeping forces.  It is managed and operated by Compass Group at its offices in the United Kingdom.  Before its contracts had been terminated and it was de-registered as a U.N. vendor,  ESS regularly conducted business in New York by submitting bids for food rations contracts to the U.N. Headquarters in New York City.  ESS Support Services Worldwide and Eurest Support Services (Cyprus) International Limited are divisions of Compass Group or ESS through which these entities conduct business operations.

### C.    Peter Harris

54.    Prior to the termination of his employment from Compass in November 2005, Peter Harris was a member of Compass's senior management team and sat on the Board of Compass as a Director.  He was the CEO of Compass's United Kingdom and Ireland, Middle East and Africa divisions, and he was also the Chief Executive Officer of Defendant ESS.  Harris held these positions when Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

### D.    Andrew Seiwert

55.    Prior to the termination of his employment in November 2005, Andrew Seiwert was a senior executive for business development at ESS.  Seiwert may also be known as Markus or Marcus Andreas Seiwert.  He was Compass's main liaison with the U.N. Procurement Service, regularly meeting with Defendant Yakovlev to discuss business issues.  Seiwert

performed this function when Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

### E.    Doug Kerr

56.    Doug Kerr, an executive of Compass who worked directly with Seiwert to prepare Compass's bids for the U.N., was terminated from Compass in November 2005.

### F.    Steve Kemp

57.    Steve Kemp was the Regional Operations Director for ESS during the relevant time period. He was responsible for Compass's performance of U.N. food rations contracts.

### G.    Len Swain

58.    Len Swain was responsible for Compass's purchases in connection with Compass's performance on its rations contracts with the U.N. during the relevant time period.

## VII.    UNITED NATIONS RATIONS CONTRACTS

59.    The market for U.N. rations contracts is a difficult market for vendors to enter. The U.N.'s standards are very high and, since the performance of procurement services are critical to peacekeeping missions, the U.N. does not welcome unproven entrants. Hence, relationships with the U.N. take many years to build.

60.    Plaintiff Supreme has been providing service to the U.N. since the 1970s, when it delivered supplies to U.N. missions in the Middle East. In 1993, Plaintiff Supreme won a U.N. contract for the provision of food rations to 2,500 U.N. peacekeeping forces stationed in Mozambique. Also in that year, Plaintiff Supreme won a rations contract for peacekeeping forces stationed in Croatia and Bosnia-Herzegovina ranging in size from 6,500 to 10,000 troops. From 1998 to 1999, Plaintiff Supreme provided food rations to a U.N. facility in Lebanon, and from 1999 to 2000, Plaintiff Supreme provided catering and food supply service to a U.N.

facility in East Timor. As of the second half of 2005, when the U.N. launched an investigation

into defendants' bribery and bid-rigging scheme, Plaintiff Supreme was providing foodservice

and catering to U.N. peacekeepers in the Ivory Coast and catering and retail services to U.N.

staff in Afghanistan.

61.     Compass entered the market for the provision of food rations to U.N.

peacekeeping forces when it became a U.N-registered vendor in approximately 2000. Shortly

thereafter, Compass won a contract for the first bid it submitted to the U.N. – a contract for the

provision of food rations to peacekeeping forces in East Timor. Despite the U.N.'s longstanding

practice of requiring bidders to prove themselves over time, Compass's business with the U.N.

grew at a torrid pace from the moment Compass entered the market for food rations contracts.

62.     Compass hired Defendant IHC to be its so-called "vendor intermediary" for most,

if not all, of its bid submissions.

63.     The legitimacy of vendor intermediaries is highly suspect. The U.N. has issued

the following statement concerning the use of such intermediaries:

> There are indications that certain parties have approached prospective vendors
> offering to act as intermediaries in dealings with the U.N. Some of these
> intermediaries purport to have various arrangements with the U.N., or to possess
> support facilities within UN missions or projects which can place a vendor in a
> more advantageous position in a competitive bidding exercise.

> Vendors are advised that the UN prefers to deal directly with principals to the
> extent possible. Vendors are therefore urged to consult with the Procurement
> Service before deciding to submit offers or negotiate contracts through any
> intermediary.

64.     Compass, through its employees, paid Defendant IHC millions of dollars to be its

so-called "vendor intermediary" for its U.N. contracts.

65.     Since 2000, with the help of Defendant IHC, Compass won U.N. contracts for the

provision of food rations to peacekeeping forces in Sudan, East Timor, Liberia, Burundi, Eritrea,

Lebanon, Cyprus and Syria. As of October 2005, Compass serviced approximately 50% of the market for peacekeeping rations contracts. Compass's foodservice contracts could be worth in excess of $350 million.

66.    Of the rations contracts won by Compass, Plaintiff Supreme submitted bids for Sudan, East Timor, Liberia, Burundi and Eritrea.

67.    The U.N. removed Defendant IHC and Compass from its approved vendor list in late 2005, when the U.N. began to investigate how Defendant IHC and Compass obtained top-secret information about the Liberia Rations Contract.

68.    In June 2006 the U.N. re-tendered seven contracts being performed by Compass, and Supreme submitted bids for five of those contracts (Syria, Eritrea, Liberia, Lebanon, and Sudan). The U.N. awarded Supreme the Syria, Eritrea, and Liberia contracts.

## VIII.  RACKETEERING AND OTHER UNLAWFUL ACTIVITY

### A.    The Criminal Enterprise

69.    From approximately 1999 to 2005, Defendants Yakovlev and IHC coordinated an illegal conspiracy to rig the bidding process for contracts awarded by the U.N. for the purchase of goods and services to illicitly favor "clients" of IHC that paid millions of dollars in bribes for such preferential treatment.

70.    As part of this conspiracy, from at least 2000 to 2005, Defendant Yakovlev rigged the bidding process for U.N. food rations contracts so that Compass would win several U.N. contracts that could be worth in excess of $350 million.

71.    Defendant Yakovlev received approximately nearly $1 million, if not more, from Compass as compensation for his illicit activities. Additionally, in an effort to bribe Defendant Yakovlev through patronage, Defendant IHC's CEO, Defendant Ezio Testa, hired Defendant Yakovlev's son, Defendant Dmitry, to work at Defendant IHC. This occurred at a time when

Defendant IHC was supplying the U.N. with nearly $2 million worth of portable generators pursuant to a contract that Defendant Yakovlev had negotiated with Defendant IHC.

72.     By obtaining a job for his son, Defendant Yakovlev violated at least two U.N. conflict-of-interest rules. One such rule stated, "Staff members shall not use their office or knowledge gained from their official functions for private gain, financial or otherwise, or for the private gain of any third party, including family, friends and those they favour." The other rule required U.N. officials to certify that they did not have a "conflict of interest with regard to the economic activities of spouses and children." Defendant Dmitry lived with Defendant Yakovlev while employed by Defendant IHC.

73.     Through his father, Defendant Dmitry had access to confidential U.N. information concerning, among other things, vendor bids for food rations contracts and the U.N.'s evaluations of such bids. Defendant Dmitry's cell phone records indicate that during his employment with IHC, Defendant Dmitry placed numerous phone calls to IHC that were immediately preceded or followed by phone calls to Defendant Yakovlev. By making these calls, Defendant Dmitry acted as a conduit through which confidential U.N. information was transferred between and among Defendants Yakovlev, IHC and Testa. Even after his employment relationship with IHC ceased in December 2003, Defendant Dmitry continued to speak to IHC officials, including Defendant Quinteros using his cellular phone and regularly telephoned Defendant Yakovlev immediately before and after such phone calls. These phone calls were in furtherance of the bribery and bid-rigging conspiracy.

74.     Crucial to IHC's ability to gain special access to U.N. sources, and to attract large corporations as "clients" to IHC and deliver results for them by improperly securing preferential treatment, was the involvement of Defendant Picco. Picco served in the U.N. as Under Secretary

19

General of the U.N. from 1973 to 1992. In 1998 Picco was appointed Personal Representative of

the Secretary General for the U.N. Year of Dialogue among Civilization for the year 2001.

During his first assignments with the U.N., Picco spent much of his time in the Middle East and

led the first rounds of negotiations with Saddam Hussein's regime to set up the Oil-for-Food

program, which commenced operations in 1996. It has since been discovered that Benan Sevan,

the U.N. official in charge of running the Oil-for-Food Program, if not others, was enriched by a

scheme that illicitly used the Oil-for-Food Program to divert to Saddam Hussein and his cronies

vast sums of oil wealth from a U.N.-administered escrow account maintained for the benefit of

the Iraqi people. The effect of this conspiracy was to abscond with billions of dollars belonging

to the Iraqi people, strengthen the rogue regime of Saddam Hussein, and thereby threaten global

security.

75.     Following his initial tenure with the U.N., Picco founded a New York-

headquartered consulting firm, GDP Associates, which claimed to have offices in Iraq, and other

locations in the Middle East, Europe and Southeast Asia.

76.     Picco became a director of IHC in 1997, and subsequently became Chairman of

IHC's Board of Directors in 1998. Picco served as IHC's Chairman from 1998 until at least

2000, and possibly until 2003. Picco's involvement with IHC facilitated IHC's efforts to obtain

confidential information and illicit influence at the U.N. By virtue of his role at IHC, Picco

knew of IHC's efforts on behalf of its "clients" and controlled IHC in its dealings with the U.N.,

including participation in the bribery and bid-rigging scheme.

77.     In August 1999, while serving as IHC's Chairman, Picco accepted a high-profile

appointment from U.N. Secretary-General Kofi Annan to serve as a U.N. Under-Secretary.

While Picco was both an official U.N. representative for Secretary-General Annan and chairman

of the IHC Board, Picco also advised private clients, including David Chalmers, owner of Bayoil

(USA), Inc. and Bayoil Supply & Trading Limited (collectively, "Bayoil"), in their dealings

under the Oil-for-Food program.  Chalmers and Bayoil were indicted on May 4, 2005 in the

United States District Court for the Southern District of New York for participating in an illegal

kickback scheme in connection with the Oil-for-Food program, in part as a result of information

provided by Picco to Chalmers.  Chalmers and Bayoil are currently awaiting trial.

78.    Compass employees Harris, Seiwert, Kerr, Kemp and Swain were instrumental in

Defendants' bribery and bid-rigging scheme.

79.    Defendant Yakovlev paid Defendant Kuznetsov a portion of his illicit proceeds,

amounting to several hundred thousand dollars, in exchange for Defendant Kuznetsov's

assistance.

80.    Collectively, the Defendants perpetrated a scheme whereby IHC clients –

including Compass – were awarded U.N. contracts in exchange for illicit payments and

patronage to Defendant Yakovlev.  As part of this scheme, Defendant Yakovlev disclosed

confidential information to Compass concerning Compass's performance on at least one U.N.

contract.  The purpose of disclosing information relating to Compass's performance failures was

to enable Compass to correct its service problems before the U.N. cancelled its contract with

Compass and tendered the contract to the marketplace for re-bid.  Without such support,

Compass not only would have lost the Burundi Rations Contract, but its other U.N. contracts

would have been put in jeopardy.  Similarly, as part of this scheme, confidential bid information

was disclosed to Compass and Defendant IHC to assist Compass in "winning" U.N. foodservice

business that would otherwise have been won by Supreme.

### B.    A Pattern of Racketeering Activity

#### i)    Defendant Yakovlev's Money Laundering Scheme

81.    Defendant Yakovlev instructed Defendant IHC to make payments to the account he set up for Defendant Moxyco at Antigua Overseas and to a secret bank account in Switzerland in exchange for confidential information and illegal assistance that Compass utilized to obtain and retain U.N. contracts.

#### ii)    Defendant Kuznetsov Joins Defendant Yakovlev's Criminal Scheme

82.    In early 2000, Defendant Yakovlev informed Defendant Kuznetsov of his criminal scheme to obtain money from companies seeking to secure U.N. contracts.

83.    Sometime thereafter, Defendant Kuznetsov established Defendant Nikal and opened a bank account in the name of Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

84.    Defendant Kuznetsov did not report Defendant Yakovlev to the U.N. or any law enforcement authority.  In exchange for Defendant Kuznetsov's silence, Defendant Yakovlev agreed to transfer, and did transfer, a share of his illegally-obtained proceeds to Defendant Kuznetsov.

85.    Defendant Kuznetsov used the off-shore account for Defendant Nikal at Antigua Overseas to facilitate and hide Defendant Yakovlev's payments of hush money.

86.    From approximately 2000 through June 2005, Defendant Kuznetsov received at least approximately $300,000 dollars in criminal proceeds from Defendant Yakovlev.  Defendant Kuznetsov used these proceeds to pay for, *inter alia*, a new home in a ritzy suburb outside Moscow.

### iii)   Authorities Discover the Criminal Conspiracy - Defendant Yakovlev Pleads Guilty

87.     Defendant Yakovlev resigned from the U.N. in June 2005 after the news media reported that Defendant Yakovlev had obtained a job for his son at Defendant IHC's headquarters in New York City at a time when Defendant Yakovlev had been overseeing Defendant IHC's performance on a U.N. contract.

88.     On August 8, 2005, Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken bribes in connection with U.N. procurement contracts and the Oil-for-Food program.

89.     Following Volcker's announcement, authorities arrested Defendant Yakovlev on August 8, 2005.  That same day, Defendant Yakovlev pleaded guilty before the Honorable William H. Pauley, United States District Judge for the Southern District of New York, to charges of conspiracy to commit wire fraud, wire fraud and money laundering stemming from his receipt of several hundred thousand dollars, if not more, from foreign companies seeking to obtain contracts from the U.N. between the years 1993 and 2005.

90.     Prior to his guilty plea, Defendant Yakovlev was able to effect several transfers of cash from Moxyco's offshore account to Olga's Swiss bank account.

91.     Following Defendant Yakovlev's plea, the FBI arrested Defendant Kuznetsov on September 1, 2005.  The United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with one count of conspiracy to commit money laundering in connection with his receipt of hush money from Defendant Yakovlev.  In March 2007 Kuznetsov was convicted of conspiring to commit money laundering in a jury trial presided over by the Honorable Debra A. Batts, United States District Judge for the Southern District of New York.

Defendant Yakovlev was the central government witness in the trial of co-conspirator Defendant Kuznetsov. Defendant Kuznetsov is currently awaiting sentencing.

### iv) Defendant IHC Leaks U.N.'s Top Secret Information on Liberia Rations Contract to Compass

92.     Under U.N. rules, sealed bids for procurement contracts are submitted to the U.N. in a top-secret bidding process pursuant to an RFP. Responses to an RFP must include a technical and a financial proposal, which are submitted in separate sealed envelopes. Pursuant to U.N. procedures, technical proposals submitted to the Procurement Division are opened publicly for the sole purpose of recording that the proposals were submitted by the due date and time. No price is to be extrapolated or announced at the time of the public opening. The financial proposals are not revealed at the public opening.

93.     As of November 6, 2003, the U.N. had not yet decided who would be awarded the Liberia Rations Contract. Yet, on that date, Defendant Testa (Defendant IHC's CEO), and Seiwert received three highly confidential U.N. documents concerning the Liberia Rations Contract.

94.     One of those documents was a draft of the U.N. Procurement Service's official recommendation to the U.N. Headquarters Committee on Contracts to award the $62 million Liberia Rations Contract to Compass.

95.     Another of those documents was an evaluation of the technical abilities of twelve food supply firms bidding for the Liberia Rations Contract (the "Technical Evaluation"). According to the Technical Evaluation, Supreme met the U.N.'s technical requirements.

96.     The third document showed that Plaintiff Supreme was a finalist in the competition for the Liberia Rations Contract. This document provided a cost description of the finalists' bids, including bids by Plaintiff Supreme and Compass.

97.    On or about November 12, 2003, the U.N. Headquarters Committee on Contracts approved the award of the $62 million Liberia Rations Contract to Compass, as per the Procurement Service's recommendation.

98.    In or about October 2005 the U.N. launched an investigation to determine how Defendant Testa obtained confidential U.N. information.  Soon thereafter, the U.N. de-listed Compass from its registry of vendors, cancelled Compass's U.N. contracts, re-tendered those contracts to the marketplace, and awarded a substantial portion of that business to Supreme.

### v)    Defendant Yakovlev Leaks Top-Secret Information on Burundi Rations Contract to Compass

99.    On April 27, 2005, Defendant Yakovlev leaked confidential information to Seiwert concerning Compass's performance failings with respect to the Burundi Rations Contract.  Seiwert forwarded the e-mail to Compass employees Kemp and Swain, seeking their urgent attention, and to Defendant Testa.

### vi)    IHC's Attempt At Cover-Up

100.    As Defendants' massive bribery and bid-rigging scheme began to be investigated, IHC made attempts to cover up the involvement of IHC's owners and controlling persons in IHC's activities. On or about June 3, 2005, in the aftermath of the indictment of Defendant Picco's clients Chalmers and Bayoil in connection with alleged illegal kickbacks under the U.N. Oil-for-Food Program, IHC's stock was purchased by Defendant Alliance Investment Development Ltd., a company registered in the British Virgin Islands, formerly known as Strategic International Alliance Limited, with its primary business address in Guernsey in the British Channel Islands.  The sale was structured and timed to distance Defendant Torno and Defendant Torno S.p.A., Dario Fischer, and others from the scheme in the midst of federal criminal and other regulatory scrutiny as to misconduct in various U.N. procurement programs.

For this purpose as well as for other presently unknown purposes, ownership interest in IHC was transferred away from certain participants in the scheme, thus insulating those participants from discovery through the use of corporate shells and nominee entities representing undisclosed principals. Peter Harris and Andrew Siewert represented the buyers of IHC in the transaction, and Harris was identified as the sole director of Strategic International Alliance Limited. Dario Fischer represented IHC's majority shareholder, Torno S.A.H., at the closing. Through its agents Harris and Siewert, Defendant Alliance Investment Development Ltd. knew of IHC's role in the bribery and bid-rigging scheme and that a purpose of the sale was to obscure the involvement of IHC's owners and controlling persons in IHC's activities.

## IX.   UNLAWFUL RESTRAINT OF TRADE AND COMMON LAW VIOLATIONS

101.   Defendants attempted to rig, and did rig, the bribery and bidding process associated with the award of U.N. contracts for the provision of goods and services, including food rations to U.N. peacekeeping forces. As a result, the U.N. and its member states were defrauded and Plaintiff Supreme was swindled out of the profits it would have earned from contracts it would have won but for Defendants' illegal conduct.

102.   Defendants knowingly and intentionally corrupted the U.N.'s bidding process so that IHC clients – including Compass – would "win" contracts that they otherwise would not have won and keep contracts that they otherwise would not have kept. Defendants knew that by engaging in such conduct, they interfered with Plaintiff Supreme's ability to win those contracts. In the case of the Liberia Rations Contract and other contracts for which Plaintiff Supreme submitted bids, Defendant IHC and Compass knew that by bribing Defendant Yakovlev, Compass's bids would prevail over Plaintiff Supreme's bids and Compass would win the contracts. In the case of the Burundi Rations Contract, IHC and Compass knew that by bribing Defendant Yakovlev, IHC and Compass would obtain confidential information that would enable

Compass to correct performance failures before the U.N. acted to cancel Compass's Burundi Rations Contract. IHC and Compass also knew that a performance-based cancellation of Compass's Burundi Rations Contract would have barred Compass from winning future contracts and would have caused the cancellation of other Compass contracts.

103.   By their illegal scheme, Defendants sought to reduce and eliminate competition in the market for the supply of food rations to U.N. peacekeeping missions, and thereby to achieve a monopoly position in that market for Compass.

104.   There are significant barriers to entry into the market for the supply of food rations to U.N. peacekeeping missions, including the registration requirements to become a U.N. vendor and, more importantly, the very high standards imposed on vendors before such vendors' bids will be considered by the U.N. Thus, the market for U.N. food rations contracts was particularly vulnerable to Defendants' illegal scheme to reduce and eliminate competition and to gain monopoly power for Compass.

105.   Defendants used their illegal tactics described above, including bid-rigging and bribery, in an effort to reduce and eliminate competition and to gain monopoly power for Compass

106.   As a result of Defendants' illegal scheme, competition was restrained and eliminated in the market for the supply of food rations to U.N. peacekeeping missions, causing antitrust injury to both the U.N. and Compass's competitors, including Plaintiff Supreme. The U.N. was deprived of the benefits of free and fair competition in its bidding process. Plaintiff Supreme was deprived of the opportunity to compete in a free and fair bidding process, causing it to lose contracts and market share to Compass.

107.    As a result of Defendants' illegal scheme, there was a dangerous probability that

Defendants would succeed in their goal of achieving a monopoly for Compass.  Due to

Defendants' illegal scheme, the market share of Compass grew substantially after it entered the

market in approximately 2000, reaching approximately 50% of the market for peacekeeping

rations contracts by October 2005.

## X.    COUNT ONE – RICO VIOLATION

108.    Plaintiff Supreme is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and

1964(c).

109.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3)

and 1962(c).

110.    Defendants (including officers, agents and employees not named in this

Complaint) other than Olga Yakovlev (the "RICO Defendants") and the Compass Co-

Conspirators (collectively, the "RICO Participants") composed a group of persons associated

together for the common purpose of carrying out the fraudulent scheme described in this

Complaint; namely, illicitly obtaining confidential U.N. information which was improperly used

to ensure that IHC's "clients" were awarded and kept U.N. contracts for the provision of goods

and services.  This fraudulent scheme included making secret payments and providing other non-

cash benefits to Defendant Yakovlev and facilitating the transfer of cash payments to Defendant

Yakovlev's off-shore bank accounts in exchange for confidential information and favorable

treatment which enabled IHC to circumvent an otherwise aboveboard bidding and procurement

process and to illegally divert U.N. procurement contracts to Compass and other IHC "clients".

As a result, the RICO Participants constitute an association-in-fact enterprise (the "U.N. Bid-

Rigging Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); additionally,

Defendants Yakovlev, Moxyco, Kuznetsov, Nikal, the IHC Defendants, Testa and Dmitry

constitute an association-in-fact enterprise (the "U.N. Crony Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); additionally, the U.N. Procurement Service constitutes an enterprise (the "U.N. Procurement Fraud Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). (The U.N. Bid-Rigging Enterprise, the U.N. Crony Enterprise and the U.N. Procurement Fraud Enterprise are collectively referred to herein as the "U.N. Corruption Enterprises.")

111.    During all relevant times, each of the U.N. Corruption Enterprises was engaged in, and its activities affected by, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

112.    During all relevant times, each of the RICO Participants conducted and/or participated in the conduct of each of the U.N. Corruption Enterprises, directly or indirectly, through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

113.    During all relevant times, the RICO Participants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1952 (racketeering) and 18 U.S.C. § 1956 (money laundering). Under New York law, the acts set forth above also constitute commercial bribing in the first degree under Penal Law §180.03, commercial bribe receiving in the first degree under Penal Law §180.05 and commercial bribe receiving in the second degree under Penal Law § 180.08, each of which constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

114.    Each of the RICO Participants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

115.    The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, a common victim (Plaintiff Supreme), a common method of commission and the common purpose and common result of a scheme designed to obtain through bribery U.N. contracts and confidential competitor information for the benefit of IHC clients, including Compass, by bribing Defendant Yakovlev and facilitating the transfer of Defendant Yakovlev's fraudulently-obtained proceeds. The fraudulent scheme described herein began no later than 2000 and would have continued perpetually but for its discovery in or about June 2005 by the United States Attorney's Office for the Southern District of New York.

116.    As a result of the RICO Participants' violation of 18 U.S.C. § 1962(c), Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Compass.

117.    As a result of the RICO Participants' misconduct, each RICO Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

118.    Pursuant to the RICO Act, 18 U.S.C. § 1964(c), Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the RICO Defendants.

## XI.    COUNT TWO – RICO CONSPIRACY

119.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

120.    The RICO Participants conspired to commit the violation of 18 U.S.C. § 1962(c) described in Section IX of this Complaint.

121.   During all relevant times, the RICO Participants were associated with the U.N. Corruption Enterprises as set forth in paragraph 110 above.

122.   During all relevant times, each RICO Participant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of each of the U.N. Corruption Enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

123.   The RICO Participants (including officers, agents and employees not named in this Complaint) committed and caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the object thereof.

124.   As a result of the RICO Participants' violations of 18 U.S.C. § 1962(d), Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Compass.

125.   As a result of the RICO Participants' conspiracy, each RICO Defendant is liable for losses to Plaintiff Supreme in an amount to be determined at trial.

126.   Pursuant to the RICO Act, 18 U.S.C. § 1964(c), Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the RICO Defendants.

## XII.   COUNT THREE – SHERMAN ACT § 1

127.   Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

128.   Each of the Defendants is a "person" within the meaning of 15 U.S.C. § 7.

129.   Beginning in or about 2000, if not earlier, through June 2005, Defendants and the Compass Co-Conspirators engaged in a contract, agreement, arrangement, combination and

conspiracy to commit unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

130.    This contract, agreement, arrangement, combination and conspiracy consisted of, among other things, an agreement by Defendants and the Compass Co-Conspirators to rig the award of U.N. contracts for the provision of food rations to peacekeeping forces so that Compass would be awarded these contracts and would continue to retain these contracts. This bid-rigging took place in New York at U.N. Headquarters, with the assistance of Defendants Yakovlev and Kuznetsov, and facilitated by Defendant IHC as the so-called "vendor intermediary."

131.    Defendants' and the Compass Co-Conspirators' bid-rigging activities are a *per se* violation of the Sherman Act.

132.    As a result of Defendants' and the Compass Co-Conspirators' *per se* violation of the Sherman Act, Defendants and the Compass Co-Conspirators restrained competition in the marketplace, thereby preventing Plaintiff Supreme from competing freely and obstructing the free and fair determination of contract prices.

133.    By corrupting the Procurement Service in the U.N.'s Headquarters in New York, Defendants' violations of the Sherman Act have injured competition in the market for contracts to supply food rations to U.N. peacekeeping missions.

134.    As a result of Defendants' conduct, Plaintiff Supreme lost U.N. food rations contracts that could be worth in excess of $350 million plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Compass.

135.    Plaintiff Supreme's injuries were not independent of Defendants' big-rigging activities in New York. Plaintiff's Sherman Act claim results from the direct, substantial and

reasonably foreseeable effect of Defendants' anti-competitive and unlawful conduct on United States commerce.

136.    As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

137.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each Defendant and injunctive relief.

## XIII.    COUNT FOUR – ATTEMPTED MONOPOLIZATION – SHERMAN ACT § 2

138.    Beginning in or about 2000, if not earlier, through June 2005, Defendants and the Compass Co-Conspirators knowingly, intentionally and with specific intent to do so, assisted Compass in its attempt to monopolize the market for U.N. contracts to supply food rations to peacekeeping missions, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

139.    The attempt to monopolize this market was effectuated by the means and the overt acts set forth above, among others.

140.    Defendants and the Compass Co-Conspirators attempted to:

    (i)    control the award of contracts to supply food rations to U.N. peacekeeping missions;

    (ii)    corrupt the U.N. bidding process for contracts to supply food rations to U.N. peacekeeping missions;

    (iii)    deprive the U.N. of the benefits of a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

    (iv)    deprive the competitors of Compass, including Supreme, of the opportunity to compete in a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

    (v)    eliminate, reduce, limit and foreclose competition in the market for contracts to supply food rations to U.N. peacekeeping missions; and

(vi)     injure, restrain and eliminate competition in the market.

141.     As a result of the conduct alleged herein, Compass gained control of such a substantial share of the market for contracts to supply food rations to U.N. peacekeeping missions that a dangerous probability existed that Compass and Defendants would succeed in monopolizing that market.

142.     Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff Supreme is entitled to recover threefold its damages, plus costs and attorneys' fees from each Defendant and injunctive relief.

## XIV.   COUNT FIVE – CONSPIRACY TO MONOPOLIZE – SHERMAN ACT § 2

143.     Beginning in or about 2000, if not earlier, through June 2005, Defendants and the Compass Co-Conspirators willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the market for U.N. contracts to supply food rations to peacekeeping missions, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

144.     This combination and conspiracy to monopolize the market for contracts to supply food rations to U.N. peacekeeping missions has been effectuated by the means and overt acts set forth above, among others.

145.     Defendants intended by their actions to restrain trade in the market for contracts to supply food rations to U.N. peacekeeping missions in the manner set forth above.

146.     The combination and conspiracy to monopolize has had, among other things, the effects detailed above.

## XV.   COUNT SIX – RESTRAINT OF TRADE – DONNELLY ACT

147.     Beginning in or about 2000, if not earlier, through June 2005, Defendants and the Compass Co-Conspirators engaged in a contract, agreement, arrangement and combination in

unreasonable restraint of trade and commerce in violation of the Donnelly Act, §§ 340 *et seq.* of New York General Business Law.

148.    This contract, combination, agreement and arrangement consisted of, among other things, an agreement by Defendants and the Compass Co-Conspirators to rig the award of U.N. contracts for the provision of food rations to peacekeeping forces so that Compass would be awarded those contracts and would continue to retain those contracts.

149.    As a result of this conspiracy, Defendants and the Compass Co-Conspirators restrained competition in the marketplace, thereby preventing Plaintiff Supreme from competing freely and obstructing the free and fair determination of contract prices.

150.    Defendants' and the Compass Co-Conspirators' bid-rigging activities are a *per se* violation of the Donnelly Act.

151.    As a result of Defendants' conspiratorial conduct, Plaintiff Supreme lost U.N. food rations contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Compass.

152.    Defendants' violations of the Donnelly Act took place in New York, at U.N. Headquarters, and Plaintiff sustained injury to its business and property as a result of Defendants' anti-competitive and wrongful conduct perpetrated in New York.

153.    As a result of Defendants' conspiracy, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

154.    Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

## XVI.   COUNT SEVEN -- ATTEMPTED MONOPOLIZATION – DONNELLY ACT

155.    Beginning in or about 2000, if not earlier, through June 2005, Defendants and the Compass Co-Conspirators knowingly, intentionally and with specific intent to do so, attempted to monopolize the market for U.N. contracts to supply food rations to peacekeeping missions, in violation of the Donnelly Act.

156.    The attempt to monopolize this market was effectuated by the means and the overt acts set forth above, among others.

157.    Defendants and the Compass Co-Conspirators attempted to:

(i)     control the award of contracts to supply food rations to U.N. peacekeeping missions;

(ii)    corrupt the U.N. bidding process for contracts to supply food rations to U.N. peacekeeping missions;

(iii)   deprive the U.N. of the benefits of a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

(iv)    deprive the competitors of Compass, including Supreme, of the opportunity to compete in a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

(v)     eliminate, reduce, limit and foreclose competition in the market for contracts to supply food rations to U.N. peacekeeping missions; and

(vi)    injure, restrain and eliminate competition in the market.

158.    As a result of the conduct alleged herein, Compass gained control of such a substantial share of the market for contracts to supply food rations to U.N. peacekeeping

missions that a dangerous probability existed that Defendants and Compass would succeed in monopolizing that market.

159.    As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

160.    Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

## XVII.  COUNT EIGHT – CONSPIRACY TO MONOPOLIZE – DONNELLY ACT

161.    Beginning in or about 2000, if not earlier, through June 2005, Defendants and the Compass Co-conspirators willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the market for contracts to supply food rations to U.N. peacekeeping missions, in violation of the Donnelly Act.

162.    This combination and conspiracy to monopolize the market for contracts to supply food rations to U.N. peacekeeping missions was effectuated by the means and overt acts set forth above, among others.

163.    Defendants intended by their actions to restrain trade in the market for contracts to supply food rations to U.N. peacekeeping missions in the manner set forth above.

164.    The combination and conspiracy to monopolize had, among other things, the effects detailed above.

165.    As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

166.    Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

## XVIII. COUNT NINE – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AND BUSINESS RELATIONS

167.    Defendants knew that Plaintiff Supreme was a competitor of Compass's in the market for U.N. food rations contracts.

168.    With respect to the Liberia Rations Contract, Defendants knew that Compass and Plaintiff Supreme were finalists in the U.N.'s bidding process.  With respect to the Burundi Rations Contract, Compass received early indication that its performance was unacceptable to the U.N. only because Defendant Yakovlev disclosed confidential information to Compass.  This breach by Defendant Yakovlev enabled Compass to correct its performance failures before the U.N. cancelled the Burundi Rations Contract and, perhaps, other contracts performed by Compass.

169.    The Defendants intentionally interfered with Plaintiff Supreme's prospective business relations by paying and receiving bribes to obtain and distribute confidential information and favorable treatment from Defendant Yakovlev and using such information and treatment to fraudulently obtain and fraudulently retain U.N. foodservice contracts, including the Liberia Rations Contract, the Burundi Rations Contract and others.

170.    As a result of Defendants' intentional interference, Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Compass.

171.    As a result of Defendants' conspiracy, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

### XIX.   COUNT TEN – ROBINSON-PATMAN ACT– AGAINST THE IHC DEFENDANTS

172.   Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

173.   The IHC Defendants are "persons" within the meaning of 15 U.S.C. § 7.

174.   Plaintiff Supreme and Compass are competitors in the global market for contracts to supply food rations to U.N. peacekeeping missions.

175.   Defendants IHC and Testa were agents of Compass and acted as Compass's "vendor intermediary" for U.N. contracts.

176.   Compass, as a vendor to the U.N., and Defendants IHC and Testa, as "vendor intermediary" for Compass, were engaged in commerce at all times relevant to this Complaint, as active participants in the preparation and submission of bids for U.N. food rations contracts, in competition with other U.N. vendors, including Plaintiff Supreme.

177.   In the course of such domestic and foreign commerce, Compass, Defendants IHC or Testa or an agent, representative or other intermediary acting for or on their behalf, paid or granted a commission, brokerage or other compensation of significant value to Defendant Yakovlev, or an agent, representative or other intermediary acting for or on his behalf.

178.   Compass paid this commission, brokerage or other compensation directly or indirectly, through Defendant IHC or Defendant Testa, to Yakovlev, who retained this payment for his personal benefit.  The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

179.   At all times relevant to this Complaint, Yakovlev was an agent of the U.N., and owed fiduciary duties to the U.N. in such capacity.  Accepting the bribes of Compass and Defendants IHC and Testa constituted a breach of fiduciary duty.

180.    Yakovlev at all times concealed from the U.N. his acceptance of the bribes of Compass and Defendants IHC and Testa.

181.    Receipt of the bribes constituted a *per se* violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

182.    The IHC Defendants other than IHC controlled IHC in its payment of bribes to Yakovlev, or participated or assisted in the payment of those bribes.  All of the IHC Defendants violated the Robinson-Patman Act through the payment of those bribes.

183.    Through their Robinson-Patman Act violation, Compass and the IHC Defendants injured, destroyed or prevented competition in the market for contracts to supply food rations to U.N. peacekeeping missions.  As a result of this violation, Supreme lost U.N. food rations contracts worth approximately $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Compass.

184.    Supreme's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Compass and the IHC Defendants on domestic and foreign commerce.

185.    As a result of their conduct, the IHC Defendants are liable for Supreme's losses in an amount to be determined at trial.

186.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from the IHC Defendants, as well as injunctive relief.

## XX.    COUNT ELEVEN – ROBINSON-PATMAN ACT – AGAINST DEFENDANT ALEXANDER YAKOVLEV

187.    Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

188.    Defendant Alexander Yakovlev is a "person" within the meaning of 15 U.S.C. § 7.

189.    Plaintiff Supreme and Compass are competitors in the global market for contracts to supply food rations to U.N. peacekeeping missions.

190.    As senior procurement officer of the U.N. in the Procurement Service, Yakovlev was engaged in commerce at all times relevant to this Complaint, making decisions regarding the award of U.N. contracts to various vendors that participated in bids for the award of U.N. contracts, including Plaintiff Supreme and Compass.

191.    In the course of such domestic and foreign commerce, Yakovlev, and or an agent, representative or other intermediary acting for or on his behalf, received or accepted a commission, brokerage or other compensation of significant value from the IHC Defendants, Compass, or an agent, representative or other intermediary acting for or on their behalf.

192.    Compass paid this commission, brokerage or other compensation directly or indirectly, through the IHC Defendants to Yakovlev, who retained this payment for his personal benefit. The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

193.    At all times relevant to this Complaint, Yakovlev was an agent of the U.N., and owed fiduciary duties to the U.N. in such capacity. Accepting the bribes of the IHC Defendants and Compass constituted a breach of fiduciary duty.

194.    Yakovlev at all times concealed from the U.N. his acceptance of the bribes of the IHC Defendants and Compass.

195.     Receipt of the bribes constituted a *per se* violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

196.     Through his Robinson-Patman Act violation, Yakovlev injured, destroyed or prevented competition in the market for the supply of food rations to U.N. peacekeeping missions.  As a result of this violation, Supreme lost U.N. food rations contracts worth approximately $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Compass.

197.     Supreme's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Yakovlev on domestic and foreign commerce.

198.     As a result of his conduct, Yakovlev is liable for Supreme's losses in an amount to be determined at trial.

199.     Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from Yakovlev, as well as injunctive relief.

## XXI.    COUNT THIRTEEN – UNJUST ENRICHMENT – AGAINST DEFENDANTS YAKOVLEV, KUZNETSOV AND OLGA

200.     Supreme submitted each of its bids to the Procurement Service in response to a formal RFP with the understanding that the confidential information contained therein would be held in strict confidence, pursuant to U.N. procedures.

201.     Defendants Yakovlev and Kuznetsov each had a duty to maintain Supreme's proposals in confidence, pursuant to U.N. procedures.

202.    However, Defendant Yakovlev, assisted by Defendant Kuznetsov, failed to retain the confidentiality of Supreme's proposals.  Instead, Defendants Yakovlev and Kuznetsov shared Supreme's confidential information with Compass and the IHC Defendants for the purpose of carrying out the fraudulent scheme described in this Complaint.

203.    Defendants Yakovlev, Kuznetsov and Olga were unjustly enriched by receiving bribery payments in furtherance of this fraudulent scheme.

204.    Equity, good conscience and the demands of justice require the imposition of a constructive trust upon all bribery proceeds received by Defendants Yakovlev, Kuznetsov and Olga.

205.    Plaintiff Supreme is also entitled to damages for all amounts, to be determined at trial, by which Defendants Yakovlev, Kuznetsov and Olga were unjustly enriched by their misappropriation of the confidential information contained in Supreme's bids.

## XXII.  COUNT FOURTEEN – UNJUST ENRICHMENT – AGAINST THE IHC DEFENDANTS

206.    Supreme submitted each of its bids to the Procurement Service in response to a formal RFP with the understanding that the confidential information contained therein would be held in strict confidence pursuant to U.N. procedures.

207.    The IHC Defendants knew or should have known that the U.N. procedures required that the information contained in Supreme's bids must be held in strict confidence.

208.    The IHC Defendants wrongfully sought to circumvent the confidentiality requirements of U.N. procedures to obtain confidential information contained in Supreme's bids through the means of the fraudulent scheme described herein for the purpose of "winning" valuable procurement contracts by undercutting Supreme's bids.

209.   The IHC Defendants used Supreme's bids and the information they contained to prepare Compass's bid submissions to the Procurement Service.  Through such improper means, Compass was able to undercut Supreme's bids, thus enabling Compass to prevent Supreme from winning the contracts.

210.   The IHC Defendants were unjustly enriched by obtaining and using the confidential information contained in Supreme's bids as a result of the fraudulent scheme described in this Complaint.

211.   Equity, good conscience and the demands of justice require the imposition of a constructive trust upon all bribery proceeds received by the IHC Defendants through their bribery.

212.   Plaintiff Supreme is also entitled to damages for all amounts, to be determined at trial, by which the IHC Defendants were unjustly enriched by their misappropriation of the confidential information contained in Supreme's bids.

## XXIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(1)   awarding Plaintiff damages, including compensatory, treble and punitive damages, in an amount exceeding $125,000,000, as well as prejudgment and postjudgement interest, the precise amount of said damages to be determined at trial;

(2)   entering appropriate injunctive relief;

(3)   awarding Plaintiff the costs, expenses and attorneys' fees incurred in prosecuting this action; and

(4)   such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues and claims so triable.

Dated: New York, New York
      May 14, 2007

Respectfully submitted,

CONSTANTINE CANNON

By: _____
     Robert L. Begleiter (RB-7052)
     Gary J. Malone (GM-3119)
     Yang Chen (YC-3782)
     Michael C. Rakower (MR-2914)

     450 Lexington Avenue
     New York, New York  10017

     *Attorneys for Plaintiff*
     *Supreme Foodservice AG*